Bruce L. Campbell, OSB No. 925377
bruce.campbell@millernash.com
P.K. Runkles-Pearson, OSB No. 061911
p.k.runkles-pearson@millernash.com
John C. Clarke, OSB No. 153245
john.clarke@millernash.com
**MILLER NASH GRAHAM & DUNN LLP**
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204
Phone:  503.224.5858
Fax:  503.224.0155

Christopher Knauf, *pro hac vice* application pending
ck@drlcenter.org
Brendan Hamme, *pro hac vice* application pending
bh@drlcenter.org
Anthony Pinggera, *pro hac vice* application pending
acp@drlcenter.org
**DISABILITY RIGHTS LEGAL CENTER**
1541 Wilshire Boulevard, Suite 400
Los Angeles, California 90017
Phone:  213.736.1031
Fax:  213.736.1428

Timothy Fox, *pro hac vice* application pending
tfox@creeclaw.org
Pilar Gonzales Morales, *pro hac vice* application pending
pgonzalez@creeclaw.org
**CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER**
1245 E. Colfax Avenue, Suite 400
Denver, Colorado 80218
Phone:  303.757.7901

Attorneys for Plaintiffs

Page 1 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

4825-1016-1616.1

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

PHILIP WOLFE, KATALINA DURDEN, MELISSA LEWIS, JUNIPER SIMONIS, individually, and DISABILITY RIGHTS OREGON, an Oregon nonprofit and advocacy corporation,

        Plaintiffs,

    v.

CITY OF PORTLAND, a municipal corporation; TED WHEELER, in his official capacity; CHUCK LOVELL, in his official capacity; MULTNOMAH COUNTY, a political subdivision of the State; MICHAEL REESE, in his official capacity; TRAVIS HAMPTON, in his official capacity; CHAD WOLFE, in his individual and official capacity; DONALD WASHINGTON, in his individual and official capacity; and DOES 1-100, individual and supervisory officers of local, state, and federal government,

        Defendants.

Case No.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

    1.    This is a civil rights action to protect the constitutional and statutory rights

of Oregonians with disabilities who are protesting in Portland, Oregon against systemic racism

Page 2 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

4825-1016-1616.1

and police violence.  This lawsuit seeks preliminary and permanent relief to stop local, state, and federal law enforcement from assaulting, brutalizing, and failing to reasonably accommodate people with disabilities during assemblies and protests.

2.      In the wake of the killings of George Floyd, Breonna Taylor, and many other Black, Indigenous, or people of color by law enforcement, protesters have assembled in Portland, Oregon nearly every day for several months to demand police accountability and an end to systemic racism and other forms of oppression that Black, Indigenous, and people of color face in our country.  Law enforcement has reacted to these protests with repeated and disproportionate displays of brute force, including disregarding the rights of people with disabilities.

3.      In their attempts to disperse protests, law enforcement has deployed indiscriminate crowd control mechanisms, blanketing Portland's parks and streets with tear gas while discharging thousands of flashbang grenades, pepper balls, and rubber bullets, as well as using their batons and fists to beat protesters and throw them to the ground.  The burden of these tactics has fallen disproportionately on protesters and others with disabilities, who receive little or no notice or opportunity to comply before law enforcement uses overwhelming force.  In fact, protesters are often brutalized even as they attempt to comply with police instructions while informing officers of their disabilities.

4.      Defendants have often targeted people with disabilities for harassment and violence in retaliation for exercising their constitutional rights. They have told people with disabilities that they should not attend protests at all.

5.      Local, state, and federal law enforcement have failed to establish policies designed to afford people with disabilities the same opportunity to avoid law enforcement harm as those without disabilities, including, for example adequately warning protesters before attempting to take actions to disperse a crowd, making sure that there are clear routes of escape

Page 3 -      **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1                        MILLER NASH GRAHAM & DUNN LLP
                                         ATTORNEYS AT LAW
                                      TELEPHONE: 503.224.5858
                                      3400 U.S. BANCORP TOWER
                                        111 S.W. FIFTH AVENUE
                                      PORTLAND, OREGON  97204

before using tear gas or similar measures, and generally giving protesters a reasonable opportunity to comply with orders.

6.      The Portland Police Bureau, Multnomah County Sheriff's Office, Oregon State Police, U.S. Department of Homeland Security, U.S. Marshals Service, and the individual defendants (collectively, "Defendants") have violated the rights of people with disabilities in their responses to protests against police brutality, chilling the exercise of their constitutional right to assemble and protest.  Defendants' actions violate the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and the First, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution, subjecting them to unnecessary harm and discrimination, abridging their freedom of speech, subjecting them to excessive force, and denying them due process and equal protection of the law.

7.      Plaintiffs bring this action to vindicate the fundamental rights of people with disabilities.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331(a) and 1343 because Plaintiffs allege violation of rights guaranteed by the U.S. Constitution, Section 504 of the Rehabilitation Act, and the ADA.  This Court has jurisdiction over Plaintiffs' claims for injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 65 of the Federal Rules of Civil Procedure.

9.      Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b) and §1391(e) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Oregon and because Defendants are subject to personal jurisdiction in the District of Oregon.

Page 4 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

4825-1016-1616.1

## PARTIES

10.    Plaintiff Philip Wolfe[1] has been a resident of Portland, Oregon since 2010, including at all times relevant to this lawsuit.  Philip has been Deaf since birth and communicates through American Sign Language (ASL).  Philip is a qualified person with a disability within the meaning of the ADA and the Rehabilitation Act.  Philip has a lengthy history of activism, including participation in demonstrations for the Me Too movement, the March for Our Lives, actions for climate change, and opposing war, chairing Portland's Community Oversight Advisory Board (COAB), and running for Portland City Council to represent the needs of the entire community, including people who are Deaf or hard of hearing.  Philip regularly attends the protests against police brutality and continues to be subject to discrimination and harm by Defendants.

11.    Plaintiff Katalina ("Katie") Durden has been a resident of Portland, Oregon, since 2008, including at all times relevant to this lawsuit.  Katie lost her vision when she was four years old from optic nerve damage and is legally blind.  She is a qualified person with a disability within the meaning of the ADA and the Rehabilitation Act.  She initially monitored the protests online out of fear of harm stemming from Defendants' treatment of people with disabilities, particularly their use of excessive force; however, she has attended protests regularly since late July as an independent member of the press who records the protests in 360° sound for people with low vision and others.  She typically uses a guide dog to navigate, but has instead used a reflective red and white cane at protests for fear of harm to her service dog.  She continues to be subject to discrimination and harm by Defendants.

12.    Plaintiff Melissa Lewis has been a resident of Portland, Oregon, nearly her entire life, including at all times relevant to this lawsuit.  She is a person with both photosensitive

---

[1] Philip Wolfe's gender identity is non-binary and Philip does not use pronouns.  Philip will be referred to as Philip.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1          MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

epilepsy and Ehlers-Danlos Syndrome, a connective tissue disorder that results in susceptibility to soft tissue tears and slow healing from those injuries. As a result, Melissa is not able to run or move quickly. Melissa is a qualified person with a disability within the meaning of the ADA and Rehabilitation Act. Melissa has regularly attended the protests as a freelance journalist as part of Cascadian Photog and sells footage to ABC, the Daily Beast, Willamette Weekly, and other local news media. She continues to be subject to discrimination and harm by Defendants.

13.    Plaintiff Juniper Simonis has been a resident of Portland, Oregon since August 2015, including at all times relevant to this lawsuit. Juniper is living with complex Post-Traumatic Stress Disorder (PTSD) as a result of a lifetime of mistreatment due to their[2] gender identity as a non-binary transgender person. For Juniper, PTSD manifests as obsessive-compulsive tendencies, hypervigilance, panic attacks, and dissociative episodes. Juniper is a qualified individual with a disability within the meaning of the ADA and Rehabilitation Act. They are a data scientist, an ecologist, and a progressive activist. They have been regularly attending the protests in Portland with their service dog, Wallace, since June. They continue to be subject to discrimination and harm by Defendants.

14.    Plaintiff Disability Rights Oregon ("DRO") is the federally mandated protection and advocacy system for the state of Oregon. Specifically, DRO has the authority to investigate incidents of abuse, neglect, and rights violations and pursue administrative, legal and other appropriate remedies to ensure the protection of people with disabilities. 42 U.S.C. § 10805(a)(1); 42 U.S.C. § 15043(a)(2)(A) and (B). DRO's institutional mission is to promote and defend the rights of all people with disabilities or those perceived to have disabilities in the state of Oregon. DRO's vital mission, however, has been frustrated by Defendants' policies and practices, which systemically violate the rights of Oregonians, particularly those with disabilities. DRO has had to divert resources from its organizational mission to address Defendants'

---

[2] Juniper's gender identity is non-binary and they use they/them pronouns.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204

violations of the law, redirecting staff from their work on other matters and the expenditure of scarce financial resources on issues relating to the rights of protesters with disabilities. These efforts include responding to inquiries on behalf of protesters with disabilities since the beginning of the protests in May 2020, drafting and disseminating related "Know Your Rights" information, and drafting multiple requests for accommodations on behalf of protesters with disabilities directed to Defendants.

15.    Moreover, DRO's members have been impacted by Defendants' violations of the law. Because DRO is the federally designated Protection and Advocacy System for Oregon, every person with disabilities in the state is a member of DRO. DRO represents the interests of all Oregonians with disabilities, including those seeking to exercise their right to protest. Each of the named plaintiffs is a constituent of DRO and falls within DRO's mandate to ensure that the rights of people with disabilities are protected. DRO seeks injunctive relief only.

16.    Defendant City of Portland (the "City") is a municipality located in Multnomah County in the State of Oregon. As a local governmental entity, the City is subject to suit under 42 U.S.C. § 1983, the ADA, and Section 504 of the Rehabilitation Act.

17.    Defendant Ted Wheeler is both the elected Mayor of the City and the Police Commissioner for Portland Police Bureau ("PPB"). Mayor Wheeler has supervisory responsibility for the actions of the City. As the Commissioner, Mayor Wheeler is responsible for the actions of the PPB, including approval of policies and practices instituted by the Chief of Police. He is sued in his official capacity.

18.    Defendant Chuck Lovell is the Chief of Police for the PPB. He is the official policy maker for the PPB. He is sued in his official capacity.

19.    Defendant Multnomah County is a political subdivision of the State of Oregon. As a local governmental entity, the County is subject to suit under 42 U.S.C. § 1983, the ADA, and Section 504 of the Rehabilitation Act.

Page 7 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

20.     Defendant Michael Reese is the Sheriff for Multnomah County.  He is the official policy maker for the Multnomah County Sheriff's Department, which is the County's law enforcement agency.  He is sued in his official capacity.

21.     Defendant Travis Hampton is the superintendent of the Oregon State Police ("OSP").  PPB, OSP, and other Defendants have closely coordinated their responses to the protests and, on information and belief, OSP has taken a leading role in responding to certain protests in Portland.  Superintendent Hampton is sued in his official capacity.

22.     Defendant Chad Wolfe is the Acting Secretary of the U.S. Department of Homeland Security ("DHS").  DHS is a federal agency of the United States with purview over Immigrations and Customs Enforcement ("ICE").  DHS and ICE have both actively participated in the response to the Portland protests.  ICE has sent its Border Patrol Tactical Unit ("BORTAC"), the paramilitary arm of the United States Border Patrol, and DHS has sent its own, often unmarked, agents to the protests.  DHS has also deputized local law enforcement to enforce federal law.  Acting Director Wolfe is sued in his individual and official capacity.

23.     Defendant Donald Washington is the official in charge of the U.S. Marshals Service, which has acted in concert with DHS agents and other Defendants in response to the protests.  He is sued in his individual and official capacity.

24.     Does 1-100 are other government agencies and individual officers, agents, and employees of Defendants who violated the rights of Plaintiffs, but whose identities are unknown at this time.  This Complaint will be amended with leave of the Court after they are identified in discovery.

25.     Plaintiffs are informed and believe that each of the Defendants is the agent, ostensible agent, alter ego, master, servant, trustor, trustee, employer, employee, representative, affiliate, partner, and/or associate, or a similar capacity of each of the other Defendants and at all times acting and performing, or failing to act or perform, within the course

Page 8 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

and scope of each capacity, and with the authorization, consent, permission or ratification of each of the other Defendants.

## FACTUAL BACKGROUND

A.      **The Murders of George Floyd, Breonna Taylor, and Countless Others Led to Protests Against Racism and Police Brutality.**

26.      On March 13, 2020, Louisville police officers Jonathan Mattingly, Brett Hankison and Myles Cosgrove killed Breonna Taylor, a 26-year-old Black woman, after mistakenly raiding her apartment.  Only one officer, Brett Hankison, was fired as a result of the incident.  Ms. Taylor's death led to large-scale demonstrations in the spring and summer of 2020 as the case drew more attention.

27.      On May 25, 2020, Derek Chauvin, a white police officer with the Minneapolis Police Department, killed George Floyd, a 46-year-old Black man, after responding to a report that Mr. Floyd bought cigarettes with a counterfeit $20 bill.  Officer Chauvin knelt on George Floyd's neck for over eight minutes; this brutal act was captured on video and widely disseminated.  During those eight minutes, Mr. Floyd repeated what has become a shockingly familiar phrase uttered by far too many people of color, including Eric Garner, Javier Ambler, Manuel Ellis, and Elijah McClain: "I can't breathe."  Officer Chauvin and his fellow officers ignored his pleas.

28.      In response to the deaths of Breonna Taylor and George Floyd and the historic and continued police brutality and violence against Black people, Indigenous people, and other people of color, protests have erupted across the country demanding accountability and even a complete reimagining of the community approach to public safety.  These protests have too often been met with their own wave of brutality, including the use of tear gas, flashbang grenades, pepper balls, and rubber bullets.

Page 9 -      **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

**B.      Defendants Routinely Utilize Brutal Tactics Against Portland Protesters**

29.      The use of these weapons and other brutal tactics have been on full display in Portland, Oregon, where Defendants have used them to disperse groups of largely peaceful protesters, legal observers, and members of the press.  Defendants' actions have already deprived people of their rights, caused countless injuries, and sparked multiple state and federal lawsuits and court-ordered injunctions.

30.      Protesters in Portland have assembled almost every day since May 29, 2020 to protest the systemic use of violence against people of color, including at the hands of PPB and other law enforcement agencies in Oregon.  As a matter of public record, Portland Police have killed, among others, Quanice Hayes, Terrell Johnson, Aaron Campbell, Patrick Kimmons, Darris Johnson, Kendra James, and Koben Henriksen.  Mr. Henriksen was the fifth person in a mental health crisis killed by officers of the PPB in 2019 alone.

31.      During these protests, people with disabilities have been routinely discriminated against, targeted, brutalized with excessive force, and denied their freedom of speech and right to due process and equal protection of the law.

**C.      Defendants Discriminate Against People Who Are Deaf or Hard of Hearing.**

32.      Defendants discriminate against people who are Deaf or hard of hearing at protests, including by failing to provide effective communication to protesters and others.

33.      Defendants have failed to provide effective and accessible communications about law enforcement or other activities at protests.  Defendants have routinely failed to communicate orders to disperse, including instructions for doing so, warnings about imminent use of force, and declarations of unlawful assemblies and riots.  When Defendants have communicated orders, they have only done so orally.  As a result, people who are Deaf or hard of hearing have been subjected to egregious uses of force for failing to comply with orders and warnings they never received.

Page 10 -       **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

34.     This is true for members of DRO and Philip.  Philip has been subjected to this use of force on numerous occasions.  On May 31, 2020, at around 10:30 or 11:00 pm, PPB officers fired flashbang grenades into a crowd of thousands of people without any warning accessible to people who are Deaf or hard of hearing.

35.     Flashbang grenades emit an extremely loud noise and bright lights aimed at disorienting people.  For people who are Deaf or hard of hearing, flashbang grenades are particularly disorienting and can cause additional hearing damage.  Deaf and hard of hearing people often rely heavily on their vision, along with residual hearing if applicable, to access and move through the world around them.  Flashbang grenades can cause Deaf and hard of hearing people to lose their residual hearing temporarily or permanently, and to experience a temporary but devastating impact on their ability to see and maintain physical balance.  They may also experience severe ringing in their ears.  The combination of these various factors leads to extreme disorientation and an unsafe situation for Deaf and hard of hearing people.

36.     The PPB's use of flashbang grenades and other force that evening caused a stampede in the crowd, putting Philip and others, including those with disabilities that impact mobility, at significant risk of injury.  Philip and Philip's friends, who are also Deaf, desperately tried to hold hands and stay together amid the chaos.  PPB officers then fired tear gas into the crowd, causing Philip and others to cough and Philip's eyes to burn and water profusely.  As a result, Philip was unable to see or hear what was happening in an already chaotic environment.  Philip was fortunate to have escaped the crowd without significant physical injury, although Philip was left dizzy, nauseous, lethargic, and dazed from the exposure to tear gas and overall experience.

37.     Philip was not so fortunate on other occasions.  On June 19, 2020, for example, Philip, like many others, attended a protest at the Multnomah County, Oregon Justice

Page 11 -        **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1                    MILLER NASH GRAHAM & DUNN LLP
                                            ATTORNEYS AT LAW
                                        TELEPHONE: 503.224.5858
                                        3400 U.S. BANCORP TOWER
                                         111 S.W. FIFTH AVENUE
                                        PORTLAND, OREGON  97204

Center in downtown Portland.  That evening, as on other occasions, PPB officers shot tear gas canisters and flashbang grenades indiscriminately into the crowd.

38.    No accessible warnings were ever given to persons with disabilities. Philip perceived that officers began to fire out of nowhere, and then Philip felt a sharp, searing pain as a flashbang grenade hit Philip in the back.  Officers shouted at protesters as they continued to fire indiscriminately into the crowd and strike protesters with batons, even as the crowd began to disperse.  Philip was unable to understand what the officers were saying.  It felt like a war zone to Philip.

39.    On July 22, 2020, after DHS agents established a presence in the City, Philip attended a rally a few blocks away from the Justice Center and, later on, another event happening on 4th Street.  Philip observed PPB officers and federal agents work in tandem to disperse the large group with both agencies firing tear gas and flashbang grenades into the crowd.

40.    Neither PPB nor DHS gave any accessible warning to Philip.  Philip brought an interpreter that evening, who informed Philip that the authorities gave an oral warning that the event was becoming unlawful.  However, PPB and DHS did not give Philip sufficient time to disperse before using force.  Philip could not avoid exposure to the tear gas, coughed and became dizzy.  A friend who is Deaf/blind and who accompanied Philip that evening was terrified.

41.    On other occasions, Philip was forced to leave protests far earlier than Philip would have chosen because Defendants' communication was inaccessible to Philip, causing an unavoidable risk of violence and arrest by Defendants.

42.    When Philip articulated concerns about accessibility to PPB officers, the officers told Philip not to attend protests because the inaccessibility made it unsafe.  As discussed

Page 12 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1                    MILLER NASH GRAHAM & DUNN LLP
                                        ATTORNEYS AT LAW
                                     TELEPHONE: 503.224.5858
                                      3400 U.S. BANCORP TOWER
                                        111 S.W. FIFTH AVENUE
                                      PORTLAND, OREGON  97204

below, Philip also brought those concerns directly to Mayor Wheeler, who also failed to make reasonable accommodations available.

   43. PPB's use of teargas on Philip should have been avoided through effective communication.  Philip has had recurring headaches since mid-August because of the teargas.  Philip's existing PTSD has been exacerbated as a result of the war zone-like environment and has experienced severe anxiety, insomnia, fatigue, hypervigilance, night terrors, and other symptoms.

   44. Philip has attempted to meaningfully address PPB's disability discrimination through the years.  In 2012, Philip filed a lawsuit challenging PPB's failure to provide accommodations to people who are Deaf or hard of hearing when responding to calls for service.  When Philip reported a domestic violence situation and requested an interpreter, the police responded without an interpreter, refused to get one, spoke only to Philip's partner, and, as a result, did nothing.

   45. After the lawsuit settled, Philip served as a role player for the Department of Public Safety Standards and Training, attempting to train PPB officers on how to effectively work with and serve people who are Deaf or hard of hearing.  During the six months Philip worked in that capacity, Philip saw firsthand PPB's resistance to change and to accommodating people with disabilities—a resistance that continues to this day and makes this lawsuit necessary.

   46. At no time did Philip observe any discussion of the need to provide American Sign Language ("ASL") interpreters, nor did Philip see any real efforts by PPB and the City to otherwise implement the settlement.  In September 2020, City officials informed Plaintiffs' counsel that a policy on effective communication has been in draft form for the last two years.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

**D.      Defendants Discriminate Against People Who Are Blind and Low Vision.**

47.      Defendants discriminate against people who are blind or low vision at protests, including by subjecting them to excessive force and by failing to provide clear and consistent directions, such as orders to disperse, and sufficient opportunity to comply.

48.      Plaintiff Durden primarily reads Braille and primarily uses a guide dog for mobility.  Katie has concerns about tear gas and other forms of indiscriminate violence by law enforcement, and she is concerned that her guide dog would be injured if she brought the dog to a protest.  When she attends protests, Katie relies on her cane and a sighted guide, i.e., a sighted individual who can safely lead her through crowds and over uneven ground.

49.      Katie is an independent journalist and attends protests with sound recording equipment to develop 360-degree audio recordings that she edits and publishes on Soundcloud.  When attending a protest as a member of the press, Katie wears a press badge and a helmet with "PRESS" written on it.

50.      On Friday, July 24, 2020, Katie attended a nighttime march with her friend Jacob Hanning, another journalist who also served as her sighted guide for the evening. Katie and Jacob both wore full-face gas masks and helmets.  Jacob's helmet also had the word "PRESS" written on it in block letters. As an independent journalist, Jacob was live streaming the events of the evening on Periscope.

51.      During the course of the evening, Katie and Jacob were tear-gassed several times, but thanks to their gas masks, they suffered only minor irritation.

52.      Katie and Jacob spent the majority of the evening near the fence surrounding the Justice Center.  At no point were Katie and Jacob within fifteen feet of the fence. Local and federal agents were stationed on the other side of the fence firing tear gas and flashbangs into the crowd.

Page 14 -      **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

53.     At approximately 1:58 am, Katie and Jacob were standing approximately thirty feet from the fence while Jacob filmed the protesters standing between them and the fence. They were standing still, and Katie had her cane visible in front of her.

54.     Katie and Jacob heard a series of loud pops and felt several objects hit them hard in the side and legs.  Jacob led Katie away from the area as quickly as he could, and they moved to the next street corner.  Once there, they examined their clothing and realized that law enforcement had shot them with "pepper balls" – paintball-sized pellets filled with oleoresin capsicum (OC), the same substance as pepper spray.  The impacts were hard enough to leave a large welt just below Katie's hip.

55.     On August 6, 2020, Katie was attending another nighttime protest with her cane and sighted guides, this time in Southeast Portland.  PPB declared an unlawful assembly within fifteen minutes of Katie's arrival and quickly declared the assembly a riot shortly thereafter.

56.     PPB bull rushed the protesters, shoving them and hitting them with their batons to drive them in a chosen direction while yelling at them to run.

57.     Katie, led by her sighted guides, was moving as fast as she could, but she was shoved in the back by the police, lost her balance, and skidded on her knees.

58.     To get away from the crush of people, Katie's guides led her up a flight of stairs.  It was narrow enough that they had to move single-file; without her guides to help her, Katie ran face-first into a metal pole.

59.     Katie has suffered persistent knee pain since the incident on August 5, 2020.

60.     On August 7, 2020, Katie attended a nighttime protest outside the Kelly Building in Southeast Portland, together with three sighted guides.

Page 15 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

61.     After approximately three hours, PPB declared an unlawful assembly. At approximately 12:30 a.m., the police bull rushed the protesters. Police shoved Katie while yelling at her to move. Only after she identified herself as a member of the press and informed the police that they were being recorded did officers stop actively pushing her.

62.     At the same time as the bull rush, officers using the Long-Range Acoustic Device ("LRAD") orally instructed protesters to disperse to the East. Over the next twenty minutes, the LRAD instructions changed several times. Protesters were instructed to disperse to the East, then to the East or South, then solely to the South, and then finally to the West. Even the officers making the announcements seemed confused about the directions they were providing.

63.     On September 18, 2020, Katie attended a nighttime protest in downtown Portland with two sighted guides. Between 200 and 300 protesters were gathered approximately two blocks from the ICE detention facility to protest the forced sterilization of women in ICE custody.

64.     Katie normally wears a full-face gas mask to protests. On this particular night, however, she had traded masks with a sighted guide whose goggles were broken. Katie was left with only a respirator and very little eye protection. Katie believed that because of the ban on CS gas that Mayor Wheeler had issued on September 10, 2020, the chances of tear gas exposure were lower than they had been previously.

65.     When Katie and her guides arrived at the protest, DHS agents were in a riot line in front of the protesters. Federal agents attempted to push the crowd back several times without significant success.

66.     While DHS agents formed a riot line to the South, PPB officers arrived, declared an unlawful assembly, and swept from the West to the North, blocking egress for protesters in multiple directions.

Page 16 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

67.     Mayor Wheeler's ban on CS gas only applies to the PPB and not to federal agencies.  Thus, DHS agents were free to use tear gas to disperse the crowd, and they did so vigorously, firing numerous canisters of tear gas into the crowd along with hundreds of rounds of pepper balls and other munitions.

68.     Interspersed with the tear gas canisters were numerous flashbangs.  One of these flashbangs went off so close to Katie that she saw the flash with her limited vision through closed eyes and she felt acute pain and ringing in her ears.

69.     As federal agents blocked her path from the South and PPB pushed in from the North and West, officers from different agencies ordered Katie to disperse in different directions.

70.     Katie's air was saturated with tear gas and OC powder, and it was nearly impossible to escape the protest area without being affected.  The tear gas and pepper spray caused Katie significant discomfort and pain.  Katie had her eyes rinsed three times that night, only to be re-affected by tear gas and OC powder each time.

71.     Dispersal orders and excessive force are often disorienting for Katie, who cannot read street signs without assistance.  Katie, like many blind people, navigates primarily using cardinal directions such as north, south, east, or west.  Cardinal directions, however, are not useful to Katie after she becomes disoriented by law enforcement's use of force.

72.     On Saturday, September 26, 2020, Katie attended a daytime "Proud Boys" rally to record speeches and a nighttime protest at the Justice Center.  At both events, Katie's companion Jackson ("Jack") Tudela was her primary sighted guide.  Their friend "Declan Hood" served as an additional sighted guide at the nighttime protest.  Katie also had her cane with her.

73.     Katie, Jack, and Declan Hood walked arm-in-arm through the nighttime protest while Jack took video and Katie made audio recordings.  Jack was wearing a yellow high-visibility jacket, and Katie wore her bright blue helmet labeled "Press."

Page 17 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

74.     Around midnight, PPB declared an unlawful assembly and rushed the protesters.  As the crowd moved backwards with their hands up, police shoved people to the ground and beat them with batons.  The retreat became a stampede as people tried to escape the police.

75.     Katie, Jack, and Declan Hood were caught in the crowd moving backwards.  Katie and Jack repeatedly and loudly stated that Katie was blind and a member of the press.  As Jack and Declan Hood turned around to help move Katie backwards, officers shoved them, knocking all three of them to the ground.

76.     Officers surrounded and arrested Jack while others continued to strike Katie and Declan Hood with their batons.  Through the limited vision in her left eye, Katie saw the batons, which hit her in the helmet, chest, and shoulders.  Declan Hood dragged Katie away to prevent her from being injured, and Katie heard Jack screaming her name.  Katie has relied on Jack as her primary sighted guide at recent protests and the two have formed a close bond.  Thus, Jack's arrest was particularly traumatic for Katie.

77.     Declan Hood and Katie escaped the stampede and were able to locate a group of their friends.  Katie and the group of friends waited for Jack to get released from custody at 5:00 am.  When their personal effects were returned to Jack, everything, including all of their and Katie's electronic equipment, had been doused in hand sanitizer.

78.     Katie suffered numerous physical injuries from her experiences at the Portland protests, including heavy bruising and pain across her body.

79.     Repeated exposure to physical violence at the hands of state and federal law enforcement has taken a severe emotional toll on Katie.  Katie's therapist of eight years indicates that she is displaying symptoms of active trauma and PTSD:  she is barely sleeping, has persistent nightmares, and experiences brief but repeated dissociative episodes.

Page 18 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1                     MILLER NASH GRAHAM & DUNN LLP
                                              ATTORNEYS AT LAW
                                         TELEPHONE: 503.224.5858
                                         3400 U.S. BANCORP TOWER
                                           111 S.W. FIFTH AVENUE
                                         PORTLAND, OREGON  97204

80.     Katie's job and classwork have suffered because she has found it increasingly difficult to concentrate.  Katie knows the toll that attending the protests is taking on her, but she has no intention of quitting.

**E.     Defendants Discriminate Against People with Mobility Disabilities**.

81.     Defendants have systematically discriminated against protesters, members of the press, and others with mobility disabilities at protests.  Defendants and their officers and agents routinely use force against people at protests, even those who are attempting to comply with law enforcement orders, fail to ensure that people with mobility disabilities have safe routes of egress from protests, and even block persons with mobility disabilities from leaving.

82.     For example, because of Melissa's connective tissue disorder, Ehlers-Danlos syndrome, she is unable to run without risking severe injury and lasting pain.  Like countless others, as a result of her disability and Defendants' failures to accommodate, Melissa has been subjected to tear gas, flashbang grenades, baton strikes, rubber bullets, pepper balls, shoving, and other unnecessary uses of force by Defendants on numerous occasions, simply because her disability prevents from her from complying as quickly as demanded by Defendants.

83.     The first time Melissa was subjected to use of force on account of her disability was May 31, 2020.

84.     On May 31, 2020, Melissa was in a crowd of protesters when she saw PPB officers in full riot gear use indiscriminate force against protesters for behavior as minor as shaking the fence around the Justice Center.

85.     PPB provided verbal warnings before using force, but the crowd was so tightly packed that Melissa was physically unable to leave before police fired tear gas and flashbang grenades into the crowd.  Unable to run or see because of the burning pain from the gas, Melissa stumbled home.

Page 19 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1                    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

86.     On June 12, 2020, Melissa was in the crowd again when PPB officers reacted to shaking of the fence around the Justice Center with overwhelming force without providing sufficient notice for her to disperse.  Although Melissa was not shaking the fence, her hands were raised, and she posed no threat to officers, PPB officers shot Melissa in the leg from less than three feet away with a foam baton.

87.     In severe pain, Melissa went to the emergency room.  As a result of the unnecessary use of force and Melissa's susceptibility to injury, she was diagnosed with IT band syndrome, a syndrome affecting the ligaments that connect the hip to the shin.  Afterwards, she had to take opiates to control the pain, and her leg could not bear weight.  She needed to use crutches for two weeks, and, later, a cane.  Even now, Melissa must wear leg braces every day; before, she only required them occasionally.

88.     Melissa was unable to attend protests for weeks after her injury, but she continued to monitor the protests online via livestream.  On June 19, 2020, for example, Melissa observed Defendants bull rush protesters without warning.

89.     By mid-July, Melissa had recovered enough to start attending the protests four days a week.  On or about July 16, 2020, Melissa observed BORTAC and other federal Defendants working in tandem with PPB officers.  BORTAC agents fired teargas and flashbang grenades into a group of protesters assembled at Chapman Square Park before rushing protesters in an effort that appeared to be coordinated with PPB.  PPB officers and federal agents stood shoulder to shoulder as they dispersed the crowd.  Melissa received only seconds of notice before the rush.  She was forced to run for several blocks, resulting in shin splints and enormous ongoing pain.

90.     Melissa's experiences have led her to feel fear of law enforcement violence resulting from Defendants' failure to accommodate her disability by giving sufficient notice. On many occasions, this fear has caused Melissa to leave protests earlier than she wished.

Page 20 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

On or about July 19, 2020, Melissa left the protest early rather than face violence and law enforcement bull rushes.  After Melissa left, DHS agents gave only a minute's notice before chasing protesters from 3rd to 14th Street.

91.     On August 7, 2020, Melissa attended a protest at the Multnomah County Sheriff's office.  Melissa was conspicuously marked with her press credentials and helmet labeled "press."  That evening, PPB officers declared an unlawful assembly and bull rushed the gathered protesters, striking them with batons and fists.

92.     Although Melissa was lawfully on the sidewalk with a group of eight to ten other members of the press, police yelled at the group to move. As Melissa attempted to comply, an officer struck her with a baton in the back of her head just below her helmet, where her neck and head meet.  The officer shoved Melissa hard for not moving quickly enough.  Melissa went to the hospital the next day and received a cervical collar neck brace.  Her CT scan revealed inflammation and a hematoma.

93.     On or about August 9, 2020, Melissa attended a protest at the Justice Center.  Multnomah County Sheriffs' deputies forcibly removed her from the area, along with other press and protesters, so officers would have a clear path to the parking lot.  The deputies provided no warning before they began screaming at the group to move, striking them, and pushing them hard with batons.

94.     Melissa complied with the deputies' directions, and she was on the sidewalk, where a temporary restraining order said she had a right to be.  Nonetheless, the deputies pulled Melissa by her backpack, shoved her shoulders, and struck her ribs with a baton for not moving quickly enough.  But Melissa feared that she might twist her ankle or worse if she moved any faster.  When Melissa told the deputies she was complying, they told her to turn around and stop filming.  At no time did the deputies communicate to Melissa, other members of

Page 21 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1                        MILLER NASH GRAHAM & DUNN LLP
                                                ATTORNEYS AT LAW
                                          TELEPHONE: 503.224.5858
                                          3400 U.S. BANCORP TOWER
                                            111 S.W. FIFTH AVENUE
                                          PORTLAND, OREGON  97204

the press, or the protesters where they should be; instead, the deputies pushed, pulled, and jabbed them with batons.

95.     On or about August 21, 2020, Melissa was at an action in front of the ICE detention center in Portland when DHS and other federal agents fired teargas, flashbang grenades, and pepper balls at peaceful protesters. Melissa was conspicuously marked as a member of the press and had no one in her immediate vicinity. Nevertheless, DHS agents intentionally threw a teargas canister at her, hitting her in the head. Melissa went to the emergency room where she was diagnosed with a concussion and a large hematoma.

96.     On September 6, 2020, Melissa was present on the 100th night of protests in Portland. She saw law enforcement, including PPB and OSP, act in concert to quash a protest in Ventura Park before it even began.

97.     Protesters planned to march from Ventura Park, to PPB's East Precinct, and back to the park. Some of the protesters then planned to return to the precinct for a separate direct action later that night. However, PPB and OSP announced that the protesters were not allowed to leave the park. A single person in the crowd—suspected to have been a right-wing agitator—then threw Molotov cocktails, which struck protesters and journalists over 100 feet away from the line of riot police that had already formed. They landed nowhere near the police.

98.     In response to the single person's actions, PPB and OSP launched a flurry of tear gas canisters at the crowd in the park. For several hours, officers repeatedly prevented protesters from dispersing.

99.     At approximately 1:15 a.m., PPB announced that the park had closed at 10:00 p.m. The police charged, taking down protesters, medics, and members of the press at a full sprint. Melissa maneuvered behind the riot line, where she filmed the police tackling a protester.

Page 22 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1     MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

100.     Melissa heard another officer yell that the park was closed.  As Melissa began to leave, an officer tackled her.  Melissa attempted to pick up her camera and other belongings, politely telling the officer that she was moving as quickly as she could.

101.     Melissa was only three feet away when the officer tackled her again.  She finally made it back to the press line, dazed and winded after being knocked down twice.  Another journalist saw her and said, "he just kept pushing you over."

102.     Melissa went to the ER.  She was diagnosed with whiplash and contusions on her left shoulder blade, knees, and thorax.

103.     On September 18, 2020, Melissa attended a protest near ICE headquarters.  DHS agents fired a barrage of teargas, hundreds of pepper balls, and stingers.  Melissa used a door to shield herself, but she was shot in the leg seven times.

104.     Later that night, PPB officers and DHS agents coordinated to surround protesters, and Melissa stood on the tailgate of a truck to film them.  DHS and BORTAC agents used more tear gas than Melissa had ever seen, blanketing several blocks, and PPB officers began making arrests.  One officer grabbed Melissa by her backpack and threw her off the truck, knocking the wind out of her and causing severe pain as her back and hips hit the curb.

105.     Melissa went to the emergency room and was prescribed oxycodone for her continuing pain.

106.     On September 23, 2020, PPB declared a riot after someone set a small fire.  Officers pushed protesters from the Multnomah County Detention Center to Broadway Street.  PPB officers harassed protesters who tried to leave, and Melissa filmed them.

107.     A person of color approached to ask the police to let the protesters out.  Melissa and Scott, another journalist, stepped up to film the interaction.  Melissa and Scott were in the crosswalk and were not interfering with police.

Page 23 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

108.    PPB Officer #148051, ignoring the protesters, approached aggressively and screamed at Scott to move back and get on the sidewalk.  Scott and Melissa immediately began backing up.  They were only feet from the sidewalk.  Melissa told the officer that she was trying to comply, but the officer shoved her forcefully.  Melissa stumbled, her foot caught the curb, and she fell hard.

109.    Melissa felt a snap and pop inside her ankle.  The intense pain stole her breath.  She thought that the officer had torn the stitching surrounding the internal brace that prevents her tendons and ligaments from tearing.  Medics arrived, bracing her foot and ankle, and calling for an evacuation team to take her to the emergency room.

110.    At the emergency room, Melissa learned that she had likely torn tendons and ligaments in the lateral or posterior ankle, where she had previously had multiple surgeries. She received a referral to an orthopedic surgeon.  Although Melissa was in agonizing pain, the emergency room could not provide pain medication because of strict opioid restrictions. Afterwards, Melissa had to wear a walking boot and an air cast.

111.    The constant stress and fear has taken an emotional toll on Melissa.  Since she began attending protests regularly, Melissa has lost approximately thirty pounds.

### F.    Defendants Discriminate Against People with Photosensitive Epilepsy.

112.    Defendants discriminate against people with epilepsy at protests. Defendants' use of strobe lights is a significant trigger for people with photosensitive epilepsy. Use of strobes disorients protesters and stymies identification of police involved in brutal actions.

113.    In addition to EDS, Melissa also has photosensitive epilepsy.  Law enforcement has subjected her repeatedly to strobe lights, many times intentionally and after she told the officers about her epilepsy.

Page 24 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

114.    When Melissa is confronted with a strobe light, she must turn around, find a dark corner, and put her head down to avert a grand mal or petit mal seizure.  Even brief exposures to strobe lights can induce a petit mal, or absence, seizure.  When confronted with a strobe light, Melissa becomes impossibly tired, loses time, and can become stuck, so that she has to be pulled away by her companions before a grand mal seizure occurs.  A friend must tell her when the strobe has stopped and it is safe to turn around.

115.    Melissa's worst possible fear is having a grand mal seizure at a protest.  A petit mal seizure would cause her to briefly lose consciousness.  A grand mal seizure would cause her to lose consciousness, collapse, and experience muscle spasms.

116.    Melissa normally has two petit mal seizures per month.  After persistent exposure to the use of strobe lights by law enforcement, Melissa experienced two grand mal seizures in the month of July in addition to absence seizures.

117.    Although Defendants have used strobe lights pervasively, one officer has repeatedly gone out of his way to use strobe lights against Melissa specifically after Melissa and others repeatedly told him that she has photosensitive epilepsy.  The officer, PPB Officer #1004013 with helmet number 22, is so notorious for brute force that a parody account was created for him on Twitter.  He only appears to use the strobe on Melissa, targeting her specifically because of her known epilepsy.

118.    PPB Officer #1004013 has used a strobe against Melissa on more than eight separate occasions, despite being well aware of her epilepsy.  When Melissa told him about her disability, he told her "well, then go away" and continued using the strobe against her.

G.    **Defendants Discriminate Against People with Psychiatric Disabilities and Service Animals.**

119.    The PPB has a well-documented history of brutality and discrimination against people with psychiatric disabilities.

Page 25 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

120.    In 2012, the United States Department of Justice found that PPB "engages in a pattern or practice of unnecessary or unreasonable force during interactions with people who have or are perceived to have psychiatric disabilities."[3]  The DOJ found "a pattern of dangerous uses of force against persons who posed little or no threat and who could not, as a result of their psychiatric disabilities, comply with officers' commands," including "practices that escalate the use of force where there were clear earlier junctures when the force could have been avoided or minimized."[4]  These practices, the DOJ concluded, resulted from "deficiencies in policy, training, and supervision."[5]

121.    As recently as early 2020, then-police Chief Jami Resch acknowledged that the DOJ's consent decree would not stop police from shooting suspects with psychiatric disabilities.[6]  In 2019, fatal police shootings of suspects with mental health disabilities actually increased.[7]  Indeed, as City Commissioner JoAnn Hardesty remarked, "We're killing more people today with mental-health issues by the Portland Police than we did before the DOJ came to town."[8]

---

[3] Portland Police Bureau Findings Letter at 1.

[4] *Id*. at 2

[5] *Id*. at 3.

[6] Maxine Bernstein, *Justice Department Finds Portland Police in 'Substantial Compliance' with Required Reforms*, The Oregonian, Jan. 24, 2020, *available at* https://www.oregonlive.com/crime/2020/01/justice-department-finds-portland-police-in-substantial-compliance-with-required-reforms.html (quoting then-Chief Resch that belief that settlement would end fatal shootings of people in crisis was a "common misconception").

[7] Maxine Bernstein, New Portland Police Chief Jami Resch talks officer shortages, protests and people in crisis, *available at*: https://www.oregonlive.com/crime/2020/01/new-portland-police-chief-jami-resch-talks-officer-shortages-protests-and-people-in-crisis.html

[8] Tim Dickinson, Progressive City, Brutal Police, *available at*: https://www.rollingstone.com/politics/politics-features/portland-oregon-police-brutality-history-1027677/

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

122.    Juniper is a person with a psychiatric disability:  complex PTSD.  The symptoms of PTSD differ between individuals; for Juniper, it manifests as obsessive-compulsive tendencies, hypervigilance, panic attacks, and dissociative episodes.  Being in crowds or otherwise surrounded by people often exacerbates these symptoms, as does being touched or startled by strangers.  As a result, it is nearly impossible for Juniper to go out in public or interact with others for any significant length of time.  Despite this, Juniper protests to express their political beliefs.

123.    In order to manage and mitigate their symptoms, Juniper relies on Wallace, a trained service dog.  Juniper and Wallace have been working together since 2016.  Wallace has been trained as a service animal by Kayse Fletcher of Compass Key Service Dog Training.  Kayse continues to train Wallace as needed.  Wallace wears a yellow service dog vest when out with Juniper.

124.    Wallace performs a variety of tasks to assist with Juniper's disability, including but not limited to: accompanying Juniper in public; being vigilant of Juniper's surroundings and "alert barking," (i.e., barking to notify Juniper that someone is approaching them); and providing physical contact with Juniper when they experience a heightened emotional response.  As part of his training, and to further mitigate Juniper's anxiety, Wallace is taught to be unflappable and minimally responsive to outside stimuli.  Wallace is also trained to not escalate a confrontation or physically defend Juniper.

125.    Because of Wallace's presence, Juniper has been able to attend protests in downtown Portland several nights a week since June.  Because of Defendants' pervasive use of chemical agents at protests, Juniper must engage in substantial planning to protect themselves and Wallace, including bringing their car and buying plastic drop cloths to scoop up Wallace in case of chemical exposure.

Page 27 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

126. On July 7, 2020, Juniper was attending a protest with Wallace when federal officers began swarming protesters, throwing flashbangs, and firing tear gas. One flashbang exploded about twenty feet from Wallace and startled him.

127. Since then, Wallace has become hyperaware of and easily startled by loud noises. He also refuses to walk through any kind of smoke, including wafting barbecue smoke.

128. On July 9, 2020, Juniper was on the sidewalk at SW 2nd and Jefferson behind the Wyatt Building in downtown Portland, marking the property line with surveyor's chalk. Wallace was with them. Although the Wyatt Building is federal property, most of the sidewalk is City property. Juniper was marking the line to prevent fellow protesters from inadvertently trespassing and risking arrest by federal officers.

129. Federal officers approached from the Wyatt Building and surrounded Juniper. Juniper was concerned that the officers would arrest them. Juniper stated that they had PTSD, that Wallace was their service dog, and that officers should not unexpectedly surround them in that manner. The officers withdrew without taking further action.

130. The next night, July 10, 2020, Juniper and Wallace went back to the Wyatt Building to mark the property line again. Juniper tethered Wallace to a large water bottle; this is a standard practice for them.

131. Without any prior warning, federal officers emerged from the Wyatt Building. They attempted to grab Juniper and triggered an immediate panic response. Juniper dove towards Wallace, who was standing still and "alert barking." More officers arrived, surrounded Juniper, and tackled them to the ground. These were the same officers who had surrounded Juniper the night before and learned that doing so exacerbates Juniper's PTSD.

132. The officers' behavior triggered a dissociative panic attack. Juniper's body locked up and they started screaming in anticipation of the brutal assault that they believed was coming. During such panic attacks, physical touch with Wallace is incredibly important for

Page 28 -  **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204

Juniper, as Wallace's presence helps emotionally ground them.  Juniper was also worried that the officers would see Wallace as a threat and hurt him, so they reached for Wallace to protect him. Juniper put their arms around Wallace, but the officers grabbed Wallace and pulled him out of Juniper's grasp.  The officers squeezed Wallace so hard that he defecated, then yanked him away by his collar.

133.    After removing Wallace, the officers sprayed Juniper with pepper-spray at point-blank range and put them in metal handcuffs.  Within minutes, Juniper's left pinky began to go numb.  Juniper notified the agents, but they did not loosen the handcuffs. Six officers lifted Juniper, whose entire body was now rigid, and carried them into the Wyatt Building while approximately nine other officers formed a perimeter around them.  In total, fifteen officers, all fully armed, surrounded Juniper before dragging them from city property into the Wyatt Building.

134.    Juniper was covered with mace and having a dissociative panic attack. Normally, this was when Wallace could ease Juniper's anxiety through physical contact. Instead, the officers needlessly separated Juniper and Wallace for the next nine hours.

135.    Juniper told the officers that they were a woman and that their pronouns were they/them.  But throughout the night, federal officers repeatedly misgendered Juniper, suggesting that the officers would only treat Juniper as a woman if they "looked like it" and refusing Juniper's requests to be searched by a female officer, stating "we don't do that here." DHS officers looked through Juniper's money clip and removed their US Passport ID card, which indicated Juniper is legally female.  Regardless, the officers continued to misgender Juniper throughout their detainment.  Given that Juniper's PTSD is rooted in years of gender dysphoria and transphobic assaults, this persistent denial of their gender identity only served to worsen Juniper's mental health crisis.

Page 29 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

136.    The officers seated Juniper on the floor in the foyer of the Wyatt Building with pepper-spray covering their face and clothes.  A burning sensation had spread through Juniper's face, lungs, nose, and mouth, and their heart rate was continually elevated as a result of both the mace and the continuing panic attack.  The officers refused to call medical personnel to flush Juniper's eyes or nose, leaving them the choice of continuing to burn or having untrained officers attempt to do so.  Juniper again told the officers that they had a disability and were in crisis; the officers told them to "buck up" and to "relax and breathe."  Juniper again notified the officers that their hands were going numb, but the officers did not adjust the metal handcuffs.

137.    Officers attempted to question Juniper about their activities that evening. Juniper repeatedly requested a lawyer and medical attention.  Neither were provided.  Juniper recognized the badge number of the officer questioning them and knew the officer had been present the night before when they disclosed their PTSD.

138.    Eventually, the officers carried Juniper to the basement garage of the Wyatt Building, Mirandized them, and told them that they were being arrested for spray-painting federal property.  After about half an hour in the garage, Portland Fire and Rescue arrived and attempted, unsuccessfully, to flush out Juniper's eyes and nose.  This exacerbated Juniper's symptoms and made them feel as though they were drowning. Fire and Rescue refused to remove Juniper's contacts.

139.    Throughout their two-hour detention at the Wyatt Building, the officers refused to release Juniper from handcuffs or reposition them, even though they repeatedly insisted that the cuffs were unnecessarily tight and that their hands were going numb.  Much of the time, Juniper was laying on their side with their hands cuffed behind their back.

140.    After the Wyatt Building, the officers used an unmarked SUV to transfer Juniper and Wallace to the custody of the U.S. Marshals at the federal courthouse.  Before, during, and after transport, the officers put a spit hood on Juniper's head.  The hood trapped the

4825-1016-1616.1                    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

pepper spray on Juniper's face close to their nose and mouth, causing them to gag and vomit slightly.  Juniper could hear Wallace in the back of the car, but they only made brief physical contact.

141.    At the courthouse, the Marshals took Juniper out of wrist cuffs and placed them in a holding cell for six hours in leg cuffs.  They took Wallace to the courthouse garage and tethered him to a truck.  Throughout Juniper's detention, Wallace did not receive food, water or any opportunity to relieve himself.  Juniper's cell had no potable water, soap, or hand sanitizer.

142.    While Juniper was in the holding cell, their mental state continued to deteriorate.  They began to dissociate, talking to themselves, scratching themselves, and tapping their head against the wall.  They experienced minor convulsions down the left side of their body.  At one point a Marshal came and asked Juniper if they were okay.  Juniper said, "No." The Marshal told Juniper that their dog was still in the garage and walked away.  It is difficult to know when precisely in the detention this was, as Juniper's mental health crisis had warped their sense of linear time.  Juniper told the Marshals or officers that they needed to take medication at regular times throughout the day, and that the medication was with their personal effects.  The Marshals or officers withheld Juniper's medication.

143.    DHS officials came and informed Juniper that they were being charged with refusing to comply, resisting arrest, and assaulting an officer.  They also told Juniper that they would be transferred to Multnomah County Jail, a facility that would not accept Wallace.

144.    The officials told Juniper that if no one came to pick up Wallace, Wallace would go to a shelter, and that "he won't be there when you get out."  Juniper understood this as a threat to euthanize Wallace while Juniper was detained.  Juniper reiterated their request for a lawyer and said that they did not consent to Wallace's removal from them.

145.    After several hours, during which Juniper made multiple requests for her service animal and a lawyer, DHS officials told Juniper that they were going to "cut them a

Page 31 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1                    MILLER NASH GRAHAM & DUNN LLP
                                              ATTORNEYS AT LAW
                                         TELEPHONE: 503.224.5858
                                       3400 U.S. BANCORP TOWER
                                          111 S.W. FIFTH AVENUE
                                       PORTLAND, OREGON  97204

break."   The officials said they would release Juniper with a citation and a future court date because the County Jail could not be made accessible for them.  The officials returned most of Juniper's possessions and unceremoniously released them and Wallace outside the Courthouse in the middle of the night.  Notably missing from the possessions returned to Juniper was their 2019 Women's Flat Track Derby Association World Championship medal, which they were wearing when detained. The medal has not yet been returned to Juniper.

146.    Since July 10, 2020, Juniper has struggled with neuropathy in their hands after spending hours in handcuffs.  This makes it extremely difficult for them to perform their job duties, most of which involve using a computer.  Juniper has experienced heightened hypervigilance, especially about police cars, trucks, and cars with tinted windows.  Juniper has experienced bouts of depression and mania, cycling between periods of complete inaction and insomnia-fueled overwork.  In general, Juniper's social anxiety and agoraphobia are also heightened; this makes it challenging for Juniper to engage in ordinary interactions, like necessary shopping trips.  Juniper's social interaction has decreased, and their withdrawal has increased.

147.    Service dogs like Wallace rely on a strong bond with their owner to be effective.  Prolonged separation from their owner, especially in high-stress situations, can have a negative impact on a service dog's psychology and efficacy.  Since being separated, Wallace has shown symptoms of elevated attachment, including not staying outside to go to the bathroom by himself, but requiring Juniper to accompany him.

148.    Since July 10, 2020, Wallace has suffered a marked regression in his training and behavior.  Wallace has returned to Casey for supplemental training, and Juniper has resorted to using rewards to incentivize behaviors that had been deeply ingrained for years.  Wallace is now concerned for his own safety as well as Juniper's; that is unusual and, for a psychiatric service dog, counterproductive.

Page 32 -      **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**
4825-1016-1616.1
MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

149.    Wallace's regression has made it much more difficult for Juniper to attend protests as they once did.  Wallace will not leave Juniper's car in downtown Portland.  Since Juniper cannot go far from Wallace without adverse health consequences for both of them, they are essentially tethered to the car.  Juniper's participation in the protests has predominantly been limited to support work at off-site locations.

150.    Defendants' incessant use of tear gas, flashbang grenades, and other munitions pose a significant, continued threat to both Wallace and Juniper's wellbeing by exacerbating Juniper's PTSD and preventing Wallace from effectively mitigating Juniper's symptoms.

151.    The presence of heavily armed police officers, in particular those who wear riot gear and camouflage and appear without warning, puts Juniper and Wallace into states of hypervigilance that prevent normal social functioning and create physical symptoms. On multiple occasions, during protests and at other times of day, merely arriving downtown triggers anxiety attacks in Juniper that manifest in elevated heart rate, sweating, convulsions like those experienced while in custody, and hyperventilation.

152.    Use of chemical weapons without proper cleanup have also rendered the ground and air physically unsafe for Wallace and other service animals, as many of the weapons are exceptionally toxic to dogs.

**H.    Defendants' Use of Tear Gas and Other Chemical Agents Threatens the Lives of People with Disabilities.**

153.    Defendants' use of chemical agents, including those in tear gas, smoke grenades, mace, and pepper balls, poses an extraordinary risk to the health and safety of people with disabilities.  People with disabilities that involve respiratory functions or inflammatory conditions (such as endometriosis) are at significant risk of exacerbated symptoms, long term damage, and even death.

Page 33 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

154.    Chemical agents like tear gas are so noxious that they were banned in war under the 1928 Geneva Protocol.[9]  The CDC's own website labels these agents as poison, referring to exposure as "poisoning" for which "no antidote exists."[10]  Yet, as detailed above, Defendants have regularly employed these agents against those who attend protests in Portland, and they have saturated the City with toxic chemicals.

155.    Exposure to substances like tear gas immediately causes the following symptoms:  excessive tearing, burning, blurred vision, and reddened eyes; runny nose, burning, and nasal swelling; burning and irritated mouth, difficulty swallowing, and drooling; chest tightness, coughing, a choking sensation, wheezing, and shortness of breath; skin burns and rashes; and nausea and vomiting.[11]  Significant exposure can cause blindness, glaucoma, and cataracts, as well as severe chemical burns to the throat and lungs and respiratory failure, which can result in death.[12]

156.    Tear gas and other inhaled chemicals are especially harmful for people with asthma, emphysema, bronchitis, and other respiratory illnesses.  The chemicals significantly exacerbate these conditions, triggering asthma attacks and other forms of severe respiratory distress, as well as long term damage.[13]

---

[9] https://sites.fas.harvard.edu/~hsp/1925.html

[10] CDC, *Facts About Riot Control Agents Interim document*, *available at*: https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp

[11] *Id.*

[12] *Id.*

[13] Morman, et al., *Riot Control Agents: Systemic Reassessment of Adverse effects on Health, Mental Stability, and Social Inequities*, *available at*: https://www.dontshootpdx.org/wp-content/uploads/2020/06/DSPFinal-RCAreport4SocialChange-AM.AR_.ZW_.DS-.pdf

Page 34 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

157.   Some activists in Portland have reported to DRO and Plaintiffs' counsel that tear gas and other chemicals significantly aggravate their inflammatory conditions, like endometriosis and fibromyalgia, causing intense and more frequent pain.

158.   The effect on people with endometriosis, a painful inflammatory condition in which uterine tissue grows outside the uterus, is particularly marked.  Tear gas has been linked with increased bleeding, severe cramping, more frequent and disrupted menstruation cycles and even miscarriages in people whose uteruses are otherwise healthy.[14]  The impact on those with endometriosis is even more severe, given the extreme pain that accompanies menstruation.

159.   Defendants use tear gas and other chemicals indiscriminately and voluminously in Portland, blanketing a wide swath of the City sometimes dozens of times each night.[15]  The chemicals do not simply blow away in the wind.  They leave behind a residue that lingers for weeks[16] and can continue to cause deleterious health effects long after.[17]  People represented by DRO have reported that their asthma is triggered by simply walking into a park or other areas of the City the day after tear gas has been used.

160.   When dispersed in aerosolized form, tear gas and other chemicals do not isolate themselves to the immediate vicinity in which they are used.  They adhere to surfaces

---

[14] Catherine Ryan Gregory, *Tear Gaslighting: Is There a Link Between Protesting and Messed Up Periods?*, *available at*: https://www.marieclaire.com/health-fitness/a33648135/tear-gas-effects-reproductive-system/

[15] According to research from the University of Portland, the City was gassed at least 181 times between May 29, 2020, and July 15, 2020 alone, *id.*, before some of the most egregious incidents detailed in this Complaint.

[16] *Id.*

[17] Lisa Song, *Tear Gas Is Way More Dangerous Than Police Let On — Especially During the Coronavirus Pandemic*, *available at*: https://www.propublica.org/article/tear-gas-is-way-more-dangerous-than-police-let-on-especially-during-the-coronavirus-pandemic

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1
MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

almost 1,000 feet away.[18]  They have permeated people's homes,[19] the downtown county jail,[20] and even the federal courthouse, hampering the court's operations.

161.    We are now in the midst of the horrifying COVID-19 pandemic, which is spread through respiratory droplets and which has already caused the deaths of over 200,000 people.  But tear gas and other chemical agents cause coughing and choking, which create respiratory droplets and contribute to the spread of COVID-19.  For this reason, the use of chemical agents is particularly concerning for people with compromised immune systems who are at a heightened risk of severe complications from COVID-19.

162.    For these reasons, 1,288 public health professionals signed an open letter "Oppos[ing] any use of tear gas, smoke, or other respiratory irritants, which could increase risk for COVID-19 by making the respiratory tract more susceptible to infection, exacerbating existing inflammation, and inducing coughing."[21]

I.    **Defendants Are Well Aware of the Need for Reasonable Modifications and Effective Communication but Refuse to Act.**

163.    It is obvious that people with disabilities require reasonable modifications and effective communication at protests.  Defendants have an affirmative obligation to make their programs and services accessible, including programs and services related to law enforcement.  Failing to provide accessible services related to law enforcement at protests effectively denies equal access to the right to protest and creates immeasurable dangers for

---

[18] *Tear Gaslighting*, *supra*, at 15.

[19] Latisha Jensen, *Portland Settles With Downtown Resident Whose Apartment Filled With Tear Gas*, *available at*: https://www.wweek.com/news/courts/2020/07/26/portland-settles-with-downtown-resident-whose-apartment-filled-with-tear-gas/

[20] Maxine Bernstein, *Downtown jail inmates hitting panic buttons due to tear gas wafting into cells, lawyers say*, *available at*: https://www.oregonlive.com/crime/2020/07/downtown-jail-inmates-hitting-panic-buttons-due-to-tear-gas-wafting-into-cells-lawyers-say.html

[21] *Available at*: https://drive.google.com/file/d/1Jyfn4Wd2i6bRi12ePghMHtX3ys1b7K1A/view

4825-1016-1616.1                MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

people with disabilities.  Defendants should provide reasonable modifications and effective communication to protesters with disabilities as a matter of course.

164.    The PPB has enacted policies to allow protesters without disabilities to avoid harm by police officers. For example, PPB Directive 0635.10, entitled "Crowd Management/Crowd Control,"[22] provides that when feasible, police should make "loud, intelligible and consistent announcements and warnings to the crowd […] to allow the crowd time to comply with orders given from police members."  Before taking action to disperse a crowd, the police should order the crowd to disperse, and should only use riot control agents (such as teargas) "when avenues of escape (i.e., clear path or route) are available to the crowd." Police can detain protesters after "providing a lawful order to disperse followed by a reasonable opportunity to comply with that order."

165.    Upon information and belief, PPB has not enacted any similar policies to provide protesters with disabilities an equal opportunity to avoid harm by police officers. Upon information and belief, there are no directives requiring sign language interpreters to communicate dispersal warnings or other orders, providing people with mobility disabilities an accessible route to escape teargas, or otherwise providing modifications to ensure that people with disabilities have a reasonable opportunity to comply with dispersal orders.

166.    Before filing suit, Plaintiffs and others have repeatedly notified Defendants that they have an obligation to provide modifications and make law enforcement actions at protests accessible to people with disabilities.  Defendants have been notified of the need for modifications by numerous people on a variety of social media platforms, including Twitter,

---

[22] https://www.portlandoregon.gov/police/article/649358. According to the website, this Directive is "currently under review." Plaintiffs will pay attention to any changes made in the future.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1                    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

Facebook, and Instagram, through messages and posts directed at or tagging the agencies or their officials. In response, Defendants have done nothing.

167. On July 23, 2020, Philip informed Mayor Wheeler directly of the need for modifications for persons with disabilities, including people who are Deaf or hard of hearing.[23] Earlier in the day, Philip asked Wheeler on Twitter whether he would be providing any accommodations; after receiving no response, Philip addressed Wheeler at the protest and informed him directly of the need for modifications. In response, Wheeler indicated that an ASL interpreter had accompanied him that evening. Unbeknownst to Wheeler, however, Philip had arranged for and hired the interpreter. When Philip informed Wheeler of this fact, Wheeler could only move on to the next protester's question in embarrassment. Philip and the interpreter then left.

168. Similarly, Melissa e-mailed Wheeler and the City's ADA coordinator directly, and notified numerous law enforcement officers and agents, about the impact that strobe lights have on her epilepsy. Neither Wheeler nor the ADA coordinator responded. On the other hand, multiple officers told her that, if she was so affected, she should not be protesting. In fact, PPB Officer #1004013, a Doe Defendant, has repeatedly gone out of his way to strobe Melissa after being notified of Melissa's epilepsy.

169. Officers have told other protesters with disabilities that they should not be out protesting. After officers shoved the protesters and told them to move faster, the protesters told officers of their mobility related disabilities. The officers, faced with these pleas, told the protesters they did not belong and continued to shove and scream at them.[24]

---

[23] Wheeler and others were tear gassed by Department of Homeland Security agents later that evening.

[24] *See, e.g.*, https://mobile.twitter.com/griffinmalone6/status/1291644306323673090?s=21

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

170.    In addition to the efforts of individual Plaintiffs and other community members, DRO sent letters detailing the need for accommodations to Chief Lovell, Mayor Ted Wheeler, the City's ADA coordinator, the U.S. Attorney for the District of Oregon, and Acting Secretary Wolfe in late July and early August of 2020.  DRO sent a similar letter to Superintendent Hampton and Sheriff Reese in early September.

171.    DRO's letters explained the issues that impact people who use service dogs, are Deaf or hard of hearing, are blind or low vision, have asthma, mobility-based disabilities, and epilepsy, and who have inflammatory conditions.  The letters explicitly requested reasonable accommodations and modifications of tactics on behalf of protesters with disabilities.

172.    To date, only PPB and the City have responded to those letters. On September 17, 2020, DRO and Plaintiffs' counsel met with PPB and the City to discuss the ongoing issues regarding the lack of reasonable modifications for protesters with disabilities and continuing violence at the hands of PPB. During those discussions, PPB and the City acknowledged that they do not have *any* policies governing police interactions with protesters with disabilities.

173.    On October 8, 2020 via email communication, the City stated that it could not provide ASL interpreters onsite at demonstrations to communicate PPB instructions to Deaf and hard of hearing protesters.

174.    On October 14, 2020, DRO and Plaintiffs' counsel met for a second time with PPB and the City to discuss their concerns. PPB and the City would not provide any concrete steps, plans, or timelines to ensure that protesters with disabilities are afforded their constitutional rights and to prevent undue force and discrimination against them.  Indeed, PPB made clear that any potential steps they could take would be subject to a lengthy bureaucratic approval process that could take weeks or even months.

Page 39 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

175.   Acting Director Wolfe has repeatedly and publicly justified the actions of DHS agents while ignoring Plaintiffs' requests for modifications.

176.   Rather than showing any inclination to provide reasonable modifications to or respect the constitutional rights of people with disabilities, the prevailing sentiment from Defendants has been that protesting is only for people who do not have disabilities.

177.   The PPB, DHS, U.S. Marshals, OSP, and MCSO have all responded with force to various protests in the City of Portland since May 2020. Defendants have often collaborated and worked jointly in devising responses to specific protests.

178.   For instance, in September 2020, federal authorities deputized dozens of members of both PPB and MCSO to serve as federal deputies in responding to these protests. Fifty OSP troopers were federally deputized in August 2020 for the purpose of allowing joint operations between OSP and the federal authorities. Oregon Governor Kate Brown has on some occasions created a unified command allowing joint command and control for OSP and MCSO in responding to protests. Protesters have witnessed obviously coordinated action between federal and local authorities in responding to the protests.

179.   Each Defendant has coordinated its response to the protests with other agencies.  Each Defendant has individually and jointly failed to provide reasonable modifications to protesters with disabilities.  None of the agencies communicate reasonably accessible notice to protesters who are Deaf or hard of hearing before using force or making arrests.  None of the agencies appropriately restrict the use of tear gas, bull rush charges, strobes, or other force against protesters with disabilities.  After DRO submitted requests for modifications to the agencies, none of the agencies adopted reasonable modifications that would adequately provide equal access to protesters with disabilities.

180.   Plaintiffs have made every effort to resolve these issues short of litigation. Unfortunately, Defendants' refusals to act have forced Plaintiffs to file this lawsuit to vindicate

Page 40 -      **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204

their fundamental constitutional rights and the rights guaranteed to them by the ADA and

Rehabilitation Act.

**FIRST CLAIM FOR RELIEF**
**(Violation of Title II of the ADA)**
**42 U.S.C. §§ 12131 et seq.**

**Against Defendants City of Portland, Multnomah County, Ted Wheeler, Chuck Lovell,**
**Michael Reese, and Travis Hampton (All in Their Official Capacities)**

181.    Plaintiffs reallege and incorporate by reference each of the allegations in

Paragraphs 1 through 180 of this Complaint as if fully set forth here.

182.    The ADA and its implementing regulations provide that "no qualified

individual with a disability shall, by reason of such disability, be excluded from participation in

or be denied the benefits of the services, programs, or activities of a public entity, or be subjected

to discrimination by any such entity." 42 U.S.C. § 12132; 28 C.F.R. § 35.149.  Title II's

requirements extend to "anything a public entity does," including arrests and other law

enforcement interactions.  8 C.F.R. § 35, app. B.  Despite these requirements, Defendants violate

the ADA and its implementing regulations in multiple ways.

183.    Defendants have an affirmative obligation to make benefits, services, and

programs accessible to people with disabilities.  § 35.150.  "The general regulatory obligation to

modify policies, practices, or procedures requires law enforcement to make changes in policies

that result in discriminatory arrests or abuse of individuals with disabilities."  28 C.F.R. pt. 35,

app. B.  Defendants, however, have failed to make reasonable modifications that will make law

enforcement's actions equally accessible to people with disabilities; indeed, their responses to

protests actively deny people with disabilities their rights at protests.

184.    The obligation to provide reasonable modifications requires covered

entities to provide effective communication to people with communication disabilities.

185.    Defendants fail to provide reasonable modifications, including effective

communication, for people with disabilities at protests.  For Philip and others who are Deaf or

Page 41 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF,**
             **AND DAMAGES**

4825-1016-1616.1    MILLER NASH GRAHAM & DUNN LLP
                    ATTORNEYS AT LAW
                    TELEPHONE: 503.224.5858
                    3400 U.S. BANCORP TOWER
                    111 S.W. FIFTH AVENUE
                    PORTLAND, OREGON  97204

hard of hearing, for example, Defendants have failed to take "appropriate steps to ensure that communications with . . . participants, members of the public, and companions with disabilities are as effective as communications with others." § 35.160(a)(1). To that end, Defendants are required to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." § 35.160(b)(1).

186.    Defendants make no efforts whatsoever to communicate with protesters who are Deaf or hard of hearing, including when they declare unlawful assemblies and riots and issue orders to disperse. In the same way, Defendants discriminate against Plaintiffs by communicating about their activities at protests only to protesters who are hearing persons. Defendants' use of bull rushes and other forms of force violate the rights of people with a variety of disabilities, including those with mobility disabilities and those who are blind or low vision. Unlike people without disabilities, Plaintiffs are unable to disperse quickly or respond in the same way to other police commands, putting them at significant risk of violence from Defendants. Use of force by Defendants also has a disproportionate effect on people with disabilities, many of whom heal more slowly and are more susceptible to long-term damage.

187.    Defendants' use of strobe lights induces seizures in Melissa and others with epilepsy. The use of strobes, however, serves no purpose that is not equally served by other forms of lighting other than to disorient protesters and stymie efforts to identify officers.

188.    Defendants' use of flashbang grenades, tear gas, and other riot control agents, and their separation of people from their service animals, denies people who use service animals the equal opportunity to participate in protests by restricting their ability to attend protests with their animals.

189.    Defendants' use of teargas, pepper balls, and other chemical irritants poses a significant risk of harm or death for people with respiratory and inflammatory conditions.

Page 42 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

190.    The lack of clear egress routes for dispersal, and barriers to egress erected by Defendants, violate the rights of people with disabilities who are forced to risk stampedes and trampling from other protesters, law enforcement force, and other grievous harm.

191.    The lack of clear and consistent directions likewise puts Plaintiffs, including those who are blind and low vision, at significant risk of harm, arrest, and violence.

192.    Defendants subject Plaintiffs to use of force and arrest because they mistake Plaintiffs' inaction, delayed action, or slowed action in response to orders to disperse and other commands as a refusal to comply.

193.    Further, Defendants' crowd management directives and other measures constitute programs and/or activities under the ADA.  By failing to establish crowd management measures that permit protesters with disabilities an opportunity to avoid harm by police, Defendants have denied those people with disabilities meaningful access to their crowd management program/activity.

194.    Reasonable modifications and effective communication measures are readily available.  For communications with Deaf or hard of hearing protesters, for example, ASL interpreters and visual messaging systems of the sort already used on the roadside to communicate closed exits could be effectively employed to notify protesters who are Deaf or hard of hearing when an unlawful assembly is declared.  Reasonable modifications might also include ceasing the use of certain less-lethal weapons and tactics entirely, using them only in circumstances designed to minimize risk to protesters with disabilities, or providing substantial verbal and visual warning before using the less-lethal weapons and tactics.  Likewise, Defendants can identify and inform protesters of accessible avenues of egress before using force or other tactics that may harm people with mobility disabilities.

195.    Nor would the requested modifications require a fundamental alteration of Defendants' programs and services.  For example, Defendants are already constitutionally

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

required to provide adequate notice and an opportunity to comply before dispersing crowds; PPB's own policies already require the same, yet they have made no attempt to provide adequate and timely notice to people who are Deaf or hard of hearing, denying them the benefits of these policies.

196.    As set forth above, Defendants have failed to satisfy their affirmative obligation to provide reasonable modifications and auxiliary aids and services that provide equal access, with or without a specific request from a person with a disability.  Defendants have also failed to response to requests for modifications and auxiliary aids and services by individual Plaintiffs and others.

197.    Defendants failure to provide reasonable modifications and auxiliary aids and services was (and continues to be) with deliberate indifference and reckless disregard to the rights of people with disabilities.

198.    Pursuant to 42 U.S.C § 12133, Plaintiffs are entitled to declaratory and injunctive relief as well as damages and reasonable attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF
### (Violation of Section 504 of the Rehabilitation Act)
### 29 U.S.C. §§ 794 et seq.

**Against Defendants City of Portland, Multnomah County, Ted Wheeler, Chuck Lovell, Michael Reese, Travis Hampton, Chad Wolfe, and Donald Washington (All in Their Official Capacities)**

199.    Plaintiffs re-allege and incorporate by reference each of the allegations in Paragraphs 1 through 198 of this Complaint as if fully set forth here.

200.    Section 504 of the Rehabilitation Act ("Section 504") and its implementing regulations provide that "[N]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal

Page 44 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

financial assistance . . ." 29 U.S.C. § 794.  Despite these requirements, Defendants violate Section 504 in multiple ways.

201.    A "program or activity" means "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government, or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." 29 U.S.C. 794(b)(1)(A), (B).

202.    Section 504 regulations prohibit discrimination by a recipient of federal funds by denying a qualified person with a disability the opportunity to participate in or benefit from the aid, benefit, or service.  34 C.F.R. § 104.4(1)(i).

203.    Section 504 regulations prohibit discrimination by a recipient of federal funds by affording a qualified person with a disability an opportunity to participate in and benefit from the aid, benefit, or service that is not equal to that afforded others.  34 C.F.R. § 104.4.(1)(ii).

204.    Section 504 regulations prohibit discrimination by a recipient of federal funds by affording a qualified person with a disability an opportunity to participate in and benefit from the aid, benefit, or service that is not as effective as that provided others.  34 C.F.R. § 104.4.(1)(iii).

205.    Section 504 regulations prohibit discrimination by a recipient of federal funds by "providing significant assistance to an agency, organization, or person that discriminates on the basis of [disability] in providing any aid, benefit, or service to beneficiaries of the recipients' program or activity."  34 C.F.R. § 104.4(1)(v).

206.    Section 504 regulations prohibit discrimination by a recipient of federal funds by utilizing "criteria or methods of administration that have the effect of subjecting

Page 45 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

qualified [persons with disabilities] to discrimination on the basis of [disability]." 34 C.F.R. § 104.4(4).

207.    Section 504 regulations require that recipients of federal financial assistance "shall take appropriate steps to ensure that communications with their . . . beneficiaries are available to persons with impaired vision and hearing." 28 C.F.R. § 41.51(e).

208.    Plaintiffs are otherwise qualified to participate in the services, programs, or activities that are provided to individuals by Defendants. 29 U.S.C. § 794(b).

209.    Defendants all receive federal financial assistance.

210.    Through the acts and omissions described above, Defendants and their agents and employees have and continue to violate the Rehabilitation Act and the regulations promulgated thereunder by excluding Plaintiffs from participation in, denying Plaintiffs the benefits of, and subjecting Plaintiffs based solely by reason of their disability to, discrimination in Defendants' services and activities in managing and regulating protests in Portland.

211.    Defendants make no efforts whatsoever to communicate with protesters who are Deaf or hard of hearing, including when they declare unlawful assemblies and riots and issue orders to disperse. In the same way, Defendants discriminate against Plaintiffs by communicating about their activities at protests only to protesters who are hearing persons. Defendants' use of bull rushes and other forms of force violate the rights of people with a variety of disabilities, including those with mobility disabilities and those who are blind or low vision. Unlike people without disabilities, Plaintiffs are unable to disperse quickly or respond in the same way to other police commands, putting them at significant risk of violence from Defendants. Use of force by Defendants also has a disproportionate effect on people with disabilities, many of whom heal more slowly and are more susceptible to long-term damage.

4825-1016-1616.1                        MILLER NASH GRAHAM & DUNN LLP
                                        ATTORNEYS AT LAW
                                    TELEPHONE: 503.224.5858
                                    3400 U.S. BANCORP TOWER
                                    111 S.W. FIFTH AVENUE
                                    PORTLAND, OREGON  97204

212.    Defendants' use of strobe lights induces seizures in Melissa and others with epilepsy.  The use of strobes, however, serves no purpose that is not equally served by other forms of lighting other than to disorient protesters and stymie efforts to identify officers.

213.    Defendants' use of flashbang grenades, tear gas, and other riot control agents, and their separation of people from their service animals, denies people who use service animals the equal opportunity to participate in protests by restricting their ability to attend protests with their animals.

214.    Defendants' use of teargas, pepper balls, and other chemical irritants poses a significant risk of harm or death for people with respiratory and inflammatory conditions.

215.    The lack of clear egress routes for dispersal, and barriers to egress erected by Defendants, violate the rights of people with disabilities who are forced to risk stampedes and trampling from other protesters, law enforcement force, and other grievous harm.

216.    The lack of clear and consistent directions likewise puts Plaintiffs, including those who are blind and low vision, at significant risk of harm, arrest, and violence.

217.    Defendants subject Plaintiffs to use of force and arrest because they mistake Plaintiffs' inaction, delayed action, or slowed action in response to orders to disperse and other commands as a refusal to comply.

218.    Further, Defendants' crowd management directives and other measures constitute programs and/or activities.  By failing to establish crowd management measures that permit protesters with disabilities an opportunity to avoid harm by police, Defendants have denied those people with disabilities meaningful access to their crowd management program/activity.

219.    Reasonable modifications and effective communication measures are readily available.  For communications with Deaf or hard of hearing protesters, for example, ASL interpreters and visual messaging systems of the sort already used on the roadside to

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1                MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

communicate closed exits could be effectively employed to notify protesters who are Deaf or hard of hearing when an unlawful assembly is declared. Reasonable accommodations might also include ceasing the use of certain less-lethal weapons and tactics entirely, using them only in circumstances designed to minimize risk to protesters with disabilities, or providing substantial verbal and visual warning before using the less-lethal weapons and tactics. Likewise, Defendants can identify and inform protesters of accessible avenues of egress before using force or other tactics that may harm people with mobility disabilities.

220.    Nor would the requested modifications require a fundamental alteration of Defendants' programs and services. For example, Defendants are already constitutionally required to provide adequate notice and an opportunity to comply before dispersing crowds; PPB's own policies already require the same, yet they have made no attempt to provide adequate and timely notice to people who are Deaf or hard of hearing, denying them the benefits of these policies.

221.    As set forth above, Defendants have failed to satisfy their affirmative obligation to provide reasonable modifications and auxiliary aids and services that provide equal access, with or without a specific request from a person with a disability. Defendants have also failed to response to requests for modifications and auxiliary aids and services by individual Plaintiffs and others.

222.    Defendants failure to provide reasonable modifications and auxiliary aids and services was (and continues to be) with deliberate indifference and reckless disregard for the rights of people with disabilities.

223.    Pursuant to 29 U.S.C. § 794(a), Plaintiffs are entitled to declaratory and injunctive relief as well as damages and reasonable attorneys' fees and costs. No Section 504 damages are being sought against federal agencies.

Page 48 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

### THIRD CLAIM FOR RELIEF
### (Violation of Plaintiffs' Free Speech Rights Under the First
### and Fourteenth Amendments to the U.S. Constitution)

224.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 223 of this Complaint as if fully set forth here.

225.    People with disabilities in Portland, including Plaintiffs, have participated as attendees, medics, and journalists in protests against police violence, racism, and against other forms of discrimination since the protests began on May 28, 2020.

226.    Plaintiffs' protest-related activities constitute constitutionally protected speech and/or conduct.  The First Amendment to the U.S. Constitution protects Plaintiffs' right to engage in their protest-related activities free of federal government suppression or retaliation. The First and Fourteenth Amendments to the U.S. Constitution protect Plaintiffs' right to engage in their protest-related activities free from state and local government suppression or retaliation.

227.    As described in this Complaint, Defendants (a) fail to provide reasonable modifications to law enforcement practices at protests to ensure equal access by and equal treatment of Plaintiffs as people with disabilities during protest-related activity.  Defendants, for example, regularly fail to communicate orders to disperse from protest-related activity in a manner that people with disabilities can readily understand, and regularly fail to provide sufficient time or means for people with disabilities to comply with orders to disperse from protest-related activity.  Furthermore, Defendants (b) treat Plaintiffs less favorably than others because they are people with disabilities who dare to engage in protest-related activity and request reasonable modifications, and (c) routinely use excessive force against people with and without disabilities, including Plaintiffs, who engage in protest-related activity, thus creating a frightening and dangerous "war zone" environment that presents heightened danger for people with disabilities.

4825-1016-1616.1                MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

228.    Defendants' actions would deter a reasonable person of ordinary firmness from participating in protest-related activity.  Defendants' actions have in fact deterred participation in protest-related activity by Plaintiffs and others.  While some people with disabilities continue to regularly engage in protest-related activity, others have stopped going and others have been too fearful to engage at all because of police violence.

229.    Defendants' actions are, at least substantially, in retaliation for Plaintiffs' constitutionally protected participation in protest-related activity, including for their involvement in protests challenging law enforcement violence, discrimination, and other misconduct, and for their requests for reasonable modifications.

230.    Defendants' actions have chilled Plaintiffs' exercise of their First and Fourteenth Amendment rights to engage in protest-related activity.

231.    Defendants' actions also violate the First and Fourteenth Amendments because they suppress constitutionally protected protest-related activity but are not narrowly tailored to any compelling government interest.  Defendants do not enhance Plaintiffs' compliance with dispersal orders or promote public safety when they fail to provide reasonable modifications that would allow Plaintiffs to understand and comply; instead, they only increase confusion and disorder when Plaintiffs are unable to comply.  Defendants' use of excessive force against people who are protesting police brutality only fuels public anger, intensifies the need for protests, and makes the public less safe.  And Defendants' disparate treatment of people with disabilities who engage in protests does not even have a lawful and rational basis.

232.    The federal courts have inherent authority to grant injunctive relief to direct compliance of the federal government and individual federal officials with the First Amendment.

Page 50 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

## Count One: 42 U.S.C. § 1983 / *Monell*

### Against Defendants City of Portland, Ted Wheeler, Chuck Lovell,
### Multnomah County, Michael Reese, and Individual Local Doe Defendants ("Local Defendants")

233.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 232 of this Complaint as if fully set forth here.

234.    The Local Defendants have a policy, practice, and custom of the First and Fourteenth Amendment violations described in this Complaint.  The policy, practice, and custom is so widespread that officials at all levels of the Local Defendant agencies (including the individual Local Defendants) were aware of and deliberately indifferent to the violations, and/or ratified the violations, and/or actively participated in the violations, and/or ordered others to participate in the violations.

235.    Plaintiffs and others repeatedly provided the Local Defendants direct notice of the First and Fourteenth Amendment violations and the harm they were causing. Because of this notice, and because of the widespread nature of the violations, and the obviousness of the resulting harm, Local Defendant officials at all levels (including the individual Local Defendants) knew or should have known of the need to train and supervise those under their control to prevent the violations, but they repeatedly failed to provide such training or supervision.

236.    Without altering the burden of proof on any claim or defense, Plaintiffs allege that the actions of the Individual Local Doe Defendants were objectively unreasonable in light of clearly established law.

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

## Count Two: 42 U.S.C. § 1983

### Against Defendant Travis Hampton (for Injunctive Relief Only) and Individual State Doe Defendants

237.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 236 of this Complaint as if fully set forth here.

238.    Defendant Travis Hampton and Individual State Doe Defendants directed or participated in the violations of Plaintiffs' First Amendment rights as described in this Complaint.

239.    Without altering the burden of proof on any claim or defense, Plaintiffs allege that the actions of the Individual State Doe Defendants were objectively unreasonable in light of clearly established law.

## Count Three: 42 U.S.C. § 1983

### Against Defendants Chad Wolfe, Donald Washington, and Federal Doe Defendants ("Federal Defendants")

240.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 239 of this Complaint as if fully set forth here.

241.    The Federal Defendants willfully participated and conspired with State and Local Defendants in the violations of Plaintiffs' First Amendment rights as described in this Complaint.

## Count Four: *Bivens*

### Against Chad Wolfe, Donald Washington, and the Federal Doe Defendants (in Their Personal Capacities) ("Individual Federal Defendants")

242.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 241 of this Complaint as if fully set forth here.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1                MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

243.    Plaintiffs' claims against the Individual Federal Defendants arise under

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

244.    The Individual Federal Defendants, acting under color of federal authority,

actively participated in the First Amendment violations described in this Complaint, and/or were

aware of and deliberately indifferent to the violations, and/or ratified the violations, actively

participated, and/or ordered others to participate in the violations.

245.    The violations are so widespread and the resultant harm so obvious that

the Individual Federal Defendants who supervise others, including Defendants Wolfe and

Washington, knew or should have known of the need to train and supervise those under their

control to prevent the violations, but they repeatedly failed to provide such training or

supervision.

246.    Without altering the burden of proof on any claim or defense, Plaintiffs

allege that the actions of the Individual Federal Defendants were objectively unreasonable in

light of clearly established law.

### FOURTH CLAIM FOR RELIEF

**(Violation of Plaintiffs' Right to Be Free from Unlawful Seizures and Excessive Force
Under the Fourth and Fourteenth Amendments to the U.S. Constitution)**

247.    Plaintiffs reallege and incorporate by reference each of the allegations in

Paragraphs 1 through 246 of this Complaint as if fully set forth here.

248.    The Fourth Amendment to the U.S. Constitution protects Plaintiffs' right

to be free from unlawful seizures and use of excessive force by the federal government.  The

Fourth and Fourteenth Amendments to the U.S. Constitution protect Plaintiffs' right to be free

from unlawful seizures and use of excessive force by state and local governments.

249.    Defendants have routinely used excessive force and unreasonably seized

people with disabilities, including Plaintiffs, at protests.

Page 53 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF,
AND DAMAGES**
4825-1016-1616.1                    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

250.    For example, Defendants have repeatedly subjected Plaintiffs to bull rushes, use of batons, tear gas, pepper balls, rubber bullets, and other crowd control munitions even though Plaintiffs pose no threat whatsoever, are suspected of no crime or an extremely minor offense, and are not resisting lawful orders or fleeing; indeed, many are actively trying to comply.

251.    Likewise, Defendants' use of strobe lights triggers epileptic seizures in those with photosensitive epilepsy but serves no law enforcement purpose other than to disorient protesters and stymie identification of officers.

252.    Defendants also subject people with disabilities to unreasonable seizures by, for example, traumatically separating people with disabilities from their service animals without cause, using unnecessarily tight handcuffs, failing to provide needed care while in custody, and other discriminatory practices.

253.    Defendants specifically target people with disabilities for violence in retaliation for exercising their First Amendment right to free speech, including for requesting reasonable accommodations.  Defendants' overwhelming use of force against and refusal to accommodate people with disabilities during seizures is unreasonable.

254.    The federal courts have inherent authority to grant injunctive relief to direct compliance of the federal government and individual federal officials with the Fourth Amendment.

### Count One: 42 U.S.C. § 1983 / *Monell*

**Against Defendants City of Portland, Ted Wheeler, Chuck Lovell, Multnomah County, Michael Reese, and Local Doe Defendants ("Local Defendants")**

255.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 254 of this Complaint as if fully set forth here.

256.    The Local Defendants have a policy, practice, and custom of the Fourth and Fourteenth Amendment violations described in this Complaint.  The policy, practice, and

4825-1016-1616.1    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204

custom is so widespread that officials at all levels of the Local Defendant agencies (including the individual Local Defendants) were aware of and deliberately indifferent to the violations, and/or ratified the violations, and/or actively participated in the violations, and/or ordered others to participate in the violations.

257.     Plaintiffs and others repeatedly provided the Local Defendants direct notice of the Fourth and Fourteenth Amendment violations and the harm they were causing. Because of this notice, and because of the widespread nature of the violations, and the obviousness of the resulting harm, Local Defendant officials at all levels (including the individual Local Defendants) knew or should have known of the need to train and supervise those under their control to prevent the violations, but they repeatedly failed to provide such training or supervision.

258.     Without altering the burden of proof on any claim or defense, Plaintiffs allege that the actions of the Individual Local Defendants were objectively unreasonable in light of clearly established law.

### Count Two: 42 U.S.C. § 1983

### Against Defendant Travis Hampton (for Injunctive Relief Only) and Individual State Doe Defendants

259.     Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 258 of this Complaint as if fully set forth here.

260.     Defendant Travis Hampton and State Doe Defendants directed or participated in the violations of Plaintiffs' Fourth Amendment rights as described in this Complaint.

261.     Without altering the burden of proof on any claim or defense, Plaintiffs allege that the actions of the Individual State Doe Defendants were objectively unreasonable in light of clearly established law.

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

**Count Three: 42 U.S.C. § 1983**

**Against Defendants Chad Wolfe, Donald Washington, and Federal Doe Defendants
("Federal Defendants")**

262.     Plaintiffs reallege and incorporate by reference each of the allegations in
Paragraphs 1 through 261 of this Complaint as if fully set forth here.

263.     The Federal Defendants willfully participated or conspired with State and
Local Defendants in the violations of Plaintiffs' Fourth Amendment rights as described in this
Complaint.

**Count Four: *Bivens***

**Against Chad Wolfe, Donald Washington, and the Federal Doe Defendants (All in Their
Personal Capacities)
("Individual Federal Defendants")**

264.     Plaintiffs reallege and incorporate by reference each of the allegations in
Paragraphs 1 through 263 of this Complaint as if fully set forth here.

265.     Plaintiffs' claims against the Individual Federal Defendants arise under
*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

266.     The Individual Federal Defendants, acting under color of federal authority,
actively participated in the Fourth Amendment violations described in this Complaint, and/or
were aware of and deliberately indifferent to the violations, and/or ratified the violations, and/or
ordered others to participate in the violations.

267.     The violations are so widespread and the resultant harm so obvious that
the Individual Federal Defendants who supervise others, including Defendants Wolfe and
Washington, knew or should have known of the need to train and supervise those under their
control to prevent the violations, but they repeatedly failed to provide such training or
supervision.  Without altering the burden of proof on any claim or defense, Plaintiffs allege that

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF,
AND DAMAGES**
4825-1016-1616.1                    MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

the actions of the Individual Federal Defendants were objectively unreasonable in light of clearly established law.

## FIFTH CLAIM FOR RELIEF

### (Violation of Plaintiffs' Right to Due Process
### Under the Fifth and Fourteenth Amendments to the U.S. Constitution)

268.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 267 of this Complaint as if fully set forth here.

269.    The U.S. Constitution's Fifth Amendment, which applies to claims against federal defendants, and the Fourteenth Amendment, which applies to claims against state and local defendants, both provide for due process of law.  Fundamental due process principles require that people receive fair notice that certain conduct is forbidden or required so that they may conform their conduct to the law.

270.    Defendants systematically deny due process to people with disabilities, including Plaintiffs and others.  Defendants have a policy, practice, and custom of not providing sufficient notice to people with disabilities to allow them to disperse or an opportunity to otherwise comply with lawful police orders before subjecting them to violence and arrest.  For example, Defendants do not give people with mobility-based disabilities adequate time to disperse, and Defendants do not give people who are Deaf or hard of hearing any notice of the need to disperse.

271.    Defendants' failure to provide due process is not narrowly tailored to any compelling government interest.  Failing to notify people of the need to disperse, not providing sufficient time to do so, and then brutalizing people for their failure to comply only fuels public anger, intensifies the need for protests, and makes the public less safe.

272.    Federal courts have inherent authority to grant injunctive relief to direct compliance of the federal government and individual federal officials with the Fifth Amendment.

Page 57 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF,
AND DAMAGES**

4825-1016-1616.1                    MILLER NASH GRAHAM & DUNN LLP
                                            ATTORNEYS AT LAW
                                        TELEPHONE: 503.224.5858
                                       3400 U.S. BANCORP TOWER
                                          111 S.W. FIFTH AVENUE
                                        PORTLAND, OREGON  97204

## Count One: 42 U.S.C. § 1983 / *Monell*

### Against Defendants City of Portland, Ted Wheeler, Chuck Lovell, Multnomah County, Michael Reese, and Local Doe Defendants ("Local Defendants")

273.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 272 of this Complaint as if fully set forth here.

274.    The Local Defendants have a policy, practice, and custom of the Fourteenth Amendment violations described in this Complaint.  The policy, practice, and custom is so widespread that officials at all levels of the Local Defendant agencies (including the individual Local Defendants) were aware of and deliberately indifferent to the violations, and/or ratified the violations, and/or actively participated in the violations, and/or ordered others to participate in the violations.

275.    Plaintiffs and others repeatedly provided the Local Defendants direct notice of the Fourteenth Amendment violations and the harm they were causing.  Because of this notice, and because of the widespread nature of the violations, and the obviousness of the resulting harm, Local Defendant officials at all levels (including the individual Local Defendants) knew or should have known of the need to train and supervise those under their control to prevent the violations, but they repeatedly failed to provide such training or supervision.

### Count Two: 42 U.S.C. § 1983

### Against Defendant Travis Hampton (for Injunctive Relief Only) and Individual State Doe Defendants

276.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 275 of this Complaint as if fully set forth here.

277.    Defendant Ted Hampton and State Doe Defendants directed or participated in the violations of Plaintiffs' Fourteenth Amendment rights as described in this Complaint.

Page 58 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

278.    Without altering the burden of proof on any claim or defense, Plaintiffs allege that the actions of the Individual State Doe Defendants were objectively unreasonable in light of clearly established law.

## Count Three: 42 U.S.C. § 1983

### Against Defendants Chad Wolfe, Donald Washington, and Federal Doe Defendants ("Federal Defendants")

279.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 278 of this Complaint as if fully set forth here.

280.    The Federal Defendants willfully participated or conspired with State and Local defendants in the violations of Plaintiffs' Fifth Amendment rights as described in this Complaint.

## Count Four: *Bivens*

### Against Chad Wolfe, Donald Washington, and the Federal Doe Defendants (All in Their Personal Capacities) ("Individual Federal Defendants")

281.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 280 of this Complaint as if fully set forth here.

282.    Plaintiffs' claims against the Individual Federal Defendants arise under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

283.    The Individual Federal Defendants, acting under color of federal authority, actively participated in the Fifth Amendment violations described in this Complaint, and/or were aware of and deliberately indifferent to the violations, and/or ratified the violations, and/or ordered others to participate in the violations.

284.    The violations are so widespread and the resultant harm so obvious that the Individual Federal Defendants who supervise others, including Defendants Wolfe and Washington, knew or should have known of the need to train and supervise those under their

Page 59 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1     MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

control to prevent the violations, but they repeatedly failed to provide such training or supervision.

285.    Without altering the burden of proof on any claim or defense, Plaintiffs allege that the actions of the Individual Federal Defendants were objectively unreasonable in light of clearly established law.

## SIXTH CLAIM FOR RELIEF

### (Violation of Plaintiffs' Right to Equal Protection
### Under the Fifth and Fourteenth Amendments to the U.S. Constitution)

286.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 285 of this Complaint as if fully set forth here.

287.    The U.S. Constitution's Fifth Amendment, which applies to claims against federal Defendants, and the Fourteenth Amendment, which applies to claims against state and local government Defendants, guarantee equal protection of the law.  Where policies, practices, and customs burden the fundamental rights of particular classes of persons, equal protection principles require government practices to survive strict scrutiny or cease.

288.    Defendants' policies, practices, and customs substantially burden people with disabilities in the exercise of their fundamental rights to freedom of speech, to be free from unreasonable seizures and excessive force, and to procedural due process.

289.    For example, Defendants communicate orders to disperse and declarations of unlawful assembly or riot only to people who hear, denying protesters who are Deaf or hard of hearing the ability to comply with Defendants' orders before being subjected to force or arrest. Unlike people who hear, people who are Deaf or hard of hearing are, therefore, not provided the notice required by the First, Fourth, Fifth, and Fourteenth Amendments, and are subjected to uses of force and unreasonable seizures to which people who hear are not subjected.

290.    Defendants know that people with disabilities are participating in the on-going protests as members of the community, medics and press.  Defendants know that their

Page 60 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

current tactics disproportionately harm people with disabilities.  They have been told too many times by too many people to claim otherwise.  Their response has evinced a callous disregard for the rights of people with disabilities, consistently telling people with disabilities that if they cannot handle law enforcement tactics, including violence, then they should not be out protesting at all.  This indicates institutional animus towards people with disabilities.

291.    Moreover, Defendants have specifically targeted people with disabilities for violence in retaliation for their exercising their First and Fourteenth Amendment rights, including exercising the right to free speech by requesting reasonable accommodations, further demonstrating animus against people with disabilities.

292.    Defendants' actions do not survive strict scrutiny because they are not narrowly tailored to serve a compelling government interest.  Defendants have no interest in discriminating against people with disabilities, targeting them, and denying them their constitutionally protected rights.

293.    Federal courts have inherent authority to grant injunctive relief to direct compliance of the federal government and individual federal officials with the Fifth Amendment.

### Count One: 42 U.S.C. § 1983 / *Monell*

**Against Defendants City of Portland, Ted Wheeler, Chuck Lovell,
Multnomah County, Michael Reese, and Local Doe Defendants ("Local Defendants")**

294.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 293 of this Complaint as if fully set forth here.

295.    The Local Defendants have a policy, practice, and custom of the Equal Protection violations described in this Complaint.  The policy, practice, and custom is so widespread that officials at all levels of the Local Defendant agencies (including the individual Local Defendants) were aware of and deliberately indifferent to the violations, and/or ratified the

Page 61 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF,
AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

violations, and/or actively participated in the violations, and/or ordered others to participate in the violations.

296.    Plaintiffs and others repeatedly provided the Local Defendants direct notice of the Equal Protection violations and the harm they were causing.  Because of this notice, and because of the widespread nature of the violations, and the obviousness of the resulting harm, Local Defendant officials at all levels (including the individual Local Defendants) knew or should have known of the need to train and supervise those under their control to prevent the violations, but they repeatedly failed to provide such training or supervision.

### Count Two: 42 U.S.C. § 1983

### Against Defendant Travis Hampton (for Injunctive Relief Only) and Individual State Doe Defendants

297.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 296 of this Complaint as if fully set forth here.

298.    Defendant Travis Hampton and State Doe Defendants directed or participated in the violations of Plaintiffs' rights to Equal Protection as described in this Complaint.

### Count Three: 42 U.S.C. § 1983

### Against Defendants Chad Wolfe, Donald Washington, and Federal Doe Defendants ("Federal Defendants")

299.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 298 of this Complaint as if fully set forth here.

300.    The Federal Defendants willfully participated or conspired with State and Local Defendants in the violations of Plaintiffs' rights to Equal Protection as described in this Complaint.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

## Count Four: *Bivens*

### Against Chad Wolfe, Donald Washington, and the Federal Doe Defendants (All in Their Personal Capacities) ("Individual Federal Defendants")

301.    Plaintiffs reallege and incorporate by reference each of the allegations in Paragraphs 1 through 300 of this Complaint as if fully set forth here.

302.    Plaintiffs' claims against the Individual Federal Defendants arise under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

303.    The Individual Federal Defendants, acting under color of federal authority, actively participated in the Equal Protection violations described in this Complaint, and/or were aware of and deliberately indifferent to the violations, and/or ratified the violations, and/or ordered others to participate in the violations.

304.    The violations are so widespread and the resultant harm so obvious that the Individual Federal Defendants who supervise others, including Defendants Wolfe and Washington, knew or should have known of the need to train and supervise those under their control to prevent the violations, but they repeatedly failed to provide such training or supervision.

305.    Without altering the burden of proof on any claim or defense, Plaintiffs allege that the actions of the Individual Federal Defendants were objectively unreasonable in light of clearly established law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.    A declaration that Defendants' alleged conduct has violated and continues to violate:  Title II of the ADA, 42 U.S.C. §§ 12131 et seq., and its implementing regulations; Section 504 of the Rehabilitation Act, and its implementing regulations; and the First, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1
MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

2.      Preliminary and permanent orders enjoining Defendants, their agents, employees, successors, and all other persons acting in active concert or participation with Defendants from violating Title II of the ADA, 42 U.S.C. §§ 12131 et seq. and its implementing regulations; Section 504 of the Rehabilitation Act and its implementing regulations; and the First, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution.

3.      Preliminary and permanent orders requiring Defendants to cease discriminatory practices against individuals with disabilities at protests and provide reasonable modifications, including, but not limited to:

     a.      Modify use of force policies to address the needs of people with disabilities and/or their service animals, including, but not limited to:  ceasing using force, such as impact munitions, flashbang grenades, batons, shoving and other types of force and tactics unless necessary for officer safety based on an immediate threat of serious harm from an individual;

     b.      Use the least amount of force possible against people with disabilities and their assistants, interpreters, sighted guides and/or service animals;

     c.      Cease using chemical munitions that negatively affect people with respiratory and inflammatory disabilities, and that negatively affect service animals, and remove remaining residue from areas where used;

     d.      Cease using strobe lights;

     e.      Provide ASL interpreters and visual messaging systems to convey orders or other directions to people who are Deaf or hard of hearing at protests;

**COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

f.      Provide adequate time and clear and consistent directions for individuals with disabilities to comply with lawful orders;

g.      Before dispersing a crowd or taking other actions that may place persons with disabilities in danger, identify and inform protesters and others of accessible avenues of escape;

h.      Stop separating people with disabilities from their assistants, interpreters, sighted guides and/or service animals;

i.      Ensure access to proper medical treatment including medication;

j.      Cease practices that aggravate people's psychiatric disabilities or trigger PTSD responses, such as:  misgendering people, refusing to house people in Defendant's custody according to their gender identity, subjecting people to unnecessary body searches, and/or refusing to use staff of a different gender to carry out body searches when requested.

4.      Award compensatory and punitive damages as may be allowed under the laws set forth above;

/ / /

/ / /

/ / /

Page 65 -    **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

5.     An order awarding Plaintiffs' attorneys' fees, expenses, and costs as provided by law; and

6.     Such other and further relief as the Court may deem just and proper.

DATED this 1st November, 2020.

MILLER NASH GRAHAM & DUNN LLP

*s/ John C. Clarke*
Bruce L. Campbell, OSB No. 925377
bruce.campbell@millernash.com
P.K. Runkles-Pearson, OSB No. 061911
p.k.runkles-pearson@millernash.com
John C. Clarke, OSB No. 153245
john.clarke@millernash.com
111 S.W. Fifth Ave., Suite 3400
Portland, OR  97204
Phone: 503.224.5858

DISABILITY RIGHTS LEGAL CENTER
Christopher Knauf, (Pending *Pro Hac Vice*)
ck@drlcenter.org
Brendan Hamme, (Pending *Pro Hac Vice*)
bh@drlcenter.org
Anthony Pinggera, (Pending *Pro Hac Vice*)
acp@drlcenter.org
1541 Wilshire Boulevard, Suite 400
Los Angeles, California 90017
Phone:  213.736.1031

CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
Timothy Fox, (Pending *Pro Hac Vice*)
tfox@creeclaw.org
Pilar Gonzales Morales, (Pending *Pro Hac Vice*)
pgonzalez@creeclaw.org
1245 E. Colfax Avenue, Suite 400
Denver, Colorado 80218
Phone:  303.757.7901
*Attorneys for Plaintiffs*

Page 66 -     **COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES**

4825-1016-1616.1     MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204