**Bruce L. Campbell**, OSB No. 925377
bruce.campbell@millernash.com
**John C. Clarke**, OSB No. 153245
john.clarke@millernash.com
**MILLER NASH GRAHAM & DUNN LLP**
3400 U.S. Bancorp Tower 111 S.W. Fifth Avenue
Portland, Oregon 97204
Phone: 503.224.5858

**Christopher Knauf**, admitted *pro hac vice*
ck@drlcenter.org
**Anthony Pinggera**, admitted *pro hac vice*
acp@drlcenter.org
**DISABILITY RIGHTS LEGAL CENTER**
1541 Wilshire Boulevard, Suite 400
Los Angeles, California 90017
Phone: 213.736.1031

**Amy Robertson**, admitted *pro hac vice*
arobertson@creeclaw.org
**Timothy Fox**, admitted *pro hac vice*
tfox@creeclaw.org
**Pilar Gonzales Morales**, admitted *pro hac vice*
pgonzalez@creeclaw.org
**CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER**
1245 E. Colfax Avenue, Suite 400
Denver, Colorado 80218
Phone: 303.757.7901

Page 1 -   DECLARATION OF JUNIPER SIMONIS IN SUPPORT OF PLAINTIFFS'
           MOTION FOR PRELIMINARY INJUNCTION

4844-7362-3766.2

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PHILIP WOLFE, KATALINA DURDEN, MELISSA LEWIS, JUNIPER SIMONIS, individually, and DISABILITY RIGHTS OREGON, an Oregon nonprofit and advocacy corporation,<br><br>          Plaintiffs,<br><br>     v.<br><br>CITY OF PORTLAND, a municipal corporation; TED WHEELER, in his official capacity; CHUCK LOVELL, in his official capacity; MULTNOMAH COUNTY, a political subdivision of the State; MICHAEL REESE, in his official capacity; TERRI DAVIE, in her official capacity; CHAD WOLF, in his individual capacity; ALEJANDRO MAYORKAS, in his official capacity; DONALD WASHINGTON, in his individual and official capacity; and DOES 1-100, individual and supervisory officers of local, state, and federal government,<br><br>          Defendants. | Case No. 3:20-cv-01882-SI<br><br>DECLARATION OF JUNIPER SIMONIS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

I, Juniper Simonis, hereby declare and state as follows:

1. I am 18 years of age or older and am otherwise competent to make this declaration. I am an individual plaintiff in this action. I make this declaration on personal knowledge of the matters stated in this declaration or from sources deemed reliable.

2. I reside in Portland, Oregon with my service dog, Wallace. I am an environmental data scientist and a progressive activist.

Page 2 -    DECLARATION OF JUNIPER SIMONIS IN SUPPORT OF PLAINTIFFS'
            MOTION FOR PRELIMINARY INJUNCTION

3.  I am non-binary and transgender. My government-issued identifications all list my sex as female, and my pronouns are "they/them."

4.  As a person living with Complex Post-Traumatic Stress Disorder (PTSD), I am also a person with a disability.

5.  PTSD presents differently for every person. For me, it manifests as obsessive-compulsive tendencies, hypervigilance, panic attacks, and dissociative episodes. Being in crowds or otherwise surrounded by people often exacerbates these symptoms, as does being touched or startled by strangers.

6.  My PTSD is the result of a lifetime of dysphoria and trauma related to my gender identity and presentation. As a result, people misgendering me or otherwise refusing to recognize my identity is another potent PTSD trigger.

7.  To better manage and mitigate my symptoms, I rely on my psychiatric service dog, Wallace. Wallace performs a variety of tasks, including: accompanying me in public; being vigilant of my surroundings and "alert barking" to notify me that someone is approaching me; and providing physical contact with me when I am experiencing a panic attack or another heightened emotional response. When he is out with me, Wallace wears a yellow service dog vest.

8.  Wallace has been with me since 2016. He has been trained as a service animal by Kayse Fletcher of Compass Key Service Dog Training, and he continues to receive training as needed.

9.  As part of his training, Wallace is taught to be unflappable and minimally responsive to outside stimuli. He is also trained never to escalate a confrontation or to physically defend me. This both keeps Wallace safe and further mitigates my own anxiety, as Wallace's safety is as important to me as my own.

10. Because of Wallace's presence, I have been able to attend protests in downtown Portland several nights a week since June. Without him, it is nearly impossible for me to go out in public or interact with others for any significant length of time.

11. Unfortunately, law enforcement's constant use of chemical agents at protests forces me to undertake substantial additional planning in order to ensure the safety of both Wallace and me. If I want to attend a protest, I have to drive so that we have a quick means of escape should chemical agents be used. My car is always loaded with plastic drop cloths so that I can "scoop" Wallace up in the event of chemical exposure.

12. Wallace is just as susceptible to both the physical and emotional effects of law enforcement violence as humans. For example, on July 7, 2020, I was attending a protest with Wallace when law enforcement swarmed the protesters, throwing flashbangs and firing tear gas. One flashbang exploded less than twenty feet from Wallace, startling him. Since that day, he has become hyperaware of and easily startled by loud noises, whereas he had previously been extremely difficult to surprise. He also refuses to walk through any kind of smoke, including wafting barbecue smoke.

13. When federal law enforcement agents were deployed to Portland in early July, protesters were being arrested for, among other things, trespassing on federal property in downtown Portland.

14. Because of my work as an environmental data scientist in Portland, I have extensive experience reviewing and analyzing plat and property maps in the city. I decided that it would be worthwhile to consult those maps and mark the boundaries of federal property in downtown Portland with surveyor's chalk insofar as those boundaries extend to sidewalks and streets. My hope was that these lines would prevent protesters from inadvertently crossing onto federal property and risking arrest.

15. On July 9th, I brought my surveyor's chalk to the Wyatt Building at SW 2nd and Jefferson. According to the property maps that I consulted, the Wyatt Building is federal property, but the sidewalk outside is city property. As always, Wallace was with me as well.

16. As I was marking the property line, federal officers emerged from the Wyatt Building and surrounded me. I was very concerned in that moment that I would be arrested. I told the officers that I had PTSD, that they should not unexpectedly approach and surround me in that manner, and that Wallace was my service dog. The officers withdrew, but I was still shaken by the encounter.

17. The night after my initial encounter with federal officers, July 10th, I returned to the Wyatt Building to mark the property line again with surveyor's chalk. While I was there, I tethered Wallace to a large water bottle. This is standard practice for us. Even though Wallace could easily pull the bottle over, he never moves unless instructed to do so.

18. While I was marking the property line, officers emerged from the Wyatt Building again and approached me unexpectedly. When I looked up from the sidewalk, there was an officer reaching for me with several others in camouflage directly behind him. This triggered an immediate panic response.

19. When I am panicking, one of the most effective coping strategies that I have is physical touch with Wallace. I backed up, tripped, and then dove for Wallace to try to make contact with him. At the same time, Wallace was standing still and alert barking just as he was trained to do. I was afraid that the officers would see him as a threat, and I wanted to protect him.

20. The officer closest to me jumped on me and held me on the ground while more officers arrived and pinned me down. I learned later that some of these officers had been among those who had approached me the night before, when I had specifically told them that I had PTSD and a service dog.

Page 5 -   DECLARATION OF JUNIPER SIMONIS IN SUPPORT OF PLAINTIFFS'
            MOTION FOR PRELIMINARY INJUNCTION

4844-7362-3766.2

21. Being physically restrained by multiple men triggered a dissociative panic attack. At that moment in my mind, I was completely certain that I was about to experience a brutal assault, so my body locked up and I started screaming. I continued to try to reach for Wallace, and managed to get my arms around him, but officers grabbed him and pulled him out of my arms. When they grabbed Wallace, they squeezed him so hard that he defecated on the ground next to me. At some point, they dragged my body across Wallace's feces, and I spent the rest of the night with feces on my clothes.

22. After pulling Wallace away from me, the officers pepper-sprayed me at point-blank range and put me in tight metal handcuffs. Within minutes, my left pinky went numb. Over the next several hours, I repeatedly asked for the cuffs to be loosened, but they never were. I wound up in wrist cuffs for over two hours, most of the time either lying on my side with my hands cuffed behind my back.

23. Because I had gone completely rigid, six officers lifted me and carried me into the Wyatt Building while other officers stood around us blocking other protesters from intervening.

24. My panic attack did not subside once we were inside the building. In fact, it got worse. I repeatedly asked for Wallace to be brought to me, but I was denied. I was deposited on the floor of the foyer of the Wyatt Building and left there for close to an hour.

25. Once it came time for a search, I requested that I be searched by a female officer. I was told "we don't do that here" and that I would only be treated like a woman if I "looked like it." Despite the fact that I explicitly told officers my pronouns, and that the identification that I had with me when I was arrested indicates that I am legally female, officers insisted on misgendering me throughout the night. Given that my PTSD is rooted in transphobic assaults and dysphoria, this only served to worsen my already severe mental health crisis.

26. As I sat on the floor of the foyer with pepper spray covering my face and my clothes, a burning sensation spread through my face, lungs, nose, and mouth. The foyer was not well-ventilated, and having been freshly doused in pepper spray, the pain only spread and got worse the longer I sat there and chemicals saturated my clothes and my skin. Both the burning pain and my continuing panic attack kept my heart rate elevated. I repeatedly asked for medical personnel to flush my eyes and nose, and informed officers that I had a disability and I was in crisis. Their response was that I should "buck up" or "relax and breathe." At the same time, they attempted to question me about my activities that evening. I repeatedly requested a lawyer and medical attention. Neither were provided.

27. Eventually, I was carried to the basement of the Wyatt Building, read my Miranda rights, and told that I was being arrested for spray-painting federal property, even though I used chalk that was easily removable. This was the first time that I was told why I was being detained.

28. After about a half an hour of lying on the floor in the garage, Portland Fire and Rescue arrived and attempted, unsuccessfully, to flush out my eyes and nose. They only succeeded in making the sensation worse, filling my breathing passages with fluid and making me feel as if I was drowning. They never even bothered to remove my contact lenses, which were covered in pepper spray, even though I told them as much and explicitly asked them to do so.

29. Once Fire and Rescue attempted to treat me, I regained enough vision to finally see the officers around me and make out some of the details on their uniforms. I recognized the ID number on one officer's arm patch as belonging to an officer who I had spoken to the night before.

30. Eventually, I was put in a Federal Protective Service SUV, and driven to the federal courthouse. As I was being brought to the SUV, I saw Wallace's lead, but could not

see him. I called his name, and he stood up from behind an officer and looked at me. This was the only visual contact that we made before a spit hood was put over my head. This trapped the cloud of pepper spray wafting off my face and head, making me gag and choke back vomit.

31. I was placed in the rear passenger side seat of the SUV, and I heard, but did not see, Wallace get strapped into the rear driver's side seat next to me. We were able to make brief physical contact in the short ride to the federal courthouse.

32. Once I arrived at the federal courthouse, I was transferred to the custody of the U.S. Marshals. Wallace was separated from me almost immediately after I arrived at the courthouse. We were not reunited until I was released on the 11th.

33. I was released from wrist cuffs and placed into leg cuffs, then brought to a solitary holding cell and left there for six hours. My cell had no potable water, soap, or hand sanitizer.

34. By the time I was placed in a holding cell, I had already been in the grips of a mental health crisis for two hours. My mental and emotional state only continued to deteriorate while I was in that cell. I was scratching myself, tapping my head against the wall, and experiencing minor convulsions down the left side of my body. At the same time, I was dissociating, which warped my sense of linear time.

35. That said, I do recall certain events from my time in the holding cell. At one point, a Marshal approached the cell and asked if I was okay. I explicitly said "No." He informed me that Wallace was still in the garage and walked away.

36. At another point, I told a marshal that I had medication in my personal effects that I needed to take at certain times throughout the day, but my medication was never provided to me.

37. After I had been in the holding cell for some time, DHS officers came and informed me that I was being charged with refusing to comply, resisting arrest, and assaulting an

officer. They also told me that I was going to be transferred to the Multnomah County Jail, a facility that was not accessible to service dogs. The officers insisted that I had to get someone to pick up Wallace for me so that I could be transferred. If I didn't, they said that they would send Wallace to a shelter, and "he won't be there when you get out." I understood this as a threat to have Wallace euthanized while I was detained.

38. I refused to release Wallace to them and repeatedly asked to speak to an attorney. After several such conversations, officers told me that they would "cut me a break" and release me with a citation because the County Jail could not be made accessible for me.

39. When I was finally reunited with Wallace, I discovered that he had spent the last six hours in the courthouse garage tethered to a truck. He did not receive food, water, an opportunity to relieve himself, or any padding for sitting or standing on concrete.

40. After being reunited with Wallace, most of my possessions were returned to me — except for my 2019 Women's Flat Track Derby Association World Championship medal, which I was wearing when I was detained-- and I was deposited on the street outside the federal courthouse in the middle of the night.

41. Since my detention, my physical and mental health has deteriorated.

42. Spending hours in handcuffs has left me with persistent neuropathy in my hands, manifesting as a general loss of motor control, loss of strength, and numbness. This makes my job duties, most of which involve using a computer, much more difficult. I started seeing an occupational therapist in mid-July to help regain functionality in my hands, but it has only been marginally successful. Five months after my arrest, my left pinky finger is still completely numb. I have lost enough feeling in my hands that I have accidentally cut and scraped my knuckles and fingers without noticing. Using my right hand for regular activities like writing or drawing, even for an hour or two, makes my hand lock up and lose functionality for

days afterward. My occupational therapist and I are both concerned that the nerve damage that I sustained may soon become permanent.

43. My social anxiety and agoraphobia have dramatically increased since July 10, as has my hypervigilance, particularly regarding police cars, trucks, and cars with tinted windows. I check over my shoulder to watch every passing car, and I watch the skies for passing planes and drones.

44. For months afterward, I have experienced bouts of both depression and mania, cycling between periods of complete inaction and insomnia-fueled overwork. I have only been able to sleep for any appreciable length of time with the help of strong sedatives, and I am only now returning to what could be considered a somewhat regular sleep schedule. These sedatives leave me with a significant amount of "brain fog" for most of the day, making it even harder to work or focus, but my emotional health is improving slowly.

45. My long separation from Wallace had a negative effect on not only my own mental health, but on Wallace's efficacy as well. Since July 10, he has demonstrated a marked regression in his behaviors, showing elevated levels of attachment and concern for his own safety. This is unusual and, for a psychiatric service dog, counterproductive. I have returned to Kayse with Wallace for supplemental training. In the meantime, I have resorted to using rewards to incentivize behaviors that were previously automatic.

46. Wallace's regression has made my life more difficult, and it is impossible to attend protests as I once did. If I go to downtown Portland, Wallace will not leave my car. Since I cannot go far from Wallace without adverse psychological effects for both of us, this means that I am essentially tethered to my car. It has also been nearly impossible for me to manage my own hypervigilance and agoraphobia because I have to attend to Wallace's needs instead of my own every time that I leave my house.

47. Being around armed police officers, particularly those who wear camouflage and riot gear, puts both me and Wallace in a hypervigilant state that manifests with physical symptoms. Even being in downtown Portland can trigger an anxiety attack that causes an elevated heart rate, sweating, convulsions, and hyperventilation. Because Wallace will not walk through any form of smoke, be it natural or chemical, many places in the city are out of bounds for both of us, including most anywhere where people are cooking outdoors.

48. Thus, my participation in the protest movement has mostly been limited to the environmental research that I have taken on. In the months since my arrest, I have decided to put my training as an ecologist and data scientist to use. Chronic exposure to chemical weapons like tear gas and pepper spray have not been extensively studied, particularly in a non-military context. As such, I have founded the Chemical Weapons Research Consortium so that researchers can collaborate, share their findings, and work together to secure funding for future projects and publication.

49. My own research as part of this consortium is focused on Portland's aquatic system. I know from past work that the Willamette River has salmon populations that spawn close to the city's stormwater drainage outflow pipes from downtown. These are the same pipes where all the spent munitions, unexploded pepper balls, and chemical sprays that wash into the stormwater system flow into the river. This subsection of the city's stormwater system is quite old, and water empties into the river without any kind of filtering. My research and sampling has already indicated that many of these munitions are full of heavy metals like chromium, zinc, and lead. I am gravely concerned that these metals will decimate the fish populations both in Portland and downstream all the way to the ocean.

50. Other researchers and I have also been examining the trees and birds that have died at protest sites, sampling air quality by pulling samples from protesters' clothes and respirator filters, and checking soil quality in city parks. We have discovered the same heavy

metal deposits on protesters' clothes and in their air filters, with much higher concentrations for protesters who have been exposed to tear gas. The soil in the city parks is contaminated with synthetic capsaicin from heavy pepper spray and pepper ball use. This is not only bad for the soil; it is also a serious irritant for dogs that may be walking or playing in the park. The more that I learn about the toxicity of these chemical weapons, the more of the city that is foreclosed to Wallace and myself.

**I declare under penalty of perjury and under the laws of the United States, pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, memory, and belief.**

Executed on February 5, 2021, Portland, Oregon.

*s/ Juniper Simonis*
Juniper Simonis

CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing DECLARATION OF JUNIPER SIMONIS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION on the attorney or party listed below on the date set forth below by the method(s) indicated:

| | |
|---|---|
| JEFFREY BOSSERT CLARK<br>Acting Assistant Attorney General<br>BILLY J. WILLIAMS<br>United States Attorney<br>JOHN V. COGHLAN<br>Deputy Assistant Attorney General<br>ALEXANDER K. HAAS<br>Director, Federal Programs Branch<br>BRIGHAM J. BOWEN<br>Assistant Director, Federal Programs Branch<br>MICHAEL P. CLENDENEN, DC #1660091<br>Trial Attorney<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch<br>1100 L Street, NW<br>Washington, D.C. 20530<br>Telephone: (202) 353-0693<br>Facsimile: (202) 616-8460<br><br>*Attorneys for Defendants Wolf and Washington in their official capacity* | ☐ First-class mail, postage prepaid<br>☐ Facsimile, pursuant to ORCP 9 F<br>☐ Hand-delivery<br>☐ Overnight courier, delivery prepaid<br>☐ E-mail, pursuant to ORCP 9 G<br>☒ E-mail copy, as a courtesy only<br>☒ OJD EFILING SYSTEM, if registered at the party's email address as recorded on the date of service in the eFiling system, pursuant to UTCR 21.100.<br>☐ Other |
| ELLEN F. ROSENBLUM, OSB #753239<br>Attorney General<br>DREW K. BAUMCHEN, OSB #045032<br>Senior Assistant Attorney General<br>Department of Justice<br>1162 Court Street NE<br>Salem, OR 97301-4096<br>Telephone: (503) 947-4700<br>Facsimile: (503) 947-4791<br>Email: ellen.f.rosenblum@doj.state.or.us<br>       Drew.Baumchen@doj.state.or.us<br><br>*Attorneys for Defendant Terri Davie* | ☐ First-class mail, postage prepaid<br>☐ Facsimile, pursuant to ORCP 9 F<br>☐ Hand-delivery<br>☐ Overnight courier, delivery prepaid<br>☐ E-mail, pursuant to ORCP 9 G<br>☒ E-mail copy, as a courtesy only<br>☒ OJD EFILING SYSTEM, if registered at the party's email address as recorded on the date of service in the eFiling system, pursuant to UTCR 21.100.<br>☐ Other |

Page 1 -    Certificate of Service

4844-7362-3766.2

| | |
|---|---|
| DANIEL SIMON, OSB #124544<br>Deputy City Attorney<br>LINDA LAW, OSB #943660<br>Chief Deputy City Attorney<br>linda.law@portlandoregon.gov<br>LINH T. VU, OSB #004164<br>Senior Deputy City Attorney<br>linh.vu@portlandoregon.gov<br>ELIZABETH C. WOODARD, OSB #075667<br>Deputy City Attorney<br>beth.woodard@portlandoregon.gov<br>Portland City Attorney's Office<br>1221 SW 4th Ave., Rm. 430<br>Portland, OR 97204<br>Telephone: (503) 823-4047<br>Facsimile: (503) 823-3089<br>Email: dan.simon@portlandoregon.gov<br>      linda.law@portlandoregon.gov<br>      linh.vu@portlandoregon.gov<br>      beth.woodard@portlandoregon.gov<br><br>*Attorneys for City of Portland, Ted Wheeler and Chuck Lovell* | ☐ First-class mail, postage prepaid<br>☐ Facsimile, pursuant to ORCP 9 F<br>☐ Hand-delivery<br>☐ Overnight courier, delivery prepaid<br>☐ E-mail, pursuant to ORCP 9 G<br>☒ E-mail copy, as a courtesy only<br>☒ OJD EFILING SYSTEM, if registered at the party's email address as recorded on the date of service in the eFiling system, pursuant to UTCR 21.100.<br>☐ Other |
| GLENN GREENE<br>New York State Bar No. 2674448<br>Senior Trial Attorney<br>DAVID G. CUTLER<br>Illinois State Bar No. 6303130<br>Trial Attorney<br>Torts Branch, Civil Division<br>Constitutional and Specialized Tort Litigation<br>PO Box 7146<br>Ben Franklin Station<br>Washington, D.C. 20044<br>Telephone: (202) 616-4143<br>Facsimile: (202) 616-4314<br>Email: glenn.greene@usdoj.gov<br><br>*Attorneys for Defendants Wolf and Washington in their individual capacity* | ☐ First-class mail, postage prepaid<br>☐ Facsimile, pursuant to ORCP 9 F<br>☐ Hand-delivery<br>☐ Overnight courier, delivery prepaid<br>☐ E-mail, pursuant to ORCP 9 G<br>☒ E-mail copy, as a courtesy only<br>☒ OJD EFILING SYSTEM, if registered at the party's email address as recorded on the date of service in the eFiling system, pursuant to UTCR 21.100.<br>☐ Other |

Page 2 -    Certificate of Service

4844-7362-3766.2

|  |  |
|---|---|
| CHRIS GILMORE, OSB #980570<br>Multnomah County Attorney's Office<br>501 SE Hawthorne Blvd., Ste. 500<br>Portland, OR 97214<br>Telephone: (503) 988-3138<br>Facsimile: (503) 988-3377<br>Email: chris.gilmore@multco.us<br><br>*Attorney for Multnomah County and Michael Reese* | ☐ First-class mail, postage prepaid<br>☐ Facsimile, pursuant to ORCP 9 F<br>☐ Hand-delivery<br>☐ Overnight courier, delivery prepaid<br>☐ E-mail, pursuant to ORCP 9 G<br>☒ E-mail copy, as a courtesy only<br>☒ OJD EFILING SYSTEM, if registered at the party's email address as recorded on the date of service in the eFiling system, pursuant to UTCR 21.100.<br>☐ Other |

DATED:  February 8th, 2021.

*s/ John C. Clarke*
Attorneys for Plaintiffs

Page 3 -    Certificate of Service

4844-7362-3766.2