ELLEN F. ROSENBLUM
Attorney General
DREW K. BAUMCHEN  #045032
JILL SCHNEIDER  #001619
Senior Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4700
Fax: (503) 947-4791
Email:  Drew.Baumchen@doj.state.or.us
        Jill.Schneider@doj.state.or.us

Attorneys for Defendant Terri Davie

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PHILIP WOLFE, KATALINA DURDEN, MELISSA LEWIS, JUNIPER SIMONIS, individually, and DISABILITY RIGHTS OREGON, an Oregon nonprofit and advocacy corporation,<br><br>        Plaintiffs,<br><br>    v.<br><br>CITY OF PORTLAND, a municipal corporation; TED WHEELER, in his official capacity; CHUCK LOVELL, in his official capacity; MULTNOMAH COUNTY, a political subdivision of the State; MICHAEL REESE, in his official capacity; TERRI DAVIE, in her official capacity; ALEJANDRO MAYORKAS, in his official capacity; CHAD WOLF, in his individual capacity; DONALD WASHINGTON, in his individual and official capacity; and DOES 1-100, individual and supervisory officers of local, state, and federal government<br><br>        Defendants. | Case No.  3:20-cv-01882-SI<br><br>DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

Page i -    DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
            TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
        DB7/mm8/38300472                    Department of Justice
                                        1162 Court Street NE
                                        Salem, OR 97301-4096
                                    (503) 947-4700 / Fax: (503) 947-4791

# TABLE OF CONTENTS

A.   Factual and Procedural Outline.................................................................................. 1

B.   Plaintiffs seek an extraordinary remedy, one that carries a heightened burden of proof, and is particularly disfavored............................................................................ 5

C.   Plaintiffs cannot show a likelihood of success on their ADA claim................................. 7

    1.   OSP had no notice of the specific need for accommodation.......................................... 8

    2.   The existing exigent circumstances nullify any ability to accommodate unknown disabilities............................................................................................................. 10

    3.   The requested relief is not reasonable. ..................................................................... 11

        a.   Accommodations for hearing-impaired persons in crowds. .................................. 11

        b.   "Bull rush" crowd control maneuvers................................................................ 12

        c.   Providing notice of alternate methods of egress for crowds................................. 13

        d.   Unilateral ban of the use of chemical munitions in crowds.................................. 13

        e.   Strobe lights in crowds................................................................................... 14

        f.   Separating people with disabilities from their assistants in crowds. ...................... 15

D.   Plaintiffs cannot show a likelihood of success on their First Amendment Claim. ........... 15

E.   Plaintiffs cannot show a likelihood of success on their Fourth Amendment Claim......... 16

F.   Plaintiffs cannot show they suffer irreparable harm in the absence of a preliminary injunction. ............................................................................................................... 17

G.   The balance of equities does not weigh in favor of an injunction. ................................. 17

H.   Plaintiffs' requested injunction is not in the public interest. ........................................ 18

CONCLUSION........................................................................................................... 18

DB7/mm8/38300472
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

# TABLE OF AUTHORITIES

**Cases**

*Adams-Chevalier v. Spurlock*, 2017 WL 5665149 *6 (D.Colo. 2017) ........................................ 10
*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .................................. 17
*Anderson v. U.S.*, 612 F.2tjd 1112 (9th Cir. 1980) ...................................................................... 6
*Avila v. City of Visalia*, 2010 WL 4483393, at *3 (E.D. Cal. Nov. 1, 2010)................................. 10
*Bingham v. Oregon Sch. Activities Ass'n*, 24 F. Supp. 2d 1110 (D. Or. 1998)...................... 6, 11
*Chalk v. U.S. Dist. Court*, 840 F.2d 701 (9th Cir. 1988) ............................................................. 5
*City & Cnty. Of San Francisco, Cal. v. Sheehan*, 575 US 600 (2015) ........................................ 7
*City of Los Angeles v. Lyons*, 461 U.S. 95, (1983) ................................................................... 15
*Cty. of Los Angeles v. Mendez*, ––– U.S. ––––, 137 S. Ct. 1539, 1546-47 (2017) ...................... 16
*Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399 (9th Cir.1993)............................................. 6
*Dunlap v. City of Sandy*, No. 3:17-CV-01749-YY, 2018 WL 4782263, at *4 (D. Or. June 4, 2018) .............................................................................................................................. 7
*Gammage v. West Jasper School Bd.*, 179 F.3d 952 (5th Cir.1999) ............................................ 9
*Graham v. Connor*, 490 U.S. 386 (1989) ........................................................................... 16, 18
*Hainze v. Richards 207 F.3d 795 (5th Cir. 2000)* .............................................................. 7, 10
*Headwaters Forest Def. v. Cnty. of Humboldt*  276 F.3d 1125 (9th Cir. 2002) .......................... 16
*Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928 (7th Cir.1995) .................................. 8
*Hicks v. City of Portland*, No. CV 04-825-AS, 2006 WL 3311552, at *10 (D. Or. Nov. 8, 2006) ................................................................................................................................ 18
*Hill v. Colorado*, 530 U.S. 703 (2000) .................................................................................... 17
*Johnson v. Gambrinus Co.*, 116 F.3d 1052 (5th Cir.1997)......................................................... 11
*Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61 (3d Cir.1996)......................... 8
*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) ....................................................................... 6
*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, (9th Cir. 2009) ....... 6
*Mazurek v. Armstrong*, 520 U.S. 968 (1865) ........................................................................... 6
*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996). ........................................................................ 17
*Meghrig v. KFC W., Inc.*, 516 U.S. 479 (1996) ........................................................................ 5
*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005).................................................... 15, 18
*Midgett v. Tri–Cnty. Met. Trans. Dist. of Or.*, 254 F.3d 846 (9th Cir.2001) ............................ 17
*Oregon Sch. Activities Ass'n*, d.24 F. Supp. 2d 1110 (D. Or. 1998) ......................................... 11
*Randolph v. Rodgers*, 170 F.3d 850 (8th Cir.1999).................................................................. 8
*Reed v. LePage Bakeries, Inc.*, 244 F.3d 254 (1st Cir.2001)...................................................... 9
*Seaman v. CPSH, Inc.*, 179 F.3d 297 (5th Cir.1999)................................................................. 9
*Sheehan v. City & Cnty. of San Francisco*, 743 F3d 1211 ........................................... 7, 8, 9, 10
*Stanley v. University of Southern California*, 13 F.3d 1313 (9th Cir.1994). .............................. 6
*Taylor v. Schaffer*, 2015 WL 541058 (2015) ............................................................................ 9
*Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985) ........................................................................ 16
*Thomas v. Sacramento Cty.*, No. 215CV01952TLNEFB, 2017 WL 550052, at *5 (E.D. Cal. Feb. 10, 2017) .............................................................................................................................. 9
*Wilson v. City of Southlake,* 936 F.3d 326 (5th Cir. 2019) ...................................................... 10
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................................................... 6

**Statutes**

Oregon House Bill 4208………………………………………………………………………………...13
ORS 166.015………………………………………………………………………………..…………13

Page iii -   DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
              TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DB7/mm8/38300472                         Department of Justice
                                          1162 Court Street NE
                                          Salem, OR 97301-4096
                                     (503) 947-4700 / Fax: (503) 947-4791

**United States Code**

42 U.S.C. § 12132 ................................................................................................................. 7

**Constitutional Provisions**

First Amendment ................................................................................................. passim

**Other**

OSP Mobile Response Team Standard Operating Procedures Manual ................................ passim

OSP Use of Force Policy ......................................................................................... passim

OSP Mobile Response Team Policy ......................................................................... passim

Page iv -   DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
            TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DB7/mm8/38300472                    Department of Justice
                                   1162 Court Street NE
                                   Salem, OR 97301-4096
                            (503) 947-4700 / Fax: (503) 947-4791

Plaintiffs seek this Court to enjoin crowd control measures utilized at times by the Oregon State Police ("OSP"). Because those measures are a necessary component of OSP's obligation to protect the safety of the general public, and because the measures are not in violation of the First or Fourth Amendments, and do not violate the provisions of the Americans with Disabilities Act, this Court should deny Plaintiffs' motion. Defendant requests that, in reviewing this response to Plaintiffs' Motion for a Preliminary Injunction [ECF 35] (Feb. 8, 2021), the Court consider the declarations of OSP Lieutenant Joey Pollard (March 4, 2021) and Sergeant Cameron Bailey (March 11, 2021), and exhibits thereto, submitted herewith.

A.      **Factual and Procedural Outline**

Plaintiffs craft their position as an attempt to arrest perceived assaults on their right to protest. OSP, through Terrie Davie in her official capacity as Superintendent for the Oregon State Police, respectfully submits that is an incorrect framing of the relevant issues. The crowd control measures used by OSP at all relevant times were not utilized to interfere with "protests" – the measures were used to attempt to curtail the physical property damage and injuries inflicted during unlawful assemblies. The protests which began following the death of George Floyd were, at the relevant times, violent, unlawful, and in no way reflected the long and proud history of people, including those with disabilities, exercising their right to peacefully protest. It is against that tumultuous background that Plaintiffs' motion must be considered.

Starting on May 30, 2020, OSP's Mobile Response Team, ("MRT") was deployed into the City of Portland to assist the Portland Police Bureau ("PPB") in dealing with the large-scale demonstrations. (Declaration of Oregon State Police Lieutenant Joey Pollard, ¶ 2). These protests often turned violent later at night in conjunction with the violence directed at the responding police. The MRT is a unit of OSP troopers that train together, have specialized equipment and tactics, and operate to respond to significant events calling for a law enforcement response, including the simple presence. (*Id.*). The mission of the MRT is to effectively deal with civil unrest or the potential for civil unrest through the use of specialized training, equipment, and

Page 1 -      DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
             TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
             DB7/mm8/38300472              Department of Justice
                                          1162 Court Street NE
                                          Salem, OR 97301-4096
                                    (503) 947-4700 / Fax: (503) 947-4791

tactics. (*Id.,* Ex. 201, MRT Standard Operating Procedures Manual). MRT operations are governed by state and federal law, and by OSP policies including its Use of Force policy and the MRT Standard Operating Procedures Manual (*Id.,* ¶ 4). The manual has the force and effect of policy in all aspects of crowd control. (*Id.*).[1] Each MRT member is provided a copy of the manual, its contents are reviewed with each member upon their assignment to the MRT, and each member is required to maintain a complete and up-to-date manual.

Throughout the summer and fall of 2020, MRT squads were confronted with property damage and looting, setting of fires (including attempts to incinerate buildings), injuries to citizens, and injuries to police officers. (*Id.,* ¶ 8). Almost every one of these occasions resulted in the declaration of a riot and/or unlawful assembly. (*Id.*). For OSP's MRT, coordinated responses to large-scale demonstrations and protests involve an Incident Command system. (*Id.,* 9).

The Incident Command is staffed by senior police officials, usually including at least one representative of each responding police agency, in a unified command center, which maintains visual observations (through real-time video feeds) and radio/phone communications with police commanders on the ground. (*Id.*). On most occasions that MRT was deployed to assist the City of Portland, the Incident Commander was a PPB official. (*Id.*).  Regardless of whether operational goals and directives come from a PPB or OSP Incident Commander, OSP troopers were (and are) always required to follow OSP policy and direct orders from OSP superiors**.** (*Id.*)**.**

On May 30, 2020, Portland Mayor Wheeler issued an 8:00 pm city-wide curfew and extended it to the evening of May 31, 2020 due to the escalating violence among the assembled crowds. (Bailey Decl., ¶ 5). Plaintiffs Wolfe and Lewis describe events occurring on May 31, 2020 in front of the Multnomah County Justice Center on SW 3rd between Madison and Main streets. Around 11 pm that night, PPB used a long-range acoustic device ("LRAD") to admonish the crowd, ordering them to move west into the park and that they could be subject to force

---

[1] MRT is also governed by the MRT policy, attached as Exhibit 203 to the Declaration of OSP Sergeant Cameron Bailey.

Page 2 -    DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
             TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DB7/mm8/38300472                    Department of Justice
                                   1162 Court Street NE
                                   Salem, OR 97301-4096
                            (503) 947-4700 / Fax: (503) 947-4791

and/or arrest if they failed to comply. (*Id.*). The Incident Commander authorized deployment of pepperballs[2] to deny access to the federal courthouse and disperse protestors from the scaffolding from which a bottle had been thrown at police. MRT members started taking projectiles from the crowd, including plastic bottles filled with unknown liquid, a large wooden baton, mortar-type fireworks, and laser devices pointed at police. (*Id.*).  Police were commanded to clear the streets and park; dispersal orders were given and CS gas and smoke canisters were deployed to protect police from serious injury. (*Id.*)

On June 30, 2020, police intelligence indicated that a "direct action" march toward the Portland Police Association (PPA) building on N Lombard Street would take place. Several nights earlier, an attempt had been made to unlawfully enter and set fire to the nearby PPB North Precinct building. (*Id.,* ¶ 6). MRT received information that 200-300 people were marching toward the PPA building, and that members of the crowd were wearing helmets and goggles, blocking traffic, and shining lasers toward police. (*Id.*). MRT members were assaulted with glass bottles, frozen water bottles, rocks of various sizes, and green lasers. (*Id.*).

The PPB LRAD began admonishing the crowd that it was an unlawful assembly and directed the protestors to move to the east or be subject to arrest or the use of force. (*Id.*).   Sgt. Bailey witnessed these repeated admonishments to be loud, clear, and easy to understand. (*Id.*) In coordination with PPB leadership, a plan was developed to push the crowd east, away from the PPA building. PPB officers formed a line across Lombard, with MRT members moving behind, parallel to the crowd, to prevent protestors from going south and circling behind police lines. (*Id.*). The north avenues were left open to allow egress to both the east and north. (*Id.*). Nonetheless, as MRT squads moved east to Fenwick Avenue, protestors moved around the

---

[2]        A "pepperball" launcher is very similar to a paint ball gun. Instead of deploying a paint round shelled in thin plastic, however, it deploys a dry powder mixture containing oleoresin capsicum ("OC" or pepper spray). Pepperballs deploy a very localized amount of non-lethal deterrent and are only used against individuals who may be presenting an immediate threat of harm or to deter access to a small area by any individual, by deploying the pepperballs against the ground or other fixed objects.

Page 3 -    DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
           TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

police line and started forming behind the MRT. (*Id.*). MRT then pulled back to the PPA building to disengage with the crowd and attempt to de-escalate tensions. The crowd moved west, placing trash cans and dumpsters in the street and lighting some on fire. (*Id.*). The Incident Commander authorized the use of CS[3] gas and admonishments from the LRAD continued to be given. Some protestors began shooting "Roman candle" fireworks at police. (*Id.*).

On August 6, 2020, MRT was engaged in crowd control activities around the PPB East Precinct on SE 106th Avenue, including a dynamic maneuver[4] around 11:02 pm. (*Bailey Decl.,* ¶ 7).

On August 8, 2020, MRT was deployed to assist PPB with crowd control activities at the Penumbra Kelly Building at E Burnside and 47th Avenue around 1:00 a.m. (*Id.,* ¶ 8).

On September 5-6, 2020, MRT deployed to assist PPB in preventing a "direct action" march planned from Ventura Park to the PPB East Precinct on SE 106th Avenue. (*Id.,* ¶ 9). A significant protest event was anticipated that night because it was the "100th night" of consecutive protests occurring in the City of Portland following the death of George Floyd. MRT was assigned, through the PPB Incident Commander, to keep any group leaving Ventura Park from marching in the street east of SE 112th Avenue, and away from the East Precinct. (*Id.*). The MRT received intelligence updates that the crowd in Ventura Park was estimated at 500 or more people, including numerous individuals wearing masks and carrying shields. (*Id.*). The group appeared to move as a unit and was blocking vehicular traffic.  PPB admonished the crowd with its LRAD that the march would not be allowed to continue to the East Precinct and that "time, place, and manner" restrictions were being placed on the assembly. (*Id.*). The LRAD ordered the marchers to return to Ventura Park using the sidewalks. (*Id.*).

---

[3]    CS gas is an aerosol of a volatile solvent and 2-chlorobenzalmalononitrile, which is a solid compound at room temperature. OSP has limitations on the use of CS gas, which were in place prior to the passage and implementation of HB 4208, and require announcements prior to the deployment of CS gas via hand-tossed or launchable (40mm) canisters. (*Pollard Decl.,* ¶ 17 )

[4]    A dynamic movement is a traditional advance of a line of police officers.  See Section 3(b) for further discussion on dynamic maneuvers.

Page 4 -    DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The crowd did not comply with the order. Instead, the march proceeded to within 60-80 feet of the police line, and MRT began receiving projectiles from the crowd as well as the use of green lasers directed at police officers' eyes. (*Id.*). At 9:15 p.m., a "Molotov cocktail"-type device was thrown at police, bursting into a fireball on the ground between the police and protestors. A protestor who was walking in between the police line and protestor group caught on fire, which was extinguished by the MRT with a fire extinguisher. (*Id.*). More Molotov cocktails were thrown toward the police line as well as commercial-grade fireworks. (*Id.*). The Incident Commander declared the assembly a riot and the crowd was ordered to disperse. (*Id.*). After several more admonishments, MRT deployed CS gas to disperse the crowd. (*Id.*).

On September 26, 2020, the PPB declared an unlawful assembly and rushed the protestors. MRT was deployed into downtown Portland and engaged in crowd control activities. (*Bailey Decl..,* ¶ 10). These events of May 31, June 30, August 6, August 7-8, and September 26, 2020 described by the plaintiffs as infringements on their rights to protest were not peaceful protest gatherings; they were unstable, violent, tumultuous events, putting community property and lives at risk. They were, by definition, exigent circumstances.[5]

**B.    Plaintiffs seek an extraordinary remedy, one that carries a heightened burden of proof, and is particularly disfavored.**

A preliminary injunction can take one of two forms: prohibitory or mandatory. A prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988). A mandatory injunction "orders a responsible party to take action." *Meghrig v. KFC W., Inc.*, 516 U.S. 479 (1996). A mandatory injunction "goes well beyond simply maintaining the status quo," requires a heightened burden of proof, and is "particularly

---

[5]  Those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts. *United States v. McConney*, 728 F. 2d 1195, 1199 (9th Cir.), *cert. denied,* 469 U.S. 824 (1984).

Page 5 -    DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
            TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
            DB7/mm8/38300472                        Department of Justice
                                                    1162 Court Street NE
                                                    Salem, OR 97301-4096
                                                (503) 947-4700 / Fax: (503) 947-4791

disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (*quoting Anderson v. U.S.*, 612 F.2d 1112, 1114 (9th Cir. 1980)). In general, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Id.* (*quoting Anderson*, 612 F.2d at 1115). *See also Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion") (*quoting Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

A "mandatory" injunction requires a heightened standard.  In *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1979), the court outlined the distinction as follows: "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo Pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." "Courts are more reluctant to grant a mandatory injunction than a prohibitory one and ... generally an injunction will not lie except in prohibitory form. Such mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation damages." *Bingham v. Oregon Sch. Activities Ass'n*, 24 F. Supp. 2d 1110, 1115 (D. Or. 1998), *citing Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir.1993); *Stanley v. University of Southern California*, 13 F.3d 1313, 1320 (9th Cir.1994).

In this matter, Plaintiffs do not want to preserve the status quo; they want this Court to permanently prohibit the use of specified crowd control measures regardless of the critical need for them in appropriate circumstances. They are not entitled to such a remedy. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (*quoting Mazurek v. Armstrong*, 520 U.S. at 972 ). A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a

Page 6 -    DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DB7/mm8/38300472                        Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4)
that an injunction is in the public interest. *Id*. at 20. Plaintiffs cannot sustain their burden of proof
on any of the required elements.

**C.    Plaintiffs cannot show a likelihood of success on their ADA claim.**

Generally, the ADA applies broadly to services, programs, or activities provided by a
public entity, including police. 42 U.S.C. § 12132*; see also Sheehan v. City & Cnty. of San
Francisco*, 743 F3d 1211, 1232*, rev'd in part, cert. dismissed in part sub nom. City & Cnty. Of
San Francisco, Cal. v. Sheehan*, 575 US 600, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015). But not
all circuits have extended the application of the ADA to arrests or other police activities
involving exigent circumstances. In *Hainze v. Richards*, the Fifth Circuit held that "Title II does
not apply to an officer's on-the-street responses to reported disturbances or other similar
incidents, whether or not those calls involve subjects with mental disabilities, prior to the
officer's securing the scene and ensuring that there is no threat to human life." 207 F.3d 795, 801
(5th Cir. 2000). The court reasoned that "[t]o require the officers to factor in whether their
actions are going to comply with the ADA, in the presence of exigent circumstances and prior to
securing the safety of themselves, other officers, and any nearby civilians, would pose an
unnecessary risk to innocents." *Id.*

Moreover, "[t]he Supreme Court has not yet decided whether Title II of the ADA applies to
arrests." *Dunlap v. City of Sandy*, No. 3:17-CV-01749-YY, 2018 WL 4782263, at *4 (D. Or.
June 4, 2018*), report and recommendation adopted as modified*, No. 3:17-CV-01749-YY, 2018
WL 4778042 (D. Or. Oct. 3, 2018). The Court granted certiorari in *Sheehan* to address that very
question. *See City & Cnty. of San Francisco, Cal. v. Sheehan*, 575 U.S. 600 (2015). But because
all parties in that case ultimately accepted that the ADA applied to arrests and did not argue the
contrary view, the court declined to reach that question. *Id.* at 1773. The court's opinion and the
dissent by Justices Scalia and Kagan make clear, however, that the Court wanted to resolve

Page 7 -    DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DB7/mm8/38300472                          Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

whether the ADA's reasonable accommodations requirement applies to officers facing violent circumstances. *See id.* at 1778-79.

As discussed at length in Defendant's Motion to Dismiss, filed simultaneously, as a threshold matter, plaintiffs take for granted that Title II of the ADA extends to situations where police face volatile or violent circumstances involving multiple persons, *i.e.,* riots. But the holding in *Sheehan* does not extend that far, and even if it did, the Supreme Court has yet to decide whether that interpretation of the ADA is correct.

Indeed, even *Sheehan* recognizes that that "exigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment." *Sheehan v. City & Cty. of San Francisco*, 743 F.3d at 1232.

Plaintiffs have thus not shown their proposed accommodations to be reasonable in light of the totality of the exigent circumstances that exist when the police conduct they seek to limit occurs.  However, even if Plaintiffs have made the required initial showing of reasonableness, OSP's proffered evidence demonstrates that Plaintiffs' requested injunction would impose an undue hardship and fundamentally interfere with their public safety mission when responding to riots and unlawful assemblies.  *See Zukle v. Regents of U. of California,* 166 F.3d 1041, 1047 (9th Cir. 1999); *Sheehan,* 743 F.3d at 1233.  Therefore, even if the ADA applies in the context of a riot or civil disturbance, and OSP maintains it should not, Plaintiffs' claims fail because they cannot sustain those claims under the provisions and requirements of the ADA.

### 1.    OSP had no notice of the specific need for accommodation.

Under the accommodation provisions of the ADA, public entities such as OSP are not required to "guess" an individual's need for an accommodation. *See, e.g., Randolph v. Rodgers,* 170 F.3d 850, 858 (8th Cir.1999); *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 69 (3d Cir.1996) (stating that a defendant is not "expected to accommodate disabilities of which it is unaware"); *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 934 (7th Cir.1995) (stating that the "ADA does not require clairvoyance"). Rather, the general rule in

Page 8 -    DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DB7/mm8/38300472                    Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

cases under both Titles I and II of the ADA, is that a plaintiff must show "that the [defendant] knew not only of the [individual's] disability, but also of the physical or mental limitations resulting therefrom." *See Seaman v. CPSH, Inc.*, 179 F.3d 297, 300 (5th Cir.1999); *Gammage v. West Jasper School Bd.*, 179 F.3d 952, 954 (5th Cir.1999). "Because an [individual's] disability and concomitant need for accommodation are often not known to the [defendant] until the [individual] requests an accommodation, the ADA's reasonable accommodation requirement usually does not apply unless triggered by a request from the [individual]." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir.2001) (emphasis supplied).

The *Sheehan* court didn't address the issue of knowledge because it was clear that the officers knew of the individual plaintiff's disability by the time that they reentered the plaintiff's room. *Sheehan,* 743 F.3d at 1218.  Similarly, in a case out of Vermont that relied on *Sheehan*, the court declined to dismiss ADA claims, because the jury could find that the officer did not face an exigency when approaching the individual, *knew of their disability,* could reasonably accommodate the disability and then failed to accommodate that disability. *Taylor v. Schaffer*, 2015 WL 541058 at *8 (2015). For this matter, on the facts presented to this Court, OSP had no knowledge of the specified disabilities and had received no individualized requests for the various accommodations they contend should have been provided.[6]

The knowledge requirement can also be tied to the Title II element that the discrimination was by reason of the person's disability. One district court in California stated that the plaintiff had "to plead that his known disability was a motivating factor in the non-accommodation of his arrest, or that the deputies *knew of and were motivated by* his investigation with ADA compliance." *Thomas v. Sacramento Cty.*, No. 215CV01952TLNEFB, 2017 WL 550052, at *5 (E.D. Cal. Feb. 10, 2017) (emphases added); *see also Avila v. City of Visalia*, 2010 WL 4483393,

---

[6] In support of their motion for a preliminary injunction, Plaintiffs offer a letter to former OSP Supt. Travis Hampton dated Sep. 4, 2020.  Decl. of Tom Stenson (Feb. 5, 2021) [ECF 44], Ex. 1, 7.  This letter is so vague and generalized it cannot be interpreted as a reasonable request for accommodations.

Page 9 -    DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

at *3 (E.D. Cal. Nov. 1, 2010) (complaint insufficient to state an intentional discrimination claim because "[a]lthough the FAC alleges that Plaintiff told 'Defendants, or some of them' that she had Parkinson's Disease, the FAC does not indicate which of the Defendants were purportedly aware of Plaintiff's disease or which Defendants failed to consider Plaintiff's disease in deciding to place Plaintiff under arrest.").

> ### 2.   The existing exigent circumstances nullify any ability to accommodate unknown disabilities.

Plaintiffs also have failed to demonstrate the reasonableness of the accommodations under the relevant context.  Plaintiffs take for granted that the requested accommodations are reasonable even where police face volatile or violent circumstances involving numerous persons. But the holding in *Sheehan* does not extend that far.

Plaintiffs appear to misunderstand the legal effect of exigent circumstances on <u>crowd control measures</u>, which is the precise issue here. None of their cited caselaw regarding exigent circumstances support their facts or claims in this lawsuit. In *Sheehan, supra*, the police entered the home of a mentally ill woman without a warrant. 743 F.3d at 1233 (jury could find officers had sufficient opportunity to wait for backup and employ "less confrontational tactics.")  The plaintiff in *Wilson v. City of Southlake,* 936 F.3d 326, 331 (5th Cir. 2019)[7] was a lone, 8-year-old disruptive child confronted by the police at the child's school ("There was no potentially life-threatening situation or threat to human life"). In *Adams-Chevalier v. Spurlock,* the plaintiffs were two family members in their home.  2017 WL 5665149 *6 (D.Colo. 2017) ("The area at this point was secure.")  None of those cases involved the need to gain control over unlawful assemblies and riotous crowds. None of those cases stand for the proposition that riots and unlawful assemblies do not constitute exigent circumstances. None of those cases hold that

---

[7]  *Wilson* is a 5th Circuit case.  The Fifth Circuit does not recognize that Title II of the ADA applies in exigent circumstances. *See Hainze, supra*, 207 F.3d at 797, holding that officers do not first have to consider whether their actions will comply with the ADA 'in the presence of exigent circumstances and prior to securing the safety of themselves'. The *Wilson* court recognized and distinguished the facts of *Hainze. Wilson*, 936 F.3d at 331.

police cannot utilize reasonable crowd control measures in highly exigent circumstances under a general fear that persons with disabilities *could* be disproportionately affected.

Plaintiffs argue that because the Portland protests were anticipated events, OSP and other defendants should have planned for ways to accommodate their disabilities. That argument is contradicted by the statements of multiple police officials and brings to mind Mike Tyson's comment when he was asked whether he was worried about his fight plan with Evander Holyfield: *"Everyone has a plan until they get punched in the mouth."* The events that occurred in the summer and fall of 2020 were volatile, dangerous, unpredictable and definitively exigent. That exigency defines the law, and OSP complied with existing law at all times.

### 3.    The requested relief is not reasonable.

Under the ADA, Plaintiffs have the burden of proving that a requested modification is reasonable. "Plaintiff meets this burden by introducing evidence that the requested modification is reasonable in the general sense, that is, reasonable in the run of cases." *Bingham v. Oregon Sch. Activities Ass'n*, 24 F. Supp. 2d 1110, 1116 (D. Or. 1998), *citing Johnson v. Gambrinus Co*., 116 F.3d 1052, 1059 (5th Cir.1997). The demanded accommodations are not reasonable.

### a.    Accommodations for hearing-impaired persons in crowds.

Most of the events confronted by MRT this past spring and summer have been unique as to mood, pace, and "feel." Every night was different, as was the crowd encountered by police each night. (*Pollard Decl,*, ¶ 14 ). Placing an ASL interpreter in front of a line of police officers would place the interpreter at extreme risk of harm and expose them to projectiles and other violent conduct by rioters. (*Id.*). Additionally, an ASL interpreter at ground level would only be visible to those at the front of a crowd of protestors. Visual messaging systems are also impractical - the mobility limitations both in staging at an appropriate location and placing a visual messaging system (electronic sign board or otherwise) where it can be seen impair any utility of a visual messaging system when crowd control measures are anticipated. Further, the protests/demonstrations of the kind experienced by the parties in this matter often involved

Page 11 -    DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
       TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
       DB7/mm8/38300472                     Department of Justice
                                     1162 Court Street NE
                                     Salem, OR 97301-4096
                                (503) 947-4700 / Fax: (503) 947-4791

marches and roving groups. OSP does not expect that fundamental fact to change for future protests.

### b.    "Bull rush" crowd control maneuvers.

OSP employs two different tactics that might be what Plaintiffs are describing as a "bull rush": the "dynamic" movement, or a "rabbit" arrest procedure. A dynamic movement is a traditional advance of a line of police officers (though a dynamic can also move as a column in certain scenarios). *(Id., ¶ 15)*. A dynamic movement is used to disperse a crowd most often after dispersal warnings have been given. Officers move deliberately and in some level of unison to maintain the integrity of the line. When individuals resist the dispersal orders and the line advances, through words or conduct indicating intentional resistance, MRT members may push such individuals with a two-handed grasp on their batons, along with instructions to "MOVE!!" *(Id.)*.  When MRT members encounter persons with apparent disabilities or mobility limitations during a dynamic movement, they will simply go around them if they do not present a threat to police or others.  *(Id.)*

The rabbit, on the other hand, is a targeted arrest of an individual, usually a person who is observed to engage in violent or threatening conduct, or inciting others to do so. *(Id.,)*. In order to effect a "rabbit" arrest, a few (usually two) MRT members will move forward to encircle the suspect/arrestee and prevent others from interfering with the arrest, while a third trooper physically arrests the person and pulls them back behind the police line for further subduing (as needed) and processing. *(Id.)*.

Taking away MRT's ability to conduct dynamic movements to disperse unlawful assemblies and riotous crowds would remove an important—essential, in fact—tool from the available resources and options to manage civil disturbances. *(Id.)*.  The "rabbit" arrest technique is designed to minimize the risk of injuries to arrestees, the arresting officers, and other citizens. *(Id.)*.  When MRT members move to make a targeted arrest of an individual in a riotous crowd, often other individuals will physically interfere with or seek to prevent the arrest from taking

Page 12 -   DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
             TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
             DB7/mm8/38300472                        Department of Justice
                                                     1162 Court Street NE
                                                     Salem, OR 97301-4096
                                             (503) 947-4700 / Fax: (503) 947-4791

place. (*Id.*).  This puts police in the untenable situation of trying to take control over another individual (the arrestee) while also seeking to defend themselves from violence at the hands of others. Deploying assisting officers to encircle and protect the arresting officer and arrestee actually increases the overall safety and security of making the arrest. (*Id.*).

> ### c.    Providing notice of alternate methods of egress for crowds.

Plaintiffs do not explain how they believe police should go about "identify[ing] and inform[ing]" protestors of accessible avenues of egress in any given situation. Declarations of unlawful assembly/riot and orders to disperse come at unplanned times and/or locations. (*Pollard Decl.*, ¶ 16). It would not be practical for police to adequately assess all avenues of dispersal, evaluate accessibility considerations with respect to each, and effectively communicate that information in the context of a dynamic and typically violent confrontation with a riotous crowd. Time constraints and other exigencies alone preclude such an approach. (*Id.*).

There is no evidence that MRT members have used force to disperse crowds in a way that trapped or otherwise prevented those in the crowd from reasonably dispersing the area. To the extent OSP has ever blocked or otherwise sought to limit movement of a crowd being dispersed, it was only from the direction of the advance or line, seeking to prevent the continuation of an unlawful march, or movement toward a target of "direct action". (*Id.*)  Alternate routes of egress remain on satellite streets and, when dispersal orders are given, they include directions on where to go. (*Id.*)

> ### d.    Unilateral ban of the use of chemical munitions in crowds.

MRT uses non-lethal force to disperse groups or crowds only after the declaration of an unlawful assembly or riot is made pursuant to ORS 131.675 and appropriate announcements have been given. (*Id.*, ¶ 11). Pursuant to House Bill 4208[8] and consistent with agency practice prior to its going into effect, OSP/MRT did not deploy CS gas until after an unlawful assembly

---

[8] Oregon House Bill 4208, limiting use of teargas to riots as defined in ORS 166.015 (effective June 30, 2020):
https://olis.oregonlegislature.gov/liz/2020S1/Downloads/MeasureDocument/HB4208/Enrolled

Page 13 -   DEFENDANT OREGON STATE POLICE SUPERINTENDENT TERRI DAVIE'S RESPONSE
             TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
             DB7/mm8/38300472                        Department of Justice
                                                     1162 Court Street NE
                                                     Salem, OR 97301-4096
                                                (503) 947-4700 / Fax: (503) 947-4791

or riot had been declared and repeated announcements that tear gas would be deployed had been given. (*Id.*).

CS gas is an important tool for any law enforcement agency dealing with civil disorder or riot situations. (*Id.*, 17). It works very well for its intended purpose, *i.e.*, getting people to stop doing what they are doing and leave the area. (*Id.*).  OSP has limitations on the use of CS gas, which were in place prior to the passage and implementation of HB 4208, and require announcements prior to the deployment of CS gas.  (*Id.*).

To the extent plaintiffs here also seek to limit the use of more localized crowd control measures that involve the deployment of OC powder (pepperballs), those munitions only deploy very localized amounts of chemical irritant and are typically used to deter specific conduct or bad actors who present an imminent threat to the police or others. (*Id.*, ¶ 17). As such, pepperballs are unlikely to have a chemical effect on other than their intended targets. (*Id.*).

### e.    Strobe lights in crowds.

OSP does not possess in its equipment inventory "strobe lights," *per se*. (*Id.*, ¶ 18).  Some MRT members carry law enforcement-type flashlights that have a "strobe" feature. The tactical purpose of a trooper using the strobe feature on their flashlight is to disorient the person it is aimed at and make it difficult for them to concentrate and proceed with an unlawful objective. (*Id.*). Strobe lights can be a particularly effective form of non-lethal self-defense for an individual trooper facing an imminent threat to their safety, without having to resort to going "hands-on" or other, physical interventions. (*Id.*) In plaintiff Lewis' recording of an MRT member using the strobe feature of his flashlight,[9] the trooper ceased the use of the strobe feature when he was told that Lewis has epilepsy, thereby providing the remedy Plaintiffs demand. (*Id.*). When a disability is made known and the accommodation is made, there is no violation of the ADA.

---

[9] (*Lewis Decl.* [ECF 42], Ex. 2 (video))

Page 14 -   DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DB7/mm8/38300472                    Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

f.      **Separating people with disabilities from their assistants in crowds**.

To the extent that an OSP trooper, through a particularized intervention or more-general crowd control operations, would separate persons with disabilities from their assistants, interpreters, sighted guides, or service animals, the only occasion where such conduct would be purposeful, and not merely inadvertent, would be where either the person with a disability or their assistant would be subject to arrest or a targeted use of force to deter specific, illegal conduct. (*Pollard Decl.*, ¶ 19).  In the event that more general crowd control measures do end up separating persons with disabilities from their assistants or service animals, the separation is unintentional, and unavoidable given the exigencies of the situations crowd control measures are deemed necessary. This type of collateral consequence of exigency is not the proper subject for injunctive relief.  *City of Los Angeles v. Lyons,* 461 U.S. 95, 106 (1983) (in order to establish standing for an injunction against chokeholds, plaintiff had to establish that *all* police choke *any* citizen they encounter) (original emphasis).

**D.      Plaintiffs cannot show a likelihood of success on their First Amendment Claim**.

Plaintiffs assert that their First Amendment rights are impacted by OSP's use of crowd control measures. But there is no authority suggesting that protestors have an absolute right to protest at any time and at any place, or in any manner of their choosing. *Menotti v. City of Seattle,* 409 F.3d 1113, 1138–39 (9th Cir. 2005), (holding that an emergency order prohibiting access to portions of downtown Seattle, Washington, during the 1999 World Trade Organization (WTO) conference was constitutional.) As the *Menotti* court noted, Justice Stewart once observed that "[t]he guarantees of the First Amendment have never meant that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." *Id.* at 1155 *citing Greer v. Spock*, 424 U.S. 828, 836 (1976).

OSP does not, and would never, dispute that Plaintiffs have the right under the First Amendment to assemble lawfully and protest peacefully, though Plaintiffs would have this be the central issue in this case.  But Plaintiffs do not have the right to be part of unlawful assemblies

Page 15 -   DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
          TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DB7/mm8/38300472                    Department of Justice
                                   1162 Court Street NE
                                   Salem, OR 97301-4096
                                (503) 947-4700 / Fax: (503) 947-4791

and riots, nor do they have the right to impede OSP from carrying out the actions necessary to

control a crowd that has grown violent and is disobeying lawful orders to disperse.

**E.      Plaintiffs cannot show a likelihood of success on their Fourth Amendment Claim**.

In respect to the claims brought under the Fourth Amendment, OSP is controlled by the

factors set forth in *Graham v. Connor*, 490 U.S. 386 (1989).  Indeed, the *Graham* paradigm for

analyzing a Fourth Amendment claim is incorporated into OSP's policy manual. (Use of Force

Policy, attached to Pollard Decl. as Ex. 202). The *Graham* court cautioned that courts must allow

"for the fact that police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

necessary in a particular situation." *Id.* at 397. The determination of unreasonableness requires a

court to decide "whether the totality of the circumstances justified a particular sort of ... seizure,"

*Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985).

When the governmental interests at stake are substantial, a greater intrusion upon the

Fourth Amendment rights of the person may be justified. Conversely, when the governmental

interest is insubstantial, the application of even minimal force may be unreasonable. When

balancing the degree of force used against the governmental interests, "it is the need for force

which is at the heart of the [analysis]." *Headwaters Forest Def. v. Cnty. of Humboldt*  276 F.3d

1125, 1130 (9th Cir. 2002). Only information known to an officer at the time of the officer's

conduct is relevant to the analysis. *Cty. of Los Angeles v. Mendez*, —— U.S. ——, 137 S. Ct.

1539, 1546-47 (2017). In their motion for injunctive relief, Plaintiffs are asking this Court to

ignore that standard of analysis and rule unilaterally that certain crowd measures should never be

used. OSP has demonstrated that the methods used are appropriate in certain circumstances; this

Court should not intervene in that professional consideration and determine that OSP's policies

and sanctioned practices are *per se* unreasonable.

Page 16 -  DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DB7/mm8/38300472                          Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

**F.    Plaintiffs cannot show they suffer irreparable harm in the absence of a preliminary injunction.**

To prevail on a motion for injunctive relief, the Plaintiffs "must establish that irreparable harm is likely, not just possible[.]" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original). Plaintiffs cannot make such a showing – they are free to engage in engage in peaceful protests and to exercise their rights under both the First and Fourth Amendments. To sustain their claim, they must establish that is likely that they will continue to be subjected to crowd control measures. If that is their position, then they are representing to the court that it is likely they will continue to be involved in unlawful assemblies, which might require OSP to employ the kinds of crowd control measures Plaintiffs find offensive. Surely a representation that they will likely participate in future illegal activities, whether intentionally or not, does not entitle them to the mandatory injunction they are seeking.

Moreover, any isolated, past incidents of ADA violations do not support an inference that a plaintiff faces a real and immediate threat of continued, future violations of the ADA in the absence of injunctive relief. *See Midgett v. Tri–Cnty. Met. Trans. Dist. of Or.*, 254 F.3d 846, 850 (9th Cir.2001). Plaintiffs appear to be arguing that OSP should rely on the assumption that all protests will turn into riots and proactively abstain from exercising their duty to protect the public from such tumult.

**G.    The balance of equities does not weigh in favor of an injunction.**

The Supreme Court has declared that "[i]t is a traditional exercise of the States' police powers to protect the health and safety of their citizens." *Hill v. Colorado*, 530 U.S. 703, 714 (2000); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). As with every exercise of the state's police powers, rules that provide specific guidance to enforcement authorities serve the interest in evenhanded application of the law. No one could seriously dispute that the government has a significant interest in maintaining public order; indeed, this is a core duty that the government owes its citizens. In the face of violent riot, the

Page 17 -   DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
            TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DB7/mm8/38300472                     Department of Justice
                                    1162 Court Street NE
                                    Salem, OR 97301-4096
                            (503) 947-4700 / Fax: (503) 947-4791

Ninth Circuit agreed that Seattle had a duty to restore order and to ensure the safety of WTO delegates and the city's residents. *Menotti v. City of Seattle*, 409 F.3d 1113, 1131 (9th Cir. 2005).

When Plaintiffs' rights to be involved in protests that develop into unlawful assemblies and riots are compared to OSP's authority and duty to protect the health and safety of the broader community (including those who do not participate in the riot or share the views of the participants), Plaintiffs' demand for injunctive relief must fail.

**H.    Plaintiffs' requested injunction is not in the public interest**.

This District has already noted that the governmental interest in maintaining order and controlling a large, and unlawfully assembled crowd is substantial. *See Hicks v. City of Portland*, No. CV 04-825-AS, 2006 WL 3311552, at *10 (D. Or. Nov. 8, 2006) (dismissing a challenge to the legality of an arrest during an anti-war protest). Plaintiffs' requested relief would severely impact the ability of OSP, and all defendants, to attempt to maintain control over riotous and violent assemblies. Unilateral rules that certain crowd control measures are always illegal would impair OSP's ability to maintain order. On January 6, 2021, this nation witnessed what happens when the law enforcement agencies tasked with keeping crowds under control lack the necessary tools to keep control and protect the citizens they serve. OSP is already bound to observe the *Graham* factors under the Fourth Amendment – there is no need to neuter that analysis by proactively declaring broadly in an injunction that many legitimate crowd control measures are illegal.

## CONCLUSION

This Court should deny Plaintiffs' Motion for Injunctive Relief. If this Court enjoins the crowd control measures OSP, through defendant Terri Davie, considers necessary to protect the safety of the general public, it will place the Plaintiffs' unique and specialized needs above the public's interest. Plaintiffs' rights to engage in protests are not at issue in this matter; their rights to engage in illegal activity—including remaining unlawfully where other violent conduct is taking place—must cede to OSP's obligation to protect the greater community.

DB7/mm8/38300472                          Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

The crowd control measures sought to be enjoined are not in violation of the First or Fourth Amendments, and do not violate the reasonable accommodations requirements of the ADA. Accordingly, this Court should deny Plaintiffs' motion for a preliminary injunction.

DATED March __15__, 2021.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General


_s/ Drew K. Baumchen_
DREW K. BAUMCHEN #045032
JILL SCHNEIDER #001619
Senior Assistant Attorneys General
Trial Attorneys
Tel (503) 947-4700
Fax (503) 947-4791
Drew.Baumchen@doj.state.or.us
Jill.Schneider@doj.state.or.us
Of Attorneys for Defendant Terri Davie

Page 19 -  DEFENDANT OREGON STATE POLICE SUPERINTENDANT TERRI DAVIE'S RESPONSE
         TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DB7/mm8/38300472              Department of Justice
                             1162 Court Street NE
                             Salem, OR 97301-4096
                        (503) 947-4700 / Fax: (503) 947-4791