BRIAN M. BOYNTON
Acting Assistant Attorney General
SCOTT ERIK ASPHAUG
Acting United States Attorney
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
MICHAEL P. CLENDENEN (DC 1660091)
JORDAN L. VON BOKERN (DC 1032962)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:   (202) 353-0693
Fax:   (202) 616-8460

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| PHILIP WOLFE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF PORTLAND, a municipal corporation, *et al.*, <br><br> Defendants. | Case No. 3:20-cv-01882-SI <br><br> **DECLARATION OF GABRIEL RUSSELL** |

I, Gabriel Russell, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2.  I am the Federal Protective Service (FPS) Regional Director for Region 10. In that role, I supervise the Federal Protective Service in the states of Washington, Oregon, Idaho, and Alaska.

DECLARATION OF GABRIEL RUSSELL – 1

I also command the U.S. Department of Homeland Security (DHS) Rapid Deployment Force for Operation Diligent Valor in Portland Oregon.

3. Regular protests began in downtown Portland on May 26, 2020. The protests occurred on a daily basis, with largely peaceful protests occurring during the daytime. The daytime protests were regularly followed by nightly criminal activity in the form of vandalism, destruction of property, looting, arson, and assault, directed at federal property (Mark O. Hatfield Federal Courthouse, the Pioneer Federal Courthouse, the Gus Solomon Federal Courthouse, the Immigration and Customs Enforcement ("ICE") Building, and the Edith Green Wendall Wyatt Federal Office Building) and federal law enforcement officers.

4. In response to this increase in damage to federal property and assaults on federal law enforcement officers, DHS deployed more officers to Portland as part of Operation Diligent Valor, for the purposes of protecting federal buildings and property. All DHS law enforcement officers engaged in protecting federal facilities within Portland are doing so under the Secretary of Homeland Security's authority provided in 40 U.S.C. § 1315.

5. The level of violence occurring currently is significantly lower than it was during the May-October period. Currently, protest activity continues in Portland with several distinctions in location, frequency, crowd size, and espoused complaint by comparison to the height of activity over the summer 2020. Since November 1, 2020, the focus of the protests has shifted from the Hatfield Courthouse in downtown Portland to the ICE building two miles away in south Portland. They typically begin at 8:00 p.m. during the latter part of the week (Wednesday-Sunday) and are of a more general anti-government sentiment mainly directed at government immigration practices than were the earlier social justice protests. Most of the protests involve fewer than two hundred people, with some as small as ten to twelve people, making them much smaller than the summer 2020 protests. Some of the larger protests are held in conjunction with protests focused on the same issues in other areas of the country.

6. Since November 1, 2020 there has been a significant decline in violent activities associated with the protests around federal property along with an increase in the coordinated response efforts between federal and local law enforcement. During that time, there have been only nine protests declared unlawful due to violence activity which required the use of force by DHS law enforcement officers (warnings, compliance period, push-backs or other enforcement), with approximately 40-60 officers responding. That response resulted in the arrest of eighteen individuals for misdemeanor offenses and one felony charge for the destruction of government property, most of whom were simply cited and released. The felony charge was the result of the violent attack on the Hatfield Courthouse on the evening of March 11, 2021 after the security fence surrounding the courthouse was removed. In responding to the nine incidents, thirty-six law enforcement officers suffered various injuries.

7. In contrast, during the period from May 26, 2020 through October 31, 2020 there was daily violence that required DHS law enforcement officers to use force. Over 1,000 individuals were arrested during that time frame with Federal law enforcement officers arresting 147 and the Portland Police Bureau arresting 941. In addition, 219 federal law enforcement officers were injured responding to the violence.

DECLARATION OF GABRIEL RUSSELL – 2

8. When larger nationwide protests are publicized, federal law enforcement is able to prepare in advance for the associated protest activities at federal buildings in Portland. While these events are larger and may have more individuals becoming violent, the advanced planning enables federal law enforcement agencies to maintain better control, allowing for the larger peaceful protest to occur at the federal facilities while addressing violent activities. With smaller direct-action events, it is often not possible to engage in advanced planning due to limited publicity regarding the events and the spontaneous nature of the protests.

9. It is my understanding the Plaintiffs are seeking a Preliminary Injunction which would limit or place specific requirements on law enforcement officers while engaging in crowd control in Portland. These include the following:

   a. Cease using strobe lights;

   b. Provide communications, such as American Sign Language (ASL) interpreters and visual messaging systems, when conveying orders or other directions to people who are deaf or hard of hearing at protests;

   c. Cease the use of "bull-rushes" and similar practices which they claim do not provide people with disabilities adequate time or directions or provide adequate time and clear and consistent directions for individuals with disabilities to comply with lawful orders;

   d. Identify and inform protesters and others of accessible avenues of egress before dispersing a crowd or taking other actions that may place persons with disabilities in danger;

   e. Cease using chemical munitions that they allege negatively affects people with respiratory and inflammatory disabilities, and that negatively affects service animals, and remove remaining residue from areas where used; and

   f. Cease separating people with disabilities from their assistants, interpreters, sighted guides and/or service animals.

10. With respect to the above items:

   a. Although some individual DHS law enforcement officers' flashlights have a 'strobe' function, DHS does not deploy any other equipment in Portland that has a strobe function, and DHS has not instructed its officers during Portland operations to use the 'strobe' features;

   b. DHS officers in Portland are not able to provide its communications through ASL because the safety of ASL interpreters could not be guaranteed by DHS officers as they are coming under attack themselves with objects and items as described in paragraph 3 above. Moreover, ASL interpreters would not be visible to the crowd because they would be behind the officers and the crowds are large and highly mobile, typically convening at night, often between 10:00pm and 3:00am. Likewise, DHS officers are often interacting with numerous individuals in isolated encounters at the spur of the moment and would not have time to request and wait for an ASL interpreter due to the fluid dynamics and hostile nature of the violent agitators;

DECLARATION OF GABRIEL RUSSELL – 3

c. DHS officers in Portland are not able to provide its communications to protesters/rioters through visual messaging systems because most violent protests take place at night as described above and are often spread across multiple locations, move to different locations, and face in different directions. As such, no stationary or even mobile system would be likely to communicate effectively with the crowds. Moreover, the protesters/rioters already use paint, projectiles launched with powerful slingshots, incendiary devices, and explosives to damage and destroy government equipment, so it is anticipated that they would do the same thing to static or mobile messaging systems utilized by the government;

d. With the exception of emergency situations, DHS officers in Portland do not engage with the crowds of rioters until multiple warning orders are issued utilizing Long Range Acoustic Devices and a reasonable amount of time is allowed to pass for dispersal by the crowd, so even a person with disabilities has adequate time to leave the scene between the warning orders being issued and the use of force;

e. When DHS officers in Portland disperse a crowd, they do not close in from all sides but instead leave a route of egress for the crowd being dispersed;

f. DHS officers in Portland comply with the DHS' "Department Policy on the Use of Force (DHS Policy Statement 044-05), which includes a section on less-lethal force devices. The policy additionally includes training requirements for de-escalation, employment of safe tactics and warning before using force if feasible. Consistent with this policy, DHS officers rely on less lethal chemical-based crowd-control devices like pepper spray and pepper balls to control crowds without having to use more dangerous tactics that could result in serious injury or death. Prohibiting less-lethal chemical-based crowed-control devices would increase direct physical contact between DHS officers and crowds of rioters endangering the safety of the officers, protesters/rioters, and the public; and

g. When DHS officers in Portland detain or arrest an individual it is based on established 4th Amendment legal jurisprudence, and individuals must be separated from other people or animals for officer, individual and public safety. If the individual needs the services of an assistant or service animal, the officers must also ensure that the assistant and/or service animal does not pose a threat. Once all individuals and/or service animals are deemed safe, every effort is made to reunite the individual being detained or arrested with their assistant or service animal.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated this 15th day of March 2021.

_____
GABRIEL RUSSELL

DECLARATION OF GABRIEL RUSSELL – 4