BRIAN M. BOYNTON
Acting Assistant Attorney General
SCOTT ERIK ASPHAUG
Acting United States Attorney
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
MICHAEL P. CLENDENEN (DC 1660091)
JORDAN L. VON BOKERN (DC 1032962)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 353-0693
Fax:    (202) 616-8460

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| PHILIP WOLFE, *et al.*, | Case No. 3:20-cv-01882-SI |
| Plaintiffs, | **FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| CITY OF PORTLAND, a municipal corporation, *et al.*, | |
| Defendants. | |

## FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS
## UNDER RULES 12(b)(1) AND 12(b)(6)

Federal Defendants respectfully move under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss all claims against federal officers sued in their official capacities. In support of this Motion, Federal Defendants refer the Court to the attached Memorandum. Pursuant to Local Rule 7-1, Federal Defendants certify that their counsel has conferred in good faith with counsel for Plaintiffs but were unable to resolve the issues raised by this motion.

BRIAN M. BOYNTON
Acting Assistant Attorney General

SCOTT ERIK ASPHAUG
Acting United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Michael P. Clendenen*
MICHAEL P. CLENDENEN (DC 1660091)
JORDAN L. VON BOKERN (DC 1032962)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 353-0693
Fax: (202) 616-8460
Email: michael.p.clendenen@usdoj.gov

*Attorneys for Defendants*

FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

PHILIP WOLFE, *et al.*,

        Plaintiffs,

     v.

CITY OF PORTLAND, a municipal
corporation, *et al.*,

        Defendants.

Case No. 3:20-cv-01882-SI

**FEDERAL OFFICIAL-CAPACITY
DEFENDANTS' MOTION TO
DISMISS**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FEDERAL
OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS
<u>UNDER RULES 12(b)(1) AND 12(b)(6)</u>**

FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD.......................................................................................................... 6

ARGUMENT ...................................................................................................................... 6

   I.    Plaintiffs Lack Standing to Obtain Equitable Relief Against Federal Defendants .............. 7

      A.  Plaintiffs Must Demonstrate a Certainly Impending Injury............................................. 8

      B.  Individual Plaintiffs Have Failed to Demonstrate Standing for Injunctive Relief ......... 11

      C.  DRO Has Failed to Demonstrate Standing for Injunctive Relief................................... 14

      D.  Because Plaintiffs Lack Standing For Injunctive Relief, They Also Cannot Obtain a Declaratory Judgment ........................................................................................... 16

  II.    Plaintiffs' Claims Are Moot........................................................................................ 17

      A.  Changed Circumstances Render Plaintiffs' Claims Moot.............................................. 18

      B.  USMS Has No Role in the Present Protest Activity ..................................................... 20

  III.    The Relief Requested by Plaintiffs Is Not Required by the Rehabilitation Act............. 21

CONCLUSION.................................................................................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Choate*,
    469 U.S. 287 (1985)..............................................................................................22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................2, 6, 23

*Austin v. Univ. of Or.*,
    925 F.3d 1133 (9th Cir. 2019) ...............................................................................6

*Barney v. City of Eugene*,
    20 F. App'x 683 (9th Cir. 2001) ..........................................................................26

*Bayer v. Neiman Marcus Grp., Inc.*,
    861 F.3d 853 (9th Cir. 2017) ...............................................................................17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................6

*Blair v. Shanahan*,
    38 F.3d 1514 (9th Cir. 1994) .................................................................................8

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)....................................................................................7, 8, 9, 13

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)........................................................................8, 11, 12, 16

*EEOC v. Nev. Resort Ass'n*,
    792 F.2d 882 (9th Cir. 1986) ...............................................................................15

*Eggar v. City of Livingston*,
    40 F.3d 312 (9th Cir. 1994) ...................................................................................9

*Fair Hous. of Marin v. Combs*,
    285 F.3d 899 (9th Cir. 2002) ...............................................................................15

*Felarca v. Birgeneau*,
    891 F.3d 809 (9th Cir. 2018) .........................................................................27, 28

*Friends of the Earth, Inc. v. Laidlaw Envt. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)..............................................................................................14

*Gilbert v. DaGrossa,*
    756 F.2d 1455 (9th Cir. 1985) ........................................................... 5

*Gov't Emps. Ins. Co. v. Dizol,*
    133 F.3d 1220 (9th Cir. 1998) ......................................................... 16

*Graham v. Connor,*
    490 U.S. 386 (1989) ........................................................... 27, 28, 29

*Gray v. Cummings,*
    917 F.3d 1 (1st Cir. 2019) ............................................................. 10

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ...................................................................... 27

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ...................................................................... 15

*Index Newspapers LLC v. City of Portland,*
    474 F. Supp. 3d 1113 (D. Or. 2020) .............................................. 14

*Index Newspapers LLC v. City of Portland,*
    480 F. Supp. 3d 1120 (D. Or. 2020) ......................................... 14, 28

*Jackson v. City of Bremerton,*
    268 F.3d 646 (9th Cir. 2001) ......................................................... 27

*Jacobson v. Delta Airlines,*
    742 F.2d 1202 (9th Cir. 1984) ....................................................... 22

*Kentucky v. Graham,*
    473 U.S. 159 (1985) ........................................................................ 5

*Khoja v. Orexigen Therapeutics, Inc.,*
    899 F.3d 988 (9th Cir. 2018) ........................................................... 3

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
    624 F.3d 1083 (9th Cir. 2010) ....................................................... 15

*Lee v. Los Angeles,*
    250 F.3d 668 (9th Cir. 2001) ........................................................... 3

*Lovell v. Chandler,*
    303 F.3d 1039 (9th Cir. 2002) ................................................. 22, 23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................ 7

*McGary v. City of Porltand*,
    386 F.3d 1259 (9th Cir. 2004) ............................................................................... 23

*Menotti v. Seattle*,
    409 F.3d 1113 (9th Cir. 2005) ............................................................................... 27

*Miller v. Lifestyle Creations, Inc.*,
    993 F.2d 883 (9th Cir. 1993) .................................................................................. 6

*Munns v. Kerry*,
    782 F.3d 402 (9th Cir. 2015) ............................................................................ 11, 12

*Murphy v. Kenops*,
    99 F. Supp. 2d 1255 (D. Or. 1999) ........................................................................ 10

*Nationwide Mut. Ins. Co. v. Liberatore*,
    408 F.3d 1158 (9th Cir. 2005) ............................................................................... 16

*Nelsen v. King Cnty.*,
    895 F.2d 1248 (9th Cir. 1990) ................................................................................. 8

*Odneal v. Pac. Gas & Elec. Co.*,
    948 F.2d 1293 (9th Cir. 1991) ............................................................................... 13

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999) .............................................................................................. 22

*O'Neal v. City of Seattle*,
    66 F.3d 1064 (9th Cir. 1995) ................................................................................. 17

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ................................................................................................ 9

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ................................................................................................ 9

*Rosenblum v. Does 1-10*,
    No. 3:20-CV-01161-MO, 2020 WL 4253209 (D. Or. July 24, 2020) ....................... 8

*Ruiz v. City of Santa Maria*,
    160 F.3d 543 (9th Cir. 1998) ................................................................................. 17

*Se. Cmty. College v. Davis*,
    442 U.S. 387 (1979) ................................................................................................ 22

*Sheehan v. City & Cty. of San Francisco*,
    743 F.3d 1211 (9th Cir. 2014) ........................................................................... 24, 27

*Shell Gulf of Mex. Inc. v. Ctr. for Biological Diversity, Inc.*,
    771 F.3d 632 (9th Cir. 2014) ............................................................................. 16, 17

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007) .................................................................................................. 1

*Skaff v. Meridien N. Am. Beverly Hills, LLC*,
    506 F.3d 832 (9th Cir. 2007) ................................................................................... 14

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) .................................................................................................... 8

*Taylor v. Resolution Tr. Corp.*,
    56 F.3d 1497 (D.C. Cir. 1995) ................................................................................. 17

*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*,
    477 U.S. 597 (1986) ................................................................................................. 22

*United States ex rel. Solis v. Millennium Pharm., Inc.*,
    885 F.3d 623 (9th Cir. 2018) ..................................................................................... 6

*United States v. Washington*,
    759 F.2d 1353 (9th Cir. 1985) ................................................................................. 16

*Updike v. City of Gresham*,
    62 F. Supp. 3d 1205 (D. Or. 2014) .................................................................... 10, 13

*Updike v. City of Gresham*,
    99 F. Supp. 3d 1279 (D. Or. 2015) .......................................................................... 10

*Updike v. Multnomah Cnty.*,
    870 F.3d 939 (9th Cir. 2017) ............................................................................... 8, 10

*Uzuegbunam v. Preczewski*,
    --- S. Ct. ---, 2021 WL 850106 (Mar. 8, 2021) ..................................................... 18

*Vinson v. Thomas*,
    288 F.3d 1145 (9th Cir. 2002) ................................................................................. 24

*Vos v. City of Newport Beach*,
    892 F.3d 1024 (9th Cir. 2018) ........................................................................... 24

*Waller ex rel. Estate of Hunt v. City of Danville*,
    556 F.3d 171 (4th Cir. 2009) ............................................................................. 24

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................................... 18

*Walsh v. Nev. Dep't of Human,*
    *Res.*, 471 F.3d 1033 (9th Cir. 2006) .................................................................. 18

*Wheeler v. Hurdman*,
    825 F.2d 257 (10th Cir. 1987) .............................................................................. 6

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) .............................................................................. 6

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ............................................................................................. 8

**Statutes**

5 U.S.C. § 702 ................................................................................................................. 5

20 U.S.C. § 1681 ........................................................................................................... 22

28 U.S.C. § 566 ............................................................................................................... 3

29 U.S.C. § 794 ........................................................................................................ 5, 22

40 U.S.C. § 1315 ...................................................................................................... 3, 19

42 U.S.C. § 2000d ......................................................................................................... 22

42 U.S.C. § 10805 ........................................................................................................... 4

42 U.S.C. § 15043 ........................................................................................................... 4

**Rules**

Fed. R. Civ. P.12(b)(1) .................................................................................................... 6

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 3

Fed. R. Civ. P. 12(d) ....................................................................................................... 3

Fed. R. Civ. P. 25(d) ........................................................................................................ 4

Fed. R. Civ. P. 2556 ........................................................................................................ 3

## Regulations

6 C.F.R. pt. 15 ................................................................................................................. 5

6 C.F.R. § 15.70 ............................................................................................................. 24

28 C.F.R. § 39.130 .......................................................................................................... 5

85 Fed. Reg. 40,081 (June 26, 2020) ........................................................................... 20

## Other Authorities

10B Charles Alan Wright & Arthur R. Miller Federal Practice and Procedure § 2751
(4th ed. 2020) ............................................................................................................ 17

110 Cong. Rec. 13380 (1964) ....................................................................................... 22

*Executive Order on the Revocation of Certain Presidential Actions*, Briefing Room (Feb. 24,
2021),
https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/24/executive-order-
on-the-revocation-of-certain-presidential-actions/ .................................................. 20

*Memorandum M-21-16*, Office of Management & Budget (Feb. 26, 2021) (rescinding
Memorandum M-20-36, issued Sept. 21, 2020) ...................................................... 20

Portland Police Bureau, *Fires and Criminal Activity Outside the Federal Courthouse* (July 24,
2020), https://www.portlandoregon.gov/police/news/read.cfm?id=251024 ......................... 3, 4

*Portland Protesters Set Fires, Damage Federal Courthouse, Officers Respond with Tear Gas,
Impact Munitions*, Oregonian (Mar. 12, 2021),
https://www.oregonlive.com/portland/2021/03/federal-officers-deploy-impact-munitions-tear-
gas-at-downtown-portland-protesters.html .............................................................. 19

PPB, *Group Gathers Outside of ICE Buildings; Subject Arrested* (Jan. 28, 2021),
https://www.portlandoregon.gov/police/news/read.cfm?id=281490 ........................................ 19

Press Release, *Governor Kate Brown Announces Phased Withdrawal of Federal Law
Enforcement from Portland* (July 29, 2020),
https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=53222 ........................... 4

*Withdrawal of Designation of Anarchist Jurisdictions*, Office of the Attorney General (Feb. 25, 2021),
    https://www.justice.gov/ag/page/file/1371751/download ....................................................... 20

## INTRODUCTION

This case concerns protests and civil unrest in downtown Portland during the spring and summer of 2020. Those protests frequently centered around federal property, including the Mark O. Hatfield Federal Courthouse and the Edith Green–Wendell Wyatt Federal Building. While generally peaceful during the daytime, these protests often turned violent at night, as members of the crowd attempted to damage buildings and attack law enforcement officers. When the protests turned violent, local law enforcement responded with force to protect city and state property, typically in the form of temporary dispersal actions and the use of crowd control munitions. As these conditions developed, officers from two federal agencies, the Department of Homeland Security (DHS) and the U.S. Marshals Service (USMS), deployed to protect federal property.

Plaintiffs are four individuals who participated in these protests and a public advocacy group for Oregonians with disabilities. They allege that federal law enforcement agencies violated the Rehabilitation Act by using various crowd-control techniques and law-enforcement tactics that discriminate against people with disabilities. Plaintiffs seek injunctive and declaratory relief with regard to their Rehabilitation Act claim.

Plaintiffs' claims should be dismissed either for lack of standing or mootness because their allegations do not reflect the situation on the ground at the time they filed their Complaint, much less the current situation. Federal involvement in Portland waned significantly between the July protests and the time Plaintiffs filed their Complaint, and there is no allegation that federal officers are likely to renew heightened activity in Portland in the future. As a result, Plaintiffs have no standing to seek prospective equitable relief because they have not carried their burden to demonstrate certainly impending future injury. Alternatively, even if Plaintiffs had standing at some point, their prospective claims are now moot. *See Sinochem Int'l Co. v. Malaysia Int'l*

FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS – 1

*Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[A] federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" (internal quotation marks and citations omitted)).

Plaintiffs also fail to plead a violation of the Rehabilitation Act. The Rehabilitation Act must be applied within "manageable bounds," and law enforcement officers must be given latitude to respond to fast-developing situations. Plaintiffs' requests that this Court order that defendants, among other things, (1) be restrained from using standard, lawful force; and (2) "[p]rovide [American Sign Language] interpreters and visual messaging systems to convey orders," Compl. pp. 64–65 (Prayer for Relief), are not only unmanageable, but also are neither reasonable nor required by the Rehabilitation Act. The federal officers sued in their official capacities accordingly submit this motion to dismiss all claims against them.[1]

## BACKGROUND[2]

Beginning on May 29, 2020, protesters gathered in the streets of Portland to protest racism and police violence. Compl. (ECF No. 1) ¶ 30. Those protests continued almost every night for several months. *Id.* The protests often clustered around certain federal buildings, including the

---

[1] For clarity, this motion is submitted by Secretary of Homeland Security Alejandro Mayorkas in his official capacity and USMS Director Donald Washington in his official capacity, collectively referred to as "federal official-capacity defendants." Former Acting Secretary of Homeland Security Chad Wolf (misspelled as "Wolfe" in the Complaint) and USMS Director Washington are additionally named as Defendants in their individual capacities. Because those Defendants are represented separately, this motion will not address those claims in the Complaint (third through sixth claims for relief) that seek relief only against the individual-capacity Defendants. *See* Compl. (ECF No. 1) ¶¶ 240–46, 262–67, 279–85, 299–305. Plaintiffs' Complaint also includes federal "Doe" officers sued in their individual capacities. Plaintiffs have not named or served these defendants.

[2] This motion treats the Complaint's factual allegations as true only for purposes of the motion to dismiss for failure to state a claim, as this Court must in ruling on it. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Mark O. Hatfield Federal Courthouse and an Immigration and Customs Enforcement (ICE) detention facility, as well as Portland city government buildings. *See id.* ¶¶ 37, 63, 91, 95, 128, 140. Each night, hundreds or thousands of protesters gathered in those locations. *See id.* ¶ 34. On many of these nights, the protests degenerated into a dangerous state of civil unrest. *See* Portland Police Bureau, *Fires and Criminal Activity Outside the Federal Courthouse* (July 24, 2020), https://www.portlandoregon.gov/police/news/read.cfm?id=251024.[3]

Consequently, each night during this summer stretch, police responded to violent groups. Compl. ¶ 3. While initially these encounters involved the Portland Police Bureau (PPB), in early July, 2020, DHS and USMS also deployed law enforcement units to Portland to protect federal property, including the Hatfield Federal Courthouse. *See id.* ¶¶ 22–23, 39.[4] As PPB has noted, protesters have thrown projectiles, launched fireworks, and set fires at the federal courthouse while federal officers were inside. *See* PPB, *Fires and Criminal Activity Outside the Federal Courthouse*

---

[3] The Court may take judicial notice of public records. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("[A] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." (quoting *Lee v. Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001))). To the extent that the Court finds any of the documents cited by Defendants to be improper for consideration in this posture, Defendants ask that the Court exclude those documents so that this motion is not converted into one for summary judgment. *See id.* at 998 ("When 'matters outside the pleading are presented to *and not excluded by the court*,' the 12(b)(6) motion converts into a motion for summary judgment under Rule 56." (emphasis added) (quoting Fed. R. Civ. P. 12(d))).

[4] The Federal Protective Service (FPS), a component law enforcement agency within DHS, is tasked with the protection and security of federal property and its occupants. *See* 40 U.S.C. § 1315. USMS is tasked with, among other things, providing security to federal courthouses. *See* 28 U.S.C. § 566(i). As such, both agencies have some permanent personnel assigned to the Portland area. As events continued to devolve with the escalating violence of nighttime crowds, and as the focal point of these events shifted towards federal property, FPS had to reallocate resources from across the country to respond to the growing threat. USMS likewise reallocated resources to defend the Hatfield Federal Courthouse. FPS additionally requested assistance from its sister law enforcement agencies within DHS, Customs and Border Protection (CBP) and Immigration & Customs Enforcement (ICE), to help support its operations protecting federal facilities in Portland, which ultimately led to the deployment challenged in this case.

FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS – 3

(July 24, 2020), https://www.portlandoregon.gov/police/news/read.cfm?id=251024. The Complaint acknowledges that some members of the large crowds engaged in acts of violence, including throwing Molotov cocktails, *see* Compl. ¶ 97, and lighting fires, *see id.* ¶ 106, often leading law enforcement to declare a riot. Federal law enforcement officers, like Portland police, frequently responded to the assaults on federal property. *See id.* ¶¶ 67–68, 95. On July 29, 2020, Governor Kate Brown and federal agencies reached an agreement for a "phased withdrawal of federal officers" from Portland, after which point federal involvement in the protests waned. Press Release, *Governor Kate Brown Announces Phased Withdrawal of Federal Law Enforcement from Portland* (July 29, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid= 53222; *see also* Compl. ¶¶ 63, 103–04 (remarking on events of September 18, 2020, the last date of any incident mentioned in the Complaint involving federal officers).

Plaintiffs include four individuals who have attended these protests in Portland. Compl. ¶¶ 10–13. Plaintiff Philip Wolfe is Deaf, *id.* ¶ 10; Plaintiff Katalina Durden is legally blind, *id.* ¶ 11; Plaintiff Melissa Lewis has photosensitive epilepsy and Ehlers-Danlos Syndrome, *id.* ¶ 12; and Plaintiff Juniper Simonis has Post-Traumatic Stress Disorder (PTSD), *id.* ¶ 13. They claim to have been disproportionately affected by law enforcement's response to the episodes of civil unrest as a result of their disabilities. *Id.* ¶ 3. A fifth Plaintiff, Disability Rights Oregon (DRO), is the federally mandated disability-rights advocacy system for the State of Oregon. *Id.* ¶ 14; *see also* 42 U.S.C. §§ 10805(a), 15043(a). Plaintiffs filed their Complaint on November 1, 2020. Plaintiffs have sued the City of Portland; Multnomah County; various state and local officials; Secretary of Homeland Security Alejandro Mayorkas[5]; former Acting Secretary of Homeland Security Chad

---

[5] Pursuant to Fed. R. Civ. P. 25(d), Secretary Mayorkas is automatically substituted for former Acting Secretary Chad Wolf for all official-capacity claims.

FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS – 4

Wolf, in his individual capacity; and USMS Director Donald Washington, in his official and individual capacities; and unnamed local and federal officers ("Doe Defendants"), in their individual capacities. Compl. ¶¶ 16–24. Although Plaintiffs bring a number of claims against the local and individual-capacity Defendants, the *only* claim brought against federal officers sued in their official capacities is for alleged violations of Section 504 of the Rehabilitation Act. *Id.* ¶¶ 199–223 (second claim for relief);[6] *see* 29 U.S.C. § 794(a); *see also* 6 C.F.R. pt. 15 (DHS Rehabilitation Act regulations); 28 C.F.R. § 39.130(a) (Department of Justice Rehabilitation Act regulations). Plaintiffs seek a declaratory judgment and injunctive relief, along with attorneys' fees and costs, but expressly do not seek damages from federal official-capacity defendants.[7] Compl. ¶ 223. Plaintiffs request an order declaring, among other things, that Defendants "ceas[e] using force, such as impact munitions, flashbang grenades, batons, shoving and other types of force and tactics unless necessary for officer safety"; "[c]ease using chemical munitions"; "[p]rovide [American Sign Language] interpreters and visual messaging systems to convey orders"; and "identify and inform protesters and others of accessible avenues of escape" before dispersing a crowd. *Id.* pp. 64–65 (Prayer for Relief).

---

[6] The First Claim for Relief, for violations of Title II of the Americans with Disabilities Act (ADA), is brought only against local and state defendants. Compl. ¶¶ 181–98. The Third through Sixth Claims for Relief, each of which is split into four "counts," assert violations of the First, Fourth, Fifth, and Fourteenth Amendments. *Id.* ¶¶ 224–305. The Third through Sixth Claims for Relief appear to be asserted only against individual-capacity defendants. In any event, each of the "counts" within these claims make clear that Plaintiffs are asserting damages claims, which, as discussed below, cannot be asserted against federal official-capacity defendants. *See infra note* 7.

[7] Like federal agencies, federal officers may not be sued in their official capacity for damages absent a waiver of sovereign immunity. *See, e.g., Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). There is no waiver here. *See* 5 U.S.C. § 702; 29 U.S.C. § 794. Plaintiffs implicitly recognize this by only requesting monetary damages under the claims for relief against individual-capacity defendants. *See* Compl. ¶¶ 240–46, 262–67, 279–85, 299–305.

FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS – 5

## **LEGAL STANDARD**

Federal official-capacity defendants bring this motion under Federal Rule of Civil Procedure 12(b)(1), arguing that Plaintiffs lack standing, and under Rule 12(b)(6), arguing that Plaintiffs have failed to state a claim upon which relief can be granted.

In response to a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *United States ex rel. Solis v. Millennium Pharm., Inc.*, 885 F.3d 623, 625 (9th Cir. 2018). In order for the Court to have subject-matter jurisdiction over a challenge to agency action, the plaintiff must have standing to sue. *See, e.g.*, *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A court may examine materials outside the pleadings as it deems appropriate in order to resolve the question of its jurisdiction. *See Miller v. Lifestyle Creations, Inc.*, 993 F.2d 883 (9th Cir. 1993) (mem.) (citing *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).

Under Rule 12(b)(6), courts must dismiss complaints that do not allege sufficient facts to demonstrate a plausible entitlement to relief. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility showing "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and it "asks for more than a sheer possibility that the defendant has acted unlawfully." *Id.*; *see Austin v. Univ. of Or.*, 925 F.3d 1133, 1137 (9th Cir. 2019).

## **ARGUMENT**

Plaintiffs' claims for prospective relief are predicated on alleged events and circumstances that have materially changed. These developments underscore the absence of the type of

continuing risk of injury alleged by Plaintiffs. This Court should thus find that dismissal is warranted either because Plaintiffs lack standing to assert the type of prospective relief claimed, or because the need for any such relief has been mooted. Plaintiffs also fail to state a claim because the relief they propose under the Rehabilitation Act is not manageable in the context of law enforcement's response to the type of civil unrest and exigent circumstances at issue in this case.

## I.        Plaintiffs Lack Standing to Obtain Equitable Relief Against Federal Defendants

Plaintiffs seek only prospective equitable relief, rather than damages, from federal official-capacity defendants. Yet they have failed to demonstrate the standing necessary for this Court to have jurisdiction to consider such relief. Notwithstanding that federal involvement in Portland has been greatly diminished since July of last year, Plaintiffs ask the Court to enjoin the hypothetical actions of federal officers at hypothetical future protests where such actions might be taken at some indeterminate time. Such speculative requests for relief fall short of establishing standing to sue.

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983). One of the "landmarks" that differentiates a constitutional case or controversy from more abstract disputes "is the doctrine of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The first requirement of standing is that "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Id.* Second, "there must be a causal connection between the injury and the conduct complained of" such that the injury is fairly traceable to the defendant and not the result of the independent action of some third party not before the court. *Id.* Third, it must be "likely," and not merely "speculative," that the injury will be redressed by a favorable decision from the court. *Id.* at 561.

A.        **Plaintiffs Must Demonstrate a Certainly Impending Injury**

Where, as here, a party seeks prospective equitable relief, the injury in fact must be in the future; there must be "allegations of future injury [that are] particular and concrete." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 109 (1998). That "threatened injury must be *certainly impending*" and not merely "*possible*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Accordingly, the injury may not be based on a "speculative chain of possibilities." *Id.* at 410. While a plaintiff's allegations that he was injured in the past might support a remedy at law, a plaintiff seeking prospective equitable relief must establish imminent future harm to himself. *Lyons,* 461 U.S. at 105; *see also Nelsen v. King Cnty.*, 895 F.2d 1248, 1251 (9th Cir. 1990). Thus, even when he has suffered a specific past injury, a plaintiff must show a significant likelihood that it will be sustained again in the immediate future. *Updike v. Multnomah Cnty.*, 870 F.3d 939, 947 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 55 (2018) (mem.). Moreover, a plaintiff seeking injunctive relief must show not just that the predicted *injury* will reoccur, but also that the plaintiff himself will suffer it. *See, e.g.*, *id.* at 948 (holding that the plaintiff lacked standing for injunctive relief because his evidence was "insufficient to establish that any such wrongful behavior is likely to recur against him"); *Blair v. Shanahan*, 38 F.3d 1514, 1519 (9th Cir. 1994) (holding that a plaintiff seeking declaratory or injunctive relief must "establish a personal stake" in the relief sought); *Rosenblum v. Does 1-10*, No. 3:20-CV-01161-MO, 2020 WL 4253209, at *6 (D. Or. July 24, 2020).

The facts and reasoning of *Lyons* are instructive. *Lyons* was a civil rights action against the City of Los Angeles and several police officers who had allegedly stopped the plaintiff for a routine traffic violation and applied a chokehold without provocation. In addition to seeking damages, the plaintiff sought an injunction against future use of the chokehold unless deadly force was

threatened. The Supreme Court held that plaintiff lacked standing to seek prospective relief

because he could not show a real or immediate threat of future harm.

> That Lyons may have been illegally choked by the police . . . , while
> presumably affording Lyons standing to claim damages . . . does nothing to
> establish a real and immediate threat that he would again be stopped for a
> traffic violation, or for any other offense, by an officer or officers who
> would illegally choke him into unconsciousness without any provocation or
> resistance on his part.

*Lyons*, 461 U.S. at 105; *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure

to illegal conduct does not in itself show a present case or controversy regarding injunctive

relief . . . if unaccompanied by any continuing, present adverse effects."); *Rizzo v. Goode*, 423 U.S.

362, 372 (1976). *Lyons* concluded that to demonstrate a real and immediate threat of injury, the

plaintiff would have to show either a consistent practice, always followed by all officers, that

violated his rights, or an official policy. *See Lyons*, 461 U.S. at 106 (requiring that he show "(1) that

all police officers in Los Angeles always choke any citizen with whom they happen to have an

encounter, . . . or, (2) that the City ordered or authorized police officers to act in such manner").

Even an official policy that simply allowed for the challenged conduct is insufficient. *Id.* Similarly,

a widespread practice that is not common to all law enforcement officers with whom a plaintiff

may come in contact is also insufficient. *Rizzo*, 423 U.S. at 372 (holding that plaintiffs' allegations

that police had engaged in widespread unconstitutional conduct aimed at minority citizens was

based on speculative fears as to what an unknown minority of individual police officers might do

in the future).

Courts in this Circuit have applied *Lyons* and *O'Shea* in similar contexts to hold that

plaintiffs lack standing to pursue prospective injunctive relief where they could only speculate as

to whether particular law enforcement practices would occur, even if they had previously been

subjected to them. *See, e.g.*, *Eggar v. City of Livingston*, 40 F.3d 312, 317 (9th Cir. 1994) (holding

FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS – 9

that a plaintiff who had been repeatedly convicted without court-appointed counsel lacked standing because whether she "will commit future crimes in the City, be indigent, plead guilty, and be sentenced to jail is speculative"); *Murphy v. Kenops*, 99 F. Supp. 2d 1255, 1259–60 (D. Or. 1999) (holding that plaintiffs lacked standing because it was highly speculative "that the Forest Service will exercise its discretion to issue future closure orders, that the closure orders will violate the First Amendment, that plaintiffs will violate those closure orders, and that plaintiffs will be arrested because of those closure orders").

The requirement for future injury applies to claims arising under the Rehabilitation Act. In *Updike v. City of Gresham*, Multnomah County officials failed to provide an American Sign Language (ASL) interpreter at a deaf arrestee's arraignment and thus required the arrestee to stay in jail overnight. 62 F. Supp. 3d 1205, 1209 (D. Or. 2014) (Simon, J.). The arrestee sued for injunctive relief under the Rehabilitation Act. *Id.* at 1213. This Court, citing *Lyons* and *O'Shea*, dismissed that claim for lack of standing, concluding:

> Plaintiff provides no explanation for his assertion that he will likely be booked into a county detention center and need to make a first appearance as a pretrial detainee again. The mere fact that Plaintiff has been arrested in the past does not create the real and immediate threat of repeated injury required to seek equitable relief.

*Id.* at 1214; *see also Updike v. City of Gresham*, 99 F. Supp. 3d 1279, 1287 (D. Or. 2015) (Simon, J.) (dismissing *sua sponte* the same claim against a different defendant for the same reason). The Ninth Circuit affirmed this reasoning. *Updike*, 870 F.3d at 947–48; *see also Gray v. Cummings*, 917 F.3d 1, 19 (1st Cir. 2019) (citing *id.* at 948) (finding no standing under *Lyons* for a disability-rights claim against police tasing).

Finally, plaintiffs cannot create standing for injunctive relief by alleging that their own fear of future government action has led them to leave protests early or forgo attending certain protests.

*See* Compl. ¶ 90.  When a plaintiff contends that she is entitled to injunctive relief because she is changing her own behavior to account for her fears of future events, the analysis is unchanged from the *Lyons* inquiry—the supposed effect on her behavior will not provide standing for injunctive relief if it is "based on a plaintiff's fear of future injury that itself was too speculative to confer standing." *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015); *see also Clapper*, 568 U.S. at 416 ("[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). In other words, where a plaintiff's request for injunctive relief lacks any non-speculative basis for finding a likelihood of future harm, the plaintiff cannot circumvent Article III merely by saying that he or she is *afraid* of future harm. *See Clapper*, 568 U.S. at 416.

### B.    Individual Plaintiffs Have Failed to Demonstrate Standing for Injunctive Relief

Plaintiffs' allegations are insufficient to demonstrate imminent future injury that confers standing. The Complaint describes a handful of allegedly discriminatory past interactions between Plaintiffs and federal officers. *See* Compl. ¶¶ 39–40 (DHS officers employed chemical agents and flash grenades on a crowd including Plaintiff Wolfe); *id.* ¶¶ 65–68 (DHS officers employed chemical agents and flash grenades on a crowd including Plaintiff Durden); *id.* ¶ 89 (ICE officers employed chemical agents and flash grenades and rushed a crowd including Plaintiff Lewis); *id.* ¶ 95 (DHS officers employed chemical agents, flash grenades, and pepper balls on a crowd including Plaintiff Lewis); *id.* ¶¶ 103–04 (DHS/ICE officers employed chemical agents, pepper balls, and "stingers" on a crowd including Plaintiff Lewis); *id.* ¶ 126 ("federal officers" employed chemical agents and flash grenades on a crowd including Plaintiff Simonis; *id.* ¶¶ 130–45 (DHS officers arrested Plaintiff Simonis and separated them from their service dog, and USMS

temporarily detained Simonis in a holding cell).[8] Even assuming *arguendo* these allegations establish a *past* violation of the Rehabilitation Act, they do not establish a certainly impending injury in connection with theoretical *future* protests that Plaintiffs may attend, and at which Plaintiffs suggest they may, in theory, be subjected to dispersal actions by federal officers.

Plaintiffs cannot create standing by speculating about a potential future harm. For Plaintiffs to be subject to the same harm again in the future, the following chain of events would have to occur:  First, Plaintiffs would have to attend a protest in the future. Although the Complaint indicates that Plaintiffs were regular attendees at the summer protests, they do not state that they have concrete plans to do so any more. Second, federal officers from DHS or USMS would have to be in the vicinity of the protest. This is increasingly unlikely due to the reduced level of involvement from federal officers in Portland. Third, officers would have to determine that the protest had turned violent based on the actions of individual members of the crowd. Fourth, the federal officers would have to respond to the crowd in the same manner (*e.g.* with the same kind of force, such as chemical agents) as alleged in the Complaint. And fifth, Plaintiffs would have to be personally be subject to any such crowd control measures. This speculative chain of events is not likely to occur, let alone "certainly impending" to occur, as is required to establish standing. *Clapper*, 568 U.S. at 409. Plaintiffs' statements that their fear of law enforcement's response to the protests has led them to behave differently, *see* Compl. ¶¶ 90, 230, cannot be used to cure the speculative nature of the alleged future harm, *see Clapper*, 568 U.S. at 416; *Munns*, 782 F.3d at 410. Such statements do not demonstrate that the practices employed by federal officers in past

---

[8] Plaintiffs do not allege in the Complaint that federal officers used strobe lights. *See id.* ¶¶ 112–18.

FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS – 12

encounters will necessarily be used against Plaintiffs in every future interaction, as required to establish standing. *See Lyons*, 461 U.S. at 106.

The allegations regarding Plaintiff Simonis's arrest are particularly insufficient to confer standing for prospective relief. For that alleged injury to recur, not only would Simonis have to attend a future protest, but Simonis themself would again have to be arrested by federal officers—meaning that Simonis would have to first commit a crime.[9] In this regard, Simonis is in the same position as the plaintiff in *Updike*, in which this Court noted that "Plaintiff provides the Court with no reason why he would be unable to conduct his activities within the law." *Updike*, 62 F. Supp. 3d at 1214. And even then, federal officers may not respond in the same way if Simonis is arrested a second time (*i.e.*, by separating Simonis from their service dog); the Complaint only alleges this one episode in which an arrestee had a service dog, so future situations may be dealt with differently. *Cf. Odneal v. Pac. Gas & Elec. Co.*, 948 F.2d 1293 (9th Cir. 1991) (mem.) ("[O]ne instance does not a policy make."). The future chain of events needed to recur (Simonis attends protest, chalks sidewalk, is arrested, and is separated from their dog) is too speculative to confer standing.[10]

---

[9] Simonis appears to suggest that they were arrested for no crime at all or without probable cause. *See* Compl. ¶¶ 128–31. However, Simonis does not say so explicitly, nor do they challenge the legality of the arrest. In any event, it is unlikely, and not "certainly impending," that federal officers will again arrest Simonis for marking the sidewalk with chalk.

[10] The only references to USMS in the Complaint are the allegations regarding Marshals' temporary involvement in housing Plaintiff Simonis after their arrest. *See* Compl. ¶¶ 140–42. As such, if the Court agrees that Plaintiff Simonis lacks standing to pursue prospective equitable relief, it should at a minimum dismiss the Rehabilitation Act claim against USMS Director Washington in his official capacity.

Likewise, Simonis is the only Plaintiff to allege that federal officers separated them from their service animal, that federal officers denied them medical treatment while in custody, and that federal officers misgendered them or otherwise aggravated their PTSD while in custody. Thus, if the Court agrees that Plaintiff Simonis lacks standing, it should also dismiss the claims for relief related to these allegations. *See* Compl. p. 65 (Prayer for Relief 3(h)–(j)).

FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS – 13

Finally, this case is distinguishable from *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1124 (D. Or. 2020) (Simon, J.) (PI opinion), *appeal docketed*, No. 20-35739 (9th Cir.). Setting aside that federal official-capacity defendants respectfully maintain their view that the preliminary injunction should not have issued in *Index Newspapers*, that action also involves law enforcement response to the protests in Portland, specifically with regard to journalists and legal observers in or near crowds of protesters. *Id.* The Court found that plaintiffs in that case had established standing under *Lyons*. *See Index Newspapers LLC v. City of Portland*, 474 F. Supp. 3d 1113, 1122 (D. Or. 2020) (TRO opinion). However, as the Court later made clear, "Article III standing is evaluated by considering the facts as they existed *at the time of the commencement of the action*." *Index Newspapers*, 480 F. Supp. 3d at 1139 (emphasis added) (citing *Friends of the Earth, Inc. v. Laidlaw Envt. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000); *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007). The Second Amended Complaint in *Index Newspapers* (naming federal defendants for the first time) was filed on July 17, 2020, *see Index Newspapers*, 474 F. Supp. 3d at 1117, at the height of the summer protests around the Hatfield Courthouse and the federal government's response to the crowds. At that time, the nightly protests and federal response occurred with such a predictable pattern that, as this Court said, "future injury [was] all but inevitable."[11] *Id.* at 1122. In this case, however, Plaintiffs did not file their Complaint until November 1, 2020, long after the height of the protests and federal involvement in Portland. Plaintiffs cannot establish a "certainly impending" injury, and for that reason they lack standing.

## C.    DRO Has Failed to Demonstrate Standing for Injunctive Relief

---

[11] The United States has appealed the Court's ruling on standing in *Index Newspaper* and disagrees with the Court's characterization of the plaintiffs' alleged injury in that case.

The inclusion of DRO as an organizational plaintiff does not alter the conclusion that no Plaintiff has standing to seek prospective equitable relief. In general, an organization can establish associational standing on behalf of its members if it adequately alleges that "(1) any one of its members would have standing to sue; (2) the interests the organization seeks to protect are germane to the purposes of the organization; and (3) neither the action nor the relief sought requires the participation by the individual member or members." *EEOC v. Nev. Resort Ass'n*, 792 F.2d 882, 885 (9th Cir. 1986). Here, DRO fails the first requirement. As discussed above, no individual Plaintiff has standing to sue for prospective relief, and there are no allegations pertaining to any other member of the organization. Since no member of DRO has standing to sue, DRO has no standing to sue.

Alternatively, "[a]n organization suing on its own behalf can establish an injury when it suffered 'both a diversion of its resources and a frustration of its mission.'" *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (indicating that "a setback to the organization's abstract social interests" is insufficient to confer standing). DRO claims that it "has had to divert resources from its organizational mission to address Defendants' violations of the law, redirecting staff from their work on other matters and the expenditure of scarce financial resources on issues relating to the rights of protesters with disabilities." Compl. ¶ 14. Even assuming this alleged diversion of resources was enough to establish standing generally, the past expenditure of resources would be insufficient to demonstrate a certainly impending *future* injury under *Clapper*, *Lyons*, and *O'Shea*, given the diminution of federal involvement in Portland prior to the commencement of this action. And even if DRO is currently expending or intends to expend resources in anticipation of potential

future actions by federal official-capacity defendants, that expenditure of resources cannot support standing, because DRO would be expending resources to protect against future harms that are, as discussed, too speculative to support standing themselves; an organization "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.  So DRO likewise does not have standing to seek prospective injunctive relief.

### D.    Because Plaintiffs Lack Standing For Injunctive Relief, They Also Cannot Obtain a Declaratory Judgment

Plaintiffs also cannot pursue a declaratory judgment. A request for declaratory judgment does not present a standalone claim, but merely is a remedy—and one that Plaintiffs here are not entitled to seek. *Shell Gulf of Mex. Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632, 635 (9th Cir. 2014) ("The Declaratory Judgment Act . . . does not create new substantive rights, but merely expands the remedies available in federal courts"). The Declaratory Judgment Act does not by itself confer federal subject-matter jurisdiction. *Nationwide Mut. Ins. Co. v. Liberatore*, 408 F.3d 1158, 1161 (9th Cir. 2005). For a plaintiff to claim an entitlement to declaratory relief, the plaintiff "must first present an actual case or controversy within the meaning of Article III." *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1222 (9th Cir. 1998) (en banc).

Here, as demonstrated above, Plaintiffs have not shown that a case or controversy exists with respect to their claims for prospective relief. Furthermore, declaratory relief is improper here because it "will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *United States v. Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985). As the Ninth Circuit has recognized, the utility of a declaratory judgment is fairly narrowly cabined, designed principally to allow a potential defendant "to file preemptive litigation to determine whether they

have any legal obligations to their potential adversaries." *Shell Gulf of Mex.*, 771 F.3d at 635. This action has not been filed by a party that faces the "Damoclean threat of impending litigation which a harassing adversary might brandish." *Id.*; *see also* 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2751 (4th ed. 2020) (noting that declaratory judgement "is intended to minimize the danger of avoidable loss and the unnecessary accrual of damages and to afford one threatened with liability an early adjudication without waiting until an adversary should see fit to begin an action after the damage has accrued"). Instead, Plaintiffs claim that they have been harmed by Defendants in the past and want an injunction against future harm of the same conduct. That does not require an anticipatory settling of the legal relations between the parties. In short, Plaintiffs' request for declaratory relief is entirely duplicative of the relief they already seek and suffers from the same shortcomings.

## II.    Plaintiffs' Claims Are Moot

Even assuming Plaintiffs had standing as of the date they filed their Complaint in this case, the Court can now dismiss the claims for equitable relief against the federal official-capacity defendants as moot based on changed circumstances, including the decline in violent protest activity, the diminished federal footprint in Portland, and the change of administration.

"A request for injunctive relief remains live only so long as there is some present harm left to enjoin." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017) (quoting *Taylor v. Resolution Tr. Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* (quoting *O'Neal v. City of Seattle*, 66 F.3d 1064, 1066 (9th Cir. 1995)). "Thus, a claim for injunctive relief becomes moot once subsequent events have made clear the conduct alleged as the basis for the requested relief could not reasonably be expected to recur." *Id.* (quoting *Ruiz v. City of Santa Maria*, 160 F.3d 543, 549 (9th Cir. 1998)).

Similarly, a plaintiff who cannot reasonably be expected to benefit from prospective relief ordered against the defendant in light of intervening events has no claim for an injunction. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 364–65 (2011) (concluding plaintiffs whose employment ended after an action was filed had no claim for injunctive relief against their former employer concerning its employment practices); *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1036–37 (9th Cir. 2006) (concluding a plaintiff requesting an injunction requiring her former employer to adopt and enforce lawful policies "lacked standing to sue for injunctive relief from which she would not likely benefit"); *see also Uzuegbunam v. Preczewski*, --- S. Ct. ---, 2021 WL 850106, at *2 (Mar. 8, 2021) ("To demonstrate standing, the plaintiff must . . . seek a remedy that redresses that injury. And if in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot.").

## A.    Changed Circumstances Render Plaintiffs' Claims Moot

The decline in violent protest activity and the decline in federal involvement in Portland post-July 2020 have left prospective relief unnecessary. Defendant USMS has not responded to any incidents of late, and the incidents to which DHS has responded are markedly different from last summer's. Plaintiffs cannot continue to rely on predictions based on incidents from last summer, nor can the Court enter an injunction based on the *possibility* that something similar might recur at an unknown time, in an unknown place.

Since November 2020, protest activity at federal property has been intermittent, and the size and strength of the protests has been shrinking, not growing, for months. *See generally* Ex. 401, Cajigal Decl. ¶ 8; Ex. 402, Russell Decl. ¶ 6 ("Since November 1, 2020 there has been a significant decline in violent activities associated with protests around federal property . . . ."). Accordingly, uses of force and engagement with protesters by federal officers has declined significantly. Cajigal Decl. ¶ 8; Russell Decl. ¶ 6. In the months of June, July, and August, demonstrations were far more frequent, and drew an augmented federal response. *See* Cajigal Decl.

¶ 6; Russell Decl. ¶ 7. Conversely over the past four months, only nine protests near federal property in Portland were declared unlawful assemblies. Russell Decl. ¶¶ 5–6. DHS law enforcement personnel were only required to use force during those nine unlawful assemblies. *Id.* Only eighteen individuals were arrested, and, with one exception, only for misdemeanor offenses. To the extent that there continues to be unlawful activity at all to which federal officers have responded or may respond, it has taken place at the U.S. Immigration and Customs Enforcement ("ICE") facility on South Macadam Avenue in Portland, and most recently at the U.S. Citizenship and Immigration Services ("USCIS") facility in Portland.[12] The need for federal law enforcement activity in Portland has declined precipitously and bears no resemblance to the situation of last summer, meaning that the likelihood that federal officers will engage with persons with disabilities while dispersing violent crowds is now greatly reduced. DHS retains its mandate to protect federal property and its occupants under 40 U.S.C. § 1315 and will continue to do so as threats arise, but the dramatically reduced frequency and intensity of criminal activity directed at federal properties since its height in the summer of 2020 means that the threat landscape facing DHS at this time simply is not the same as it was during those daily attacks.[13]

Federal policy has also changed. For example, Section 5 of Executive Order 13933, which directed the Secretary of Homeland Security to provide additional "personnel to assist with the protection of Federal monuments, memorials, statues, or property," expired on December 26, 2020

---

[12] The nature of the protests has also changed fundamentally. Recent demonstrations have shifted from a focus on social justice to a more generally anti-government sentiment. Russell Decl. ¶ 5; *see also* PPB, *Group Gathers Outside of ICE Buildings; Subject Arrested* (Jan. 28, 2021), https://www.portlandoregon.gov/police/news/read.cfm?id=281490. Plaintiffs have not indicated their intent to take part in such anti-government activities.

[13] On March 11, 2021, FPS removed the security fence around the Hatfield Federal Courthouse. Later that night, a group of individuals used this opportunity to attack the courthouse, setting multiple fires and breaking one large window. FPS officers dispersed the group with chemical irritants. *See* Cajigal Decl. ¶ 9; *Portland Protesters Set Fires, Damage Federal Courthouse, Officers Respond with Tear Gas, Impact Munitions*, Oregonian (Mar. 12, 2021), https://www.oregonlive.com/portland/2021/03/federal-officers-deploy-impact-munitions-tear-gas-at-downtown-portland-protesters.html.

FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS – 19

and has not been renewed. *See* 85 Fed. Reg. 40,081, 40,083 (June 26, 2020). And on February 24, 2021, President Biden revoked a September 2, 2020, presidential memorandum directing agencies to review funding to state and local governments that were "permitting anarchy, violence, and destruction in American cities." *Executive Order on the Revocation of Certain Presidential Actions*, Briefing Room (Feb. 24, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/24/executive-order-on-the-revocation-of-certain-presidential-actions/.   Pursuant to that presidential memorandum, the City of Portland had been identified as such a local government. *Withdrawal of Designation of Anarchist Jurisdictions*, Office of the Attorney General (Feb. 25, 2021), https://www.justice.gov/ag/page/file/1371751/download; *see also* Office of Public Affairs, U.S. Dep't of Justice, *Update* (Feb. 25, 2021) (noting that the designations of New York, Portland, and Seattle had been withdrawn); *Memorandum M-21-16*, Office of Management & Budget (Feb. 26, 2021) (rescinding Memorandum M-20-36, issued Sept. 21, 2020). Because the September 2020 memorandum has been repealed, Portland is no longer deemed by the federal government to permit "anarchy, violence, or destruction," and its federal funding is no longer jeopardized by the prior administration's contrary conclusion. *Executive Order on the Revocation of Certain Presidential Actions*, Briefing Room (Feb. 24, 2021), https://www.whitehouse.gov /briefing-room/presidential-actions/2021/02/24/executive-order-on-the-revocation-of-certain-presidential-actions/. These changes reflect federal law enforcement's scaled back involvement in Portland and the further reduced likelihood that federal officers will engage with persons with disabilities while dispersing violent crowds.

In the absence of any continuing practices by federal officers that could adversely affect persons with disabilities, there is no basis on which to award prospective injunctive relief and therefore Plaintiffs' claims are moot.

### B.    USMS Has No Role in the Present Protest Activity

Even if the Court were to find that the changes in circumstance discussed above have not

mooted all of Plaintiffs' Rehabilitation Act claims, it should nevertheless find that the claims for equitable relief against Defendant Washington in his official capacity as USMS Director are moot. USMS is charged with protecting federal courthouses, including the Hatfield Federal Courthouse. *See* Cajigal Decl. ¶¶ 7–9. USMS is not charged with protecting federal property writ large, *cf. id.* ¶ 12, nor does USMS provide security outside the courthouse perimeter, *id.* ¶ 11.

Last summer, during the height of the protests, USMS augmented its presence to provide additional protective support to the Hatfield Federal Courthouse. Cajigal Decl. ¶ 6. But since November 9, 2020, that augmented staff has departed. *Id.* ¶ 7. Prior to the events that began on March 11, 2021, *see supra* note 13, there had been no protest activity at the Hatfield Courthouse for since November 11, 2020. *Id.* ¶ 8. Regardless, FPS is responsible for securing the perimeter of the Hatfield Courthouse, and USMS does not anticipate that USMS will need to assist FPS in that task. *Id.* ¶ 11. Indeed, even during the events that began on March 11, USMS officers did not leave the interior of the Hatfield Courthouse; only FPS and PPB officers responded to the group outside the courthouse. *Id.* ¶ 8. USMS has not participated in any law enforcement response at other locations in Portland and does not have any present intention to participate in any such response. *Id.* ¶ 11–12.

Therefore, independent of any other legal or factual issues remaining in this case, due to changes in the circumstances of the protests, there is no possible present or certainly impending harm caused by USMS that the Court can enjoin on behalf of the Plaintiffs. The Court should find that all claims against USMS are moot.

## III.   The Relief Requested by Plaintiffs Is Not Required by the Rehabilitation Act

On the merits, Plaintiffs have failed to state a claim upon which relief can be granted. They have not alleged a prima facie violation of the Rehabilitation Act, and the accommodations they seek are not reasonable within the context of law enforcement crowd control in response to the civil unrest and exigent circumstances at issue in this case. The requested accommodations would

impose an undue burden on the agencies, would pose a direct threat to health and safety, and would require a fundamental alteration in the "program" being challenged.

Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794, provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity . . . conducted by any Executive agency . . . ."[14] The Supreme Court has held that § 504 of the Rehabilitation Act does not "embrace all claims of disparate-impact discrimination." *Alexander v. Choate*, 469 U.S. 287, 299 (1985). Instead, courts must "keep § 504 within *manageable bounds*." *Id.* (emphasis added). Thus, the federal government "may be required to make 'reasonable'" accommodations, but it "need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped." *Id.* (quoting *Se. Cmty. College v. Davis*, 442 U.S. 387, 410, 412–13 (1979)); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 (1999).

To make out a prima facie case under the Rehabilitation Act, plaintiffs must show that they are disabled within the meaning of the Act, that they have been denied the benefits of services, programs, or activities for which defendants are responsible or have otherwise been discriminated against, and that the discrimination is solely by reason of their disability. *See Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). To show that they have been denied benefits, plaintiffs with

---

[14] The Complaint appears to allege that federal official-capacity defendants are "recipient[s] of federal funds" subject to the Rehabilitation Act. Compl. ¶¶ 202–07. The law enforcement activities conducted by DHS and USMS are more appropriately characterized as a "program or activity" under § 504. *See U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 612 (1986) (recognizing that "program[s]" or "[a]ctivities wholly carried out by the United States with Federal funds . . . cannot fairly be described as receiving Federal 'assistance'" for purposes of § 504 and other statutes like Title VI (42 U.S.C. § 2000d) and Title IX (20 U.S.C. § 1681) (quoting 110 Cong. Rec. 13380 (1964))); *accord Jacobson v. Delta Airlines*, 742 F.2d 1202, 1213 (9th Cir. 1984).

disabilities must allege facts either that they were treated less favorably than non-disabled persons under similar circumstances ("disparate treatment"), or that the defendant failed to reasonably accommodate plaintiffs' disabilities, thereby denying meaningful access to programs and services available to non-disabled individuals ("accommodation"). *See McGary v. City of Porlland*, 386 F.3d 1259, 1265–66 (9th Cir. 2004); *Lovell*, 303 F.3d at 1056–57. In either scenario, plaintiffs' disability must be the sole reason for the denial of access to the services or program. *See McGary*, 386 F.3d at 1265; *Lovell*, 303 F.3d at 1052.

To the extent that Plaintiffs in this case assert a disparate treatment claim against federal official-capacity defendants, they have failed to allege facts sufficient to support such a claim. *See Iqbal*, 556 U.S. at 678. In carrying out their duty to protect federal property and to control unruly crowds nearby, DHS and USMS officers did not treat protesters who happened to be disabled differently from non-disabled protesters. The same law enforcement techniques were allegedly applied to all and the Plaintiffs in this case were not singled out solely because of their disability. In other words, federal officers did not use crowd-control devices like chemical agents and impact munitions against plaintiffs *because* they are disabled—they used such techniques against all protesters to maintain law and order. *Cf.* Compl. ¶¶ 117–18 (alleging, in one instance, that a *local* law enforcement officer targeted Plaintiff Lewis with a strobe light because of her epilepsy).

To the extent that Plaintiffs assert a claim for accommodation, the accommodations they seek are not reasonable and would pose an undue burden on law enforcement officers who are trying to maintain order and security during periods of civil unrest where they have to respond to rapidly changing circumstances.[15] Although the Ninth Circuit has never addressed the

---

[15] Plaintiffs assert that they put federal official-capacity defendants "on notice" as to the need for accommodations by sending a letter to former Acting Secretary of Homeland Security Chad Wolf.

Rehabilitation Act in the context of responding to large-scale civil unrest, it has held, in the context

of arrests, that "the exigencies surrounding police officers' decisions in the field must be taken

into account when assessing the reasonableness of the officers' actions." *Sheehan v. City & Cnty.*

*of San Francisco*, 743 F.3d 1211, 1217 (9th Cir. 2014), *rev'd in part on other grounds*, 575 U.S.

600 (2015).[16] "[E]xigent circumstances inform the reasonableness analysis under" the

Rehabilitation Act, "just as they inform the distinct reasonableness analysis under the Fourth

Amendment." *Id.* at 1232; *see also Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir.

2018) (noting that the "accommodation analysis" in the law enforcement context is connected to

whether the officers' actions were "objectively reasonable"); *Waller ex rel. Estate of Hunt v. City*

*of Danville*, 556 F.3d 171, 175 (4th Cir. 2009) ("Just as the constraints of time figure in what is

required of police under the Fourth Amendment, they bear on what is reasonable under the ADA."

(quoted in *Sheehan*, 743 F.3d at 1232)).

     Plaintiffs in this case request that the Court enjoin federal law enforcement agencies to

make the following accommodations:

> a. Modify use of force policies to address the needs of people with disabilities
> and/or their service animals, including, but not limited to: ceasing using force, such
> as impact munitions, flashbang grenades, batons, shoving and other types of force
> and tactics unless necessary for officer safety based on an immediate threat of
> serious harm from an individual;
>
> b. Use the least amount of force possible against people with disabilities and their
> assistants, interpreters, sighted guides and/or service animals;

---

*See* Compl. ¶ 170. DHS regulations state that "complaints" that are not related to employment
discrimination and that allege a violation of section 504 of the Rehabilitation Act should be sent
to "the Officer for Civil Rights and Civil Liberties, Department of Homeland Security,
Washington, DC," not the Secretary. 6 C.F.R. § 15.70(c). There is no allegation that a letter was
sent to USMS.

[16] Although *Sheehan* involved the ADA rather than § 504 of the Rehabilitation Act, "there is no
significant difference in the analysis of rights and obligations created by the two Acts." *Vinson v.*
*Thomas*, 288 F.3d 1145, 1152 (9th Cir. 2002).

c. Cease using chemical munitions that negatively affect people with respiratory and inflammatory disabilities, and that negatively affect service animals, and remove remaining residue from areas where used;

d. Cease using strobe lights;

e. Provide ASL interpreters and visual messaging systems to convey orders or other directions to people who are Deaf or hard of hearing at protests;

f. Provide adequate time and clear and consistent directions for individuals with disabilities to comply with lawful orders;

g. Before dispersing a crowd or taking other actions that may place persons with disabilities in danger, identify and inform protesters and others of accessible avenues of escape;

h. Stop separating people with disabilities from their assistants, interpreters, sighted guides and/or service animals;

i. Ensure access to proper medical treatment including medication;

j. Cease practices that aggravate people's psychiatric disabilities or trigger PTSD responses, such as: misgendering people, refusing to house people in Defendant's custody according to their gender identity, subjecting people to unnecessary body searches, and/or refusing to use staff of a different gender to carry out body searches when requested.

Compl. pp. 64–65.

The relief requested is not a reasonable accommodation, nor would such relief be within the "manageable bounds" of the Rehabilitation Act, because it does not account for the exigent circumstances that arise when law enforcement is responding to large-scale violent activity. The very demands imposed on law enforcement in the face of civil unrest make much of the requested relief impossible. These environments are chaotic and volatile and require on-the-spot decisionmaking by law enforcement officers. An on-the-spot accommodation assessment in this environment would distract the officers from their primary role of maintaining law and order and would thereby pose an undue threat to the safety and security of the officers as well as the public. Plaintiffs' requested relief would fundamentally change how law enforcement officers carry out

crowd control, and the Rehabilitation Act does not compel agencies to make such unreasonable accommodations.

Plaintiffs' request for ASL interpreters demonstrates the unreasonableness of the requested accommodations. When a gathering turns into a dangerous riot that law enforcement officers need to disperse, it is not possible for officers to ensure the safety of an ASL interpreter. Moreover, an ASL interpreter is unlikely to provide much help in conveying a dispersal order because the crowds being dispersed are often large and unruly, and   a deaf or hard-of-hearing individual within the crowd would have to be in the immediate vicinity to see the interpreter. It is not possible to ensure that the ASL interpreter would be located in the precise spot where his services would be accessible under the conditions in which a dispersal order would be issued. Likewise, a visual messaging system would not be logistically feasible, given that law enforcement officers generally do not know when and where a riot will occur and do not have time to move a large display system. And the large size of the crowds often makes it impossible to give one-on-one directions to any individual, including individuals with disabilities.

Moreover, law enforcement agencies have an exigent need to use crowd-control devices when gatherings turn violent and require dispersal. Cases applying the Fourth Amendment standard for excessive use of force illustrate this point. The Ninth Circuit has never held that the use of chemical agents, flashbang grenades, or impact munitions[17] is per se unreasonable under the Fourth Amendment when dispersing a crowd. *See, e.g.*, *Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001) (regarding the use of tear gas to disperse a violent crowd to be reasonable

---

[17] Although the Complaint also seeks relief from "strobe lights," the only allegations in the Complaint pertaining to the use of strobe lights are against local law enforcement officers. *See* Compl. ¶¶ 117–18. There are no allegations in the Complaint that the federal officers used strobe lights.

FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS – 26

under the Fourth Amendment, even though some members of the crowd remained peaceful); *see also Graham v. Connor*, 490 U.S. 386, 397 (1989) (noting that excessive force requires showing that the "use of force" was "objectively unreasonable under the circumstances."); *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment."); *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018) ("[T]he government ha[s] a 'safety interest in controlling' a mass of people . . . ." (quoting *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001)); *Menotti v. Seattle,* 409 F.3d 1113, 1122, 1155–56 (9th Cir. 2005) (declining "to hold unconstitutional the City's implementation of procedures necessary to restore safety and security," including the use of "tear gas and similar non-lethal weapons like pepper gas, beanbag guns, and rubber  bullets" when confronted by protesters with "violent and disruptive aims" that "substantially disrupt civic order"). These cases underscore the need for law enforcement officers to use crowd-control devices under certain circumstances. Yet Plaintiffs' requested relief would prohibit the use of such devices in any situation in which persons with disabilities may be present, regardless of exigencies. Again, the situations in which a crowd must be dispersed are generally chaotic and volatile, and may involve gatherings of hundreds of people, meaning it will often not be possible for law enforcement to know whether persons with disabilities are present. Plaintiffs' requested relief would thus effectively prohibit crowd-control devices in any situation. This Court should not hamstring the ability of law enforcement officers to respond to the exigent circumstances of each situation. Such a result would require a fundamental change to law enforcements' crowd-control activities. *See Sheehan*, 743 F.3d at 1232; *see also* Compl. ¶¶ 65–67 (recognizing that DHS officers employed chemical agents only after "attempt[ing] to push the crowd back several times without significant success").

This Court's Preliminary Injunction in *Index Newspapers* is particularly instructive. In that case, the Court enjoined federal law enforcement agencies from targeting journalists and legal observers with crowd-control devices. *Index Newspapers*, 480 F. Supp. 3d at 1155–56. However, the Court clarified that federal officers "shall not be liable for violating this injunction if a Journalist or Legal Observer is *incidentally exposed* to crowd-control devices after remaining in the area where such devices were deployed after the issuance of an otherwise lawful dispersal order." *Id.* at 1157 (emphasis added). Thus, the Court recognized that crowd-control devices may be necessary in some circumstances and that they should not be prohibited writ large just because members of a protected class may be nearby. Now, long after the height of the Portland protests has passed, Plaintiffs in this case ask the Court to go further and prohibit crowd-control devices any time a person with disabilities is present—and perhaps even if they are not present, as federal law enforcement officers would have no way to know whether a crowd contains individuals with a particular disability. The Court should reject this invitation to vastly limit the ability of federal law enforcement agencies to protect the public and themselves.

Finally, Plaintiffs' request that officers "[u]se the least amount of force possible against people with disabilities and their assistants, interpreters, sighted guides and/or service animals" is neither feasible nor legally required. The Fourth Amendment requires that the use of force be "objectively reasonable," *Graham*, 490 U.S. at 397, not the "least amount possible" or even the "least amount necessary," *see Felarca*, 891 F.3d at 818 (allowing the use of overhand baton strikes); *see also Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (internal quotation marks and citation omitted)). Law enforcement officers' actions are judged not with "the 20/20 vision of hindsight," but with recognition that they must make "split-second judgments" in

"circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396–97. In such circumstances, the Rehabilitation Act similarly does not require law enforcement officers to know or ascertain whether a particular individual has a disability, to determine in a split second how that disability might affect that person's reactions to potential uses of force, and to treat that individual differently from others in the exact same circumstances.

Because all of the relief requested by Plaintiffs from the federal official-capacity defendants is unavailable under the Rehabilitation Act, this Court should dismiss the claims against the federal official-capacity defendants.

## <u>CONCLUSION</u>

For the foregoing reasons, all claims against the federal officers in their official capacities should be dismissed.

Dated: March 15, 2021                                    Respectfully submitted,

                                                         BRIAN M. BOYNTON
                                                         Acting Assistant Attorney General

                                                         SCOTT ERIK ASPHAUG
                                                         Acting United States Attorney

                                                         ALEXANDER K. HAAS
                                                         Director, Federal Programs Branch

                                                         BRIGHAM J. BOWEN
                                                         Assistant Branch Director

                                                         */s/ Michael P. Clendenen*
                                                         MICHAEL P. CLENDENEN (DC 1660091)
                                                         JORDAN L. VON BOKERN (DC 1032962)
                                                         Trial Attorneys
                                                         United States Department of Justice
                                                         Civil Division, Federal Programs Branch
                                                         1100 L Street NW
                                                         Washington, DC 20530
                                                         Tel: (202) 353-0693
                                                         Fax: (202) 616-8460

FEDERAL OFFICIAL-CAPACITY DEFENDANTS' MOTION TO DISMISS – 29

Email: michael.p.clendenen@usdoj.gov

*Attorneys for Defendants*