DANIEL SIMON, OSB #124544
Deputy City Attorney
dan.simon@portlandoregon.gov
LINDA LAW, OSB #943660
Chief Deputy City Attorney
linda.law@portlandoregon.gov
LINH T. VU, OSB #004164
Senior Deputy City Attorney
linh.vu@portlandoregon.gov
ELIZABETH C. WOODARD, OSB #075667
Deputy City Attorney
beth.woodard@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendants City of Portland, Ted Wheeler, and Chuck Lovell*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| PHILIP WOLFE, KATALINA DURDEN, MELISSA LEWIS, JUNIPER SIMONIS, individually, and DISABILITY RIGHTS OREGON, an Oregon nonprofit and advocacy corporation, | **3:20-cv-01882-SI** |
| PLAINTIFFS, | **DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| CITY OF PORTLAND, a municipal corporation; TED WHEELER, in his official capacity; CHUCK LOVELL, in his official capacity; MULTNOMAH COUNTY, a political subdivision of the State; MICHAEL REESE, in his official capacity; TERRI DAVIE, in her official capacity; CHAD WOLF, in his individual capacity; ALEJANDRO MAYORKAS, in his official capacity; DONALD WASHINGTON, in his individual and official capacity; and DOES 1-100, individual and supervisory officers of local, state, and federal government, | |
| DEFENDANTS. | |

Page i – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND ...............................................................................2

     A.      Protests in Portland Throughout 2020 ...................................................2

     B.      Existing Restrictions on PPB's Use of Force .........................................3

           1.      CS Gas ...........................................................................................4

           2.      Impact Munitions, Aerosol Agents, Batons, Other Forms of Physical Force .........................................................................................5

           3.      Index Newspapers Injunction – Press ........................................7

     C.      PPB's Policies Concerning People With Disabilities ............................7

III.    PLAINTIFFS CANNOT MEET THE TEST FOR A PRELIMINARY INJUNCTION IN THIS CASE ...................................................................8

     A.      Legal Standard ...........................................................................................8

     B.      Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits ................10

           1.      City Defendants' Policies and Procedures Do Not Violate the Americans with Disabilities Act ........................................................12

                a.      PPB's Crowd Control Directives, Policies, and Practices Provide Effective Communication Consistent with Requirements of the ADA ..................... 13

                     i.      Plaintiffs' requests for auxiliary aids are not feasible under dynamic protest conditions ................. 14

                     ii.     PPB policies and practices already provide the requested time and direction for those with disabilities to comply with dispersal orders. ............................ 16

                b.      Plaintiffs' requests for orders addressing PPB's crowd control strategies should be reviewed under an "exigent circumstances" reasonableness analysis, or would constitute a fundamental alteration to PPB's programs, activities and services ................... 17

           2.      City Defendants' Policies and Procedures Do Not Violate Plaintiffs' First Amendment Rights ................................................................21

           3.      City Defendants' Policies and Procedures Do Not Violate Plaintiffs' Fourth Amendment Rights..........................................................24

           4.      City Defendants' Policies and Procedures Do Not Violate Plaintiffs' Fourteenth Amendment Rights.................................................26

     C.      Plaintiffs Cannot Show Irreparable Harm if No Preliminary Injunction Issues ....28

     D.      Plaintiffs Have Not Established and Cannot Establish that the Balance of Equities Weighs in Their Favor or that a Preliminary Injunction is in the Public Interest..31

           1.      CS Gas .........................................................................................32

           2.      Plaintiffs' Other Proposed Injunctive Relief.........................34

IV.     CONCLUSION...................................................................................................38

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

# TABLE OF AUTHORITIES

Page(s)

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ................................................................. 9

*Arpin v. Santa Clara Transp. Agency*,
261 F.3d 912 (9th Cir. 2001) ................................................................. 24

*Associated Press v. Otter*,
682 F.3d 821 (9th Cir. 2012) ................................................................. 37

*Barney v. City of Eugene*,
20 F. App'x 683 (9th Cir. 2001) ............................................................ 24

*Boyd v. Benton*,
374 F.3d 773 (9th Cir. 2004) ................................................................. 25

*Campbell v. City of Oakland*,
2011 WL 5576921 (N.D. Cal. Nov. 16, 2011) .......................... 10, 33, 34

*Cantwell v. Connecticut*,
310 U.S. 296 (1940) ............................................................................... 22

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ............................................................ 9, 28

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ........................................................................... 28, 29

*Dallas v. Stanglin*,
409 U.S 19 (1989) .................................................................................. 23

*Dougherty v. City of Covina*,
654 F.3d 892 (9th Cir. 2011) ................................................................. 11

*Felarca v. Birgeneau*,
891 F.3d 809 (9th Cir. 2018) ................................................................. 23

*Forrester v. City of San Diego*,
25 F.3d 804 (9th Cir. 1994) ............................................................. 24, 25

*Friends of the Wild Swan v. Weber*,
955 F. Supp. 2d 1191 (D. Mont. 2013) .................................................. 33

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ............................................................. 9, 25

*Gish v. Newsom*,
2020 WL 1979970 (C.D. Cal. Apr. 23, 2020) ...................................... 28

*Graham v. Conner*,
490 U.S. 386 (1989) ........................................................................... 4, 24

*Hadley v. City of Beaverton*,
2010 WL 1257609 (D. Or. Feb. 16, 2010) ............................................ 24

*Hodgers-Durgin v. Gustavo De La Vino*,
199 F.3d 1037 (9th Cir. 1999) ............................................................... 28

*Index Newspapers LLC et al v. City of Portland et al*, Case No: 20-cv-1035-SI,
480 F.Supp.3d 1120 (2020) ................................................................... 21

*Jackson v. City of Bremerton*,
268 F.3d 646 (9th Cir. 2001) ................................................................. 25

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ............................................................... 9

*Los Angeles County v. Humphries*,
    562 U.S. 29, 131 S.Ct. 447, 178 L.Ed.2d 460 (2010) .............................. 12

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ............................................................... 10

*Martinez v. City of Santa Rosa*,
    482 F.Supp.3d 941 (N.D. Cal 2020) ..................................................... 12

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ............................................................................. 9

*McGary v. City of Portland*,
    386 F.3d 1259 (9th Cir. 2004) ............................................................. 11

*Monell v. New York City Dep't of Social Services*,
    436 U.S. 658 (1978) ........................................................................... 11

*Nelson v. City of Davis*,
    685 F.3d 867 (9th Cir. 2012) ......................................................... 24, 25

*Nieves v. Bartlett*,
    139 S. Ct. 1715 (2019) ....................................................................... 22

*Rosenblum v. Does 1-10 et al.*, 3:20-cv-01161-MO,
    2020 WL 4253209 (D. Or. July 24, 2020) ...................................... 28, 29

*Sanchez v. Johnson*,
    416 F.3d 1051 (9th Cir. 2005) ............................................................. 10

*Sheehan v. City & Cty. of San Francisco*,
    743 F.3d 1211 (9th Cir. 2014) ............................................................. 18

*Simula, Inc. v. Autoliv, Inc.*,
    175 F.3d 716 (9th Cir. 1999) ............................................................... 28

*Sternberg v. Town of Danville*,
    2015 WL 9024340 (N.D. Cal.) ............................................................ 11

*Tennessee v. Garner*,
    471 U.S. 1, (1985) ............................................................................. 24

*Terry v. Ohio*,
    392 U.S. 1 (1968) ............................................................................... 24

*Texas v. Johnson*,
    491 U.S. 397 (1989) ........................................................................... 23

*Thompson v. Davis*,
    295 F.3d 890 (9th Cir. 2002) ............................................................... 11

*United States v. O'Brien*,
    391 U.S. 367 (1968) ........................................................................... 23

*United States v. Poocha*,
    259 F.3d 1077 (9th Cir. 2001) ............................................................. 27

*Webb v. Sloan*,
    330 F.3d 1158 (9th Cir. 2003) ............................................................. 11

*Western States Center*, 3:20-cv-01175-JR,
    2020 WL 6555054 ............................................................................. 32

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008) ........................................................... 9, 10, 31, 32

Page iv – TABLE OF AUTHORITIES

*Wise et al. v. City of Portland, et al.*, 3:20-cv-01193-IM,
    483 F.Supp.3d 956 (D. Or. Sep. 2, 2020) .................................. 2, 10, 17, 21, 23, 24, 25, 26, 37

State Cases

*City of Portland v. Hemstreet*,
    119 Or App 239 (1993) ........................................................................................ 22

Federal Statutes

42 U.S.C. § 504 ........................................................................................................ 10
42 U.S.C. § 1983 ...................................................................................................... 11
42 U.S.C. § 12132 .................................................................................................... 10

State Statutes

ORS 131.675 ...................................................................................................... 21, 23
ORS 162.247 ............................................................................................................ 21
ORS 166.015 .............................................................................................................. 5

Federal Regulations

28 C.F.R. pt. 35, App. A (2009) ............................................................................... 14
28 C.F.R. § 35.130(b)(7)(i) ...................................................................................... 11
28 C.F.R. § 35.160(a)(1) .......................................................................................... 13
28 C.F.R. § 35.160(b)(2) .......................................................................................... 16

Other Authorities

House Bill 4208 ...................................................................................................... 5, 6

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

I.    **INTRODUCTION**

Thousands of Portlanders have joined with millions around the country to protest the injustices of police brutality and racism, highlighted by the police killing of George Floyd, an African-American man, by a white Minneapolis police officer on May 25, 2020. These protests are clearly protected First Amendment expression, subject to the lawful time, place and manner restrictions, associated with all protected expression. As the City has reiterated numerous times during the protest litigation of the past year, the City agrees with plaintiffs that peaceful protests are essential to advancing a long overdue need for meaningful reform and restorative justice.

The undeniably important message of these protests is not in dispute. This case does not relate to those thousands of people who have powerfully expressed these important values.

Rather, the case involves the Defendants' response to a much smaller number of people who have not peaceably assembled, but have instead engaged in violent, destructive, life-threatening, criminal activity. Initially, that coordinated lawlessness was focused principally in the areas around the Multnomah County Justice Center, PPB's North and Central Precincts, the Portland Police Association Union Hall in NE Portland, the Mark O. Hatfield United States Courthouse, and law enforcement offices of PPB and other agencies beginning on May 29, 2020. This same violence, property damage, life threatening behavior and disruption of the community's normal affairs have occurred at Multnomah County's Penumbra Kelly Building at 4735 E. Burnside and at the PPB's East Precinct at 737 SE 106th Avenue.  Both the Kelly Building and the East Precinct are in or near residential neighborhoods.  This violence, property damage, life threatening behavior and disruption of the community's normal affairs usually occurred after 10:00 p.m., when it was dark. (*See* Declaration of Craig Dobson ("Dobson Decl."), ¶ 7). Throughout the late Spring and early Fall of 2020, the Portland Police Bureau as well as other law enforcement agencies faced protests that turned into unlawful assemblies or riots on a nearly nightly basis.

The protests in Portland throughout the late spring and fall of 2020 have led to significant

Page 1 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

litigation in this Court. Through those cases, the Court has undertaken a comprehensive and principled look at protest policing in Portland, and the Court has already imposed many limitations on protest policing and police use of force during protests. *See, e.g., Don't Shoot Portland v. City of Portland*, No. 3:20-cv-00917-HZ ("*Don't Shoot Portland*"); *Index Newspapers et al. v. City of Portland et al.,* No. 3:20-cv-1035-SI ("*Index Newspapers*"); *Wise et al. v. City of Portland et al.,* No. 3:20-cv-01193-IM ("*Wise et al.*"). Despite those existing restrictions, plaintiffs in this case now move for the most extensive restrictions on police powers seen in any case arising out of last year's protests. Under the guise of protecting people with disabilities, plaintiffs have moved to broadly shut down many of the techniques police use to disperse crowds and protect the safety of people and property. The restrictions proposed by plaintiffs are unworkable and would lead to police being unable to efficiently or effectively disperse crowds engaging in lawlessness. The public necessity of law enforcement's ability to handle dangerous crowd management situations, as well as the hardship to the public if law enforcement is unable to do so because of overbroad restrictions, weigh heavily in favor of the Court denying plaintiffs' request for a preliminary injunction.

## II.    FACTUAL BACKGROUND

### A.    Protests in Portland Throughout 2020

Protests in Portland have occurred steadily throughout the last two years, but they reached their most intensive period between May 28, 2020, and November 17, 2020. During that period, tens of thousands of people protested peacefully within Portland. PPB liaison officers have coordinated whenever possible with protestors to ensure that groups have the opportunity to protest in a manner where they and other members of the public remain safe. As part of the protests occurring between June 8, 2020 and June 19, 2020, large groups of thousands shut down portions of Interstate 84, Interstate 5, as well as bridges and streets throughout Portland. The vast majority of these protests have occurred without police intervention, and with minimal or no police presence. (Declaration of Chris Davis ("Davis Decl."), ¶ 5).

Page 2 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

Unfortunately, PPB and other law enforcement agencies have also dealt with a smaller group of protestors who have lit fires, broken windows, graffitied buildings and otherwise engaged in property damage in the Downtown core, along portions of NE Martin Luther King Jr. Blvd (MLK), and in other parts of the City. Officers attempting to police this more violent group of protestors have consistently encountered individuals within this smaller group throwing items at them, including rocks, glass bottles, fireworks, bricks, and other items. (Davis Decl., ¶ 6). Those clashes have led to frequent officer injuries and damage to public property. (Davis Decl., ¶ 7; Declaration of Leann Barnet ("Barnet Decl."), ¶¶ 6-17; Declaration of Casey Hettman ("Hettman Decl.,"), ¶ 15).

As the protest activities continued, PPB experienced damage to police facilities, uniforms, work equipment, and vehicles on a daily basis. The damage exceeded the quantity and severity of reports that PPB's quartermaster had seen or been aware of for any prior years. (Barnet Decl., ¶ 6). From May 28, 2020, through November 17, 2020, PPB dealt with peaceful protests turning into riots or unlawful assemblies on a near-nightly basis. (Davis Decl., ¶ 12).

When a peaceful protest turns violent, PPB will declare that the gathering has become a riot or an unlawful assembly. PPB will then begin issuing the crowd orders to disperse and leave the streets (Dobson Decl., ¶¶ 10-12). At that point, the Incident Commander will work with the officers stationed in the Long-Range Acoustical Device ("LRAD") vehicle, also referred to as the "sound truck," who will make and transcribe those announcements. (Hettman Decl., ¶ 7). As the sound truck makes announcements, PPB will simultaneously broadcast the sound truck announcements on its social media through textual posts on its public Twitter account (Hettman Decl., ¶ 12).

B.    Existing Restrictions on PPB's Use of Force

After PPB has issued warnings to the crowd and declared a riot or unlawful gathering, people who refuse to comply with police orders to disperse may be subject to uses of force by law enforcement. PPB's use of force currently operates under several administrative, legislative,

Page 3 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
          FOR PRELIMINARY INJUNCTION

and judicial restrictions.

           1.     *CS Gas*

First, PPB's use of CS gas has historically been governed by two of its internal bureau directives, Directive No. 635.10, Crowd Management/Crowd Control, and Directive No. 1010.00, Use of Force. (*See Don't Shoot Portland,* Declaration of Craig Dobson in Support of City of Portland's Response to Plaintiff's Motion for TRO ("Dobson Don't Shoot Portland TRO Decl."), ECF No. 19, ¶¶ 7, 8). Directive No. 635.10 distinguishes between civil disobedience (a non-violent form of protest) and a civil disturbance ("an unlawful assembly that constitutes a clear and present danger of riot, disorder, interference with traffic…"). Directive No. 635.10 designates an Incident Commander as the police official responsible for all incident activities, including the development of strategies and tactics and the ordering and release of police resources, including the authorization for all riot control agents, including CS gas. (*Id*., at ¶¶ 9, 19, and 20). Under Directive No. 1010.00, all use of force by PPB officers must meet the constitutional standard of *Graham v. Conner*, 490 U.S. 386 (1989). More specifically, Directive No. 1010.00, section 6.4.6.1 and 6.4.6.2 detail the permitted parameters of riot control agents, including CS gas. (*See Don't Shoot Portland*, Declaration of Franz Schoening in Support of City of Portland's Response to Motion for TRO ("Schoening Don't Shoot Portland TRO Decl."), ECF No. 18, ¶¶ 4, 5, 9 and 10).

Second, on June 6, 2020, City of Portland Ted Wheeler, as Commissioner-in-Charge of the PPB, directed then PPB Chief Jamie Resch that CS gas "should not be used unless there is a serious and immediate threat to life safety, and there is no other viable alternative for dispersal." The Mayor made clear that CS gas "should only be used in response to violence that threatens life safety." (*See* Dobson Don't Shoot Portland TRO Decl., ECF No. 19, ¶ 13). The PPB has followed the Mayor's Executive Order. (*Id*. at ¶ 14).

Third, plaintiffs acknowledge that in *Don't Shoot Portland*, Chief Judge Hernandez, in addressing the possibility that CS gas might collaterally affect peaceful protestors, issued a

Page 4 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
                  FOR PRELIMINARY INJUNCTION

temporary restraining order limiting PPB's use of CS tear to situations where "the lives or safety of the public or police are at risk." (Plaintiffs' Motion, page 7). (*See* also *Don't Shoot Portland*, ECF No. 29). Judge Hernandez entered the following relief in the Order on June 9, 2020:

> The Court therefore orders that PPB be restricted from using tear gas or its equivalent except as provided by its own rules generally. In addition, tear gas use shall be limited to situations in which the lives or safety of the public or the police are at risk. This includes the lives and safety of those housed at the Justice Center. Tear gas shall not be used to disperse crowds where there is no or little risk of injury.
>
> This order will expire in 14 days unless extended, superseded, or vacated by a subsequent order. Plaintiffs are not required to post security.

(*Id*.).

On July 15, 2020, by way of Minute Order, Judge Hernandez granted the parties' joint request to continue the TRO until further order by the Court. (*See* also *Don't Shoot Portland*, ECF No. 133).

Finally, on June 30, 2020, Oregon Governor Kate Brown signed House Bill 4208 ("HB 4208"), limiting how and when Oregon law enforcement agencies may deploy "tear gas," including CS gas. Under the new law, Oregon police agencies may only use CS gas in circumstances constituting a riot under ORS 166.015, and only after announcements are made, sufficient time is allowed for persons to leave the area, and a second announcement is made prior to deployment.

2.  *Impact Munitions, Aerosol Agents, Batons, Other Forms of Physical Force*

Similarly, PPB Directive No. 635.10, Crowd Management/Crowd Control, and Directive No. 1010.00, Use of Force, section 6.4.6, also set out rules for PPB's use of other forms of riot control agents, including impact munitions and aerosol restraints. (*See* Schoening Don't Shoot Portland TRO Decl., ECF No. 18, ¶¶ 9,10.) Directive 1010.00, section 6.4.1 sets out authorized and restricted uses of batons. Finally, Directive 1010.00 and its incorporation of the *Graham*

Page 5 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

standard, governs other uses of physical force or control, including physical pushing.

In addition, on June 26, 2020, Chief Judge Hernandez, adopted the parties' stipulated additional TRO restricting PPB's use of less lethal munitions and aerosol restraints in connection with crowd control activities to the rules set forth in PPB's Use of Force Directive No. 1010.00. (*See Don't Shoot Portland*, ECF No. 43.) This TRO restricted PPB in using the following munitions in connection with crowd control as follows:

> (1) FN303s and 40MM less lethal launchers with or without OC payload are limited to use as outlined in PPB Use of Force Directive 1010, and in addition shall not be used where people engaged in passive resistance are likely to be subjected to the force.
>
> (2) Rubber Ball Distraction Devices ("RBDD") shall be limited to use as outlined in PPB Use of Force Directive 1010. In addition, use of RBDD shall be limited to situations in which the lives or safety of the public or the police are at risk and shall not be used to disperse crowds where there is no or little risk of injury.
>
> (3) Aerosol restraints (handheld OC or "pepper spray") shall not be used against persons engaged in passive resistance, and consistent with PPB Use of Force Directive 1010, members shall minimize exposure to non-targeted persons.
>
> (4) Long Range Acoustical Devices ("LRAD") shall be prohibited for use as a warning signal or distraction tactic and shall be used for announcements only.
>
> "Passive resistance" as used above means a person's non-cooperation with a member that does not involve violence or other active conduct by the individual.
>
> This order shall remain in effect until July 24, 2020 or until the Court orders otherwise, or by agreement of the parties.

(*Id*).

Judge Hernandez has extended this TRO until further notice from the Court. (*See Don't Shoot Portland*, ECF No. 133.).

Mayor Wheeler's directive regarding the use of CS gas, and HB 4208, the new Oregon state law regarding CS gas, all remain in effect. (Dobson Decl., ¶ 24.) Defendants also point out

Page 6 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
          FOR PRELIMINARY INJUNCTION

that PPB's crowd management policy, Directive No. 635.10

(https://www.portlandoregon.gov/police/article/649358), and its more general use of force

policy, Directive No. 1010.00 (https://www.portlandoregon.gov/police/article/751998), have

been for over eight years, and continue to be, subject to review and oversight by the United

States Department of Justice. (*See Wise et al.,* Declaration of Craig Dobson, ECF No. 19, ¶ 15.)

        3.    *Index Newspapers Injunction – Press*

On July 16, 2020, this Court entered a Stipulated Preliminary Injunction in the case of

*Index Newspapers et al v. City of Portland et al*, Case No. 3:20-cv-1035-SI, enjoining the City

and its agents and employees from "arresting, threatening to arrest, or using physical force

directed against any person whom they know or reasonably should know is a Journalist or Legal

Observer...unless the Police have probable cause to believe that such individual has committed a

crime." (*Index Newspapers*, ECF No. 48). That injunction specifically did not enjoin local law

enforcement's ability to declare an unlawful assembly and disperse a crowd: "The Police may

issue otherwise lawful crowd-dispersal orders for a variety of lawful reasons. The Police shall

not be liable for violating this Order if a Journalist or Legal Observer is incidentally exposed to

crowd-control devices after remaining in the area where such devices were deployed after the

issuance by the Police of an otherwise lawful dispersal order." *Id.*

On August 20, 2020, this Court extended the preliminary injunction to cover the actions

of Federal law enforcement as well. (*See Index Newspapers*, ECF No. 157).

On September 23, 2020, this Court extended an amended version of the preliminary

injunction indefinitely until a final decision on the legal issues in the *Index Newspapers* case.

The amended preliminary injunction added a statement that "No Journalist or Legal Observer

protected under this Order may impede, block, or physically prevent the lawful activities of

police." (*See Index Newspapers*, ECF No. 185).

        C.    PPB's Policies Concerning People With Disabilities

PPB conforms to the City's ADA Title II policy and provides meaningful access to

Page 7 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

enable people with disabilities to participate in PPB's programs, services, and activities.
Persons with disabilities who need to make a request for modification, translation, interpretation
or language services, or who may require an auxiliary aid or service for effective
communication with PPB, or who wishes to file a complaint pertaining to ADA matters, are
directed to contact PPB's Civil Rights Title VI and ADA Title II Coordinator by phone, email,
TTY at 503-823-6868, or Oregon Relay Service at 711. (Declaration of Marlon Marion ("Marion
Decl."), ¶¶ 5-8).

　　　PPB's public facing ADA information is found most readily at its website
(https://www.portlandoregon.gov/police/). The website contains a page dedicated to Title II and
provides methods to submit requests for accommodation under the ADA. The same page
contains information specific to attending protests and details about PPB crowd management
policies and how information is communicated to the public during protests. (Marion Decl., ¶ 8.)

　　　To make announcements and warnings and disseminate information during protests, PPB
uses multiple strategies that include a sound truck to broadcast announcements. The
announcements are simultaneously "tweeted" via PPB's Twitter page @PortlandPolice
(https://twitter.com/portlandpolice). Flash Alerts and YouTube are additional vehicles by which
PPB provides information about activities at protests.
https://www.portlandoregon.gov/police/article/767813. (Dobson Decl., ¶¶ 13, 32; Hettman Decl.,
¶ 14.))

　　　PPB also strives to review and update its directives on a two-year cycle. Directive
640.36, which pertains to effective communication with Deaf and Hard of Hearing community
members is currently under review. (Declaration of Ashley Lancaster, ¶¶ 4-10).

## III.　PLAINTIFFS CANNOT MEET THE TEST FOR A PRELIMINARY INJUNCTION IN THIS CASE

### A.　Legal Standard

A preliminary injunction is available where there are "serious questions going to the

merits and a hardship balance that tips sharply toward the plaintiff[s]," but only if plaintiff also "shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

In either case, Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008) (internal citations omitted). Significantly, plaintiffs bear the burden of proving each of the elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief."). The requirement for a plaintiff, on a motion for preliminary injunctive relief "for substantial proof is much higher" than even what is required in connection with summary judgment. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

In another recent case arising out of last year's protests, the Court described the higher standard when plaintiffs seek a mandatory injunction:

> The already high standard for granting a TRO or preliminary injunction is further heightened when the type of injunction sought is a "mandatory injunction." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden is "doubly demanding" for a mandatory injunction). To obtain a mandatory injunction, a plaintiff must "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Id.* (emphasis in original). As explained by the Ninth Circuit:

> A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." A mandatory injunction orders a responsible party to take action. A mandatory injunction goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored. In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.

Page 9 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

> The *status quo ante litem* referenced in *Chalk* means the last,
> uncontested status which preceded the pending controversy. *Marlyn
> Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873,
> 878–79 (9th Cir. 2009) (quotation marks and citation omitted)
> (alterations in original).

*Wise et al. v. City of Portland et al.*, Case No. 3:20-cv-01193-IM, 483 F.Supp.3d 956, 966 (D Or

Sep. 2, 2020).

In this case, plaintiffs seek an injunction that would both force PPB to incorporate new

elements into its crowd management policing as well as systematically prevent PPB from

utilizing many of the tools it frequently uses for crowd management. Plaintiffs therefore seek a

major disruption of the *status quo* and accordingly must meet the higher standard for a

mandatory injunction.

B.    <u>Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits</u>

As described above, plaintiffs' Complaint alleges physical injuries from previous

instances of PPB or the other defendants using riot control agents or other force to disperse

crowds. Success on these claims of individual injury "would entitle plaintiffs to money damages

only, *not* injunctive relief." *Campbell v. City of Oakland*, 2011 WL 5576921, at *3 (N.D. Cal.

Nov. 16, 2011) (citing *Winter*, 555 U.S. at 20). But plaintiffs seek a preliminary injunction

against the City and the other law enforcement defendants, not damages against individual

officers.

Title II of the Americans With Disabilities Act provides that "no qualified individual with

a disability shall, by reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity."[1] 42 U.S.C. § 12132.

Discrimination includes a failure to reasonably accommodate a person's disability. As

United States Department of Justice regulations state: "A public entity shall make reasonable

---

[1] Plaintiffs also seek relief under Section 504 of the Rehabilitation Act. "Because of the nearly identical language of 42 U.S.C. § 12132 and § 504 of the Rehabilitation Act … [courts] construe the two provisions as co-extensive." *Sanchez v. Johnson*, 416 F.3d 1051, 1062 (9th Cir. 2005).

Page 10 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

In order to state a claim of disability discrimination under Title II, a plaintiff must allege four elements: (1) they are an individual with a disability; (2) they are otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) they were either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of their disability. *McGary v. City of Portland*, 386 F.3d 1259, 1264–65 (9th Cir. 2004) (citing *Thompson v. Davis,* 295 F.3d 890, 895 (9th Cir. 2002) (per curiam), *cert. denied,* 538 U.S. 921, 123 S.Ct. 1570, 155 L.Ed.2d 311 (2003)).

To successfully make a claim against the City under 42 U.S.C. Section 1983, a plaintiff must establish: "(1) that the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the municipality had a policy, custom, or practice; (3) that policy, custom or practice amounted to a deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy, custom, or practice was the moving force behind the constitutional violation." *Sternberg v. Town of Danville*, 2015 WL 9024340, at *3 (N.D. Cal.) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). A plaintiff may also establish this type of *Monell* liability [*Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978)] against the City where the employee engaged in the unconstitutional act was a final policymaker. *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003).

The requirement that plaintiff must show that a government employee's allegedly unconstitutional actions were taken pursuant to a municipal policy or custom "does not merely apply to efforts by plaintiffs to recover damages from a municipality for employee wrongdoing;

Page 11 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

it also applies to any effort to seek an injunction against the municipality." (*Martinez v. City of Santa Rosa*, 482 F.Supp.3d 941, 942-43 (N.D. Cal 2020), *citing Los Angeles County v. Humphries*, 562 U.S. 29, 131 S.Ct. 447, 178 L.Ed.2d 460 (2010)).

Here, plaintiffs cannot show that the City has either an official policy, custom or practice regarding the use of riot control agents, or other forms of physical force during crowd control situations, that amounts to deliberate indifference to plaintiffs' rights under the ADA or the First, Fourth, Fifth and Fourteenth Amendments. Rather, the declarations of PPB's principal Incident Commanders show that PPB's use of riot control agents is measured, proportional, and necessary to address the severe public safety risks created by the criminal acts of certain persons. (*See* Dobson Don't Shoot Portland TRO Decl., ECF No. 19, ¶¶ 22-26; Dobson Don't Shoot Portland Declaration in Support of Preliminary Injunction ("Dobson Don't Shoot Portland PI Decl."), ECF No. 113, ¶¶ 20-32, 34-39, 41-46, 51-59, 64-69, 72-73, 79-86, 90-96, 99-109, 111-112; Schoening Don't Shoot Portland TRO Decl., ECF No. 18, ¶115; Declaration of Anthony Passadore in Support of Defendant City of Portland's Response to Plaintiffs' Motion for Preliminary Injunction and Motion for Contempt ("Passadore Don't Shoot Portland Decl."), ECF No. 111, ¶¶ 18-20, 27-28, 31-36, 40, 51-58; *Wise et al.* Dobson Decl., ECF No. 19, ¶¶ 10-14.).

1.   *City Defendants' Policies and Procedures Do Not Violate the Americans with Disabilities Act*

Plaintiffs seek a preliminary injunction ordering defendant City and PPB and other law enforcement defendants to do the following:

- Provide effective communications, such as ASL interpreters and visual messaging systems, when conveying orders or other directions to people who are deaf or hard of hearing at protests;

- Cease the use of "bull-rushes" and similar practices that do not provide people with disabilities adequate time or directions or provide adequate time and clear and consistent directions for individuals with disabilities to comply with lawful orders;

- Identify and inform protesters and others of accessible avenues of egress before dispersing a crowd or taking other actions that may place persons with disabilities in danger;

Page 12 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

- Cease using chemical munitions that negatively affect people with respiratory and inflammatory disabilities, and that negatively affect service animals, and remove remaining residue or chemical buildup from areas where such munitions have been used;

- Cease using strobe lights; and

- Cease separating people with disabilities from their assistants, interpreters, sighted guides and/or service animals.

    a.    PPB's Crowd Control Directives, Policies, and Practices Provide Effective Communication Consistent with Requirements of the ADA

Implementing regulations for Title II provide that a public entity must "take appropriate steps to ensure that communications" with disabled persons "are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). The regulations provide in pertinent part:

> (b) (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.
>
> (2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

The Appendix to the ADA regulations also makes clear that the public entity has a duty to ensure effective communications and establishes a required deference that must normally be given to a disabled person's personal choice of aid and service:

> The public entity shall honor the choice [of the individual with a disability] unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be

Page 13 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

> required under § 35.164. Deference to the request of the individual
> with a disability is desirable because of the range of disabilities, the
> variety of auxiliary aids and services, and different circumstances
> requiring effective communication.

*Id.* pt. 35, App. A (alteration in original) (quoting 28 C.F.R. pt. 35, App. A (2009)). The

Appendix goes on to explain that "the type of auxiliary aid or service necessary to ensure

effective communication will vary with the situation." *Id.* These regulations "require effective

communication in courts, jails, prisons, and with law enforcement officers." *Id.*

One limitation on this duty, however, provides that a public entity is not required "to take

any action that it can demonstrate would result in a fundamental alteration in the nature of a

service, program, or activity or in undue financial and administrative burdens." *Id.* § 35.164; *see*

*also id.* pt. 35, App. A.

i.    Plaintiffs' requests for auxiliary aids are not feasible under
dynamic protest conditions

It is important to note that the hundreds of protests that have taken place since May 28,

2020, have varied significantly in size, location, timing, and attendance. Further, the protests

have been spontaneous, unscheduled, and unpermitted, morphing from one moment to the next.

While the majority of protests have been peaceful expressions of First Amendment rights,

requiring minimal to no PPB presence or intervention, a small number of protests that required

PPB presence devolved into unlawful civil disturbance.

After receiving plaintiffs' requests for an ASL interpreter and/or visual messaging

systems, PPB researched the feasibility of implementing these requests, and reached out to over

200 law enforcement agencies regarding their communication tools during protests. The agencies

that responded said they use the same communication methods for protests as PPB, namely a

sound amplifying device to broadcast messages at the scene and use of social media to further

spread the message. (Dobson Decl., ¶ 32.)

Independently, PPB reviewed the plaintiffs' request for modification of existing policy to

include an ASL interpreter at all times in PPB's activities and responses to protests but

Page 14 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

determined such request was not a reasonable accommodation. The challenges PPB identified in connection with providing an ASL interpreter as part of communicating information, warnings, and orders under Directive No. 653.10 include first and foremost a safety concern for the individual providing interpreting services, and logistically finding a place to stage an interpreter where they will be seen in an oftentimes moving crowd. (Davis Decl., ¶16; Dobson Decl., ¶ 34; Hettman Decl., ¶ 9).

In regard to a visual messaging system, PPB has evaluated the use of a road signage trailer that would wheel a light display that can show pre-programmed messages. This road signage trailer display would be what the public may see along highway shoulders or road construction sites. It may be used to direct vehicular traffic and possibly pedestrians entering an event or avoiding a location, or fixed location obstructions. This type of display is meant to be situated at a static location. To capture the driver or pedestrian attention quickly, these trailers display limited messages  such as "Please Slow Down", "Reduce Speed", "Photo Radar in Use", "Construction Ahead", "Left Lane Closed", "Click it or Ticket". Although messaging is easily visible up to a certain distance, this type of visual messaging system is cumbersome to move and can only provide limited text information of fixed responses. Road Signage Trailer does not accommodate the ebbs and flows of public messages in dynamic crowd management where re-direction may need to change depending on the violence and criminality happening in a crowd or the law enforcement response to such activities. Additionally, based on protestors intentionally targeting police property used for communications such as the PPB sound truck, it is likely that a readerboard could become a potential target for protestor destruction. (Hettman Decl, ¶ 15; Dobson Decl, ¶ 33; Davis Decl., ¶ 15). Accordingly, a readerboard would present challenges for PPB regarding its potential to be a target as well as the logistics and expense associated with the readerboard. (*Id*.)

PPB also researched additional types of visual messaging system called mobile advertising signage, a digital platform attached to or fixed on a vehicle, as well as a building

Page 15 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
              FOR PRELIMINARY INJUNCTION

projection system. However, these messaging systems are not rated for withstanding projectiles, and it would be difficult to station them in a location where they could be effectively used during a dynamic protest situation. (Dobson Decl., ¶ 33).

As noted above, the implementing regulations for Title II make it clear that while public entities are required to provide auxiliary aids and deference is given to the type of aid being requested by the person with the disability, this must be balanced with considerations such as the nature, length, and complexity of the communication involved, and the context in which the communication is taking place. 28 C.F.R. § 35.160(b)(2).

The types of auxiliary aids plaintiffs are requesting will not provide effective communication under Directive No. 653.10 in a protest situation, where PPB's current policies and practices already account of effective communication. Therefore, plaintiffs' request for an ASL interpreter and visual messaging systems are not reasonable accommodations.

          ii.     PPB policies and practices already provide the requested time and direction for those with disabilities to comply with dispersal orders.

Consistent with Directive 635.10 Section 8, whenever feasible PPB begins issuing announcements and warnings in an effort to keep a protest lawful, and well in advance of a finding that a protest has transitioned from civil disobedience to a civil disturbance. Specifically, warnings are designed to allow the crowd time to comply with orders given from police members. The Directive states that when tactically feasible and time permits, members shall issue a minimum of two warnings at reasonable intervals to notify the crowd of an impending order. PPB inevitably provided and will continue to provide more than the minimum number of warning. In almost all cases when warnings have been issued, PPB has issued them at regular intervals, repeatedly, up to an hour prior to a crowd dispersal order. For example, on September 26, 2020, the sound truck began issuing warnings to the crowd to move out of the public street at 8:57 PM and continued to give warnings until 11:41 PM when the police declared an unlawful assembly. (Hettman Decl., ¶ 11, 13, Exhibit 101).

Page 16 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

In another example where the crowd's behavior dictated a quicker police response, on August 23, 2020, the sound truck gave multiple warnings between 10:09 PM and 10:30 PM, when PPB declared an unlawful assembly. During that entire time, people remained in the street and continued to throw projectiles at the sound truck. The sound truck repositioned itself frequently and continued to give the crowd announcements to disperse until 1:19 AM. *Id*. Some of these announcements were captured on plaintiffs' declarant Heather Van Wilde's video footage and five audible announcements can be heard at 1:20:36 to 1:33:07 of Exhibit 1 to the Van Wilde declaration (ECF No. 38).

As to plaintiffs' second and third requests (additional time to disperse and/or provide clear directions for egress), PPB's current policies and practices already provide the requested notice and information. It is important to note that when a dispersal order is given under Directive No. 653.10, the behavior and activities of those who are in the protest have already devolved to an unlawful civil disturbance. Thus, the second request to cease the use of "'bull-rushes' and similar practices" will be addressed below.

        b.    Plaintiffs' requests for orders addressing PPB's crowd control strategies should be reviewed under an "exigent circumstances" reasonableness analysis, or would constitute a fundamental alteration to PPB's programs, activities and services

Plaintiffs seek an order that would prevent PPB and the other law enforcement defendants from using the following tactics: "bull-rushes" and other similar practices, chemical munitions (with removal of residue of such chemicals), and strobe lights.

Discussed elsewhere in this brief, PPB's use of riot control agents under Directive No. 653.10 Section 9, Crowd Dispersal, has been reviewed in other litigation and subject to limitations from those cases. *See, e.g., Don't Shoot Portland,* No. 3:20-cv-00917-HZ; *Index Newspapers,* No. 3:20-cv-1035-SI; *Wise,* No. 3:20-cv-01193 IM. Specifically, this portion of the directive provides:

        9.2. When the crowd has been ordered to disperse and does not heed repeated warnings, and no reasonable alternative is apparent, riot

Page 17 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

control agents (RCAs) and/or special impact munitions may be
deployed to prevent violence, injury or property damage and to
avoid a greater application of force.

9.2.1. These weapons shall only be used at the direction of the CMIC
and when avenues of escape (i.e., clear path or route) are available
to the crowd.  Pursuant to this policy and Directive 1010.00, Use of
Force, members must issue warnings prior to deployment.

The analysis for protest situations where PPB is acting under Directive No. 653.10 Section 9,

Crowd Dispersal, is the analysis discussed under *Sheehan v. City & Cty. of San Francisco*, 743

F.3d 1211 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom. City & Cty. of San*

*Francisco, Calif. v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015).

In *Sheehan*, the Court held that the ADA applied to arrest situations:

The ADA therefore applies to arrests, though we agree with the
Eleventh and Fourth Circuits that exigent circumstances inform the
reasonableness analysis under the ADA, just as they inform the
distinct reasonableness analysis under the Fourth Amendment.

*Id*. at 1232.

The Court goes on to discuss that courts have recognized at least two types of Title II

claims applicable to arrests: (1) wrongful arrest, where police wrongly arrest someone with a

disability because they misperceive the effects of that disability as criminal activity; and (2)

reasonable accommodation, where, although police properly investigate and arrest a person with

a disability for a crime unrelated to that disability, they fail to reasonably accommodate the

person's disability in the course of investigation or arrest, causing the person to suffer greater

injury or indignity in that process than other arrestees. *Id.*

In the majority of the situations detailed by declarants in support of Plaintiffs' Motion for

Preliminary Injunction, where PPB was involved, PPB had declared a civil disturbance and

ordered the crowd to disperse. These circumstances are analogous to the two situations discussed

by the *Sheehan* court (wrongful arrest or failure to provide an accommodation). At the point

where riot control agents are in use, it is difficult to interact with protesters on an individual basis

in order to assess whether a request for an ADA accommodation has been made, can be

Page 18 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

reasonably granted, or if an individual has a qualifying disability that is impacting their interaction with or responses to PPB directions. PPB asserts that the actions or inactions taken under those exigent circumstances were reasonable under the *Sheehan* analysis.

In the majority of the situations described by plaintiffs' declarants, there is no clear accommodation request made from the plaintiffs at any point before officers have ordered a crowd to disperse and plaintiffs are subjected to uses of force because plaintiffs have not left the area where officers are dispersing the crowd. Plaintiffs make the conclusory assertion that defendants were on notice of plaintiffs' accommodation requests throughout their Motion. (*See*, e.g., Plaintiffs' Motion, at 8. Plaintiffs' evidence that the City would be on notice, however, is largely based on generalized assertions that do not relate to specific plaintiffs and do not provide adequate notice of a particular person requesting a specific accommodation for a disability. (*See*, e.g., Declaration of Philip Wolfe, ECF No. 41, ¶ 11; Declaration of Tom Stenson, ¶ 8, Exhibit 1). Generalized demands for fundamental alterations of existing programs, activities and services do not constitute accommodation requests under the ADA.

Moreover, there is no evidence that any plaintiff has ever attempted to use the City's existing process for submitting an ADA request to PPB's ADA Coordinator. (*See* Marion Decl.) During his tenure with PPB as its ADA Coordinator, which includes the period from May 2020 to the present, PPB's ADA Coordinator has not received any requests for ADA accommodations related to the protests. (Marion Decl., ¶ 11).

The only declarant who appears to have made a specific accommodation request is Heather Van Wilde, who is not currently a plaintiff to this lawsuit and whom plaintiffs do not refer to at all in the Motion for Preliminary Injunction.

Heather Van Wilde describes sending an email to City staff on August 9, 2020, requesting accommodations that are similar to the relief plaintiffs request in this lawsuit, although the Van Wilde declaration does not attach the referenced email as an exhibit. (*See* Declaration of Heather Van Wilde ("Van Wilde Decl."), ECF No. 38, ¶¶ 14-15). On August 23,

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

2020, Van Wilde then attended a protest where Van Wilde captured nearly two hours of video footage without incident before police moved to disperse the crowd (Van Wilde Decl., ¶¶ 16-20, Exhibit 1). There is no indication that the officer was aware of the email Van Wilde had sent to City staff two weeks earlier or that Van Wilde made the officer aware of any previous accommodation request. Instead, Van Wilde asserted a press privilege as the reason why Van Wilde refused to leave the street. (Van Wilde Decl., ¶ 19).

Plaintiffs also assert that Juniper Simonis and Melissa Lewis made individual accommodation requests to officers during protests (*See* Plaintiffs' Motion, at 19-20). Juniper Simonis's requests, and indeed all of the allegations in Simonis's declaration, appear to be asserted solely at the federal defendants in this case and there is no evidence that any City defendant was aware of Simonis's request (*See* Declaration of Juniper Simonis, ECF No. 39, ¶¶ 18-21). Melissa Lewis's declaration describes her making supposed accommodation requests to officers only after violent situations have led to officers declaring riots or unlawful assemblies. (*See* Lewis Decl., ECF No. 42, ¶¶ 18-22, Exhibits 1-3). Thus, her requests were made while law enforcement was dealing with exigent circumstances and officers would not be in a position to provide a reasonable accommodation while they were actively engaged in clearing the streets. In sum, plaintiffs fail to show that they made reasonable accommodation requests on behalf of protestors with disabilities and plaintiffs fail to show that they were denied reasonable accommodations.

Finally, as discussed above, the City is subject to limitations on its use of riot control agents under Directive No. 653.10 Section 9, Crowd Dispersal, in connection with other litigation, as well as the Mayor's directive to PPB regarding the use of CS gas. Implicit in these orders is the underlying acknowledgment that Directive No. 653.10 Section 9 is a fundamental part of PPB's programs and activities. To grant plaintiffs' motion would be to fundamentally alter PPB's programs and activities and serve as a significant deterrent in PPB's ability to maintain public order.

Page 20 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

2.      *City Defendants' Policies and Procedures Do Not Violate Plaintiffs' First Amendment Rights*

Peaceful protests are undeniably a protected form of speech; rioting and unlawful conduct are not. Contrary to the narrative plaintiffs have put before this Court, PPB does not arbitrarily declare a protest a riot or an unlawful gathering, but only does so when officers perceive a legitimate threat to the officers' or citizens' personal safety or legitimate attempts by protestors to damage property. (*See* Dobson Decl., ¶ 10-11).

Plaintiffs' own declarations speak to some of this lawlessness and violence. For example, the Declaration of Melissa Lewis states that during a September 6, 2020 protest, she observed that "One person in the crowd...threw Molotov cocktails that struck protesters and journalists." (Lewis Decl., ECF No. 42, ¶ 20). The videos submitted by plaintiffs as exhibits to their declarations also show protestors at times throwing projectiles and shining laser pointers at the police. (*See* Declaration of Katalina Durden, ECF No. 37, Exhibit 1; Lewis Decl., ECF No. 42, Exhibit 5).

As discussed above, the protests in Portland descended into lawlessness on a near-nightly basis throughout the spring, summer and fall of 2020, and police had to declare riot or unlawful assemblies to disperse crowds in order to protect personal safety and property. (Davis Decl., ¶ 10-12; Dobson Decl., ¶ 10-11).

Under ORS 131.675 and ORS 162.247, police have authority to disperse a lawless crowd and arrest those who do not comply with the dispersal order. *See Index Newspapers LLC et al v. City of Portland et al*, Case No: 20-cv-1035-SI, 480 F.Supp.3d 1120, 1126 (2020) ("When local law enforcement lawfully declares a riot and orders people to disperse from city streets, generally they must comply or risk arrest"); *Wise et al v. City of Portland et al*, Case No. 3:20-cv-01193-IM, 2020 WL 5231486, at *8 (D Or Sep. 2, 2020), *citing* ORS § 131.675. ("Once an unlawful assembly or riot has been declared, the PPB has authority under Oregon law to disperse the group, and arrest those who fail to comply with police orders."). Whether or not a gathering or assembly of people has become unlawful is determined by whether the conduct of persons

Page 21 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

within the group presents a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order..." *City of Portland v. Hemstreet*, 119 Or App 239, 242 (1993) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)).

The declarations of Deputy Chief Davis and Commander Dobson, as well as past declarations by Commander Dobson, Captain Passadore, and Lieutenant Schoening, provide the context for the police use of force alleged by plaintiffs. The continuous, violent, life-threatening attacks on police officers and other persons at the Justice Center, the Federal Courthouse and PPB's North Precinct easily meets the *Hemstreet* standard.  (*See* Davis Decl., ¶¶ 6-12; Dobson Decl., ¶¶  7, 10-11; Dobson Don't Shoot Portland TRO Decl., ECF No. 19, ¶¶ 22-26; Dobson Don't Shoot Portland PI Decl., ECF No. 113, ¶¶ 20-32, 34-39, 41-46, 51-59, 64-69, 72-73, 79-86, 90-96, 99-109, 111-112; Schoening Don't Shoot Portland TRO Decl., ECF No. 18, ¶115; Passadore Don't Shoot Portland Decl., ECF No. 111, ¶¶ 18-20, 27-28, 31-36, 40, 51-58; Dobson Decl., ¶¶ 10-14). Additionally, the declarations of Leann Barnett and Casey Hettman show that protestors have intentionally targeted police personnel and public property with their actions (*See* Barnet Decl., ¶¶ 6-16; Hettman Decl., ¶¶ 15-18). There is no question that police have issued lawful orders to disperse streets in the face of nightly violence.

Plaintiffs were present in areas where police had declared riots or unlawful assemblies, and were subject to uses of force and sometimes arrests when police dispersed crowds (*See*, e.g., Lewis Decl., ¶¶ 18-22). Plaintiffs claim that these police actions chilled their speech, but plaintiffs ignore three distinctions with First Amendment law; First, "The presence of probable cause [for an arrest] should generally defeat a First Amendment retaliatory arrest claim." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019). In a crowd control event, reasonable force includes physical pushing and baton strikes because the government is not required to permit "organized lawlessness." *Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018).

Second, plaintiffs were not engaging in protected speech with a particularized message

Page 22 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

when they remained in areas where police had moved to disperse crowds. Certainly, the First Amendment protects not simply the written or spoken word from government interference, but also certain forms of expressive conduct. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Significantly though, a person's mere subjective intent to express an idea through conduct, does not necessarily merit First Amendment protection. *See United States v. O'Brien,* 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."); *see also Dallas v. Stanglin*, 409 U.S 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes … but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.")

Plaintiffs point to no particularized message regarding their remaining in areas where police have ordered crowds to disperse. Accordingly, plaintiffs have no unique status that allowed them to ignore those dispersal orders under the First Amendment. *See Wise et al v. City of Portland*, 483 F.Supp.3d at 967-68 (finding that protest medics did not show a particularized message giving them the right to ignore dispersal orders).

Third, plaintiffs' conduct was subject to an appropriate time, place and manner regulation when officers declared riots or unlawful assemblies. Regulation of speech is justified "if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id*. at 968, *quoting United States v. O'Brien*, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

Portland police have authority to issue lawful orders to disperse crowds under ORS 131.675, and police are entitled to use some level of reasonable force under the circumstances to effectuate the dispersal. *Wise, citing Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001). Accordingly, PPB's use of force to effectuate its dispersal orders is not a violation of

Page 23 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
            FOR PRELIMINARY INJUNCTION

plaintiffs' First Amendment Rights when plaintiffs were incidentally subject to force by remaining in areas where police had ordered the dispersals.

      3.    *City Defendants' Policies and Procedures Do Not Violate Plaintiffs' Fourth Amendment Rights*

Under the Fourth Amendment, a seizure results in a constitutional violation only if it is unreasonable. *Graham*, 490 U.S. at 395. The determination of reasonableness requires an examination of "whether the totality of the circumstances justified [the] seizure." *Tennessee v. Garner*, 471 U.S. 1, 8-9, (1985). In other words, context matters. "When the governmental interests at stake are substantial, a greater intrusion upon the Fourth Amendment rights of persons may be justified." *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012).

The analysis of use of force is a fact-specific inquiry which looks, in part but not exhaustively, at (1) the severity of the crime, (2) the immediacy of the threat to the safety of the officers or others, and (3) whether the suspect was resisting arrest or attempting to evade arrest. *Graham*, 490 U.S. at 396. Importantly, the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *See Terry v. Ohio*, 392 U.S. 1, 20-22 (1968). "The reasonableness analysis must make 'allowance for the fact that police officers are forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving –about the amount of force that is necessary in a particular situation." *Hadley v. City of Beaverton*, 2010 WL 1257609 at *12 (quoting *Graham*, 490 U.S. at 396). Plaintiffs bear the burden of proving that the force used was unreasonable. *Arpin v. Santa Clara Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001).

It is well-settled law that the City has a "legitimate interest in quickly dispersing and removing lawbreakers with the least risk of injury to police and others." *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). More specifically, the government has a safety interest in controlling a group of people, and force can be justified when protestors substantially outnumber officers and refuse to obey commands to disperse. *See Jackson v. City of Bremerton*,

Page 24 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
                FOR PRELIMINARY INJUNCTION

268 F.3d 646, 652-53 (9th Cir. 2001). Even if the potential for criminal activity involves only low-level misdemeanors, the government has a significant interest when the occurrence is wide-spread. *See Forrester*, 25 F.3d at 807.

Additionally, officers are permitted to use "less-than-lethal" alternatives in order to avoid unnecessary fatalities. *See Boyd v. Benton*, 374 F.3d 773, 779 (9th Cir. 2004). This rule is not surprising. Any plaintiff should be hard-pressed to complain about the application of less than lethal force in situations justifying deadly force, i.e., in situations presenting an immediate threat of death or serious bodily injury. In any event, in determining whether less than lethal force is excessive, the "context of the officers' actions must be considered[.]" *Nelson v. City of Davis*, 685 F.3d 867, 886 (9th Cir. 2012).

Plaintiffs fail to consider the context of the protests. They only discuss the conduct of the police and they often completely omit the circumstances that led them to a place where they were obstructing police activity or any observations of the crowds' behavior that led to police declaring a riot or unlawful assembly. Plaintiffs' self-serving declarations do not demonstrate that the law and facts clearly favor their position, as the Court at this stage of the litigation cannot make the credibility determinations necessary to find for plaintiffs on the merits of their claims without the benefit of discovery.

As the Court wrote in *Wise* when it found that plaintiffs could not prove a likelihood on the merits of Fourth Amendment claims:

> While some of these alleged instances do raise serious questions about the merits of the excessive force claims, Plaintiffs have not demonstrated that "the law and facts *clearly favor* [their] position," as required to obtain a mandatory injunction at this time. *Garcia*, 786 F.3d at 740 (emphasis in original). Many of the alleged instances of excessive force occurred while police were attempting to clear an area through a dispersal order. *See, e.g.*, Wise Decl., ECF 6 at ¶ 22 (describing being shot in the shin with a rubber bullet while attempting to pull another fallen protester out of a recently deployed cloud of tear gas). In other allegations, the context of the surrounding circumstances is entirely unclear. *See* Martinez Decl., ECF 9 at ¶ 32 (explaining that "[w]hile serving as a protest medic,

Page 25 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

[declarant has] been shoved, shot at, and tear gassed" without providing any further context). Plaintiffs claim they were targeted, but as previously mentioned, their appearance would not make them obviously distinguishable from others, particularly in the dark amongst a large crowd. Further, Plaintiffs often position themselves directly between law enforcement and other protesters during dispersals. *See* Durkee Decl., ECF 5 at ¶¶ 14–15.

Finally, in some circumstances, there are directly competing narratives about what transpired on the ground. *See* Dobson Supp. Decl., ECF 43–1 (explaining declarant Rivera's arrest occurred because he repeatedly shined a high-powered flashlight directly at police officers' eyes in an alleged attempt to obscure their vision); Rivera Supp. Decl., ECF 46 at ¶¶ 3–5 (refuting allegations declarant ever possessed a high-powered flashlight or shined it at officers). A determination of excessive force in this context is better suited through litigation of the underlying Complaint, upon fuller development of the record. This Court cannot make the credibility determinations necessary to find for the Plaintiffs on the merits of their Fourth Amendment claims at this stage.

*Wise*, 483 F.Supp.3d at 969-70.

4.    *City Defendants' Policies and Procedures Do Not Violate Plaintiffs' Fourteenth Amendment Rights*

Plaintiffs' Fourteenth Amendment Claims fail because PPB provides all protestors, including those with disabilities, fair and adequate notice and an opportunity to comply with dispersal orders before using force.

Plaintiffs allege Defendants have a policy, practice, and custom of failing to provide sufficient notice to people with disabilities to allow them to disperse or an opportunity to otherwise comply with lawful police orders before subjecting them to violence and arrest. (Plaintiffs' Complaint, ECF No. 1, ¶ 270)

PPB provides numerous audible dispersal orders through the sound truck and contemporaneous visual/alternate messaging via Twitter. Plaintiffs cite a number of cases that discussing the requirement of fair notice in the context of disorderly conduct statutes. PPB's dispersal orders constitute fair notice and provide adequate time for dispersal.

Plaintiffs' video exhibits demonstrate that multiple dispersal orders are given and

Page 26 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs choose to ignore those orders and remain in the area. The Ninth Circuit evaluated discussed similar behavior in *U.S. v. Poocha*. *Poocha* appealed his conviction for "intentionally fail[ing] to obey a lawful order" stemming from an altercation and spontaneous protest outside Curry Village Lodge in Yosemite National Park. *United States v. Poocha*, 259 F.3d 1077, 1082–83 (9th Cir. 2001). Poocha appealed his conviction alleging, in part, there was insufficient proof that he heard the order to disperse and willfully and intentionally disobeyed it. The Court found the relevant facts regarding notice as follows: 1) Ranger Lober made eye contact with Poocha and ordered him to disperse. 2) Poocha responded by yelling profanities at Ranger Lober. 3) Ranger Lober moved closer and repeated his instruction to leave. 4) Ranger Ingram approached Poocha, told him to leave and warned he would be arrested if he did not. 5) An acquaintance approached Poocha and convinced him to leave.

The Ninth Circuit held a reasonable factfinder could conclude that the dispersal order was clearly communicated to Poocha and Poocha intentionally defied the order by: 1) standing his ground; 2) shouting an obscenity at the ranger; and 3) refusing to leave until he was threatened with arrest and persuaded to leave by an acquaintance. The Court opined Poocha's conduct, though protected First Amendment speech, indicated that he heard and understood the order to leave and willfully disobeyed it.

This fact pattern mirrors many, if not all, of the incidents cited in plaintiffs' supporting declarations. Many protesters, including plaintiffs, remain after dispersal orders and after fair and ample notice warning that they may be subject to use of force. Plaintiffs Lewis and Durden, and Declarant Van Wilde identify both as individuals with disabilities and members of the press. Critically, their ability to remain after dispersal orders as members of the press has no bearing on the fairness or efficacy of the dispersal orders for evaluation of those orders in the context of the Fourteenth Amendment. For purposes of the due process claims, all protesters receive fair notice when dispersal orders are communicated through the LRAD and Twitter.

Plaintiffs' conduct, though possibly protected First Amendment speech, indicates they

Page 27 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

hear, understand, and ignore repeated dispersal notices. For example, Declarant Van Wilde's video exhibit contains five (5) audible dispersal announcements before the use of force incident.

Even to the extent the Court may question whether or not the subsequent use of force constitutes Fourth Amendment violations, it is clear plaintiffs have fair notice and opportunity to disperse and cannot maintain due process claims under the Fourteenth Amendment.

      C.    <u>Plaintiffs Cannot Show Irreparable Harm if No Preliminary Injunction Issues</u>

To obtain a preliminary injunction, plaintiffs must show that they will suffer *immediate and irreparable injury* in the absence of the requested relief. *Hodgers-Durgin v. Gustavo De La Vino*, 199 F.3d 1037 (9th Cir. 1999) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff[s] will be wronged again – a 'likelihood of substantial and immediate irreparable injury.'"). "The propriety of an injunction, in particular, hinges on a significant threat of irreparable injury that must be imminent in nature." *Gish v. Newsom*, 2020 WL 1979970, at *3 (C.D. Cal. Apr. 23, 2020) (citing *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999); *Baldridge*, 844 F.2d at 674. Moreover, "[A] federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

Judge Mosman recently relied on *Lyons* in *Rosenblum v. Does 1-10 et al.,* 3:20-cv-01161-MO (ECF 23); 2020 WL 4253209 in ruling that the State of Oregon lacked standing for injunctive relief. In that case, the Court found that the state did not have enough evidence that the unlawful seizures by unidentified federal agents on the streets of Portland in unmarked vans were likely to continue. See *Rosenblum* 2020 WL 4253209 *6.

Judge Mosman held:

> Standing is a remedy-specific inquiry. *See Lyons v. City of Los Angeles*, 461 U.S. 95, 105, 109 (1983) (holding that the plaintiff had standing to pursue damages for his past injury but lacked standing to pursue injunctive relief to prevent future harm). "Past exposure to harmful or illegal conduct does not necessarily confer standing to

Page 28 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
                FOR PRELIMINARY INJUNCTION

seek injunctive relief if the plaintiff does not continue to suffer adverse effects." *Mayfield*, 599 F.3d at 970 (citation omitted). In other words, injunctive relief requires more than a showing that a plaintiff has been harmed; it requires a showing that she will likely be harmed again. *Lyons*, 461 U.S. at 111 ("[An injunction] is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again in a similar way.").

This case is nearly on all fours with *Lyons.* In that case, the plaintiff was subjected to an unconstitutional chokehold by City of Los Angeles police officers, and he sought injunctive relief to prevent them from using chokeholds in the future. *Lyons*, 461 U.S. at 97-98. The United States Supreme Court held that he could not seek injunctive relief because he had no evidence that he would be subject to an unconstitutional chokehold again. *Id.* at 105-6. The court provided two primary examples of how a plaintiff could show the required "real or immediate threat that [he] will be wronged again:" either, "(1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 106.

The same is true here. The State has alleged that the purportedly illegal seizures by Defendants have caused an injury to its citizens' rights to speech and assembly. In other words, the State must show that the illegal seizures—analogous to the chokeholds in *Lyons*—will occur again in the future. The State could try to show, for example, that all of Defendants' seizures are illegal, or that they are under orders to fail to identify themselves or to make random arrests without probable cause. The state has shown none of this. It has presented no evidence of any official orders or policies and has presented no evidence that these allegedly illegal seizures are a widespread practice. Despite the broad language in the complaint, Oregon has shown—at most—that this type of seizure has happened twice.[7] At oral argument, when asked what evidence it could present to show the likelihood of future harm, the State pointed to the fact that Defendants have  defended against this lawsuit. Tr. at 39-40. Not only is defending a lawsuit not evidence of constitutionally unlawful behavior, it is not sufficient to support the showing the State is required to make under *Lyons.*

*Rosenblum,* 2020 WL 4253209, at *6 (D. Or. July 24, 2020).

In the case at hand the same is true. As previously stated above there are now existing restrictions on PPB's use of CS gas and the use of certain impact munitions. These include PPB's internal directives, Directive No. 635.10, Crowd Management/Crowd Control, and

Page 29 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
            FOR PRELIMINARY INJUNCTION

Directive No. 1010.00, Use of Force. Mayor Wheeler's Executive Order further limiting the use of CS gas only when there is a serious and immediate threat to life safety, and there is no other viable alternative for dispersal. And finally, and most importantly, the TROs issued by Chief Judge Hernandez in *Don't Shoot Portland*. Judge Hernandez's TRO restricting PPB's use of tear gas was entered on June 9, 2020. Judge Hernandez entered a stipulated additional TRO restricting PPB's use of certain crowd control munitions on June 26, 2020. These TROs are currently in effect and have been extended until further order of the Court.

Plaintiffs' concerns of irreparable harm if no new injunction is issued have been adequately addressed by the existing TRO restrictions and PPB policies and there is no need or constitutional right for additional special restrictions. While plaintiffs have arguably been harmed in the past and may seek redress for those harms as they have done in this lawsuit as individual plaintiffs, for an injunction to issue, *Lyon* requires a showing that they will likely be harmed again by PPB. With the current restrictions that is highly unlikely to occur and if it did, the City would be subject to a contempt motion in the other cases.

PPB has significantly reduced its use of CS gas following Judge Hernandez's order in *Don't Shoot Portland*. Since the June 9, 2020 TRO, PPB has only used CS gas on June 25, June 30, July 4, July 25, August 5, August 12, August 20 and August 23, 2020. A riot was declared on each of those days prior to PPB's use of CS gas (See Dobson declaration; *Don't Shoot Portland*, Passadore *Don't Shoot Portland* Decl., ECF No. 111, ¶¶ 25-48; 49-60). For July 4, 2020, *See Don't Shoot Portland*, Dobson Don't Shoot Portland PI Decl., ECF No. 113, ¶¶ 99-110. For July 25, 2020, *See* Dobson Decl., ¶¶ 8-15; For August 23, 2020, see Dobson Decl., ¶¶ 21-24).

Additionally, in regards to the protests generally, the lawless element of last year's protests has slowed down substantially since November 2020. PPB no longer must take action to disperse protests on a nightly basis. The Incident Command Center stopped nightly operations in mid-November 2020 (Dobson Decl., ¶ 35). Judge Mosman also cited the changed situation as his

Page 30 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
             FOR PRELIMINARY INJUNCTION

basis for lifting a preliminary injunction restricting the authority of federal law enforcement agents acting around the Hatfield federal courthouse in November 2020. *See Western States Center, Inc. Et al v. U.S. Dept. Of Homeland Security et al.,* No. 3-20-cv-01175-JR.

The situation on the ground during protests in Portland has changed significantly since the height of the protests between spring and fall of 2020. Plaintiffs appear to recognize that distinction, as only one declarant discusses any protest incidents after September 2020. (*See* Lewis Declaration, ¶¶ 29, 32). Despite the supposed danger of irreparable harm, plaintiffs waited until November 2020 to file their Complaint and then waited until February 2021 to file for preliminary injunction. That delay cuts against plaintiffs' argument that they will suffer irreparable harm if the Court does not issue an injunction. Plaintiffs' delay constitutes independent grounds for the Court to deny the injunction. *See, e.g., Newcomb et al v. City of Portland*, Case No. 3:20-cv-00294-SI, ECF No. 19 (Denying a Motion for Temporary Restraining Order "solely on the grounds that the Plaintiffs' delay before seeing a temporary restraining order implies a lack of urgency and a lack of irreparable harm."). Moreover, plaintiffs delay combined with the changed situation means that plaintiffs have failed to show the necessary irreparable harm.

> D.    <u>Plaintiffs Have Not Established and Cannot Establish that the Balance of Equities Weighs in Their Favor or that a Preliminary Injunction is in the Public Interest</u>

A plaintiff seeking a preliminary injunction or temporary restraining order must establish not only that he is likely to succeed on the merits and is likely to suffer irreparable harm in the absence of preliminary relief, but also that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter*, 555 U.S. at 20. "In exercising their sound discretion, courts of equity should pay particular regard for the public . . . consequences in employing the extraordinary remedy of injunction." *Id*. at 24 (internal citations omitted).

Here, the balance of equities now tips in favor of the City, and granting a preliminary injunction is not in the public interest. Plaintiffs do not address the burden on the defendants in

Page 31 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

their briefing outside of the conclusory statement that "any harm to the Defendants would be negligible." (Plaintiffs' Motion, ECF No. 35, at 34). The burden on the City is significant and includes officer injuries, injuries to other protesters in the area and individuals inside the Justice Center, and the burning and destruction of public and private buildings and property.  Officers must have the tools necessary to disperse violent crowds without needing to resort to more stringent uses of physical force such as repeated baton strikes or firearms. The Court in *Western States Center et al v. U.S. Dept. Of Homeland Security et al.* addressed the difficulty officers face when confronted with protestors in a violent crowd:

> Injunctions are supposed to be grounded in redressability. They typically should prevent action so that the threatened harm does not occur, without infringing on a defendant's legitimate interests or actions. What they must not do is paper over a problem with endless lawyer talk. This is particularly true here, where Plaintiffs seek finely-drawn limitations on law enforcement conduct in a situation that can involve hundreds or even thousands of protesters in a small area in front of the U.S. Courthouse, some of whom are engaged in violent conduct, in the middle of the night, all obscured by the smoke from commercial grade fireworks....nonviolent protesters found in the midst of such a melee cannot readily be distinguished from violent protesters.

*Western States Center*, 3:20-cv-01175-JR, 2020 WL 6555054 at *1. Here, plaintiffs propose a series of restrictions that ignore the difficulties and burdens police must consider when policing protests.

      1.    *CS Gas*

As discussed herein, after many hours each day of peaceful protests by thousands of people, PPB utilized riot control agents in very limited circumstances, after warnings were given, to disperse the crowd following a civil disturbance. The circumstances giving rise to these civil disturbances included the breaking of the windows of the Justice Center and other buildings, setting off fireworks, property destruction, looting, setting fires in the Justice Center and other areas of downtown, throwing and launching deadly projectiles at the police, and attempting to dismantle a fence put up to protect the Justice Center. Further, riot control agents have only been

Page 32 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
        FOR PRELIMINARY INJUNCTION

used on some nights, against smaller groups of protesters engaged in violent activity and refusing to follow lawful commands to disperse. The City's interest is in dispersing crowds in these circumstances where it is necessary to preserve the lives and the safety of the protesters, officers, and the individuals detained in the Multnomah County Detention Center. This is consistent with how riot control agents will be used moving forward, as required by PPB's directives and Mayor Wheeler's limitation on use of CS gas.

Weighing the hardship of the use of riot control agents against the benefits of protecting all individuals and government buildings in the area, while difficult, tips the equities in favor of the City. *See Friends of the Wild Swan v. Weber*, 955 F. Supp. 2d 1191, 1196 (D. Mont. 2013) (The balance of equities and public interest considerations, including the protection of governmental buildings and facilities, weighed in favor of the defendants.). . . Moreover, the use of riot control agents is limited to instances when "there no other viable alternative for dispersal" and may be used to "avoid a greater application of force." The City has no interest in deploying any force against a crowd. But the restrictive policy on the use of riot control agents is designed to ensure the least intrusive application of force necessary to maintain the important goal of protecting life and safety.

Should the Court determine that the balance of equities and public interest of both parties are compelling, then these two factors do not support the issuance of a TRO. In *Campbell*, the plaintiffs filed a motion for temporary restraining order alleging excessive force and seeking to enjoin the City of Oakland from using certain crowd control techniques during the "Occupy" protests. 2011 WL 5576921 at *1-2. The Court determined that both parties presented compelling interests:

> Plaintiffs, of course, seek to protect and exercise their First and Fourth Amendment rights in ways that implicate the public interest. The defendants, on the other hand, have indisputably accommodated the majority of the demonstrations, and seek to protect the safety and property of other Oakland residents.

Page 33 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
        FOR PRELIMINARY INJUNCTION

*Id*. at *5. The Court then held, "[a]ccordingly, the final two factors do not weigh in favor of issuing a TRO." *Id*. For the foregoing reasons, the balance of equities and public interest do not favor the granting of an injunction.

As discussed above, PPB is operating under several TROs, policy restrictions, and legislation enacted by the City and State.  As a result, to the extent Plaintiffs continue to complain about the police use of CS gas and less lethal munitions (see Second Motion, page 32), the restrictions already imposed on PPB by this Court readily address the concerns of Plaintiffs in this case related to those issues.

### 2.    *Plaintiffs' Other Proposed Injunctive Relief*

The balance of equities tips further towards the City due to the broad range of restrictions plaintiffs seek to impose through the preliminary injunction. Additionally, the remaining forms of injunctive relief are unworkable and would impose an incredible hardship on PPB, to the extent that PPB would be unable to disperse lawless crowds and fulfill its mission to protect life, safety and property. Plaintiffs ask this Court to impose restrictions on PPB that have no precedent in any Court in this country. Those restrictions would fundamentally diminish PPB's ability to address threats to public safety and property. The proposed injunction would prevent PPB from being able to effectively disperse crowds who had engaged in criminal activity (Davis Decl., ¶ 27).

First, live ASL-interpreters would not be feasible due for PPB to provide during protests for multiple safety and logistical reasons, including their potential as a target for protestor violence, and the difficulty with positioning an ASL-interpreter in a visible location where the interpreter could effectively communicate messages to protestors. The ASL-interpreter would need to be positioned at a height where officers and protestors could see them, and it would be challenging for sign language to be visible at night in a dark environment. Additionally, due to protestors often attempting to injure officers or targeting police property during protests, concerns about personal safety would be heightened for a live ASL interpreter during a protest

Page 34 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
                    FOR PRELIMINARY INJUNCTION

(Davis Decl., ¶ 16; Dobson Decl., ¶ 34; Hettman Decl, ¶ 9).

A readerboard would also not be feasible due to several reasons, including the expense of acquiring the readerboard; its potential as a target for protestors to destroy; and the difficulty with positioning a readerboard effectively so it could communicate messages to protestors. As protests are often spontaneous events that can cover numerous streets, readerboards would not be an effective tool for communicating police messages to protestors. They would also likely need to be mounted on vehicles to be at a visible height, which would create additional logistical challenges for moving a police vehicle into traffic (Davis Decl., ¶ 15; Dobson Decl., ¶ 32-33).

Second, plaintiffs also do not offer the Court any workable definition of their proposed bans on a "bull rush" or strobe lights, which leaves both defendants and the Court to guess what police tactics plaintiffs refer to with those proposed injunctions. The term "bull rush" could encompass nearly any rapid or aggressive movement by police, while "strobe lights" could mean anything from police car lights to flashlights to the same readerboard plaintiffs seek to impose on the City.

PPB policy and training does not use any tactic called a "bull rush." PPB, as part of crowd management, will sometimes engage in a "dynamic movement," which is when officers will move quickly to disperse a crowd or make targeted arrests within the crowd. While crowds are given numerous warnings and opportunities to clear streets after PPB has declared a riot or an unlawful assembly, PPB must sometimes use dynamic movements when a crowd refuses to disperse or when people who have engaged in lawlessness have embedded themselves within the crowd. (Davis Decl., ¶ 18-20). The goal of this "dynamic movement" is encourage the crowd to disperse or move once officers have determined that people in the crowd are beginning to engage in criminal activity. The dynamic movement is considered a lower use of force because officers can use this tactic to attempt to disperse a crowd without the use of impact or chemical munitions. (*Id*.)

PPB policy and training does not provide for the use of strobe lights as a crowd

Page 35 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

management technique. It is unclear what plaintiffs are specifically referring to when they ask for the Court to prohibit PPB's usage of strobe lights (Davis Decl., ¶¶ 22, 23). PPB also uses emergency lighting on police vehicles that PPB considers to be strobe lights. Emergency lighting on vehicles is necessary for police vehicles to direct traffic and conduct regular police activities. A ban on the use of strobe lights would remove PPB's ability to use police vehicles to guide traffic during protests, which would endanger the public. (*Id.*)

Finally, the Court imposing an obligation on PPB to affirmatively identify protestors who may have disabilities, or identify disabled protestors' assistants, interpreters, sighted guides, and service animals in the midst of a protest for the purpose of providing them additional time to disperse or identifying their means of assistance would force PPB into an impossible task. Officers would have an exceptionally difficult time trying to identify protestors with disabilities during a protest and make on-site accommodations for protestors with disabilities. Protests often involve exigent circumstances in chaotic and dark environments. Not only would be difficult for officers to identify individual people in the crowd who may have disabilities and require accommodation, but many disabilities are invisible and have no outward indicators. (Davis Decl., ¶ 20).

PPB officers do not intentionally separate a person with a disability from their assistant, interpreter, sight guide, or service animal during an arrest. It is possible that over the course of officers making arrests during a protest that this could incidentally occur, but that situation would only occur when an officer would have probable cause to make an arrest. Should someone whom PPB has taken into custody requests an accommodation, the arresting officer would take responsibility for evaluating the request and providing an accommodation if reasonable. (Davis Decl., ¶ 24).

Additionally, the same concerns for identifying protestors with disabilities would apply to identifying protestors who may be acting as an assistant, interpreter, or sight guide, as well as identifying service animals. Officers would have an exceptionally difficult time identifying

Page 36 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

individuals acting in such capacities and officers would still have to arrest such individuals

whom officers had probable cause to arrest. (Davis Decl., ¶ 25).

The hardship on law enforcement is another factor that the Court may consider when

evaluating plaintiffs' request for a preliminary injunction:

> This Court acknowledges the significance of this moment in our
> nation's history, and the crucial role of peaceful assembly in
> preserving American democracy. *See Associated Press v. Otter*, 682
> F.3d 821, 826 (9th Cir. 2012) (noting the important public interest
> in upholding First Amendment principles). However, there is also a
> strong public interest in maintaining order and public safety.
>
> In their request for relief, the protest medics essentially ask for
> special status. They seek an exemption from generally applicable
> dispersal orders. However, doing so may impose irreparable harm
> and undue hardship on law enforcement, creating an unworkable
> distinction between the ordinary protestor, who is subject to
> dispersal orders, and the protest medics, who are not.

*Wise*, 483 F.Supp.3d at 971.

In this case, plaintiffs propose restrictions that are so significant that it would create the

same type of unworkable distinction that the Court identified in the *Wise* case. The *Wise* court

noted the difficulty for police to identify who would be subject to a restraining order concerning

protest medics:

> The protest medics wear no particular uniform, offer no particular type of aid, and
> possess no particular level of medical training. When they attend the protests,
> many deliberately stand in the spaces between law enforcement and the protesters,
> or even enmesh themselves with other protesters. See, e.g., Rivera Decl., ECF 36
> at ¶ 15 (describing declarant's participation in forming a wall between protesters
> and police with other non-medic, military veteran protesters after the PPB made
> an unlawful assembly announcement). The protest medics' actions and
> appearance would not obviously distinguish them from a diverse crowd of
> protesters.

*Id.* at 972.

In the current case, the same concerns apply to a greater degree, as plaintiffs would have

this Court force PPB to account for protestors who in many circumstances would not stand out in

Page 37 –  DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
           FOR PRELIMINARY INJUNCTION

any way among a protesting crowd.

Plaintiffs would have this Court impose obligations on PPB that would be unworkable and force PPB into impossible positions when PPB is dispersing crowds. The significant hardship plaintiffs' proposed injunction would create on PPB as well as the government's interest in maintaining order when peaceful protests turn into violent riots weigh in favor of the Court denying the injunction.

## IV.    CONCLUSION

Plaintiffs unquestionably have the right to protest peacefully in the City of Portland. However, when protests turn violent and lawless and PPB has ordered a crowd to disperse, plaintiffs do not have the right to remain within that crowd.

PPB does not declare that a protest has become a riot or an unlawful assembly lightly; rather, PPB only does so when the crowd has targeted police or public buildings for violence and destruction. Officers policing protests last year between May and November 2020 faced a constant barrage of protestors trying to deliberately injure police officers with violence including projectiles, shields, laser pointers, and explosive devices. Officers also had to deal with protestors attempting to destroy public property through arson and vandalism.

When PPB declares a riot or unlawful assembly, PPB strives to provide ample warnings in multiple forms, including frequent announcements from the LRAD sound truck and posts on PPB's publicly accessible Twitter account. These warnings adequately address the communication concerns plaintiffs raise in their Motion for Preliminary Injunction. Moreover, PPB has systems in place and drafted policies that allow plaintiffs to make reasonable accommodation requests in an appropriate matter, rather than plaintiffs trying to assert accommodation requests after officers have already moved to disperse a crowd.

Plaintiffs, however, ignore those facts and instead argue that their allegations justify an injunction of unprecedented breadth on the City. The massive restrictions that plaintiffs propose in this injunction are overbroad, ill-defined, and in many cases covered by existing restrictions

Page 38 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
            FOR PRELIMINARY INJUNCTION

that this Court as well as the City Council and state legislature have already imposed on PPB's crowd management policing. Plaintiffs' inunction would fundamentally diminish PPB's ability to disperse violent and lawless crowds without resorting to greater uses of force.

The Court should deny plaintiffs' requested injunction based on plaintiffs' failure to show a chance of success on the merits, plaintiffs' failure to show irreparable harm, as well as the balance of equities and public interest tipping in the City's favor.

DATED: March 15, 2021

Respectfully submitted,

DANIEL SIMON, OSB # 124544
Deputy City Attorney
dan.simon@portlandoregon.gov
LINDA LAW, OSB #943660
Chief Deputy City Attorney
linda.law@portlandoregon.gov
LINH T. VU, OSB #004164
Senior Deputy City Attorney
linh.vu@portlandoregon.gov
ELIZABETH C. WOODARD, OSB #075667
Deputy City Attorney
beth.woodard@portlandoregon.gov
*Of Attorneys for City of Portland, Ted Wheeler and Chuck Lovell*

Page 39 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION