**Bruce L. Campbell**, OSB No. 925377
bruce.campbell@millernash.com
**John C. Clarke**, OSB No. 153245
john.clarke@millernash.com
**MILLER NASH GRAHAM & DUNN LLP**
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204
Phone: 503.224.5858


**Christopher H. Knauf**, admitted *pro hac vice*
ck@drlcenter.org
**Alexandra M. Robertson**, admitted *pro hac vice*
ak@drlcenter.org
**Corrigan L. Lewis**, admitted *pro hac vice*
cll@drlcenter.org
**DISABILITY RIGHTS LEGAL CENTER**
1541 Wilshire Boulevard, Suite 400
Los Angeles, California 90017
Phone: 213.736.1031


**Amy Robertson**, admitted pro *hac vice*
arobertson@creeclaw.org
**Timothy Fox**, admitted *pro hac vice*
tfox@creeclaw.org
**Pilar Gonzales Morales**, admitted *pro hac vice*
pgonzalez@creeclaw.org
**CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER**
1245 E. Colfax Avenue, Suite 400
Denver, Colorado 80218
Phone: 303.757.7901

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PHILIP WOLFE, KATALINA DURDEN, MELISSA LEWIS, JUNIPER SIMONIS, individually, and DISABILITY RIGHTS OREGON, an Oregon nonprofit and advocacy corporation, | Case No. 3:20-cv-01882-SI |
| Plaintiffs, | PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| CITY OF PORTLAND, a municipal corporation; TED WHEELER, in his official capacity; CHUCK LOVELL, in his official capacity; MULTNOMAH COUNTY, a political subdivision of the State; MICHAEL REESE, in his official capacity; TERRI DAVIE, in her official capacity; CHAD WOLF, in his individual capacity; ALEJANDRO MAYORKAS, in his official capacity; DONALD WASHINGTON, in his individual and official capacity; and DOES 1-100, individual and supervisory officers of local, state, and federal government, | |
| Defendants. | |

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ......................................................................................... 1

II. RESPONSIVE FACTUAL AND PROCEDURAL BACKGROUND ...................... 3

    A.  The City of Portland Has Long Been Aware of Its Duties to Disabled Residents Yet Has Shirked Those Duties ............................................... 4

    B.  The Federal Defendants Have Also Known of Their Non-Discrimination Obligation ........................................................................... 6

    C.  Defendants' Records Establish That the Circumstances During the Past Year of Protests Were Not "Exigent." .................................................. 7

    D.  Investigations Reveal City of Portland's and Federal Defendants' Improper Police Tactics and Lack of Proper Training ........................... 9

III. ARGUMENT ............................................................................................ 11

    A.  Plaintiffs Have Standing to Seek Injunctive Relief ............................ 11

        1.  Individual Plaintiffs Have Standing ........................................ 11

        2.  Disability Rights Oregon Has Standing .................................. 13

            a.  Associational Standing .............................................. 13

            b.  Organizational Standing ........................................... 14

    B.  Plaintiffs Are Likely to Succeed on the Merits of Their ADA and Section 504 Claims ......................................................................... 16

        1.  Defendants' Actions Are Covered by the ADA and Section 504 ........... 16

        2.  Defendants' Methods of Administration Discriminate on the Basis of Disability ......................................................... 17

        3.  Defendants Did Not Respond as Required to Plaintiffs' Requests for Reasonable Modification and Effective Communication ............... 18

        4.  Defendants' ADA and Section 504 Violations Are Not Excused by Exigent Circumstances ............................................... 23

        5.  Plaintiffs Are Not Required to Show a Policy, Custom, or Practice of Discrimination or Deliberate Indifference ........................... 25

    C.  Plaintiffs Are Likely to Succeed on Their Constitutional Claims ....................... 25

        1.  Plaintiffs Are Likely to Succeed on Their First Amendment Claims ...... 26

        2.  Plaintiffs Are Likely to Succeed on Their Fourth Amendment Claims ....................................................................... 28

        3.  Continuing Violations of Due Process Under the Fifth and Fourteenth Amendments Also Supports a Preliminary Injunction ......... 31

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

4825-9493-6809.1

**TABLE OF CONTENTS**
**(continued)**

D.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction and That the Balance of Hardships and Public Interest Factors Tip Sharply in Favor of Granting a Preliminary Injunction ........................................................................ 32

E.    Plaintiffs' Claims Against Federal Defendants Are Not Moot ........................... 35

IV.    **CONCLUSION** ................................................................................................. **38**

**TABLE OF AUTHORITIES**

**Cases**

*Collins v. Jordan,*
   110 F.3d 1363 (9th Cir. 1996) ...................................................................26, 27

*Adarand Constructors, Inc. v. Slater,*
   528 U.S. 216 (2000)................................................................................................35

*Alexander v. Choate,*
   469 U.S. 287 (1985)................................................................................................19

*Biodiversity Legal Found. v. Badgley,*
   309 F.3d 1166 (9th Cir. 2002) .............................................................................11

*Bird v. Lewis & Clark College,*
   303 F.3d 1015 (9th Cir. 2002) .............................................................................11

*Blum v. Yaretsky,*
   457 U.S. 991 (1982)................................................................................................12

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.,*
   725 F.3d 1088 (9th Cir. 2013) .............................................................16, 19, 20, 24

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983)...........................................................................................11, 12

*Comer v. Cisneros,*
   37 F.3d 775 (2d Cir. 1994)...................................................................................36

*Dunn v. Dunn,*
   318 F.R.D. 652 (M.D. Ala. 2016) ..................................................................17, 18

*El Rescate Legal Servs., Inc. v. Exec. Office of Immigr. Rev.,*
   959 F.2d 742 (9th Cir. 1991) ...............................................................................15

*Est. of Silva v. City of San Diego,*
   No. 3:18-CV-2282-L-MSB, 2020 WL 6946011 (S.D. Cal. Nov. 25, 2020) ...........16

*Fair Housing of Marin v. Combs,*
   285 F.3d 899 (9th Cir. 2002) ...............................................................................15

*Felarca v. Birgeneau,*
   891 F.3d 809 (9th Cir. 2018) ..........................................................................28, 30

*Forrester v. City of San Diego,*
   25 F.3d 804 ...........................................................................................................30

**TABLE OF AUTHORITIES**
**(continued)**

*Friends of the Earth, Inc. v Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)...........................................................................13, 37

*Fry v. Napoleon Cmty. Sch.*,
    137 S. Ct. 743 (2017)................................................................................25

*Graham v. Connor*,
    490 U.S. 386 (1989).................................................................................30

*Havens Reality Corp. v. Coleman*,
    455 U.S. 363 (1982).................................................................................13

*Hayden v. Redwoods Cmty. Coll. Dist.*,
    No. C-05-01785NJV, 2007 WL 61886 (N.D. Cal. Jan. 8, 2007) ...........19

*Huezo v. Los Angeles Cmty. Coll. Dist.*,
    672 F. Supp. 2d 1045 (C.D. Cal. 2008) ..................................................18

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977).................................................................................13

*Index Newspapers LLC v. City of Portland*,
    480 F. Supp. 3d 1120 (D. Or. Aug. 20, 2020) ........................................27

*Jackson v. City of Bremerton*,
    268 F.3d 646 (9th Cir. 2001) ..................................................................30

*Kimbro v. Miranda*,
    735 F. App'x 275 (9th Cir. 2018) ...........................................................16

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
    567 U.S. 298 (2012).................................................................................35

*LaLonde v. Cty. of Riverside*,
    204 F.3d 947 (9th Cir. 2000) ..................................................................24

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ..................................................................16

*Los Angeles Cty. v. Davis*,
    440 U.S. 625 (1979).................................................................................35

*Magnuson v. City of Hickory Hills*,
    933 F.2d 562 (7th Cir. 1991) ..................................................................36

**TABLE OF AUTHORITIES**
**(continued)**

*Martinez v. Cty. of Alameda*,
  No. 20-CV-06570-TSH, --- F. Supp. 3d ---, 2021 WL 105771 (N.D. Cal. Jan.
  12, 2021) ........................................................................................................21, 22, 25

*Melendres v. Arpaio*,
  695 F. 3d 990 (9th Cir. 2012) ............................................................................32

*Nat'l Ass'n for the Advancement of Colored People v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982)............................................................................................26

*Nat'l Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) ...........................................................................14

*Nelson v. City of Davis*,
  685 F.3d 867, 873-74 (9th Cir. 2012) ................................................................29

*Nieves v. Bartlett*,
  139 S. Ct. 1715 (2019)..................................................................................26, 28

*O'Shea v. Littleton*,
  414 U.S. 488 (1974)......................................................................................11, 12

*Oregon Advocacy Center v. Mink*,
  322 F.3d 1101 (9th Cir. 2003) ...........................................................................14

*Sheehan v. City & Cty. of San Francisco*,
  743 F.3d 1211 (9th Cir. 2014), *rev'd in part on other grounds, cert. dismissed
  in part* 575 U.S. 600 (2015) ...................................................................16, 24, 25

*Skaff v. City of Corte Madera*,
  No. C 08-5407-SBA, 2009 WL 2058242 (N.D. Cal. July 13, 2009).....................18

*Skaff v. Meridien North America Beverly Hills, LLC*,
  506 F.3d 832 (2007)............................................................................................11

*Smith v. City of Oakland*,
  No. 19-CV-05398-JST, --- F. Supp. 3d ---, 2020 WL 2517857 (N.D. Cal. Apr.
  2, 2020) ..............................................................................................................19

*Smith v. Pac. Props. & Dev. Corp.*,
  358 F.3d 1097 (9th Cir. 2004) .....................................................................14, 19

*Thomas v. Cnty. of Los Angeles*,
  978 F.2d 504 (9th Cir. 1992) .............................................................................12

**TABLE OF AUTHORITIES**
**(continued)**

*U.S. v. W. T. Grant Co.*,
    345 U.S. 629 (1953) ...........................................................................................35

*United States v. Poocha*,
    259 F.3d 1077 (9th Cir. 2001) ...........................................................................31

*Updike v. Multnomah Cty.*,
    870 F.3d 939 (9th Cir. 2017) ........................................................................16, 20

*Vos v. City of Newport Beach*,
    892 F.3d 1024 (9th Cir. 2018) ......................................................................24, 25

*Western States Center v. United States Homeland Security, et al.*,
    Case No. 3:20-cv-01175-JR .............................................................................37

*Wise v. City of Portland*,
    483 F. Supp. 3d 956 (D. Or. 2020) ...............................................................27, 28

*Wong v. Regents of the Univ. of California*,
    192 F.3d 807 (9th Cir. 1999) ........................................................................21, 22

**Statutes**

ADA ............................................................................................................ *passim*

ADA Title II ................................................................................................ *passim*

Although a 2013 City Ordinance ...................................................................5

Americans with Disabilities Act ...................................................................1

Americans with Disabilities Act (1993), https://www.ada.gov/taman2.html#II-
    8.2000 .........................................................................................................5

Defendants' Actions Are Covered by the ADA ...........................................16

PPA ...............................................................................................................8

Rehabilitation Act ...........................................................................10, 16, 17

Rehabilitation Act Section 504 .....................................................................1

Section 504 ................................................................................................ *passim*

**Other Authorities**

6 C.F.R. § 15.2 .............................................................................................17

**TABLE OF AUTHORITIES**
**(continued)**

6 C.F.R. § 15.30(b)(4)(i), (ii) ...................................................................................17

6 C.F.R. § 15.60(a)(1)(i) ..........................................................................................19

6 C.F.R. § 15.60(e)..............................................................................................20, 21

28 C.F.R. § 35.105 ...................................................................................................5

28 C.F.R. § 35.105(a-b) ..........................................................................................18

28 C.F.R. § 35.130(b)(3)(i), (ii) .............................................................................17

28 C.F.R. § 35.130(b)(7) .........................................................................................19

28 C.F.R. § 35.130(b)(7)(i)..................................................................................19, 24

28 C.F.R. §§ 35.130(b)(7)(i) and 35.160 ................................................................28

28 C.F.R. § 35.150(d) ...............................................................................................5

28 C.F.R. § 35.160(b)(2)...........................................................................................19

28 C.F.R. § 35.160(c)(1) ..........................................................................................23

28 C.F.R. § 35.164 ...................................................................................................21

49 Fed. Reg. 3573435724 (Sept. 11, 1984) ...............................................................7

56 Fed. Reg. 35694 ...................................................................................................5

2021 Regular Session:
    https://olis.leg.state.or.us/liz/2021R1/Downloads/MeasureDocument/HB2928/
    A-Engrossed.............................................................................................34

 (also available at:
    https://www.dhs.gov/sites/default/files/publications/ice_disability_access_pla
    n_508_08-19-20.pdf) ................................................................................7

 (also available at: https://www.portlandoregon.gov/police/article/533213)...................................6

First Amendment .................................................................................26, 27, 28, 32

Fourth Amendment .................................................................................24, 28

Fourteenth Amendment ..................................................................................25

Fifth and Fourteenth Amendments .................................................................31

**TABLE OF AUTHORITIES**
**(continued)**

Fed. R. Evid. 1006 ....................................................................................................8

House Bill 2928 .....................................................................................................34

https://www.portlandoregon.gov/cbo/article/487375 .........................................5

https://www.portlandoregon.gov/cbo/article/766041 .........................................6

https://www.portlandoregon.gov/police/article/649358 (last visited May 13, 2021) .....................8

Justice, *Title II Technical Assistance Manual* ...................................................5

No. 0635.10 "Crowd Management/Crowd Control," ...........................................8

(Oct. 2014) https://www.portlandoregon.gov/oehr/article/498497 ...................5

Translation, Interpretation, and Accommodation, Portland Police Bureau,
     https://www.portlandoregon.gov/police/article/767813 (last visited May 12,
     2021) ..............................................................................................................22

Plaintiffs respectfully submit this reply brief in support of their Motion for Preliminary Injunction (ECF 35) ("Motion") against Defendants City of Portland, Ted Wheeler, in his official capacity, and Chuck Lovell, in his official capacity (collectively, the "City"), and Alejandro Mayorkas, in his official capacity, and Donald Washington, in his official capacity (collectively, the "Federal Defendants") (the City and Federal Defendants are collectively, "Defendants").[1]

## I.    INTRODUCTION

Plaintiffs have obtained and produced ample evidence to show that the City and Federal Defendants engaged in crowd-control activities that failed to account for the needs and safety of protesters with disabilities, thereby depriving Plaintiffs of equal access to police services in violation of the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act ("Section 504").

The City and Federal Defendants deny that their crowd-control policies are inadequate or that they discriminate against people with disabilities. Yet, in their opposition briefs, these Defendants collectively point to only one accommodation offered to disabled protesters: the City's claim that it posts notices of unlawful assembly and other announcements on Twitter for people who are deaf or hard of hearing. As explained below, this single measure does not even solve the problem it sets out to solve, let alone address the other requested accommodations.

The ADA requires a detailed investigation into requested and required communication and accommodations; instead, Defendants have essentially thrown up their hands, refused

---

[1] At this stage, Plaintiffs withdraw and do not intend to seek a preliminary injunction against defendants Terri Davie (State of Oregon), Sheriff Reese, and Multnomah County.

Page 1 -    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

accommodations, and asserted the blanket justification—for all alleged discrimination—that nearly a year's worth of daily protests were *all* exigent circumstances.

Indeed, Defendants' own internal reports acknowledge that Defendants have failed to meet their legal obligations in two areas relevant here: (1) in planning for crowd control during protests, including training and monitoring law enforcement officers; and (2) in implementing their obligations under the ADA. In light of Defendants' admitted shortcomings in these areas, it is not surprising that Defendants repeatedly disregarded the rights of disabled protestors beginning in May 2020. The combination of Defendants' decades-long ignorance of their statutory obligations to people with disabilities and failure to develop and implement effective crowd-control measures created a substantial risk that Defendants would not take measures to fulfill their obligations. That risk became reality in 2020 when Defendants were faced with nightly protests against police brutality, creating the perfect storm for Defendants to run roughshod over the rights of disabled protestors.

Defendants' self-serving statements that they fully complied with their legal obligations collapse under the great weight of Plaintiffs' evidence showing multiple instances of improper and discriminatory treatment as well as Defendants' admissions that their policies are deficient. As detailed in Plaintiffs' Motion and this reply, Defendants have repeatedly violated the statutory and constitutional rights of disabled protestors and will continue to do so unless enjoined by this Court. Accordingly, Plaintiffs respectfully request that the court issue a preliminary injunction to prevent Defendants from exacting further harm on Portland's disabled protestors.

4825-9493-6809.2

## II.    RESPONSIVE FACTUAL AND PROCEDURAL BACKGROUND

The City and Federal Defendants misstate the factual events giving rise to this lawsuit: this case relates to people—including Plaintiffs—who gathered peacefully to express the important values of anti-racism and meaningful reform. *Compare* Def. City of Portland's Resp. to Pls.' Mot. Prelim. Inj., ECF No. 70 ("City Opp.") at 1. Because the City and Federal Defendants have failed to make their programs and services (such as the protection of peaceful protesters) accessible to people with disabilities; failed to provide reasonable accommodations and auxiliary aids and services; and chosen methods of administration that discriminate against disabled protesters, Plaintiffs have been treated—on the ground by law enforcement officers and in Defendants' briefing—as lawbreakers when they are not, solely on the basis of their disabilities.

The City and Federal Defendants both attempt to excuse their discrimination against Plaintiffs and disabled protesters by claiming that they had no notice of the need to offer nondiscriminatory services and to provide required accommodations. According to them, each new day of protest—*every* single one since May 29, 2020—presented exigent circumstances that they could not have anticipated. Defendants' asserted surprise at the presence of disabled protesters is belied by the decades they had to evaluate and ensure that their crowd control policies did not discriminate and by the repeated nature of the protests over the past year, during which defendants had ample time to plan and prepare for the measures required to avoid discrimination.

The City also presents the balance of interests in this preliminary injunction motion as a false contest between non-discrimination and safety. *See* City Opp. at 2. In advancing this

position, the City excludes the *disabled* public from the public whose safety Portland Police

Bureau ("PPB") is tasked with protecting, echoing in the courtroom the discrimination that PPB

carries out on the street. Had the City: (1) started evaluating and modifying its policing and

crowd-control policies in 1993 as required by Title II of the ADA (or earlier by Section 504);

(2) listened to the advice of the Oregon Association of the Deaf ("OAD") or Plaintiff Philip

Wolfe in 2012 and 2013; (3) properly responded to the July 30, 2020, letter of Plaintiff Disability

Rights Oregon ("DRO"),[2] and other requests by Plaintiffs last summer;, or (4) even taken

advantage of the downtime between the protests that occurred each evening, it could have

implemented policies that would have prevented discrimination against disabled protesters

without compromising public safety.

A.    **The City of Portland Has Long Been Aware of Its Duties to Disabled Residents Yet Has Shirked Those Duties.**

The City has known for decades that it is required to make its services available and

accessible to people with disabilities, and that it has failed to do so. Long before the OAD and

DRO reached out to the City, *see* Ludwig Decl., Ex. 1, ECF No. 43-1, and Stenson Decl., Ex. 1,

the United States Department of Justice ("DOJ"), through its ADA implementing regulations,

required the City to:

> evaluate its current services, policies, and practices, and the effects thereof, that
> do not or may not meet the requirements of [those regulations] and, to the extent
> modification of any such services, policies, and practices is required, . . . make the
> necessary modifications.

---

[2] *See* Stenson Decl., Ex. 1, ECF No. 44-1.

4825-9493-6809.2

28 C.F.R. § 35.105. The deadline for this "self-evaluation" was one year after the effective date

of the regulations, *id.*, or January 26, 1993.[3] The DOJ's Title II Technical Assistance Manual,

published in 1993, provided detailed instructions concerning what a self-evaluation should

contain.[4]

     Plaintiffs have been unable to find any evidence that the City ever conducted the required

self-evaluation of its services, policies, or practices.[5] Although a 2013 City Ordinance, submitted

by the City in this matter, declared that "an emergency exists because delay in the creation of

rules, procedures and forms to implement the [Title II] program could unreasonably burden the

community of persons with disabilities," Marion Decl., Ex. 111-117, ECF No. 75-1, at 2, a City

budget request for fiscal year 2014-2015—over 20 years past the deadline for self-evaluation—

recognized that "[t]he City initiated a basic self-evaluation in previous years, but the work was

not implemented, nor was oversight established to ensure completion." Clarke Supp. Decl., ¶ 8,

Ex. 7 at 4.[6] A September 2020 document addressing the need for a Disability Digital Access

Coordinator conceded that:

> All public entities under ADA Title II are required to have a self-evaluation of
> City programs, services and activities. All previous attempts to perform this type

---

[3] *See* 56 Fed. Reg. 35694 (effective date of DOJ regulations was January 26, 1992).

[4] Department of Justice, *Title II Technical Assistance Manual*, The Americans with Disabilities Act, (1993), https://www.ada.gov/taman2.html#II-8.2000.

[5] The City's website links to several versions of an ADA "transition plan." *See, e.g.*, "ADA Title II Transition Plan Update," (Oct. 2014) https://www.portlandoregon.gov/oehr/article/498497. These plans, prepared pursuant to 28 C.F.R. § 35.150(d), address the need for physical barrier removal rather than modifications in services, policies, or practices.

[6] https://www.portlandoregon.gov/cbo/article/487375.

of City-wide audit have failed because of a lack of even a basic understanding of ADA Title II compliance.

Clarke Supp. Decl., ¶ 2, Ex. 2 at 8 (Budget Monitoring Process Report ("BMP") attached to Memorandum to City Council from Markisha Smith re: Office of Equity (Sep. 10, 2020)).[7] Although the City contends that it is "impossible" to identify a single person with a disability during a protest, City Opp. at 36, the City's own record acknowledges that 21 percent of people living in Portland identify as having a disability. BMP at 8.

Despite the 1993 ADA self-evaluation deadline, which should have led the City to enact policies that would protect and serve over one-fifth of the City's population, the PPB does not appear to have even a general policy governing its crowd-control measures and interactions with disabled people. In 2012, Plaintiff Philip Wolfe, who is Deaf, filed suit challenging PPB's failure to provide an interpreter. As part of the settlement of the case, Wolfe participated in the Department of Public Safety Standards and Training program through which PPB officers were to be trained as to how to provide effective communications for people who are deaf or hard of hearing. Wolfe Decl., ECF 41, ¶ 12. In 2013, the PPB adopted a policy called "Communication with Hearing Impaired and Limited English Proficient Persons,"[8] which has apparently been under review for over seven years. *See id.*; *see also* Lancaster Decl., ECF 73, ¶ 6.

**B.    The Federal Defendants Have Also Known of Their Non-Discrimination Obligation.**

The Department of Homeland Security ("DHS") was established nearly 30 years after the Section 504 was enacted. The U.S. Marshals Service has been governed by detailed regulations

---

[7] https://www.portlandoregon.gov/cbo/article/766041.

[8] Clarke Supp. Decl., ¶ 6, Ex. 5 (also available at: https://www.portlandoregon.gov/police/article/533213).

4825-9493-6809.2

since 1984, 49 Fed. Reg. 35724 (Sept. 11, 1984). DHS's Immigration and Customs Enforcement

("ICE") has conducted a self-evaluation as required, but reports a projected fiscal year 2021 date

for issuing an "ICE-wide policy and its implementing procedures" that "will provide staff with a

uniform process for providing reasonable accommodations and modifications, including

procedures for how to engage with individuals with disabilities in an interactive process to

understand their needs and accommodation requests." ICE Disability Access Plan (August 19,

2020) at 11.[9]

   **C.    Defendants' Records Establish That the Circumstances During the Past Year
           of Protests Were Not "Exigent."**

   As set forth in Plaintiffs' Motion, on May 25, 2020, George Floyd was killed by the

Minneapolis Police Department, and people around the country took to the streets to protest this

and many other examples of violence and excessive use of force against minority group

members. In Portland, protests started on May 29 and continued nearly daily through the summer

and to the present. Starting that day and for each ensuing day, the City and Federal Defendants

were fully aware that these protests would occur and that they could become violent; each night,

the crowds dispersed, permitting these Defendants to prepare for the next day. Indeed, the City's

opposition to this motion acknowledges that "coordinated lawlessness" occurred "[t]hroughout

the late Spring and early Fall of 2020 . . . on a near nightly basis." City Opp. at 1; *see also*

Federal Official-Capacity Defendants' Opp'n. to Mot. Prelim. Inj., ECF 59 ("Fed. Opp.")

(protests "almost every night").

---

[9] Clarke Supp. Decl., ¶ 7, Ex. 6 (also available at:
https://www.dhs.gov/sites/default/files/publications/ice_disability_access_plan_508_08-19-
20.pdf).

Page 7 -      PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
              INJUNCTION

The City's records reflect that it knew that no exigent circumstances were present. The PPB Directive on which the City relies in its opposition, No. 0635.10 "Crowd Management/Crowd Control,"[10] provides that, "[w]hen time and circumstances permit and a police response is reasonably anticipated, the [Incident Commander] shall develop an Incident Action Plan (IAP) prior to the start of an incident or event." *Id.*, ¶ 2.1. Time and circumstances permitted this advance planning from May 29 through at least November 25, 2020, the last date for which the City produced IAPs to Plaintiffs. Robertson Decl., ¶ 2, Ex. 6. These IAPs were initially issued twice each day, then once each day, and eventually, only every several days or weeks. *Id.*, ¶ 5, Exs. 2-5. Each IAP contains a section called "General Situational Awareness," which describes the repeated nature of the protests. *See, e.g., id.*, Ex. 1 (chart prepared pursuant to Fed. R. Evid. 1006 with information from all IAPs produced); Ex. 5 at 3 ("Since May 29th, groups, varying in size, have regularly been present outside the Justice Center and other law enforcement related facilities (including the PPA office) causing disorder.").

The City's Twitter records also show that the crowds would "disperse" or "subside" every day, often in the early hours, and would not resume until afternoon or evening of that day. *See generally* Ex. 102, ECF 72-2. Thus, far from being caught by surprise, the PPB had the opportunity to plan for each protest—and did plan for it—each day. As set forth in their own briefing, these Defendants dispatched a sound truck and a mobile command center every day for months. They purchased vast amounts of pepper balls, pepper spray, CS gas, impact rounds, and other gear, then managed the logistics of distributing that equipment to officers on a day-by-day

---

[10] *See* City Opp. at 4. Directive 0635.10 can be found online at https://www.portlandoregon.gov/police/article/649358 (last visited May 13, 2021).

4825-9493-6809.2

basis. Defendants planned to provide weaponry to strike protesters and planned to provide a

sound truck to broadcast instructions that deaf and hard of hearing protesters could not hear.

They selectively failed to plan for services and equipment that would accommodate disabled

protesters or provide effective communication to them, not because of any exigency but because

they chose not to.

     **D.**     **Investigations Reveal City of Portland's and Federal Defendants' Improper Police Tactics and Lack of Proper Training.**

The City and Federal Defendants contend that their crowd control policies and practices

comply with their statutory obligations under the ADA and Section 504. In the past several

weeks, however, government agencies have issued reports that have revealed that Defendants

frequently fall far short of their obligation to train officers, follow policies, and comply with the

law.

On February 10, 2021, the DOJ issued a 78-page report identifying multiple failures and

instances of the City and PPB's noncompliance with the law. Clarke Supp. Decl., ¶ 3, Ex. 2.

Among other things, the report cites inappropriate use and management of force during protests,

inadequate training, and subpar police oversight. *Id.* at 2-9, 28, 34. The report also highlights that

PPB used force during protests that violated bureau policy, with officers conflating active versus

passive resistance as the basis for firing rubber bullets and other nonlethal impact munitions. *Id.*

at 19. Moreover, PPB supervisors frequently failed to investigate or analyze their officers' use of

force, giving blanket approval of force without meaningful scrutiny. *Id.* at 2. The report

highlights that "PPB repeatedly has asserted that certain impactful events—COVID 19, national

political turmoil, and a wildfire season—were beyond its control. True though that may be, those

events do not eliminate the City's obligations" under the law. *Id.* at 13.

Page 9 -     PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
                 INJUNCTION

In addition to the DOJ's assessment, the City's hired consultants recently provided critical feedback to the City's assessment of its response to the protest activities. Clarke Supp. Decl., ¶ 4, Ex. 3. In a report dated April 14, 2021, the consultants explained in detail that PPB's internal assessment that it did an "excellent job handling the nightly protests" is not true, and that the City has no evidence to support such a claim. *Id.* at 6. The report explains that PPB has not developed any lesson plans for proposed crowd-control training, despite months of being aware of the need to improve its policies, training, and supervision. *Id.* Instead of being self-critical, the City "plac[ed] the blame on external factors, from the governor to the pandemic, draw[ing] attention away from the actions of the PPB members and changes needed to manage events of this nature in the future." *Id.* at 3.

With regard to the Federal Defendants, the DHS Office of Inspector General ("OIG") issued a report on April 16, 2021, finding that DHS was unprepared to address the protest activities in Portland. Clarke Supp. Decl., ¶ 5, Ex. 4. More specifically, OIG determined that many officers had not completed required training; did not have necessary equipment; and did not use consistent uniforms, devices, and operational tactics when responding to the events in Portland. *Id.* at 2-14.

As shown by internal governmental reports, the City and Federal Defendants failed to train, monitor, and control officers in crowd control situations and failed to discharge their duties under the ADA and Rehabilitation Act. These documented failures played an integral role in creating an environment—as demonstrated by Plaintiffs' evidence—in which Defendants did little or nothing to provide equal access to protesters with disabilities.

III.    ARGUMENT

    A.    **Plaintiffs Have Standing to Seek Injunctive Relief.**

        1.    **Individual Plaintiffs Have Standing.**

To have standing to bring this action, Plaintiffs are required to allege and show that they "(1) suffered an injury in fact, (2) that the injury is traceable to the challenged action of defendants, and (3) that the injury can be redressed by a favorable decision." *Bird v. Lewis & Clark College*, 303 F.3d 1015, 1019 (9th Cir. 2002). In the context of injunctive relief, Plaintiffs must demonstrate "a sufficient likelihood that [they] will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). That is, Plaintiffs must establish a "real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). This standing inquiry is evaluated based on the facts as they existed at the time the complaint was filed against defendants. *Skaff v. Meridien North America Beverly Hills, LLC*, 506 F.3d 832, 838 (2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992)); *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171 (9th Cir. 2002) ("standing is determined as of commencement of the litigation"). Plaintiffs have established standing to obtain injunctive relief against the City and Federal Defendants.

Plaintiffs have satisfied the standing requirements by showing that Defendants repeatedly violated Plaintiffs' rights to equal access to Defendants' crowd control services and that the Defendants have a pattern and practice of engaging in unlawful conduct. Likewise, the individual Plaintiffs have met the standing requirement for a preliminary injunction by demonstrating that they will continue to protest and thus likely encounter the City and Federal Defendants' ongoing misconduct. *See, e.g.*, Durden Decl., ECF 37, ¶ 36, Simonis Decl., ECF 39, ¶ 48, Lewis Decl., ECF 42, ¶ 40, Wolfe Supp. Decl., ¶¶ 4-13, Simonis Supp. Decl., ¶¶ 9-31. As the evidence

Page 11 -    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
                 INJUNCTION

establishes, Plaintiffs have standing to seek injunctive relief because they have suffered "actual

repeated" injuries at the hands of the City and Federal Defendants. *See Thomas v. Cnty. of Los

Angeles*, 978 F.2d 504, 507 (9th Cir. 1992).

Defendants primarily contend that Plaintiffs lack standing to obtain injunctive relief for

future injuries based on allegations of prior harm. *See* Fed. Opp. at 11 (identifying past

discriminatory interactions between plaintiffs and federal officers). While "past wrongs do not in

themselves amount to real and immediate threat of injury necessary to make out a case or

controversy," *Lyons*, 461 U.S. at 103, "past wrongs are evidence bearing on whether there is a

real and immediate threat of repeated injury," *O'Shea*, 414 U.S. at 496. The law does not

demand precognition or the "consummation of threatened injury" before a plaintiff may obtain

preventative relief. *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982) (quotation marks omitted).

Defendants have refused to implement any of portion of Plaintiffs' reasonable proposals to make

Defendants' crowd control policies accessible to people with disabilities. Because Plaintiffs have

shown that Defendants have repeatedly violated their rights and refuse to implement policies

designed to protect the rights of people with disabilities, Plaintiffs' injuries are far from a "one

off" or "speculative" injury. *Thomas*, 978 F.2d at 507 (the possibility of recurring injury "ceases

to be speculative when actual repeated incidents are documents."). Indeed, the individual

Plaintiffs have ongoing intent to attend protests where they are likely to continue to experience

the same recurring harms from Defendants, and those injuries are likely to recur to these specific

individual Plaintiffs.

4825-9493-6809.2

Accordingly, Plaintiffs have shown that the City and Federal Defendants are likely to violate their rights again, and the threat of harm is real and imminent. Plaintiffs have standing to seek injunctive relief.

### 2.    Disability Rights Oregon Has Standing.

The City does not contest DRO's standing to seek injunctive relief. The Federal Defendants, however, contend that DRO does not have standing, arguing that "no member" of DRO has standing to sue for prospective relief. *See* Fed. Opp. at 14. Entities, however, may assert standing under two distinct theories: associational standing and organizational standing. An entity asserting associational standing sues on behalf of its members or constituents. *See, e.g.*, *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). An entity asserting organizational standing sues on its own behalf, alleging injuries to the entity itself. *See, e.g.*, *Havens Reality Corp. v. Coleman*, 455 U.S. 363, 372-79 (1982). DRO has both associational and organizational standing. DRO meets the standards for standing under both theories.

### a.    Associational Standing.

An entity has associational standing to bring suit on behalf of its members when: (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," (3) and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt,* 432 U.S. at 343). The Federal Defendants do not dispute the second and third elements. Instead, addressing the first element, the Federal Defendants contend that no member of DRO has standing to sue.

As an initial—and dispositive—matter, the Ninth Circuit has held that DRO, formerly known as Oregon Advocacy Center, had associational standing to pursue claims on behalf of its members. *Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003). The court held that OAC's constituents—in that case, criminal defendants with mental illness—were the "the functional equivalent of members for purposes of associational standing." *Id.* at 1110. Here, DRO's constituents with disabilities include the disabled Plaintiffs who, as explained above, have standing to sue.

Furthermore, the Ninth Circuit does not require an entity to name a specific member in its complaint to establish associational standing when "it is relatively clear . . . that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015). DRO's constituents include disabled protesters such as the individual Plaintiffs. Stenson Decl., ECF 44, ¶ 6. DRO has shown that its members have suffered or will suffer harm from Defendants' failure to make their crowd control policies accessible to people with disabilities in violation of their rights. *Id.* Because DRO's members have suffered and will continue to suffer harm from Defendants' failure to comply with the ADA and Section 504, DRO has established that it has associational standing.

### b.    Organizational Standing.

An entity may also establish organizational standing through an "injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [conduct] in question." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097,

4825-9493-6809.2

1105 (9th Cir. 2004) (citing *Fair Housing of Marin v. Combs,* 285 F.3d 899, 905 (9th Cir. 2002)). The Federal Defendants do not dispute that the claims at issue are germane to DRO's mission or that defendants' alleged conduct frustrates DRO's ability to promote the rights of individuals with disabilities. Instead, Federal Defendants contend that DRO's diversion of resources is based on "fears of hypothetical future harm" that are too "speculative" to establish organizational standing. Fed. Opp. at 15.

As set forth in Plaintiffs' Motion, due to Defendants' failures to provide reasonable modifications to their crowd control policies to ensure equal access to those services, DRO has devoted and continues to devote considerable resources to investigating and attempting to resolve this critical issue. Stenson Decl., ¶¶ 7-14. Courts have consistently held that diversion of resources to combat particular unlawful conduct is sufficient to establish organizational standing. *See*, *e.g.*, Combs, 285 F.3d at 905 (finding organizational standing when plaintiff alleged it had expended thousands of dollars to "redress[ ] the impact" of defendant's discrimination and, as a result, was unable "to undertake other efforts to end unlawful housing practices"); *El Rescate Legal Servs., Inc. v. Exec. Office of Immigr. Rev.*, 959 F.2d 742, 748 (9th Cir. 1991) (finding organizational standing when plaintiffs "expend[ed] resources in representing clients they otherwise would spend in other ways"). DRO's diversion of resources is not "speculative." As long as defendants continue to fail to modify their crowd control policies, the threat of future harm is sufficiently real to warrant organizational standing.

DRO has shown that defendants' conduct has frustrated its organizational mission, and DRO has diverted its limited resources to combat the particular conduct from defendants. DRO has therefore established organizational standing to seek relief. Because DRO has established

standing under two distinct theories, there is no basis to deny DRO's request for injunctive relief on the grounds that it lacks standing.

**B.      Plaintiffs Are Likely to Succeed on the Merits of Their ADA and Section 504 Claims.**

Title II of the ADA, 42 U.S.C. § 12131 *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 793, "include an affirmative obligation for public entities to make benefits, services, and programs accessible to people with disabilities." *Updike v. Multnomah Cty*., 870 F.3d 939, 949 (9th Cir. 2017). Plaintiffs have demonstrated in their motion and demonstrate in this reply that the City and Federal Defendants have not satisfied this obligation with respect to the benefits and services of their crowd control programs.

**1.      Defendants' Actions Are Covered by the ADA and Section 504.**

The Ninth Circuit has held—clearly and repeatedly—that Title II of the ADA applies to "anything a public entity does." *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds, cert. dismissed in part* 575 U.S. 600 (2015); *see also Kimbro v. Miranda,* 735 F. App'x 275, 277 (9th Cir. 2018) (holding that Title II applies to claims of excessive force by prison guards); *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) (holding that "the ADA's broad language brings within its scope anything a public entity does," including the services of "local law enforcement agencies"). In *Sheehan*, the Ninth Circuit specifically held that the "ADA . . . applies to arrests." 743 F.3d at 1232. This analysis applies with equal force to the Rehabilitation Act, as the Ninth Circuit has held that "there is no significant difference in the analysis of rights and obligations created by" the ADA and Section 504. *K.M. ex rel. Bright v. Tustin Unified Sch. Dist*., 725 F.3d 1088, 1098 (9th Cir. 2013); *see also, e.g.*, *Est. of Silva v. City of San Diego*, No. 3:18-CV-2282-L-MSB, 2020 WL

6946011, at *23 (S.D. Cal. Nov. 25, 2020) ("Both the ADA and the Rehabilitation Act apply in the context of arrests.").

There can be no question that the actions of the PPB and the federal law enforcement officers at issue here are covered by the ADA and Section 504. There is no "riot" exception. There is no exception for arrests. There is no exception for non-arrest police actions.

### 2.    Defendants' Methods of Administration Discriminate on the Basis of Disability.

Defendants' crowd-control methods discriminate against people with disabilities and substantially impair the objectives of the crowd-control programs for disabled people, in violation of 28 C.F.R. § 35.130(b)(3)(i), (ii) and 6 C.F.R. § 15.30(b)(4)(i), (ii).[11] Even though Plaintiffs made this argument in their Motion, *id.* at 12, 15-16, neither the City nor the Federal Defendants addressed it.

The "methods of administration" regulations "'appl[y] to written policies as well as actual practices, and [are] intended to prohibit . . . policies and practices that are neutral on their face, but deny individuals with disabilities an effective opportunity to participate.'" *Dunn v. Dunn*, 318 F.R.D. 652, 664 (M.D. Ala. 2016) (quoting *Cota v. Maxwell-Jolly*, 688 F.Supp.2d 980, 995 (N.D. Cal. 2010)).

The objectives of the PPB's crowd control directive include "reasonably protect[`] public safety," "facilitate[ing] participants' lawful objectives and protect[ing] their right to assemble." *See* Clarke Decl., ¶ 2, Ex. 1 (PPB Directive 0635.10). Disabled protesters and disabled members

---

[11] This regulation, which governs "all programs or activities conducted by the Department of Homeland Security," 6 C.F.R. § 15.2, demonstrates that the Federal Defendants are incorrect to limit the available theories of disability discrimination to disparate treatment and failure to accommodate. *See* Fed. Opp. at 21.

Page 17 -    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

of the press are not afforded this protection, thereby substantially impairing PPB's stated objectives by preventing them from participating in or reporting on protests without fear of injury. Defendants' failure to incorporate or anticipate interactions with disabled people in their crowd control policies, and their practices of discrimination violate the "methods of administration" provision. *See, e.g.*, *Dunn*, 318 F.R.D. at 665 ("an omission as well as a commission can be an actionable method of administration"). "The methods-of-administration regulation makes clear that a know-nothing, do-nothing policy of non-administration is a privately actionable violation of the ADA, at least when plaintiffs can show that it has the effect of discriminating." *Id.* at 665 n.12. Had the City properly evaluated its programs with input from the community, as required by 28 C.F.R. § 35.105(a)-(b),[12] heeded the advice of OAD or Philip Wolfe, or even engaged in the training and monitoring that the City's internal and self-commissioned assessments confirm did not occur, the City would have avoided the situation that the City itself describes as a "lack of even a basic understanding of ADA Title II compliance." Clarke Supp. Decl., ¶ 2, Ex. 1 at 8 (BMP).

### 3. Defendants Did Not Respond as Required to Plaintiffs' Requests for Reasonable Modification and Effective Communication.

As set forth in Plaintiffs' Motion, Plaintiffs, through direct meetings and DRO's letters, proposed a number of reasonable modifications to the City's and the Federal Defendants'

---

[12] Plaintiffs are not asserting a separate claim under section 35.105(a). *Cf. Skaff v. City of Corte Madera*, No. C 08-5407-SBA, 2009 WL 2058242, at *2 (N.D. Cal. July 13, 2009) (holding no private right of action to enforce self-evaluation requirement (citing *Lonberg v. City of Riverside*, 571 F.3d 846, 852 (9th Cir. 2009)). However, the failure to engage in the required self-evaluation can be *evidence* supporting a disability discrimination claim. *See, e.g.*, *Huezo v. Los Angeles Cmty. Coll. Dist.*, 672 F. Supp. 2d 1045, 1052 (C.D. Cal. 2008) (referencing earlier holding that lack of self-evaluation was evidence supporting discrimination claim).

4825-9493-6809.2

policies that were necessary to avoid discrimination on the basis of their disabilities and to provide effective communication and meaningful access to Defendants' services. *See* Motion at 8-11*; 28 C.F.R. § 35.130(b)(7) (requiring reasonable modifications); *id.* § 35.160(a) (requiring effective communication); *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (disabled people "must be provided with meaningful access to the benefit that the grantee offers")*. These communications satisfied Plaintiffs' duty to identify modifications that are reasonable on their face. *See Smith v. City of Oakland*, No. 19-CV-05398-JST, ___ F. Supp. 3d ___, 2020 WL 2517857, at *11 (N.D. Cal. Apr. 2, 2020) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). Once Plaintiffs identified these reasonable modifications, the burden then shifted to Defendants to "'show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'" *Smith*, 2020 WL 2020 WL 2517857, at *11 (quoting *U.S. Airways*, 535 U.S. at 402). Specifically, in the context of providing effective communication, Defendants must give "primary consideration" to the requests of people with disabilities. 28 C.F.R. § 35.160(b)(2); 6 C.F.R. § 15.60(a)(1)(i); *see also, e.g.*, *Hayden v. Redwoods Cmty. Coll. Dist.,* No. C-05-01785NJV, 2007 WL 61886, at *9 (N.D. Cal. Jan. 8, 2007) (holding that if an entity proposes an alternative form of communication, it has the "burden under the statute to demonstrate the proffered aid's effectiveness.").

The City and Federal Defendants assert that Plaintiffs' proposed modifications and communications methods would constitute a fundamental alteration of their programs, activities, and services. *See* City Opp. at 17-20; Fed. Opp. at 20. This is an affirmative defense on which Defendants have the burden of proof. 28 C.F.R. § 35.130(b)(7)(i) (reasonable modifications required "unless the public entity can demonstrate" fundamental alteration); *K.M. ex rel. Bright*,

4825-9493-6809.2

725 F.3d at 1096. To the extent the City is claiming that the requested communications services are a fundamental alteration, that decision must be made by the head of the organization, considering all available resources, and be accompanied by a written statement providing the reasons. *Id.* (citing 28 C.F.R. § 35.164); *see also* 6 C.F.R. § 15.60(e).

Plaintiffs' requests for modifications triggered a requirement that the City and Federal Defendants investigate these requests. "It is well-settled that Title II and § 504 'create a duty to gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary.'" *Updike v. Multnomah Cty.*, 870 F.3d 939, 954 (9th Cir. 2017) (quoting *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)).

The Federal Defendants did not respond to Plaintiffs' requests at all, and appear not to have conducted any investigation into the requested measures. *See* Stenson Decl., ¶ 10; *see also generally* Russell Decl., ECF No. 61.

Although the City met with Plaintiffs on two occasions, the City took no action other than to simply acknowledge that it did not have any crowd control policies addressing police interactions with disabled people. Stenson Decl., ¶¶ 10-12. The City now asserts that it reached out to over 200 law enforcement agencies and further asserts that it discovered that these agencies use the same communications methods as the City does. City Opp. at 14. The "everyone else does it" excuse has no legal foundation and the City does not point to any authorities in which it has been recognized as a defense to a modification request. If other agencies are violating the ADA, they too must change. In any event, the City neither names these agencies nor produces the communications, *id.*; *see generally* Dobson Decl., ECF 71, rendering the assertions both unsubstantiated and hearsay. This is insufficient to satisfy the City's burden. *See*

*Martinez v. Cty. of Alameda*, No. 20-CV-06570-TSH, ___ F. Supp. 3d ___, 2021 WL 105771, at *6 (N.D. Cal. Jan. 12, 2021) (unsubstantiated arguments are insufficient to establish fundamental alteration or undue burden defense).

Finally, with respect to Plaintiffs' proposed communications modifications, neither the City nor Federal Defendants provide evidence that they considered all available resources, nor do they provide a written statement of reasons, as required by 28 C.F.R. § 35.164 and 6 C.F.R. § 15.60(e). *Cf. Wong v. Regents of the Univ. of California*, 192 F.3d 807, 819 (9th Cir. 1999) ("after-the-fact justification obviously does not satisfy" the entity's obligation to show that it conscientiously considered" the requested modification).

Ultimately, even the City's unsupported, *post hoc* justifications are insufficient to satisfy its burden. In response to Plaintiffs' request for effective communication with deaf and hard of hearing people, the City rejected the use of road signage trailers because they cannot "accommodate the ebbs and flows of public messages" and are "static." City Opp. at 15. The City instead relies on sound trucks—also static objects—and the rendering of the sound trucks' announcements into text via Twitter, *id.* at 3.[13] The City rejects other visual systems because they do not withstand projectiles, *see id.* at 15-16, though they continue to deploy other vehicles and equipment—not necessary to effective communication—that are also subject to damage during any instances of violence, *see id.* at 3 ("PPB experienced damage to police facilities, uniforms, work equipment, and vehicles on a daily basis"); *see also* Fed. Opp. at 24-26.

---

[13] It is evident from a comparison of the City's sound truck exhibit and its Twitter exhibit that far from "all" announcements by the sound truck are tweeted. *See* Howard Decl., ¶ 7, Ex. 1. In any event, this solution requires Deaf protesters to keep their eyes on their phones at all times so they can see when an announcement is being made and what is being said, itself a dangerous requirement in a disordered environment.

The City's responses to Plaintiffs' requested non-communication modifications are likewise deficient. Plaintiffs requested that, in physically dispersing or redirecting a crowd, Defendants provide enough time and information for disabled people to comply with PPS's directives. *See* Motion at 4, ¶¶ 2-3. In response, the City somewhat inconsistently argues that it is in full compliance with the ADA and that its compliance is excused by exigent circumstances. City Opp. at 17-20, 32-34. The latter defense will be addressed below. The former is belied by Plaintiffs' declarations and video footage, as well as footage from incidents subsequent to Plaintiffs' Motion. The City's response to the request not to use strobe lights that can trigger epileptic seizures was to unilaterally broaden the definition of "strobe" to include most forms of lighting, which is not Plaintiffs' intent. *Id.* at 36.

"[M]ere speculation that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement." *Wong*, 192 F.3d at 818. Furthermore, "even if a disabled individual's requested accommodation is not feasible, the public entity must still take any actions to establish equality, or as close thereto as possible, between disabled and non-disabled individuals using the public entity's services." *Martinez*, 2021 WL 105771, at *6.

The only affirmative measure the City appears to have taken is to add a section to a PPB webpage entitled "Translation, Interpretation and Accommodation" to address "ADA Considerations During Demonstrations/Protests."[14] This new[15] section instructs, "[p]eople with disabilities attending events who may experience challenges in receiving information should

---

[14] Translation, Interpretation, and Accommodation, Portland Police Bureau, https://www.portlandoregon.gov/police/article/767813 (last visited May 12, 2021).

[15] This part of the webpage—on which the City relies, *see* City Opp. at 8—was added after the filing of this lawsuit. Clarke Decl., ¶¶ 9-10, Ex. 8-9.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

4825-9493-6809.2

consider bringing a companion," setting forth a policy that facially violates Title II: "A public entity shall not require an individual with a disability to bring another individual to interpret for him or her." 28 C.F.R. § 35.160(c)(1). It also confirms that—after all the years since 1993 and 2013—the PPB is still "looking into alternative ways to communicate with the disability community." *Id.*

### 4.    Defendants' ADA and Section 504 Violations Are Not Excused by Exigent Circumstances.

The City urges that its actions are excused by exigent circumstances because, "[a]t the point where riot control agents are in use, it is difficult to interact with protesters on an individual basis in order to assess" whether an accommodation is appropriate. City Opp. at 18-19, *see also id.* at 36. This sentence sums up the City's 28 years of failure to ensure that its crowd control policies and practices do not discriminate on the basis of disability. Indeed, having failed to conduct the required self-evaluation and policy modification in 1993, the City appears to foreclose any avenue of notice or request for modifications. It asserts without citation that "generalized demands"—such as Philip's, OAD's, and DRO's—do not constitute accommodation requests. City Opp. at 19. Although disabled protester Heather Van Wilde emailed City ADA Coordinators before she attended a protest to request accommodations, the City complains that there is no indication that officers *on the scene* were aware of the email. *Id.* at 20. And when disabled protesters attempt to request accommodations or modifications in real time, the City asserts that it does not have to respond due to "exigent circumstances" and that this is an "impossible task." *Id.* at 18, 20, 36.

Defendants have the burden to establish exigent circumstances. As an initial matter, the argument is essentially that requested accommodations would fundamentally alter the nature of

4825-9493-6809.2

the law enforcement program at issue. The language of the applicable regulation makes clear that the burden of proof on this defense is on the entity asserting it. 28 C.F.R. § 35.130(b)(7)(i) ("unless the public entity can demonstrate . . ."); *see also K.M. ex rel. Bright*, 725 F.3d at 1096 ("The public entity has the burden to prove that a proposed action would result in undue burden or fundamental alteration.").

In addition, the parties agree that the exigent circumstances standard under the ADA is based on that in the Fourth Amendment. *See* City Opp. at 18; Fed. Opp. at 22; *Sheehan*, 743 F.3d at 1232 ("exigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment"). The government bears a "heavy burden" under the Fourth Amendment which it can meet "only by 'demonstrat[ing] specific and articulable facts to justify the finding of exigent circumstances.'" *LaLonde v. Cty. of Riverside*, 204 F.3d 947, 957 (9th Cir. 2000) (citing *Welsh v. Wisconsin*, 466 U.S. 740 (1984)). Neither the City nor the Federal Defendants can satisfy that burden here. The years during which the City and Federal Defendants could have evaluated and modified their policies and practices, the repeated nature of the protests over the past year, and the lull that occurred each day between protests all provide far greater "time and . . . opportunity to assess the situation and potentially employ the accommodations identified" by the plaintiffs, *see Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018), than the police had in either the *Vos* or *Sheehan* cases, both of which involved a single incident within a single day, and in both of which the Ninth Circuit refused to apply the exigent circumstances exception as a matter of law.

In arguing that daily exigent circumstances excused them from making required modifications to avoid disability discrimination, the City and Federal Defendants have not

distinguished controlling Ninth Circuit authority in *Sheehan* or *Vos*,[16] nor have they cited other cases in support of their argument. *See* City Opp. at 17-20; Fed. Opp. at 22-26. Defendants have failed to meet their burden to establish exigent circumstances, and Defendants' discrimination cannot be excused on these grounds.

> **5.      Plaintiffs Are Not Required to Show a Policy, Custom, or Practice of Discrimination or Deliberate Indifference.**

The City argues that Plaintiffs are not entitled to the requested preliminary injunction because they cannot show that the City has an official policy, custom, or practice of discrimination "that amounts to deliberate indifference to plaintiffs' rights under the ADA." City Opp. at 12. This incorrectly imposes constitutional standards onto an ADA analysis. Both the ADA and Section 504 authorize "suits for injunctive relief or money damages." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 750 (2017) (citing 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 12133). Only damages suits, however, require a showing of deliberate indifference. *See, e.g.*, *Martinez*, 2021 WL 105771, at \*6 ("To seek injunctive relief under Title II of the ADA, a plaintiff need only allege that she was denied meaningful access to a public entity's programs, services, or activities;" to claim damages, she "must further allege . . . deliberate indifference.").

> **C.      Plaintiffs Are Likely to Succeed on Their Constitutional Claims.**

The City fails to overcome Plaintiffs' arguments and evidence that Plaintiffs are likely to succeed on their First, Fourth, Fifth, and Fourteenth Amendment claims.[17]

---

[16] The City's response does not cite to the Ninth Circuit's decision in *Vos*.

[17] Without reaching the merits of Plaintiffs' arguments, the Federal Defendants argue that Plaintiffs do not seek injunctive relief in connection with their constitutional claims. *See* Fed. Opp. at 27. For purposes of this motion and efficiency, Plaintiffs intend to limit their argument in support of a preliminary injunction against the Federal Defendants to the Section 504 claim. In

4825-9493-6809.2

**1.    Plaintiffs Are Likely to Succeed on Their First Amendment Claims.**

The City's opposition to Plaintiffs' First Amendment showing suffers from the same misconceptions as its ADA and Section 504 arguments: it presupposes that Plaintiffs are lawbreakers, either refusing to comply with dispersal orders or even, by invoking *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), presenting probable cause for arrest. To the contrary, there is no evidence that the City had probable cause to arrest any of the Plaintiffs. Indeed, rather than refusing to comply with law enforcement orders, Plaintiffs were and are asking for legally-required assistance—in the form of nondiscriminatory policies, reasonable modifications, and effective communication—so that they could comply with such orders.

The City does not address this argument or the many ways in which their discriminatory conduct and use of force chill Plaintiffs' participation in the paradigmatic First Amendment activity of protest. *Cf. Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment."). Instead, the City essentially argues that, once it declares an unlawful assembly based on the conduct of any subset of protesters, it is free to take action against, and suppress the speech of, any and all protesters. *See* City Opp. at 21-22. This runs counter to *Collins*, in which the Ninth Circuit held that when a protest is largely peaceful and there are isolated instances of unlawful conduct, police must "arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." 110 F.3d at 1372; *see also Nat'l Ass'n for the Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886,

---

doing so, however, Plaintiffs reserve and do not waive any alleged claim for injunctive relief against the Federal Defendants in connection with their constitutional claims.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
               INJUNCTION

4825-9493-6809.2

at 908 (1982) ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected.").  As this Court has held, the presence of some violent individuals at a protest does not give the government *carte blanche* to attack peaceful protesters and infringe on their First Amendment rights. *See Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1143 (D. Or. Aug. 20, 2020).

Here, the City made no effort to limit its law-enforcement activities to individuals engaged in criminal activity. Instead, it declared—based on the alleged conduct of a subset of protesters—that the protests constituted unlawful assemblies or riots and proceeded to take sweeping measures to suppress protected speech of all protesters. *See, e.g.*, Passmore Decl., ECF 36, ¶¶ 10, 13. Moreover, it appears that the City relied on the conduct that occurred at previous protests to prophylactically declare unlawful assemblies or riots—directly contrary to the Ninth Circuit's holding in *Collins*, 110 F.3d at 1372 ("instances of previous violence or unlawful activity [neither] create an exception to the 'clear and present danger' test [nor] are sufficient to meet that test").

Rather than addressing Plaintiffs' First Amendment arguments, the City defends the legality of its dispersal orders and cites two cases for the proposition that PPB has the authority to declare an unlawful assembly and arrest those who do not comply. City Opp. at 21-22 (quoting *Index Newspapers*, 480 F. Supp. 3d at 1125[18] and *Wise v. City of Portland*, 483 F. Supp. 3d 956, 964 (D. Or. 2020)). The City is attacking a straw man. Plaintiffs do not challenge the

---

[18] This statement was *dicta* in *Index Newspapers*, which addressed the actions of federal agencies that did not have the authority to declare unlawful assemblies. *Id*. at 1125.

legality of the PPB's dispersal orders. Unlike the plaintiffs in *Wise*, *Nieves*, and *Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018) (cited in City Opp. at 21-22), Plaintiffs here were attempting to comply with PPB's orders but unable to do so because of the City's discrimination. In *Wise*, the court held that protest medics did not have grounds to claim "specialized treatment different from that of their fellow protesters." 483 F. Supp. 3d at 961. Here, in contrast, federal law—the ADA and Section 504—require the City to treat disabled protesters differently, by providing reasonable modifications and effective communication, 28 C.F.R. §§ 35.130(b)(7)(i) and 35.160. The City's other two cases are also distinguishable. The police in *Nieves* had probable cause to arrest respondent Bartlett, defeating his First Amendment claim. 139 S. Ct. at 1728. The City does not argue that it had probable cause to arrest (or arrested) any of the Plaintiffs. And, in contrast to the instant case, the plaintiffs in *Felarca* intentionally disobeyed orders to disperse. 891 F.3d at 816-17.

> **2.      Plaintiffs Are Likely to Succeed on Their Fourth Amendment Claims.**

In their motion, the individual Plaintiffs established that they were seized under the Fourth Amendment, that the City's use of force significantly intruded on their rights, and that they were committing no crime, posed no immediate threat, and were not resisting arrest or attempting to flee. *See* Motion at 27-28 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The City does not deny any of these facts, but argues that its use of force was reasonable given the need for split-second judgments considering the context of the officers' actions. *See* City Opp. at 24-25.

The Ninth Circuit case on which the City relies undercuts its own argument. In *Nelson v. City of Davis*—as here—the defendant used less-lethal force to disperse a crowd without

4825-9493-6809.2

appropriate warning, and ended up injuring the plaintiff, a member of the crowd who was not

committing a crime and was attempting to comply with police instructions to disperse. 685 F.3d

867, 873-74 (9th Cir. 2012), *cited in* City Opp. at 25. The City relies on *Nelson* for the

proposition that the context of police action must be considered in the reasonableness analysis,

but the case itself addresses a context akin to the one at issue, and concludes that the use of force

was unreasonable. *Nelson*, 685 F.3d at 883.

      Ultimately, the City's argument that the force they used was justified by the need for

"split-second judgments" suffers from the same flaw as its attempt to assert an exigent

circumstances defense to its ADA and Section 504 claims: responses that require "split-second

judgments" on the first day of protests cannot be defended on the same ground on day three or

day 30 or day 300. The City and the PPB had ample time (since 1993) to conduct a self-

evaluation of its crowd-control policies and ample time each day to plan for its sound truck, air

support, and medical response. Robertson Decl., ¶ 12. The City chose not to provide effective

communication and reasonable modifications for disabled protesters, and—having made that

choice—cannot legitimately claim that it should be excused from liability by a crisis of its own

creation.

      As a consequence of Defendant's tactics, Plaintiffs were repeatedly prevented from any

meaningful opportunity to safely comply with police orders to avoid force due to PPB's failure

to provide effective communication of police orders, *see, e.g.*, Wolfe Decl., ECF 41, ¶¶ 4, 6;

confusing orders to disperse and uses of force that disoriented protesters and particularly blind or

low vision protesters, *see, e.g.*, Durden Decl., ¶¶ 25-27; and insufficient time to allow protestors

with disabilities to comply with orders, *see, e.g.*, Lewis Decl., ¶¶ 14, 27. The City not only failed

4825-9493-6809.2

to provide these warnings and opportunities to avoid harm, it did not adopt alternative methods to avoid force.

For this reason, the City's reliance on *Forrester*, *Jackson*, and *Felarca* are misplaced. Each of these cases is distinguishable, as the Ninth Circuit held that use of force was reasonable where law enforcement gave clear verbal warnings, an opportunity to disperse, and opportunity to avoid use of force. *See Forrester v. City of San Diego*, 25 F.3d 804, 808 ("The videotape indicates that, after the demonstrators ignored pleas to desist and warnings regarding pain compliance techniques, the officers used minimal and controlled force in a manner designed to limit injuries to all involved."); *Jackson v. City of Bremerton*, 268 F.3d 646, 652-53 (9th Cir. 2001) ("the group was warned by police that a chemical irritant would be used if they did not move back from the area, and the group refused to comply. Jackson, who heard the warning, also chose to ignore the officers' orders, and instead began to directly interfere with Officer Davis' attempt to maintain order."); *Felarca*, 891 F.3d at 817-18 ("The protestors also ignored warnings by police and university officials before and during the protest . . . it is undisputed that these four plaintiffs in particular understood police had ordered them to disperse, ignored or dismissed those orders, and instead directly interfered with officers' attempt to enforce university policy. . .").

While the "proper application" of the *Graham* factors "requires careful attention to the facts and circumstances of each particular case," *Graham*, 490 U.S. at 396, the response from the City provides no such thing. Instead, the City refers broadly to disturbances by "smaller groups" of protesters," City Opp. at 33, while defending the indiscriminate use violence against all protesters, including Plaintiffs and other disabled people.

4825-9493-6809.2

3.    **Continuing Violations of Due Process Under the Fifth and Fourteenth Amendments Also Supports a Preliminary Injunction.**

Similarly, Plaintiffs are likely to succeed on their claims that the City violated their right to due process under the Fifth and Fourteenth Amendments. Plaintiffs have shown that the City routinely denies protesters with disabilities sufficient notice to allow them to disperse or an opportunity to otherwise comply with lawful police orders before subjecting them to violence and arrest. *See, e.g.*, Lewis Decl., ¶ 9; Wolfe Supp. Decl., ¶¶ 4-20; Simonis Supp. Decl., ¶¶ 9-35.

In its response, the City relies on *United States v. Poocha*, 259 F.3d 1077 (9th Cir. 2001), to argue that their dispersal orders are clearly communicated. *See* City Opp. at 27. Unlike the defendants in *Poocha*, the City fails to explain in any specific way its police officers communicated with Plaintiffs. In fact, by their own admission, the City's only practice to communicate dispersal orders is through an audio system and Twitter messages. By definition, an audio system (even a long-range system) cannot be used to clearly communicate with deaf or hard of hearing protesters—including Plaintiff Wolfe—because they cannot hear the messages, no matter how loudly or how many times those messages are broadcast. Similarly, the use of Twitter postings cannot amount to the type of clear orders contemplated at issue in *Poocha*, 259 F.3d at 1079 (explaining that officer made eye contact with the plaintiff at a distance of five feet, telling him he needed to leave). As previously stated, a Twitter feed requires disabled protesters to keep a constant eye on their cellphones, dangerous in the protest environment. Additionally, the City's Twitter posts are often delayed, non-existent, or woefully inadequate. For example, on May 31, 2020, the City simply tweeted: "An unlawful assembly has been declared. The curfew order is in effect. Everyone must leave now" without any further information about where the unlawful assembly had been declared or any egress routes. *See* Howard Decl., ¶ 7, Ex. 1

(comparing sound truck announcements with City tweets). Moreover, the City wholly ignores the needs of people with mobility impairments who may require additional time to comply with dispersal orders or of protesters, like Plaintiff Durden, who are blind and require alternative methods of communication, such as cardinal directions to attempt to comply with orders.

In sum, the City offers no evidence of any effort whatsoever to plan for and implement any accommodation to their crowd dispersal policies and practices. They now seek to use the same policies and practices to skirt the due process rights of people with disabilities as well.

**D.      Plaintiffs Will Suffer Irreparable Harm Absent an Injunction and That the Balance of Hardships and Public Interest Factors Tip Sharply in Favor of Granting a Preliminary Injunction.**

The deprivation of statutory and constitutional rights constitutes irreparable harm to Plaintiffs and can only be remedied through the granting on an injunction. Courts have consistently held that a deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F. 3d 990, 1002 (9th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Here, Plaintiffs are being deprived of their First Amendment rights due to Defendants' lack of accommodations in their policing services and use of unnecessary force against protesters. Moreover, Defendants deprive Plaintiffs of equal access to crowd control and policing services, fail to provide effective communication and reasonable modifications, and otherwise violate Plaintiffs' civil rights and subject them to discrimination based on their disabilities. These harms cannot be redressed by monetary awards and require injunctive relief.

The balance of hardships and public interest factors weigh sharply in favor of Plaintiffs' request for injunctive relief. As an initial matter, Defendants portray the balance as non-

4825-9493-6809.2

discrimination versus public safety, essentially excluding people with disabilities from their

analysis of the public interest. While stating that its goals include "protect[ing] life, safety and

property" City Opp. at 34, the City ignores the fact that the City itself estimates that

approximately 21 percent of people in Portland have a disability. BMP at 8. Defendants' failure

to provide accommodations in their provision of law enforcement services places a significant

percentage of the public in danger. Moreover, ceasing the use of excessive force and providing

reasonable accommodations not only protects protesters with disabilities but also the non-

disabled public. When people with disabilities have equal access to law enforcement services,

they can assess risks and dangers, make and carry out decisions to disperse or evacuate an area,

and thereby increase their own safety and the safety of those around them.

　　　　Plaintiffs have demonstrated that they do not present a danger to the public, property, or

Defendants. Defendants focus on alleged violent actions and actors, without introducing a shred

of evidence that Plaintiffs have engaged in such conduct. Furthermore, Defendants categorically

refuse to provide accommodations, regardless of the particular facts of any event. For example,

the City argues that it should have no obligation to use ASL interpreters because an interpreter

could have "potential as a target for protestor violence." While the City provides no evidence of

such targeting, Plaintiff Wolfe has attended various protests where an ASL interpreter was

provided by the organizations coordinating the event. Supp. Wolfe Decl., ¶¶ 16-18. In addition,

in weighing potential hardships, Defendants ignore the array of accommodations that could be

provided to Plaintiffs, including but not limited to:

- Effective Communication: remote ASL interpretation or visual messaging via screens;, providing adequate verbal notices and instructions for visually impaired people (such as indicating cardinal points) prior to taking crowd control actions.

- Mobility Accommodations: identifying and informing protesters of accessible routes of egress; providing sufficient time for people to evacuate or disperse; ensuring law enforcement personnel do not push or shove people using wheelchairs and canes; ensuring protesters are not separated from their assistants.

- Accommodations for people with seizure disorders: using alternatives to strobe lights such as verbal and visual commands or slow flashing-lower impact lights.

- Accommodations for inflammatory and respiratory disabilities: using alternatives to chemical munitions such as verbal and visual commands; limiting the amount of chemical munitions in a given period of time; removing residue or chemical buildup from areas where such munitions have been used.

While Defendants repeatedly insist that Plaintiffs' requests for accommodations are "impossible," "burdensome," and "unreasonable," the Oregon State Legislature has recently introduced and advanced legislation that parallels some of Plaintiffs' requests for relief and will dictate the tools that law enforcement agencies can use to achieve crowd control. For example, House Bill 2928 recently passed through the Judiciary Committee and is being referred to the Ways and Means Committee. If enacted into law, House Bill 2928 would ban the use of strobe lights for crowd control.[19] As House Bill 2928 reflects, Plaintiffs' request for alternatives to strobe lights is reasonable and in the best interest of the public.

Ultimately, Defendants' argument that the balance of hardships tips in their favor is predicated on the erroneous—and discriminatory—notion that any measures that protect the rights of protestors with disabilities would undermine public safety. When properly defined, the

---

[19] *See* House Bill 2928, Oregon Legislative Assembly, 2021 Regular Session: https://olis.leg.state.or.us/liz/2021R1/Downloads/MeasureDocument/HB2928/A-Engrossed.

Page 34 -      PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

public interest requires the measures Plaintiffs request here, tipping the balance strongly in their favor.

> **E.    Plaintiffs' Claims Against Federal Defendants Are Not Moot.**

Despite the ongoing protests and political activities in Portland, and the Federal Defendants' presence at those protests, the Federal Defendants contend that changes in circumstances and a change in the federal administration has mooted Plaintiffs' claims. Fed. Opp. at 16-19. The Federal Defendants are factually and legally incorrect. Given the ongoing nature of the protests, the Federal Defendants have not and cannot meet their heavy burden of establishing that Plaintiffs' claims for injunctive relief are moot.

The Federal Defendants have the burden of establishing that their claimed discontinuance of unconstitutional activity has mooted any claims in this case. *U.S. v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). "The burden is a heavy one." *Los Angeles Cty. v. Davis*, 440 U.S. 625, 644 (1979); *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (party asserting mootness has "the 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again."). A case becomes moot only when it is "impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quotations omitted). Additionally, the "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case" unless "it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur" and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631 (alteration in original) (quoting *W. T. Grant Co.*, 345 U.S. at 632-33 (1953)).

4825-9493-6809.2

The Federal Defendants begin by contending that "federal policy" relating to Plaintiffs' claims has somehow changed. Fed. Opp. at 18. The Federal Defendants, however, fail to point to any specific change in policy relating to their crowd control measures, including ensuring equal access for people with disabilities. Absent evidence of a policy shift ensuring that people with disabilities receive equal access, a change in administration provides no basis to conclude that plaintiffs' claims are moot.[20] *See Comer v. Cisneros*, 37 F.3d 775, 799-801 (2d Cir. 1994) (claims for injunctive relief may continue uninterrupted, even with a change in officeholders, when the effects of the former officeholder are not "completely and irrevocably eradicated"). Because the Federal Defendants have not identified any change in policies or events that make it absolutely clear that their wrongful behavior could not reasonably be expected to recur, Plaintiffs' claims for injunctive relief remain live.

The Federal Defendants also contend that a "decline" in protest activity and decline in federal involvement in Portland has rendered any prospective relief unnecessary. *See* Fed. Opp. at 16-17. When a defendant insists that its changed behavior has mooted a plaintiff's claims, courts examine "whether there has been complete discontinuance, whether effects continue after discontinuance, and whether there is any other reason that justifies decision and relief." *Magnuson v. City of Hickory Hills*, 933 F.2d 562, 565 (7th Cir. 1991) (quoting 13A C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure: Jurisdiction § 3533.7, at 350 (2d ed. 1984)). A complete discontinuance of wrongful behavior must be truly complete. Under that

---

[20] Compared to the previous administration, Plaintiffs would expect the current federal administration to modify federal law enforcement agencies' crowd control policies to protect disabled people, but to date, Plaintiffs have not been informed of any specific changes in policy that would moot their claims.

standard, mootness requires more than cessation of activity—rather, it demands an "absolutely clear" picture that "violations could not reasonably be expected to recur." *Friends of the Earth, Inc.*, 528 U.S. at 190 (2000).

Finally, on May 12, 2021, the Federal Defendants submitted a "supplemental" authority, contending that a recent order from Judge Mosman in *Western States Center v. United States Homeland Security, et al.*, Case No. 3:20-cv-01175-JR (D. Or. May 11, 2021), dismissing claims against the Federal Defendants for mootness is relevant here. The Federal Defendants argue that the order addresses the "same" law enforcement response to protests that is "broadly" at issue here. *See* Federal Defendants Notice of Supplemental Authority ("Supp. Auth.") at 2. That is not true. Judge Mosman's recent decision relates to a case with different facts and different legal claims than the ones at issue here. In *Western States*, the merits of plaintiffs' claims related to Twitter activity from the previous federal administration. Given the change in administration, Judge Mosman concluded that challenged conduct "could not reasonably be expected to recur." *See* Supp. Auth. Ex. 1 at 2. This lawsuit, on the other hand, relates to Federal Defendants' failure to make their crowd control services accessible for people with disabilities. The *Western States* decision is therefore not dispositive on the issue of mootness.

Indeed, even with the change in federal administration, Plaintiffs have not seen any indication that the Federal Defendants have modified their crowd control policies to ensure equal access for people with disabilities, and the Federal Defendants have provided no such support in response to this motion. Whether or not there has been a "decline" in protest activity from last year, the recent conviction of Derek Chauvin for the murder of George Floyd, the upcoming anniversary of George Floyd's murder, and other instances of police brutality across the country

4825-9493-6809.2

should dispel any reasonable belief that the protests will stop and that the Federal Defendants will not continue to violate the rights of disabled people during upcoming protests. Wolfe Supp. Decl., ¶¶ 4-13; Simonis Supp. Decl., ¶¶ 9-31. Accordingly, Plaintiffs and other disabled protesters will continue to experience the same, recurring violations of their statutory and constitutional rights. The court should therefore not conclude that Plaintiffs' claims against the Federal Defendants are moot.

## IV.    CONCLUSION

For the foregoing reasons, and the reasons set forth in the opening motion, Plaintiffs respectfully request that the court enter a preliminary injunction against the City and Federal Defendants.

DATED this 14th day of May, 2021.

MILLER NASH GRAHAM & DUNN

___*s/ John C. Clarke*_____
Bruce L. Campbell, OSB No. 925377
bruce.campbell@millernash.com
John C. Clarke, OSB No. 153245
john.clarke@millernash.com
Phone: 503.224.5858

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

4825-9493-6809.2

DISABILITY RIGHTS LEGAL CENTER

_____*s/ Christopher H. Knauff*_____

Christopher H. Knauff, admitted *pro hac vice*
ck@drlcenter.org
Alexandra M. Robertson, admitted *pro hac vice*
ak@drlcenter.org
Corrigan L. Lewis, admitted *pro hac vice*
cll@drlcenter.org
Phone: 213.736.1031


CENTER RIGHTS EDUCATION AND
    ENFORCEMENT CENTER

_____*s/ Amy Robertson*_____

Amy Robertson, admitted pro *hac vice*
arobertson@creeclaw.org
Timothy Fox, admitted *pro hac vice*
tfox@creeclaw.org
Pilar Gonzales Morales, admitted *pro hac vice*
pgonzalez@creeclaw.org
Phone: 303.757.7901

Attorneys for Plaintiffs