IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **PHILIP WOLFE**, **KATALINA DURDEN**, **MELISSA LEWIS**, **JUNIPER SIMONIS**, individually**,** and **DISABILITY RIGHTS OREGON**, an Oregon nonprofit and advocacy corporation,<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF PORTLAND**, a municipal corporation; **TED WHEELER**, in his official capacity; **CHUCK LOVELL**, in his official capacity; **MULTNOMAH COUNTY**, a political subdivision of the State; **MICHAEL REESE**, in his official capacity; **TERRI DAVIE**, in her official capacity; **CHAD WOLF**, in his individual capacity; **ALEJANDRO MAYORKAS**, in his official capacity; **DONALD WASHINGTON**, in his individual and official capacity; **and DOES 1-100**, individual and supervisory officers of local, state, and federal government,<br><br>Defendants. | Case No. 3:20-cv-1882-SI<br><br>**OPINION AND ORDER** |

Bruce L. Campbell and John C. Clarke, MILLER NASH GRAHAM & DUNN LLP, 3400 U.S. Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204; Christopher H. Knauf, Alexandra M. Robertson, and Corrigan L. Lewis, DISABILITY RIGHTS LEGAL CENTER, 1541 Wilshire Boulevard, Suite 400, Los Angeles, CA 90017; Amy Robertson, Timothy Fox, and Pilar Gonzales Morales, CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER, 1245 E. Colfax Avenue, Suite 400, Denver, CO 80218. Of Attorneys for Plaintiffs.

Daniel Simon, Deputy City Attorney; Linda Law, Chief Deputy City Attorney; Linh T. Vu, Senior Deputy City Attorney; Elizabeth C. Woodard, Deputy City Attorney; PORTLAND CITY ATTORNEY'S OFFICE, 1221 SW 4th Ave., Rm. 430, Portland, OR 97204. Of Attorneys for Defendants City of Portland, Portland Mayor Ted Wheeler, and Portland Police Chief Chuck Lovell.

Jenny M. Madkour, County Attorney, and Christopher A. Gilmore, Senior Assistant County Attorney, THE OFFICE OF MULTNOMAH COUNTY ATTORNEY, 501 S.E. Hawthorne Blvd., Suite 500, Portland, Oregon 97214. Of Attorneys for Defendants Multnomah County and Multnomah County Sheriff Michael Reese.

Ellen F. Rosenblum, Attorney General; Drew K. Baumchen, Senior Assistant Attorney General; and Jill Schneider, Senior Assistant Attorney General, OREGON DEPARTMENT OF JUSTICE, 1162 Court Street NE, Salem, OR 97301-4096. Of Attorneys for Defendant Superintendent of the Oregon State Police Terri Davie.

Brian M. Boynton, Acting Assistant Attorney General; Scott Erik Asphaug, Acting United States Attorney; C. Salvatore D'Alessio, Jr., Acting Director, Torts Branch; Andrea W. McCarthy, Senior Trial Counsel; Glenn S. Greene, Senior Trial Attorney; and David G. Cutler, Trial Attorney, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, CONSTITUTIONAL AND SPECIALIZED TORT LITIGATION, P.O. Box 7146, Ben Franklin Station, Washington, D.C. 20044. Of Attorneys for Defendants Chad Wolf and Donald Washington, in their individual capacity.

Brian M. Boynton, Acting Assistant Attorney General; Scott Erik Asphaug, Acting United States Attorney; Alexander K. Haas, Director, Federal Programs Branch; Brigham J. Bowen, Assistant Director, Federal Programs Branch; Michael P. Clendenen, Trial Attorney; and Jordan L. Von Bokern, Trial Attorney, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, FEDERAL PROGRAMS BRANCH, 1100 L Street, NW, Washington, D.C. 20530. Of Attorneys for Defendants Director of the U.S. Marshals Service Donald Washington and Secretary of Homeland Security Alejandro Mayorkas, in their official capacity.

**Michael H. Simon, District Judge.**

Plaintiffs Philip Wolfe, Katalina Durden, Melissa Lewis, and Juniper Simonis are individuals with disabilities. Plaintiff Disability Rights Oregon (DRO) is a nonprofit advocacy organization for persons with disabilities that is the federally mandated Protection and Advocacy System for the state of Oregon.[1] Plaintiffs filed this case on November 1, 2020. Plaintiffs allege that Defendants violated the rights of people with disabilities in Defendants' responses to social justice protests in Portland. Plaintiffs allege that the conduct of law enforcement officers in

---

[1] There are 57 Protection and Advocacy Systems in the United States and its territories, each providing independent services to its respective state or territory. *See State Protection & Advocacy Systems*, https://acl.gov/programs/aging-and-disability-networks/state-protection-advocacy-systems.

responding to protests and dispersing crowds has chilled the exercise of Plaintiffs' constitutional right to assemble and protest, violated the Americans with Disabilities Act (ADA), violated Section 504 of the Rehabilitation Act (Rehabilitation Act), and violated the First, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution by subjecting Plaintiffs to unnecessary harm and discrimination, abridging their freedom of speech, subjecting them to excessive force, and denying them due process and equal protection of the law.

By agreement of the parties, all Defendants' responsive filings to the Complaint were due March 15, 2021. On February 8, 2021, Plaintiffs filed a motion for preliminary injunction. On March 15, 2021, Defendants responded to the Complaint by filing five separate motions to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The pending motions to dismiss have been filed by: (1) the City of Portland (City), Mayor Ted Wheeler, and Police Chief Chuck Lovell (City Defendants); (2) Multnomah County and Multnomah County Sheriff Michael Reese (County Defendants); (3) Superintendent of the Oregon State Police (OSP) Terri Davie; (4) Former Acting Secretary of Homeland Security Chad Wolf (Wolf) and Director of the U.S. Marshals Service (USMS) Donald Washington (Washington), as individuals;[2] and (5) Washington and Secretary of Homeland Security Alejandro Mayorkas, in their official capacities (Official Federal Defendants) (Washington, Wolf, and the Official Federal Defendants are collectively referred to as the Federal Defendants).[3] In these motions, Defendants argue that Plaintiffs lack standing, the case is moot, and the allegations are

---

[2] In response to this motion, Plaintiffs agreed to withdraw and dismiss their claims against Washington in his individual capacity. Thus, the Court grants this portion of Washington's motion.

[3] Defendant Terri Davie has been substituted for Travis Hampton and Defendant Alejandro Mayorkas has been substituted for Chad Wolf in his official capacity, under Rule 25(d) of the Federal Rules of Civil Procedure.

insufficient to state a claim upon which relief can be granted. Also pending before the Court is Plaintiffs' motion for a preliminary injunction, which is opposed by all Defendants. The Court held oral argument on the motions on July 13, 2021. The Court allowed all parties to submit simultaneous supplemental briefs on August 13, 2021 and supplemental response briefs on August 27, 2021. After considering all the materials in the record and arguments of counsel, and for the following reasons, the Court grants Defendants' motions to dismiss and denies Plaintiff's motion for a preliminary injunction as moot.

## STANDARDS

### A.  Rule 12(b)(6)

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epstein Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## B. Rule 12(b)(1)

The U.S. Constitution confers limited authority on the federal courts to hear only active cases or controversies brought by persons who demonstrate standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546-47 (2016); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 89-90 (2013). Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo*, 136 S. Ct. at 1547. A plaintiff's standing under Article III of the United States Constitution is a component of subject matter jurisdiction properly challenged under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010); *see also White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Because standing and mootness both pertain to a federal court's subject-matter jurisdiction under Article III, they are properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6)."). On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), it is the plaintiff's burden to establish the existence of subject matter jurisdiction. *Chandler*, 598 F.3d at 1122; *see also Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008).

A motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction may be either "facial" or "factual." *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack on subject matter jurisdiction is based on the assertion that the allegations contained in the complaint are insufficient to invoke federal jurisdiction. *Id.* "A jurisdictional challenge is factual where 'the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.'" *Pride v. Correa*, 719 F.3d 1130, 1133 n.6 (9th Cir. 2013) (quoting *Safe Air for Everyone*, 373 F.3d at 1039). When a defendant factually challenges the plaintiff's assertion of jurisdiction, a court does not presume the truthfulness of the plaintiff's allegations and may consider evidence extrinsic to the complaint. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012); *Safe Air for Everyone*, 373 F.3d at 1039. A factual challenge "can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996) (citation and quotation marks omitted).

## C.  Standing

To have standing, a plaintiff must have a "personal interest . . . at the commencement of the litigation." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The required personal interest must satisfy three elements throughout the litigation: (1) an injury in fact, *i.e.*, an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent; (2) a causal connection between the injury-in-fact and the defendant's challenged behavior; and (3) likelihood that the injury-in-fact will be redressed by a favorable ruling. *Id.* at 180-81, 189; *see also Spokeo*, 136 S. Ct. at 1547 (reiterating that the "irreducible constitutional minimum" of standing consists of "an injury in fact . . . fairly traceable to the challenged conduct of the defendant, and . . . likely to be redressed by a favorable judicial decision").

An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). An injury is "concrete" if it is "'*de facto*'; that is it must actually exist," meaning that it is "'real' and not 'abstract.'" *Id.* "'Concrete' is not, however, necessarily synonymous with 'tangible.' Although tangible injuries are perhaps easier to recognize, [the Supreme Court has] confirmed in many . . . previous cases that intangible injuries can nevertheless be concrete." *Id.* at 1549.

A plaintiff "must show standing with respect to each form of relief sought." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011). To establish Article III standing to seek injunctive relief, a plaintiff must "allege either 'continuing, present adverse effects'" of a defendant's past illegal conduct, "or 'a sufficient likelihood that [he] will again be wronged in a similar way.'" *Villa v. Maricopa Cnty.*, 865 F.3d 1224, 1229 (9th Cir. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974), and *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983)). Additionally, standing to seek equitable relief requires "a showing of an inadequate remedy at law and . . . a serious risk of irreparable harm." *Pulliam v. Allen*, 466 U.S. 522, 537 (1984); *see also O'Shea*, 414 U.S. at 499.

When a plaintiff seeks prospective injunctive relief, threat of repeated future injury may suffice to provide standing. *See Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014). As explained by the Ninth Circuit:

> A plaintiff seeking prospective injunctive relief "must demonstrate 'that he is realistically threatened by a *repetition* of [the violation].'" *Armstrong v. Davis*, 275 F.3d 849, 860-61 (9th Cir. 2001) (alteration in original) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 109 (1983)), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504-05 (2005). A threat of repetition can be shown "at least two ways." *Id.* at 861. "First, a plaintiff may show that the defendant had, at the time of the injury, a written

> policy, and that the injury 'stems from' that policy." *Id.* "Second,
> the plaintiff may demonstrate that the harm is part of a 'pattern of
> officially sanctioned . . . behavior, violative of the plaintiffs'
> [federal] rights.'" *Id.* (alterations in original) (quoting *LaDuke v.
> Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985)).

*Id.* (emphasis and alterations in original). The threat of repeated future injury, however, may not

be "conjectural or hypothetical." *O'Shea*, 414 U.S. at 494 (quotation marks omitted).

Further, concerns about separation of powers counsel careful scrutiny of a plaintiff's

standing to seek injunctive relief against government officials. As the Supreme Court cautioned:

> When transported into the Art. III context, [the principle that the
> Government has traditionally been granted the widest latitude in
> conducting its own internal affairs], grounded as it is in the idea of
> separation of powers, counsels against recognizing standing in a
> case brought, not to enforce specific legal obligations whose
> violation works a direct harm, but to seek a restructuring of the
> apparatus established by the Executive Branch to fulfill its legal
> duties. The Constitution, after all, assigns to the Executive Branch,
> and not to the Judicial Branch, the duty to "take Care that the Laws
> be faithfully executed."

*Allen v. Wright*, 468 U.S. 737, 761 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v.

Static Control Components, Inc.*, 572 U.S. 118 (2014); *see also Lyons*, 461 U.S. at 112 ("We

decline the invitation to slight the preconditions for equitable relief [irreparable injury]; for as we

have held, recognition of the need for a proper balance between state and federal authority

counsels restraint in the issuance of injunctions against state officers engaged in the

administration of the states' criminal laws in the absence of irreparable injury which is both great

and immediate.").

**D. Preliminary Injunction**

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council,

Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show

that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

The already high standard for granting a preliminary injunction is further heightened when the type of injunction sought is a "mandatory injunction." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden is "doubly demanding" for a mandatory injunction). To obtain a mandatory injunction, a plaintiff must "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Id.* (emphasis in original). As explained by the Ninth Circuit:

> A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988); *see also Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983) (a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"). A mandatory injunction orders a responsible party to take action. A mandatory injunction goes well

> beyond simply maintaining the status quo [p]endente lite [and] is
> particularly disfavored. In general, mandatory injunctions are not
> granted unless extreme or very serious damage will result and are
> not issued in doubtful cases or where the injury complained of is
> capable of compensation in damages.
>
> The *status quo ante litem* referenced in *Chalk* means the last,
> uncontested status which preceded the pending controversy.

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th

Cir. 2009) (quotation marks and citation omitted) (alterations in original).

## DISCUSSION

The arguments raised in Defendants' various motions to dismiss overlap, particularly

relating to standing. Although only the Official Federal Defendants raised mootness in the

original briefing, joined by the City Defendants, courts "have an independent obligation to

determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any

party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513-14 (2006). At oral argument the Court

discussed mootness generally, and in supplemental briefing the City Defendants and the County

Defendants further briefed the issue. The Court, therefore, applies its standing and mootness

analyses to Plaintiffs' claims for equitable relief against all Defendants, even those who did not

raise similar specific arguments. The Court next analyzes Plaintiffs' claims for money damages

and each group of Defendants' arguments challenging those claims. Finally, the Court addresses

Plaintiffs' motion for preliminary injunction.

## A.  Standing and Mootness—Claims for Equitable Relief

Defendants raise factual challenges to the Court's jurisdiction under Rule 12(b)(1). Thus,

the Court considers documents and evidence outside of the pleadings. *See Robinson v. United

States*, 586 F.3d 683, 685 (9th Cir. 2009) (stating that in a 12(b)(1) motion "[a] district court may

hear evidence regarding jurisdiction and resolve factual disputes where necessary" (simplified));

*Farr v. United States*, 990 F.2d 451, 454 (9th Cir. 1993) (stating that "it *is* proper for the district court to consider evidence outside of the pleadings for the purpose of deciding a jurisdictional issue (emphasis in original)); *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) ("[W]hen considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction.").

Defendants argue that Plaintiffs did not have standing to bring their claims for equitable relief when they filed the Complaint on November 1, 2020. The City Defendants state that near daily protests occurred in Portland through November 17, 2020. The Federal Defendants explain that the heightened federal presence decreased after November 9, 2020, and generally describe a decrease in protest activity after November 1, 2020, without specifically describing the circumstances as of November 1, 2020. The Court assumes without deciding that Plaintiffs had standing as of November 1, 2020 to bring their claims, and the Court next analyzes mootness. *See Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 66–67, 117 (1997) (describing, despite "grave doubts" about standing, how courts may assume that standing exists in order to analyze mootness, because both questions "go[] to the Article III jurisdiction of th[e Supreme] Court and the courts below").[4]

Whether standing and the other requirements for a live case or controversy exists throughout the entirety of a case is considered under the doctrine of mootness. "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue

---

[4] The Court has doubts about Plaintiffs' standing to request equitable relief with respect to several Defendants, particularly the USMS, County Defendants, and Davie. The Court, however, need not separately analyze standing for each Defendant because of the Court's conclusion regarding mootness.

throughout its existence (mootness)." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (quotation marks omitted); *see also Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1253 (9th Cir. 2007) (noting that mootness is the doctrine under which courts ensure that "a live controversy [exists] at all stages of the litigation, not simply at the time plaintiff filed the complaint"). The doctrine of mootness is more complex, however, than simply "standing set in a time frame," because it has exceptions that do not apply to standing and because there may circumstances in which certain factors are viewed more flexibly in considering mootness than they would be in considering standing. *Laidlaw*, 528 U.S. at 189-192; *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (noting that "[t]he Supreme Court has emphasized that the doctrine of mootness is more flexible than other strands of justiciability doctrine" (quotation marks omitted)).

The Supreme Court emphasized that one of the purposes of retaining flexibility in the mootness doctrine is the "sunk costs to the judicial system" and that "[t]o abandon the case at an advanced stage may prove more wasteful than frugal." *Laidlaw*, 528 U.S. at 191-92 & n.5. The Supreme Court also has repeatedly emphasized the "heavy burden" on a defendant required to show that its voluntary cessation of conduct has mooted a case—it must be "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 189 (quotation marks omitted).

Neither of these considerations apply in this case. First, there have been no significant judicial resources expended by the Court in this case until consideration of the pending motions. The case has been active for less than one year, without any motion or other practice before the

Court. Second, Defendants' mootness arguments are not based on the voluntary cessation doctrine.[5]

Although the mootness doctrine has some flexibility, "[a] case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Clark v. City of Lakewood*, 259 F.3d 996, 1011 (9th Cir. 2001), *as amended* (Aug. 15, 2001) (quotation marks omitted). "The phrase 'legally cognizable interest' is often used to describe Article III's case or controversy requirements when mootness is at issue, while the phrase 'injury in fact' is often used to discuss these requirements when standing is at issue." *Id.* at 1011 n.7. In considering the injury requirement and mootness when a plaintiff requests future injunctive relief, courts must consider whether the plaintiff's "future injuries are now too conjectural or hypothetical to satisfy the injury-in-fact requirement allowing [the plaintiff] to pursue injunctive relief." *Id.* at 1012. "A plaintiff may not rely 'on mere conjecture about possible governmental actions' to demonstrate injury, and must instead present 'concrete evidence to substantiate their fears.'" *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 825 (9th Cir. 2020) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013). There may be circumstances, however, "in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome

---

[5] Many of Plaintiffs' arguments relating to mootness focus on standards relating to the voluntary cessation doctrine and whether the Court can issue an effective remedy. Whether the Court can issue an effective remedy is not the dispositive issue—the issue is whether Plaintiffs can continue to show the requisite injury, a different standing requirement. The voluntary cessation doctrine does not apply because the changed circumstances in this case, discussed in detail below, are not simply a voluntary cessation of conduct by Defendants in response to the same circumstances. They primarily are changed circumstances outside the control of Defendants, including significantly fewer and more sporadic protests with fewer participants. *See Wise v. City of Portland*, --- F. Supp. 3d ---, 2021 WL 1950016, at *11 (D. Or. May 15, 2021).

mootness." *Laidlaw*, 528 U.S. at 190. Plaintiffs also must continue to show "a serious risk of irreparable harm." *Pulliam*, 466 U.S. at 537.

Plaintiffs cite this Court's decision in *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120 (D. Or. 2020), stating that a case is not moot simply because "the precise relief sought at the time the application for an injunction was filed" is no longer available. *Id.* at 1140. Plaintiffs argue that a case is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Loc., 1000*, 567 U.S. 298, 307 (2012) (quotation marks omitted). The mootness issues discussed in those cases, however, did not relate to whether the Plaintiffs could still demonstrate the requisite injury after changed circumstances. Rather, the issues addressed in those cases involved whether a court could still provide a remedy to the claimed injury or whether the defendants' voluntary cessation of conduct mooted claims.

The Federal Defendants describe the significant change in protest activity in Portland from last summer to the present as it relates to federal buildings. The protests have largely moved from the downtown federal courthouse to the Immigration and Customs Enforcement (ICE) building two miles away, and focus more on "anti-government sentiment" than social justice. *See Index Newspapers LLC v. City of Portland*, Case No. 3:20-cv-1035-SI, ECF 205 at 3.[6] The protests generally involve fewer than 200 people and some involve less than a dozen. *Id.* From November 1, 2020 to August 13, 2021 (more than 9 months), there were 23 protests

---

[6] As previously discussed with the parties, Court takes judicial notice of the declarations filed in the *Index Newspapers* case describing the state of the protests in Portland and the Federal response to the protests. References to ECF numbers in the *Index Newspapers* case will have a preceding case number or "*Id.*" References to ECF numbers without a preceding case number are to the case docket in the pending action. Page number citations are to ECF pagination, not the internal pagination of the documents.

involving federal property that were declared unlawful assemblies. *Id.* (describing protests through June 11, 2021); *see also* ECF 127 at 2 (describing protests from June 11, 2021 through August 13, 2021). Those protests resulted in the arrest of approximately 35 individuals for misdemeanor offenses and about 35 federal law enforcement officers sustaining injuries. Because there have been no protests that were declared unlawful assemblies by Federal Protective Services (FPS) from June 11 to August 13, 2021,[7] the more recent protests involving unlawful behavior at federal buildings include a protest by seven persons on the evening of June 1, which dwindled to three persons by the early morning of June 2 and a protest by 12 persons on May 29. By comparison, from May 26, 2020 through October 31, 2020 (slightly more than five months), there were protests that were declared unlawful assemblies daily, which resulted in the arrest of more than 1,000 people and the injury of 219 federal law enforcement officers. *Index Newspapers*, Case No. 3:20-cv-1035-SI, ECF 205 at 3. These protests also involved much larger crowd sizes.

The federal government's changed deployment in Portland also relates to the reduction in the protests. On May 2, 2021, FPS terminated Operation Diligent Valor, the augmented response in Portland. *Id.* at 3-4. As of June 11, 2021, FPS had less than 12 officers from outside Region 10[8] deployed in Portland, and FPS was no longer being augmented by other law enforcement agencies. *Id.* at 4. By August 13, 2021, "the FPS presence in Portland ha[d] mostly returned to [a] steady state, with only those officers normally assigned to Portland." ECF 127 at 2.

---

[7] *See* ECF 127, ¶ 4 (Declaration of Patrick J. Zitny).

[8] Region 10 of FPS includes the states of Washington, Oregon, Idaho, and Alaska.

PAGE 15 – OPINION AND ORDER

As of November 9, 2020, the USMS in Portland was no longer being augmented by additional staff. Additionally, the USMS officially shut down operations related to protest activity on November 15, 2020, and is no longer responding to protests. ECF 60 at 2. Even when the federal courthouse had a renewed attack against it on March 11, 2021 after its protective fencing was temporarily removed, the USMS did not respond. *Id.* at 3. Instead, only FPS and Portland Police Bureau (PPB) responded. The last time the USMS exited the federal courthouse to respond to a protest was July 30, 2020, more than a year ago. *Index Newspapers*, Case No. 3:20-cv-1035-SI, ECF 204 at 2.

Other federal law enforcement agencies that were once augmenting the federal forces in Portland are no longer deployed in the City. The Department of Homeland Security (DHS), U.S. Customs and Border Protection, U.S. Border Patrol Special Operations Group has not been deployed in Portland since January 24, 2021. *Id.*, ECF 206 at 2. DHS ICE Enforcement and Removal Operations Special Response Team members have not been deployed in Portland since March 21, 2021. *Id.*, ECF 207 at 6. DHS ICE Homeland Security Investigations Special Response Team members have not been deployed in Portland since about March 30, 2021. *Id.*, ECF 208 at 4.

Further, the federal government's approach to protests has changed at the highest levels from summer 2020. Then-President Donald Trump had issued Executive Order 13,933 ("Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence"), which focused on enforcing laws prohibiting the "desecration of public monuments" and "the vandalism of government property." Exec. Order No. 13933, 85 Fed. Reg. 40,081, 40,083 (June 26, 2020). That Executive Order directed the United States "to prosecute to the fullest extent permitted under Federal law, and as appropriate," persons who destroy or vandalize

monuments, memorials, statues, or religious property, and "to withhold Federal support" from

State and local governments and law enforcement agencies "that have failed to protect public

monuments, memorials, and statues from destruction or vandalism" *Id.* It also contained a

provision allowing DHS to provide additional "personnel to assist with the protection of Federal

monuments, memorials, statues, or property." *Id.* This latter provision expired by its own terms

on December 26, 2020. President Biden revoked the Executive Order in its entirety on May 14,

2021.[9] Additionally, former Acting Secretary Chad Wolf, who Plaintiffs allege made public

comments that "justified the actions of DHS agents" in Portland, has been replaced by Secretary

Mayorkas. Plaintiffs allege no similar comments by Secretary Mayorkas.

Similarly, the situation in Portland has changed with respect to protests involving state

property and the state and local law enforcement response. The more recent protest activity

involves "drastically reduced numbers of participants." ECF 110 at 2. There have been more

than 100 protests in Portland since January 1, 2021 that have resulted in no response by the PPB.

*See id.*; ECF 129 at 2. From April through early August 2021, PPB responded to protests on 27

days, and declared a riot or unlawful assembly only nine times. ECF 110 at 2; ECF 129 at 2. Of

those nine times, PPB deployed less lethal munitions during three events, deployed pepper spray

during five events, and deployed Saf-Smoke during one event. ECF 110 at 2; ECF 129 at 2.

Craig Dobson, a Commander in the PPB, describes many protests, even those with some

---

[9] The Court takes judicial notice of President Biden's "Executive Order on the Revocation of Certain Presidential Actions and Technical Amendment" pursuant to Fed. R. Civ. P. 201(c)(1). *See White House Briefing Room, Executive Order on the Revocation of Certain Presidential Actions and Technical Amendment* (May 14, 2021), https://www.whitehouse.gov/briefing-room/presidentialactions/2021/05/14/executive-order-on-the-revocation-of-certain-presidential-actions-andtechnical-amendment/.

criminal activity and that included a few arrests, in which PPB did not use any munitions or force. ECF 110 at 2-8; ECF 129 at 3.

The OSP Mobile Response Team (MRT) has deployed in Portland only a handful of times from November 2, 2020 through August 27, 2021. ECF 137 at 2. None of these deployments involved the use of chemical agents or projectiles and for only one deployment did any officer report a use of force. The MRT deployed in Portland from November 2, 2020 through November 6, 2020, to support local law enforcement during the presidential election. Officers reported uses of force on November 4, 2020. The MRT also deployed on April 17, 2021 and April 20-21, 2021.

Under the specific facts of this case, considering the significantly reduced number of protests, protest crowd size, police response to protests, and deployment of less lethal munitions and aerosol restraints, the Court finds that Plaintiffs' alleged future injury is now too speculative and conjectural to provide Plaintiffs with the legally cognizable interest necessary to support ongoing claims for future injunctive relief. *Clark*, 259 F.3d at 1012; *see also Index Newspapers*, 977 F.3d at 825 (noting that for future injunctive relief, the injury must be "certainly impending, or there is a substantial risk the harm will occur" (quoting *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018)). The current situation in Portland is that there are intermittent protests of reduced size. In some circumstances these protests are declared an unlawful assembly, and in only some of those instances might a law enforcement response result in the alleged injury-producing police conduct. Almost no such conduct, however, occurred in June, July, or August, 2021. By contrast, the Complaint involved protests that were almost daily declared unlawful assemblies with a law enforcement response that included allegedly injury-producing conduct.

Plaintiffs' supplemental declarations do not support a different finding. Plaintiff Philip Wolfe describes one protest in April 2021 (April 11), when he left early because there was a large police presence and he feared for his safety. He states that he attended "several marches and rallies in March and in April [2021] where there was limited or no police involvement." ECF 94 at 5. Plaintiff Wolfe no longer attends protests or rallies with a law enforcement presence because he does not feel safe. He explains that he would like to attend such protests and would do so if law enforcement provided accommodations for deaf or hard of hearing protesters. Plaintiff Juniper Simonis describes two protests in April 2021 (16th and 17th) and two protests in May 2021 (1st and 28th) in which they experienced use of force by law enforcement. Plaintiff Simonis also describes one night in June 2021 (24th) in which they viewed force by law enforcement on video. Plaintiff Melissa Lewis describes three protests in April 2021 (April 12th, 20th, and 26th) where law enforcement used force, a protest on May 1st where she witnessed law enforcement with "cars screeching" and "weapons drawn," and no other protests for the remainder of May, June, July, or August this year. She also explains that she has "noticed that law enforcement has decreased its use of less lethal chemical munitions." ECF 124 at 5. Plaintiff Katalina Durden explains that she has not participated in protests since the summer of 2020 because she does not feel safe, although she would like to participate in protests if law enforcement would be more accommodating to blind persons. These declarations do not describe law enforcement activity in May, June, July, or August this year that shows a realistic threat of repeated injury.

Plaintiffs also request that the Court take judicial notice of the declarations filed by the plaintiffs in *Index Newspapers* describing the more recent protest conditions and law enforcement response in Portland, because the Court is taking judicial notice of the Federal

Defendants' declarations in that case. Those declarations, however, do not paint a materially different picture than Plaintiffs' own declarations. Kat Mahoney describes no protests or law enforcement conduct after March 2021. *Index Newspapers*, Case No. 3:20-cv-1035-SI, ECF 221. John Rudoff describes a protest and law enforcement response on May 1, 2021, just as some Plaintiffs here describe. *Id.*, ECF 222. Caitlin Wong describes no protests after January 27, 2021. *Id.*, ECF 223. Justin Yau describes protests and law enforcement response on March 11th into March 12th and April 13th into April 14th. *Id.*, ECF 224. None of the *Index Newspapers* plaintiffs describe any protest or law enforcement activity after May 1, 2021.

Plaintiffs' supplemental declarations are consistent with the information in Defendants' supplemental declarations—that recent protests triggering a law enforcement response involving force are sporadic and nearly nonexistent after May 2021. Plaintiffs desire to attend any social justice protests that might occur in Portland in the future. For their alleged *injury* to occur, however, requires "attempting to anticipate whether and when these" Plaintiffs might attend a social justice protest that is then declared an unlawful assembly. *See O'Shea*, 414 U.S. at 497. Then if such a protest is declared an unlawful assembly, it must result in a law enforcement response that includes the alleged excessive force, failure to accommodate, or other misconduct. Finally, the Plaintiffs must be harmed by that alleged misconduct. All of these steps must occur despite the currently reduced crowd size and protest circumstances in Portland. This "takes us into the area of speculation and conjecture." *Id.* For Plaintiffs' alleged injury to occur requires too speculative of a chain of possibilities. *See Clapper*, 568 U.S. at 410.

The circumstances now are not the same as "the time the preliminary injunction [in *Index Newspapers*] was entered, [when this] court found that the Federal Defendants had engaged in a pattern of conduct that had persisted for weeks and was ongoing." *Index Newspapers*, 977 F.3d

at 826. Neither federal nor state law enforcement officers have been responding to protests

nightly for weeks. Plaintiffs fail to provide "concrete evidence to substantiate their fear" of

future injury by Defendants. *Id.* at 825 (quoting *Clapper*, 568 U.S. at 420). Although Plaintiffs

do not have to "await the consummation of threatened injury to obtain preventative relief," they

must plausibly show "that based on their course of conduct, there is a 'realistic danger' or

'credible threat'" that "a probabilistic harm will materialize." *Doe #1 v. Trump*, 335 F.R.D. 416,

429-30 (D. Or. 2020) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013)

and *Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 878 (9th Cir. 2013)). Under the changed

circumstances, Plaintiffs are unable to do so.[10]

Nor does the fact that the individual Plaintiffs allege that their First Amendment rights

have been chilled suffice to allege injury to avoid mootness. "A chilling of First Amendment

rights can constitute a cognizable injury, so long as the chilling effect is not 'based on a fear of

future injury that itself [is] too speculative to confer standing.'" *Index Newspapers*, 977 F.3d at

826 (quoting *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015)). As discussed above, Plaintiffs'

fear of future injury is too speculative. *Clapper*, 568 U.S. at 416 ("[Plaintiffs] cannot

manufacture standing merely by inflicting harm on themselves based on their fears of

hypothetical future harm that is not certainly impending.").

_____

[10] Plaintiff DRO argues that it has direct organizational standing. "[A]n organization has direct standing to sue when it show[s] a drain on its resources from both a diversion of its resources and frustration of its mission." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (simplified). Plaintiffs contend that DRO has standing because "DRO has been contacted by several people with disabilities who have been harmed by law enforcement while peacefully protesting" and thus "DRO has devoted and must continue to devote considerable resources to investigating and advocating to resolve this critical problem." ECF 119 at 9. DRO's direct organization standing, therefore, is tied to the same underlying conduct—protesters being harmed by law enforcement's excessive force in responding to protests—that the Court has found is too speculative to support standing based on the changed circumstances.

Further, there is also a change in Oregon law. Oregon Governor Kate Brown signed into law HB 2928, which defines the circumstances under which law enforcement may use less lethal munitions and chemical agents on a crowd. ECF 131 at 3-5. It requires law enforcement agencies to "provide announcements for purposes of crowd control both audibly and visually" whenever possible. *Id.* at 4. It also requires law enforcement agencies to "take reasonable action to accommodate disabilities when issuing or enforcing orders to disperse" when using less lethal munitions, chemical agents, or sound devices. *Id.* Thus, much of the remedy Plaintiffs seek in this case has now been enacted into law in Oregon.

For all of these reasons, Plaintiffs fail to show that they have certainly impending injury for purposes of requesting future injunctive and declaratory relief. Accordingly, Plaintiffs claims for equitable relief are dismissed.

## B. Claims for Money Damages[11]

### 1. Defendant Wolf

#### a. Bivens

Wolf contends that Plaintiffs' constitutional claims are not cognizable under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Wolf argues that a *Bivens* remedy is not available to Plaintiffs because separation of powers principles caution against extending a *Bivens* remedy to this new context, particularly considering the numerous special factors that weigh against extending the remedy. Wolf further asserts that even if the Court were to find that Wolf could be held liable under *Bivens*, the Court should dismiss Plaintiffs' claims against Wolf because he is entitled to qualified immunity.

---

[11] Plaintiffs seek money damages only against Defendant Wolf, the County Defendants, and the City Defendants.

The Supreme Court "has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). Extending *Bivens* "is a significant step under separation-of-powers principles," and Congress is the branch of government with the "substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government." *Id.* at 1856. The Supreme Court "has 'consistently refused to extend *Bivens* [liability] to any new context or new category of defendants.' . . . for the past 30 years." *Id.* at 1857 (quoting *Corr. Svcs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (alteration text in *Malesko*, omitted in *Abbasi*)). "The [Supreme] Court's precedents now make clear that a *Bivens* remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Id.* (quoting *Carlson v. Green*, 446 U.S. 14, 18 (1980)). Thus, in considering possible extensions of *Bivens*, courts "engage in a two-step inquiry." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020). The first step is to "inquire whether the request involves a claim that arises in a 'new context' or involves a 'new category of defendants.'" *Id.* (quoting *Malesko*, 534 U.S. at 68). If so, the second step is to "ask whether there are any special factors that counsel hesitation about granting the extension." *Id.* (simplified).

Defendant Wolf argues that Plaintiffs' claims seek to extend *Bivens* to both a new context and new category of defendants. What constitutes a new context for purposes of *Bivens* is "broad." *Id.* A context is "'new' if it is 'different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court.'" *Id.* (quoting *Abbasi*, 137 S. Ct. at 1859).

The Court agrees with Wolf that Plaintiffs' constitutional claims against Wolf present a new *Bivens* context. Plaintiffs do not allege that Wolf personally engaged in excessive force or otherwise violated Plaintiffs rights. Plaintiffs instead allege that Wolf essentially implemented a

federal policy and knew about and made comments in support of the conduct of line-level officers. These allegations are dissimilar from the types of direct and supervisory conduct accepted in *Bivens* and its progeny. Instead, they are analogous to the allegations rejected by the Supreme Court in *Abbasi*, a case in which the plaintiffs sued high-level executive branch employees. In that case, the Supreme Court declined to extend *Bivens* in part because "a *Bivens* action is not 'a proper vehicle for altering an entity's policy.'" *Abbasi*, 137 S. Ct. at 1860 (quoting *Malesko*, 534 U.S. at 74).

Because Plaintiffs' claims arise in a new context, the Court considers whether any special factors counsel hesitation. The Court finds persuasive the special factors described in *Wolf's* motion. ECF 54 at 26-40. These factors include: (1) Plaintiffs are challenging a high-level executive policy, raising separation of powers concerns; (2) this lawsuit invites intrusive discovery to high-ranking and formerly high-ranking government officials; and (3) Plaintiffs have many alternatives to a *Bivens* claim to remedy their alleged harm. Accordingly, the Court declines to extend *Bivens* to this context. *See Clark v. Wolf*, 2021 WL 2386115, at *5 (D. Or. June 10, 2021) (declining to extend *Bivens* to Wolf's conduct in responding to the 2020 Portland protests). The Court grants Wolf's motion to dismiss on this ground. The Court thus declines to reach Wolf's argument on qualified immunity.

### b.  Section 1983

Plaintiffs allege in a conclusory fashion that Wolf is liable under 42 U.S.C. § 1983. Wolf moved against this claim in his motion to dismiss. Plaintiffs did not respond to this argument in their response brief.[12] A plaintiff who "makes a claim" in a complaint "but fails to raise the issue

---

[12] Plaintiffs' response brief suffers from the same problem as Plaintiffs' Complaint—lumping all Defendants together. For example, in discussing their § 1983 claims, Plaintiffs list all the individual defendants and then state: "Plaintiffs' complaint sufficiently alleges that Defendants' policies, practices or customs of [sic] plausibly violate Plaintiffs' constitutional

in response to a defendant's motion to dismiss" that claim, "has effectively abandoned [that] claim." *Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006); *see also Maldonado v. City of Ripon*, 2021 WL 2682163, at *8 (E.D. Cal. June 30, 2021) ("Plaintiff does not address Defendants' arguments regarding punitive damages in his opposition to the motion to dismiss and therefore concedes the arguments."); *Kerrigan v. Allstate Ins. Co.*, --- F. Supp. 3d ---, 2021 WL 2389644, at *1 (C.D. Cal. June 10, 2021) ("Plaintiff also did not oppose and, thus, concedes, Defendants' argument that because Allstate Insurance was not a party to the insurance policy at issue in this action it was improperly named and should be dismissed."). Accordingly, the Court grants this portion of Wolf's motion.

---

rights under [the] U.S. Constitution, therefore, dismissal is not appropriate." ECF 97 at 31. Whether a *federal* official is liable as a state actor under § 1983, however, involves a specific analysis that Plaintiffs do not address. Nor do Plaintiffs address the County Defendants' arguments about whether Plaintiffs alleged specific facts relating to the County Defendants, as opposed to just alleging that "Defendants" engaged in conduct. Although Plaintiffs allege that "[e]ach Defendant has coordinated its responses to the protests with other agencies," ECF 1 at 40, to the extent Plaintiffs intend to allege that Defendants are agents of one another or engaged in a joint venture, the Court does not accept this legal conclusion. Allegations are factually deficient when a "complaint lumps defendants together and fails to adequately distinguish claims and alleged wrongs among defendants. . . . Plaintiffs must allege more than generic and conclusory allegations demonstrating that 'Defendants' collectively engaged in [misconduct] and allege with at least some degree of specificity the acts which each defendant is alleged to have engaged in which support Plaintiff's claims." *McKeon v. Cent. Valley Cmty. Sports Found.*, 2018 WL 6436256, at *4 (E.D. Cal. Dec. 7, 2018) (citing cases); *see also Karkanen v. California*, 2018 WL 3820916 at * 7 (N.D. Cal. Aug. 10, 2018) (dismissing complaint where "plaintiff repeatedly lumps defendants together in her allegations," because "a complaint which lumps together multiple defendants in one broad allegation fails to satisfy the notice requirement of Rule 8(a)(2)" (simplified) (citing cases)); *In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 908 (N.D. Cal. 2018) ("Plaintiffs must identify what action each Defendant took that caused Plaintiffs' harm, without resort to generalized allegations against Defendants as a whole." (quotation marks and citation omitted)); *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 415 (D. Or. 2002) ("Broad allegations against numerous defendants are not specific enough to provide the defendants with notice of the plaintiffs' allegations."); *accord Iqbal*, 556 U.S. at 676 (stating that the plaintiffs "must plead that each Government-official defendant, through [the official's] own individual actions, has violated the Constitution").

### 2. The City Defendants

Plaintiffs currently are suing the City, along with Mayor Wheeler and Police Chief Lovell only in their official capacities.[13] The City Defendants move to dismiss Mayor Wheeler and Chief Lovell as redundant defendants, because the City also is named as a defendant. *See Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008) ("An official capacity suit against a municipal officer is equivalent to a suit against the entity. When both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant. (citation omitted)); *Updike v. Clackamas Cnty.*, 2015 WL 7722410, at *4 (D. Or. Nov. 30, 2015) ("Updike's claims against Sheriff Roberts in his official capacity, and through him against the Clackamas County Sheriff's Office, are redundant with Updike's claims against Clackamas County. The Court dismisses Updike's claims against Sheriff Roberts. (footnote omitted)). Plaintiffs did not respond to this argument in their response brief, and at oral argument conceded these claims. Accordingly, the Court dismisses the claims against Mayor Wheeler and Chief Lovell as redundant.

The City Defendants also move to dismiss the claims for money damages against the City on various grounds. Because the Court finds that Plaintiffs fail to allege *Monell*[14] liability, the Court does not reach the City's remaining arguments. The City argues that "Plaintiffs cannot show that the City's alleged excessive force was the product of a custom or policy of the City and was the moving force behind [Plaintiffs'] alleged injury." ECF 77 at 23.

---

[13] Plaintiffs have not named and served any individual police officer, despite identifying some of the alleged officers by badge number.

[14] The Supreme Court established the test for municipal liability in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

### a.  Standards under *Monell*

A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "Instead, a municipality is subject to suit under § 1983 only 'if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096-97 (9th Cir. 2013) (quoting *City of St. Louis v. Parprotnik*, 485 U.S. 112, 121 (1988)). Municipal liability may exist without any formal policy permitting the challenged conduct where the municipality has a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Gillette v. Delmore*, 979 F.3d 1342, 1346 (9th Cir. 1992); *see also Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (noting that a plaintiff can show a policy or practice through "a longstanding practice or custom" in addition to "an expressly adopted official policy").

In narrow circumstances, a municipality's failure to train its employees may be considered a policy or custom. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) ("Only where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983."). Indeed, "a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (simplified). In still rarer instances, however, the duties of a specific employee make the need for certain training obvious. *City of Canton*, 489 U.S. at 390. The classic example being that the duties of police officers to

chase fleeing felons makes the need for training on constitutional use of force by officers

obvious. *Id.* at 390 n.10.

Finally, a municipality may be liable "when the individual who committed the

constitutional tort was an official with final policy-making authority or such an official ratified a

subordinate's unconstitutional decision or action and the basis for it." *Gordon*, 6 F.4th at 974

(quotation marks omitted). To prevail on a ratification theory, a plaintiff must show both that

wrongdoer's decision was "cast in the form of a policy statement" and that a supervisor with

policy making authority expressly approved of the decision. *Gillette*, 979 F.3d at 1348.

"A defendant may be held liable as a supervisor under § 1983 'if there exists either

(1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal

connection between the supervisor's wrongful conduct and the constitutional violation.'"

*Starr*, 652 F.3d at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). The

requisite showing can be established by demonstrating that the supervisor: (1) set in motion a

series of acts by others or knowingly refused to terminate a series of acts by others, which the

supervisor knew or reasonably should have known would cause others to inflict constitutional

injury; (2) had his or her own culpable action or inaction in the training, supervision, or control

of his or her subordinates; (3) acquiesced in the constitutional deprivation by subordinates; or

(4) engaged in conduct that shows reckless or callous indifference to the rights of others. *Id.*

at 1207-08. "A plaintiff must allege facts, not simply conclusions, that show that an individual

was personally involved in the deprivation of [the plaintiff's] civil rights." *Barren v.*

*Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). A supervisor might be liable despite not

personally participating in the alleged deprivation if the supervisor "implement[ed] a policy so

deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation." *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (simplified).

> **b. Analysis**

Plaintiffs allege in a conclusory manner that the City has a policy, practice, and custom of violating the constitutional rights of persons as described in the Complaint. Plaintiffs argue that because they allege several specific instances of alleged violations, that is sufficient to allege a policy, custom, and practice.

Because Plaintiffs allege that the City has an official policy that violates their rights, the Court considers the City's official policies, provided by the City, regarding use of force and responding to protests as submitted by the City. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (discussing that documents that are not mentioned in a complaint may be incorporated by reference "when assessing the sufficiency of a claim requires that the document at issue be reviewed"). These policies do not support Plaintiffs' assertion that the City has an official policy to violate Plaintiffs' constitutional rights.

Regarding custom or practice, the facts alleged by Plaintiffs, even taking all well-pleaded factual allegations as true, do not show that in responding to protests the City has a practice or custom of violating the constitutional rights of persons with disabilities. Plaintiffs argue that in this Circuit, a claim of municipal liability under § 1983 is sufficient to withstand a motion to dismiss "even if the claim is based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice." *Shah v. County of Los Angeles*, 797 F.2d 743, 747 (9th Cir. 1986). *Shah*, however, was issued before the Supreme Court's decisions in *Iqbal* and *Twombly*. In *Starr*, the Ninth Circuit clarified post-*Iqbal* that a complaint "may not simply recite the elements of a cause of action" and must contain sufficient factual allegations to "plausibly suggest an entitlement to relief." *Starr*, 652 F.3d at 1216. *Starr*

explained that supervisor liability requires factual allegations plausibly showing the supervisor's "own culpable action or inaction in the training, supervision, or control of his subordinates, his acquiescence in the constitutional deprivations of which the complaint is made, or conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1205-06 (quotation marks omitted). Plaintiffs do not allege facts showing such conduct by any City decisionmaker.

Plaintiffs asserted at oral argument that the absence of a policy to accommodate persons with disabilities in responding to protests or in the City's use of force policy is sufficient to show a policy, custom, or practice under *Monell*. The Court requested supplemental briefing on this argument, but Plaintiffs did not provide any briefing in support of their argument. The City, however, responded that *Monell* liability cannot be premised on an omission. That is a misunderstanding of the circumstances under which liability may attach to a local government under *Monell*.

The Ninth Circuit has explained that a municipality may be liable for policies that are "through omission" and result in liability for a constitutional violation "even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Gibson v. Cnty of Washoe*, 290 F.3d 1175, 1185-86 (9th Cir. 2002)).

> A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations. *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). To establish that there is a policy based on a failure to preserve constitutional rights, a plaintiff must show, in addition to a constitutional violation, "that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right[,]" *Id.* at 1474 (quoting *Canton*, 489 U.S. at 389, 109 S. Ct. 1197), and that the policy caused the violation, "in the sense that the [municipality]

> could have prevented the violation with an appropriate policy." *Gibson*, 290 F.3d at 1194.
>
> The Supreme Court has explained that these heightened requirements for establishing responsibility for a policy of omission are necessary to avoid imposing *respondeat superior* liability, which would run afoul of *Monell*. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403-04, 117 S. Ct. 1382 (1997). After all, when a municipal employee commits a constitutional tort, it could always be alleged that the municipality failed to enact a policy that would have prevented the tort. Without the rigorous state of mind requirements set out in *Canton* and subsequent cases, there would be nothing left of *Monell* 's rule against *respondeat superior* liability. *See Connick v. Thompson*, --- U.S. ---, 131 S. Ct. 1350, 1359-60 (2011); *Bd. of Cnty. Comm'rs*, 520 U.S. at 406-07, 117 S. Ct. 1382. *Canton's* standards thus ensure that, even if the alleged defect in the municipality's policy is one of omission, the acts of constitutional tortfeasors can still "fairly be said to be those of the municipality." *Bd. of Cnty. Comm'rs*, 520 U.S. at 404, 117 S. Ct. 1382.

*Id.* at 1143-44. This doctrine, however, is not at issue in this case because Plaintiffs did not argue that the City's conduct amounted to deliberate indifference. Indeed, Plaintiffs argue that they are not required to allege deliberate indifference to succeed on their ADA and Rehabilitation Act claims. *See* ECF 90 at 35 ("Plaintiffs Are Not Required to Show a Policy, Custom, or Practice of Discrimination or Deliberate Indifference."). In arguing their constitutional claims, Plaintiffs also do not assert deliberate indifference.[15] *Id.* at 36-42.

---

[15] Although Plaintiffs allege "deliberate indifference" in their Complaint in alleging the elements of their causes of action under *Monell*, the ADA, and the Rehabilitation Act, Plaintiffs either ignore arguments challenging deliberate indifference (such as raised by the County Defendants in their supplemental briefing on *Monell*) or deny that they need allege facts demonstrating deliberate indifference (such as in addressing deliberate indifference with respect to their ADA and Rehabilitation Act claims). Thus, the bare allegation in the Complaint does not serve to save any omission-based *Monell* claim. *See, e.g.*, *Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) (stating that a plaintiff who "makes a claim" in a complaint "but fails to raise the issue in response to a defendant's motion to dismiss" that claim, "has effectively abandoned [that] claim"); *accord Starr*, 652 F.3d at 1216 (stating that a complaint may not simply allege the elements of a cause of action).

### 3.   The County Defendants

The County Defendants argue that Plaintiffs do not allege sufficient facts to state a claim against the County Defendants under 42 U.S.C. § 1983. The County Defendants assert that Plaintiffs Phillip Wolfe, Katalina Durden, and Juniper Simonis do not allege any facts specifically against the County Defendants. Plaintiffs do not respond to this argument. Plaintiffs' response brief combines the conduct of all Defendants in arguing that Plaintiffs' adequately allege sufficient harm. The Court agrees that Plaintiffs Wolfe, Durden, and Simonis do not allege facts regarding the conduct of any Multnomah County personnel and the Court grants this aspect of the County Defendants' motion.

The County Defendants argue that only Plaintiff Melissa Lewis alleges facts against the County Defendants, which she does in paragraphs 93-94 of the Complaint. Those paragraphs allege as follows:

> 93. On or about August 9, 2020, Melissa attended a protest at the Justice Center. Multnomah County Sheriffs' deputies forcibly removed her from the area, along with other press and protesters, so officers would have a clear path to the parking lot. The deputies provided no warning before they began screaming at the group to move, striking them, and pushing them hard with batons.

> 94. Melissa complied with the deputies' directions, and she was on the sidewalk, where a temporary restraining order said she had a right to be. Nonetheless, the deputies pulled Melissa by her backpack, shoved her shoulders, and struck her ribs with a baton for not moving quickly enough. But Melissa feared that she might twist her ankle or worse if she moved any faster. When Melissa told the deputies she was complying, they told her to turn around and stop filming. At no time did the deputies communicate to Melissa, other members of the press, or the protesters where they should be; instead, the deputies pushed, pulled, and jabbed them with batons.

ECF 1 at 21-22.

After oral argument, the County Defendants agreed not to assert in this motion that these allegations fail to allege excessive force. In their supplemental briefing, however, they argue that Ms. Lewis fails to allege a claim against Sheriff Michael Reese in his official capacity or against the County for *Monell* liability.

The County Defendants argue that the allegations regarding Melissa Lewis's alleged harm only involve deputies and not any decisionmaker, Sheriff Reese, or any official policy or longstanding custom or practice. Thus, argue the County Defendants, Ms. Lewis fails to state a claim under *Monell*. The County Defendants also argue that under Ninth Circuit precedent, a single instance such as Ms. Lewis experienced cannot support a *Monell* claim. *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989) ("A plaintiff cannot prove the existence of a *municipal* policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee." (emphasis in original)).

The County Defendants also argue that the Complaint is deficient to the extent it intends to assert a claim for an absence of a policy. The County Defendants contend that the Complaint fails to allege facts supporting deliberate indifference. Deliberate indifference occurs when the need for more or different action "is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. The County Defendants argue that Plaintiffs could have alleged facts such as describing a policy that should be implemented or the policy of other jurisdictions that should be emulated. Plaintiffs did not respond to the County Defendants' arguments regarding Plaintiffs insufficient allegations under *Monell* or for supervisor liability for Sheriff Reese.

The Court agrees with the County Defendants that Plaintiffs' allegations regarding Ms. Lewis's encounter fail to state a claim against Sheriff Reese for supervisor liability or against the County under *Monell*. For the reasons discussed above, Plaintiffs' allegations also fail to state a claim against the County Defendants for a custom or practice based on the failure to adopt a policy. Plaintiffs fail to allege facts showing that a policy of the County Defendants amounts to deliberate indifference to any specific Plaintiff's constitutional rights. Thus, Plaintiffs' claims for money damages against the County Defendants are dismissed.

## C.  Preliminary Injunction

Because the Court grants the pending motions to dismiss, the Court denies Plaintiffs' motion for preliminary injunction as moot.

**CONCLUSION**

The Court GRANTS the motions to dismiss filed by Defendants Chad Wolf and Donald Washington, in their personal capacities (ECF 54), Defendants Donald Washington and Secretary Alejandro Mayorkas in their official capacities (ECF 65), Defendant Terri Davie (ECF 55), Defendants the City of Portland, Mayor Ted Wheeler, and Police Chief Chuck Lovell (ECF 77), and Defendants Multnomah County and Sheriff Michael Reese (ECF 66). The Court DENIES AS MOOT Plaintiffs' motion for a preliminary injunction.

**IT IS SO ORDERED**.

DATED this 8th day of October, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge