Rian Peck (they/them), OSB No. 144012
rian@visible.law
**VISIBLE LAW**
333 SW Taylor Street, Suite 300
Portland, OR 97204
503.907.9090

Christopher H. Knauf (he/him), *pro hac vice*
ck@drlcenter.org
Corrigan L. Lewis (she/her), *pro hac vice*
cll@drlcenter.org
Alexandra M. Robertson (she/her), *pro hac vice*
ar@drlcenter.org
**DISABILITY RIGHTS LEGAL CENTER**
1541 Wilshire Blvd., Suite 400
Los Angeles, CA 90017
213.736.1428

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| PHILIP WOLFE,<br>KATALINA DURDEN, and<br>JACKSON TUDELA, individuals,<br><br>    Plaintiffs,<br><br> v.<br><br>CITY OF PORTLAND, an Oregon<br>municipal corporation; and<br>MULTNOMAH COUNTY, a political<br>subdivision of the State of Oregon, and<br>DOES 1-100,<br><br>    Defendants. | Case No.3:20-cv-01882-SI<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>1. **Americans with Disabilities Act (42 U.S.C. §§ 12131–12134)**<br>2. **Section 504 of the Rehabilitation Act (29 U.S.C. §§ 794, 794a)** |

## INTRODUCTION

1.      This amended action seeks to protect the rights of Oregonians with disabilities who exercise their fundamental constitutional rights to assemble and freely speak in protest, in an effort to hold their government and its leaders accountable. Plaintiffs' causes of action arise under two laws that exist for the purpose of ensuring that people with disabilities do not have to suffer the particularly biting form of indignity that results when their own governments and public servants discriminate against them (or worse, act as if they don't exist at all). Those civil rights laws are Title II of the Americans with Disabilities Act and its implementing regulations, 42 U.S.C. §§ 12131–12134; 28 C.F.R. part 35 (the "ADA"), and Section 504 of the Rehabilitation Act of 1973 and its implementing regulations, 29 U.S.C. §§ 794–794a; 28 C.F.R. part 41 ("Section 504").

2.      As part of their causes of action, Plaintiffs seek damages for past harm, as well as declaratory and injunctive relief, to remedy the ongoing failures of the City of Portland, through the Portland Police Bureau ("PPB"), and Multnomah County, through the Multnomah County Sheriff's Office ("the Sheriffs"), to fulfill their decades-old legal duties to ensure that Plaintiffs Philip Wolfe, Katalina ("Katie") Durden, Jackson ("Jack") Tudela,[1] and the many other Oregonians with

---

[1] Plaintiff Philip Wolfe's gender identity is nonbinary and Philip does not use pronouns. Philip will be referred to as Philip. Plaintiffs Katie Durden and Jack Tudela's gender identities are also nonbinary and they use they/them pronouns. Plaintiffs' counsel have identified each of their respective pronouns in the caption. Plaintiffs request that counsel and the Court make every effort to use plaintiffs' and counsel's correct pronouns in all court filings, in- and out-of-court proceedings, and correspondence.

disabilities and their aides, have equal access to, and the ability to safely to

participate in, the protests that have proven integral to our nation's, state's, and

city's systems of democratic representation.

3.      Indeed, the two laws on which Plaintiffs' suit is based are the direct

result of protest. In 1977, although the Rehabilitation Act of 1973 had already been

in place for several years, the federal government had made no effort to implement

the requirement under Section 504 that its buildings be accessible to those with

disabilities. Tired of waiting, people with disabilities organized nationwide protests

in federal offices, with disabled protesters occupying the federal buildings that our

government refused to make accessible to them. Some protesters lasted a few days,

but more than 100 protesters in San Francisco—including disabled protesters,

interpreters, and personal care aides—occupied the Secretary of Health, Education,

and Welfare offices for a month. The federal government tried cutting off their

access to phone lines and water supply, but they did not leave. Instead, members of

the Black Panther Party and the Gray Panthers brought them food and supplies.

The result was the federal government finally implementing the Section 504

regulations.[2]

4.      Just under 15 years later, people with disabilities were again driven to

protest when Congress stalled passage of the ADA. Having had enough, hundreds of

protesters with mobility disabilities left their mobility devices—wheelchairs, canes,

---

[2] Julia Carmel, *Before the ADA, There Was Section 504*, N.Y. TIMES (July 22, 2020), https://www.nytimes.com/2020/07/22/us/504-sit-in-disability-rights.html.

Page 3 – FIRST AMENDED COMPLAINT

walkers, crutches—at the bottom of the steps of the U.S. Capitol Building and crawled up its marble steps on March 12, 1990. Many of the protesters were arrested (not a new experience for many of them, in their work to protest and disrupt systems of power). But, just as with the Section 504 Sit-Ins, the Capitol Crawl proved effective—then-President George H.W. Bush signed the ADA into law just over a month later, on July 26, 1990.[3]

5.     Plaintiffs are all Oregonians who, for years, have dedicated their time and energy to raise awareness of and advance causes that make Portland a more socially just and equitable place for everyone to live. Their work in that space has taken many forms, including, as relevant to this lawsuit, by participating in the protests and political demonstrations that began in May 2020—demonstrations primarily focused on opposing police violence that systemically and disproportionately hurts marginalized people. In a development that proved ironic but surprising to no one, PPB and the Sheriffs, through their words and conduct, conveyed definitively the following message to Plaintiffs and others: Disabled people, and those associated with them, do not belong at a protest.

6.     This Court is well aware of the tactics that Defendants have used to police these protests. Plaintiffs bring this Amended Complaint to focus the Court on how the burden of those tactics has fallen disproportionately on them and other protesters with disabilities, effectively chilling the free speech rights of that entire

---

[3] Julia Carmel, *'Nothing About Us Without Us': 16 Moments in the Fight for Disability Rights*, N.Y. TIMES (July 22, 2020), https://www.nytimes.com/2020/07/22/us/ada-disabilities-act-history.html.

population. When Defendants refuse to give orders to disperse at protests using clear audible and visual cues, it is essentially impossible for people in Plaintiffs' position to comply with those orders.[4] Indeed, from Plaintiffs' vantage points, Defendants' means of issuing announcements are no more effective than someone whispering the warning *Fire!* in a death metal concert or sending a fax to warn of an active shooter. Defendants' announcements are all the more useless when, as here, Defendants deprive Plaintiffs of any opportunity meaningfully to comply with what little of their announcements they can make out—Defendants wait, at best, a few minutes before they unloose all manner of crowd control tactics on anyone and everyone in their path, resulting in chaos and pandemonium. In fact, protesters with disabilities and their aides are often brutalized even as they do everything within their ability to comply with Defendants' instructions, at every step informing officers of their disabilities.

7.    Simply put, Defendants have failed to establish policies, procedures, and officer training for policing protests and implementing crowd control and public safety measures that afford people with disabilities the same opportunity to engage in protest-related activities as non-disabled protesters. As a result of Defendants'

---

[4] Providing both visual and audible warnings multiple times before using crowd control tactics is neither a new nor novel concept. Police in Hong Kong have been using a combination of verbal announcements and colored flags with written announcements to issue their warnings for years. *See, Hong Kong Police tactics against citywide protests*, SOUTH CHINA MORNING POST (Aug. 16, 2019), https://www.youtube.com/watch?v=N7Yr1hYcrp0 (showing footage of Hong Kong Police color-coded flag system).

past and ongoing failures, Plaintiffs and other people with disabilities are subjected to use of force and are chilled from participating in protest.

8.      For example, Defendants have failed to communicate dispersal orders in a manner that people who are Deaf or hard of hearing can understand. For Plaintiff Philip Wolfe, who is Deaf, Defendants' failure to provide effective communication of police orders puts Philip at great risk of being perceived by Defendants as defying their orders, which Defendants will then use as justification for subjecting Philip to use of force. Effective communication from Defendants is essential to ensure Philip and others who are Deaf or hard of hearing can safely exercise their constitutional rights to peacefully protest.

9.      Additionally, verbal orders provided by Defendants are often contradictory, ever-changing, and confusing, making it difficult for anyone, and essentially impossible for people who are blind or low vision or who have mobility impairments, to comply with those orders. Those individuals also typically may need additional time to comply with orders because they often must first orient themselves before navigating or move more slowly than others. Plaintiff Katie Durden, who is blind, requires these policy modifications to be able to maneuver safely in protests and respond to orders issued by law enforcement.

10.     Plaintiff Jack Tudela works as a sighted guide for Katie. Like other persons with disabilities who rely on assistants, it is imperative that Katie remain in close physical contact with Jack to maneuver complex and chaotic environments safely. When Defendants use violence and excessive force to separate people with

disabilities, like Katie, from their guides, like Jack, it becomes impossible for them to comply with orders in a safe way, subjecting the disabled protester to further harm.

11.    Defendants' officers have also too often targeted people with disabilities for harassment and violence in retaliation for participating in protests. They have stood in their riot lines and pointed and laughed at Katie, their smiles taking on a more sheepish character when they realized that those standing next to Katie were perfectly capable of seeing what they did.  Most tellingly, they have told people with disabilities that they should not be attending protests at all.

12.    Defendants' actions and inaction violate the ADA and Section 504. Defendants lack proper policies, procedures, and officer training to ensure effective communication and other reasonable accommodations and modifications for protesters with disabilities. The lack of proper policies and training have denied, and continue to deny, Plaintiffs and others equal access and opportunity to be non-violent participants in protests.

13.    As a result, Plaintiffs have been physically and psychologically harmed and deterred from attending protests or otherwise forced to curtail the exercise of their First Amendment rights due to risk of violence and undue harm. Plaintiffs seek damages, declaratory, and injunctive relief to compensate them for past harm and to ensure that the City of Portland and Multnomah County comply with the ADA and Section 504 so that Plaintiffs and other disabled protesters can safely attend demonstrations in the future.

Page 7 – FIRST AMENDED COMPLAINT

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over Plaintiffs' claims

pursuant to 28 U.S.C. §§ 1331(a) and 1343 because Plaintiffs allege violations of the

ADA and Section 504, which are both federal laws. This Court has jurisdiction over

Plaintiffs' claims for injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201

and 2202 and Rule 65 of the Federal Rules of Civil Procedure.

15.     Venue is proper in the District of Oregon pursuant to 28 U.S.C. §

1391(b) because a substantial part of the events or omissions giving rise to

Plaintiffs' claims occurred in the District of Oregon and because Defendants are

subject to personal jurisdiction in the District of Oregon.

## PARTIES

16.     Plaintiff Philip Wolfe has been a resident of Portland, Oregon, since

2010, including at all times relevant to this lawsuit. Philip has been Deaf since

birth and communicates through American Sign Language (ASL). Philip is a

qualified person with a disability within the meaning of the ADA and the

Rehabilitation Act. Philip has a lengthy history of activism and involvement in the

Portland social justice community. Philip has served as Chair of Portland's

Community Oversight Advisory Board (COAB) and ran for Portland City Council in

2018 and 2020 to represent the needs of all Portlanders, with the benefit of the

insight and perspective that runs attendant to Philip's own lived experience as a

Deaf person. Philip also has a long history of exercising First Amendment rights

through protest. Philip has participated in various social justice protests in

Portland since 2014, including demonstrations for the #MeToo, March for Our Lives, and Black Lives Matter movements, as well as for climate change and opposing war. Philip continues regularly to attend protests for racial and social justice issues but is limited to attending those events in which PPB, the Sheriffs, or both, are not expected to be present at all—for fear that those law enforcement agencies will discriminate against and not even attempt to fulfill their legal duties to accommodate Philip, putting Philip at risk of severe harm. Philip is forced to leave some demonstrations early and, as a result of Defendants' demonstrated conduct, is left with no choice but to avoid others altogether.

17.    Plaintiff Katie Durden has been a resident of the Portland metropolitan area since 2008, including at all times relevant to this lawsuit. When Katie was four years old, they contracted an illness that damaged the optic nerve in both of their eyes, rendering them legally blind. They are a qualified person with a disability within the meaning of the ADA and the Rehabilitation Act. Katie uses a variety of tools to navigate daily life: their service dog, a Black Labrador named Betsy, guides them as they walk, often with a reflective red and white cane in their other hand; screen readers verbally announce text written on screens; Braille provides a tactile replacement for hard-copy text; and, of course, Katie's hearing gives them sensory feedback about the context of their surroundings. Katie's own lived experiences—not just as a blind person, but also as someone who is xicanx, neurodivergent, genderqueer, and, simply, human—have informed their beliefs about social justice. For years, Katie participated in protest demonstrations largely

in the background, helping independent journalists disseminate their protest coverage online. Katie made the choice to participate that way because they were dissuaded from attending protests in person, given Defendants' disregard of—and sometimes outright disdain for—people with disabilities at the protests. In June 2020, however, Katie decided to begin attending protests as an independent member of the press who records the protests in binaural, 360° sound, to give people (including those with low or no vision) a different way to experience protest coverage.[5] When attending the protests, Katie did not feel safe bringing Betsy to guide them, for fear that Defendants' crowd control measures would put their invaluable service dog in harm's way. So, Katie undertook substantial efforts to find and train people to serve as their sighted guides—one of whom was Plaintiff Jack Tudela—to assist them with avoiding curbs, poles, and other physical hazards as they move quickly to comply with Defendants' orders to disperse. Katie was also sure to always have their reflective red and white cane in their hand to help them navigate and to communicate to officers, via that universally recognized mobility device, that Katie was blind. In spite of the burdens that Katie undertook themself to account for Defendants' lack of any meaningful efforts to accommodate people with disabilities, Katie eventually had to cease attending protests in person because, as this Amended Complaint will describe in detail, Defendants went out of

---

[5] Katie's binaural audio coverage of the 2020 protests is available online via SoundCloud here: https://soundcloud.com/user-426859291, and via YouTube here: https://www.youtube.com/channel/UC38WDr3vztj6sI0Dz3g3nvg.

their way to thwart the self-accommodations that Katie had arranged to protect their personal safety.

18.    Plaintiff Jack Tudela has resided in the Portland metropolitan area since 2014, including at all times relevant to this lawsuit. Jack attended their first protest at age twelve and over the last several years has attended at least 2-3 protests per year. In the summer of 2020, Jack began attending protests almost nightly. Jack began assisting Katie as a sighted guide in August 2020 and has served as Katie's primary sighted guide since that time. As a sighted guide, Jack accompanies Katie to assist with navigating safely in the crowd and around obstacles, as well as with directions and compliance with police orders. As Katie's sighted guide, Jack is an individual associated with an individual with a known disability within the meaning of the ADA and the Rehabilitation Act. 28 C.F.R. § 35.130(g); 29 U.S.C. §§ 794(a), 794a(a)(2).  Jack is also an independent member of the press who assists Katie's journalism to document protest activity. By virtue of Jack's association with Katie as a sighted guide, Jack has been subject to discrimination and harm by Defendants and is deterred along with Katie from attending protests due to the discrimination and harm by Defendants.

19.    Defendant City of Portland (the "City") is a municipality located in Multnomah County in the State of Oregon. As a local governmental entity receiving federal funds, the City is subject to suit under the ADA and Section 504. 42 U.S.C. § 12131(1); 29 U.S.C. § 794(a).

20.     Defendant Multnomah County ("the County") is a political subdivision of the State of Oregon. As a local governmental entity receiving federal funds, the County, too, is subject to suit under the ADA and Section 504. 42 U.S.C. § 12131(1); 29 U.S.C. § 794(a).

21.     Defendants Does 1-100 are other government agencies and individual officers, agents, and employees of Defendants who violated Plaintiffs' rights, but whose identities are unknown at this time. This Complaint will be amended with leave of the Court after they are identified in discovery.

22.     Plaintiffs are informed and believe, and therefore allege that each of the Defendants is the agent, ostensible agent, alter ego, master, servant, trustor, trustee, employer, employee, representative, affiliate, partner, associate, or similar legal capacity of each of the other Defendants and that, at all times, they acted and performed (or omitted to act or perform) within the course and scope of each capacity, and with the authorization, consent, permission or ratification of each of the other Defendants.

## FACTUAL BACKGROUND

**Portland's Enduring History of Protest**

23.     Even before Oregon entered Statehood in 1859, Portland was a city of protest. Indeed, since at least 1857, Portlanders have a documented history of taking to the streets to demand change in, and raise awareness of, issues central to our lives: equity in education, press freedom, women's suffrage, immigrant rights, labor rights, socioeconomic inequality, environmental justice, war and other foreign

policy, police accountability, LGBTQ+ rights, Indigenous Peoples' rights, and racial

justice, among other things. In other words, before Portland was known for its

donuts, or its airport carpet, or its food-cart pods, or for "putting a bird on it," it was

known for being home to active, engaged citizens, who make use of their First

Amendment rights to effect lasting democratic change.

24.    Portlanders remain true to their tradition of protest to this day.

According to Portland's current mayor during an interview with CNN in 2019,

Portland is the site of around 200 demonstrations per year.[6] Portland's identity is so

associated with protest that former President George H.W. Bush called Portland

"Little Beirut" during anti-war protests in the 1990s.[7] And in 2020, the

U.S. Department of Justice, under former President Donald J. Trump, attempted to

designate Portland (along with New York City and Seattle) as a different

jurisdiction altogether, wholly separate from the rest of the country.[8]

25.    Indeed, the past decade in Portland has been characterized by nearly

ceaseless protest in some form or another. In May 2011, we had Hands Across

Hawthorne, in response to a group of five men following and attacking a gay couple

---

[6] Jason Kravarik & Sara Snider, *Why Portland? The city's history of protest takes an exceptional turn*, CNN (July 26, 2020), https://www.cnn.com/2020/07/26/us/portland-protest-history-federal-police/index.html.

[7] Ken Boddie, *Surprised about Portland protest? 'You don't know Portland'*, KOIN 6 NEWS (May 13, 2021), https://www.koin.com/is-portland-over/surprised-about-portland-protests-you-dont-know-portland/.

[8] Rebecca Ellis, *Justice Department labels Portland 'anarchist jurisdiction,' threatens cuts to federal funding*, OPB (Sep. 21, 2020), https://www.opb.org/article/2020/09/21/justice-department-labels-portland-anarchist-jurisdiction-threatens-to-cuts-federal-funding/.

who held hands while they walked across the Hawthorne Bridge. In October 2011, following Occupy Wall Street, we saw the start of Occupy Portland, protests that continued through 2015. In 2016, Portlanders protested the election of Donald J. Trump as United States President. In 2017, Portland joined in hosting the Women's March. In 2018, Portland youth led 12,000 people in March for Our Lives Portland, to demonstrate against the lack of political response to school shootings. And in 2019, Proud Boys protested all the protests in Portland during their End Domestic Terrorism Rally (also known as the "Better Dead than Red Rally").

26.     That brings us to 2020, and through today. The most nationally publicized protests began in May 2020, when Portlanders yet again filled the streets almost every day and night to protest police violence against Black people. Just two months before those protests erupted, Louisville Metro Police Department officers burst through Breonna Taylor's door in the middle of the night and murdered her in her own bed. Then in May, Minneapolis Police Department officer Derek Chauvin dug his knee into George Floyd's neck for 8 minutes and 46 seconds. Mr. Floyd's last words reminded our nation of the same anguished words another Black man, Eric Garner, had uttered only six years earlier when pleading with New York Police Department officer Daniel Pantaleo to release him from the chokehold that was killing him: "I can't breathe." "I can't breathe." "I can't breathe." "I can't breathe." Mr. Floyd and Mr. Garner were not alone in spending their last gasps on those three words, only to be ignored by the police officers who had hogtied them, or covered their heads with mesh hoods, or Tased them multiple times, or put them in

a chokehold, or knelt on their necks, or told them that they were lying because, "if you can talk then you obviously can [expletive] breathe."[9]

27.     The Black Lives Matter movement cannot be isolated from the disability rights movement. Freddie Gray, Laquan MacDonald, Kevin Matthews, Tamir Rice, Eric Garner, Elijah McClain, Charleena Lyles, Sandra Bland, Quintonio LeGrier, Stephon Watts, Korryn Gains, Natasha McKenna, Eric Smith and Daniel Prude were all Black, disabled victims of state violence. These names serve as a strong reminder that the combination of disability and skin color continues to be stigmatized by law enforcement. While there is no reliable national database tracking how many Black people with disabilities are shot by police each year, media sources have reported that since the beginning of January 2015, 244 Black people, who carried a mental disability, have been fatally shot by law enforcement.[10] Despite the startling statistics, these media findings only scratch the surface. The death toll that stems from law enforcement's reaction to the intersectionality of both race and disability remains unknown.

28.     These protests that erupted in the summer of 2020 have continued, though they have often taken on additional meaning—meaning not separate from, but inextricably intertwined with, the issues surrounding State-sanctioned violence and systemic marginalization of whole groups of people—as different events have

---

[9] Mike Baker et al., *Three Words. 70 Cases. The Tragic History of 'I Can't Breathe.'*, N.Y. TIMES (June 29, 2020) https://www.nytimes.com/interactive/2020/06/28/us/i-cant-breathe-police-arrest.html.
[10] *Fatal Force,* THE WASHINGTON POST (December 5, 2021) https://www.washingtonpost.com/graphics/investigations/police-shootings-database/.

unfolded over the past 18 months. Those events, each of which drew protest response in Portland, include:

- **July 4, 2020**: After the nightly protests in downtown Portland had dwindled into smaller and smaller numbers and nearly ceased altogether, federal agents breathed new life into the protests after implementing Operation Diligent Valor.[11]

- **August 23–25, 2020**: Kenosha Police Department officers shot Jacob Blake seven times in the back. In the ensuing protests, 17-year-old Kyle Rittenhouse traveled from Illinois and patrolled the protests with an AR-15, killing two people and severely wounding a third. In stark contrast to how Kenosha police officers treated Jacob Blake just two days earlier, they saw Mr. Rittenhouse with an AR-15 early in the evening of protests and threw him a bottle of water as they drove by in their armored vehicle; and after Mr. Rittenhouse had fired shots, the police let him safely walk away from the protest with his rifle slung across his body and his arms raised.

- **September 18, 2020**: A nurse who worked at ICE filed a whistleblower complaint, reporting that an ICE doctor—referred to

---

[11] Shawn Boburg et al., *Swept up in the federal response to Portland protests: 'I didn't know if I was going to be seen again'*, THE WASHINGTON POST (Sept. 10, 2020), https://www.washingtonpost.com/graphics/2020/investigations/portland-protesters-federal-response-trump/.

by the immigrant women detained in that facility as the "uterus
collector"—was sterilizing immigrant women detainees with no
medical basis for doing so.[12]

- **April 16, 2021**: Portland Police officer Zachary DeLong shot and
  killed Robert Delgado in Lents Park. Mr. Delgado was experiencing
  a mental health crisis at the time. After Officer DeLong shot Mr.
  Delgado, police continued shouting directions at Mr. Delgado for 9
  minutes as he lay motionless in the grass, believing (no doubt due
  to the common stereotype that people with mental illness are
  "manipulative" and "dangerous") that he was merely pretending to
  be injured.[13]

- **June 24, 2021**: Portland Police officer Curtis Brown shot and killed
  Michael Ray Townsend, who was sitting outside a Motel 6 in the
  Lloyd Center. Mr. Townsend, who lived with mental illness, had
  called 911 himself, to ask for help because he was having suicidal
  ideations.[14]

---

[12] Jacob Soboroff et al., *Lawyers allege abuse of migrant women by gynecologist for
Georgia ICE detention center*, NBC NEWS (Sept. 15, 2020),
https://www.nbcnews.com/news/latino/nurse-questions-medical-care-operations-
detainees-immigration-jail-georgia-n1240110.
[13] Jonathan Levinson & Conrad Wilson, *Grand jury declines to charge officer who
killed Robert Delgado in Portland park*, OPB (Sept. 24, 2021),
https://www.opb.org/article/2021/09/24/multnomah-county-grand-jury-declines-
charge-police-officer-who-killed-robert-delgado-in-lents-park/.
[14] Jonathan Levinson, *Man killed by Portland police called 911 himself, seeking
mental health care*, OPB (June 28, 2021),

29.     Protests are still happening in relation to those and current events. In September of this year, a grand jury declined to indict Portland Police Officer DeLong for any crime associated with shooting Mr. Delgado. In November of this year, a jury acquitted Kyle Rittenhouse. Portland protests followed, demonstrating that this community's protests are far from over, but Plaintiffs continue to be deterred from participating.

30.     Over these past 18 months, Portland protest attendees have been met with officers clad in riot gear nearly every night—no matter whether the protesters are breaking windows or spray-painting buildings (true, that has happened); or drawing on a public street with sidewalk chalk (that, too); or holding a solemn candlelight vigil for a protester who was killed by a Seattle driver who blasted his car through the crowd of protesters; or linking arms and singing.

31.     No matter how protesters protest, all protest attendees find themselves being told they are not complying with the officers' orders correctly. Then, as they choke on clouds of tear gas or other noxious fumes, or reorient themselves after officers threw a flash bang grenade right next to them, Defendants kettle and bull-rush them, shove them in the back with billy clubs, throw and tackle them to the ground, hold them down and empty an entire can of mace in their eyes,

---

https://www.opb.org/article/2021/06/28/man-killed-by-portland-police-called-911-himself-seeking-mental-health-care/.

nose, and mouth, and then sometimes—just in case that's all not enough—deliver blow after blow with closed fist to the face.[15]

32.    This police response is not tied to probable cause or reasonable suspicion by any definition of those legal standards; instead, it's tied to the officers' own definition of "refusing to obey lawful orders"—a definition that, upon examination, includes persons failing to hear or perceive the officers' orders in the first place, or failing to understand the orders because they are confusing and often conflicting, or failing to move as quickly as officers want them to. And then, for good measure, the officers hop 12-deep onto the runner boards of riot vans, searching for and arresting protest attendees who could not keep up with the rest of the crowd.

33.    It should be no surprise that this "culture of compliance," if left entirely to the officers' own discretion, serves disproportionately to penalize people with disabilities, including Plaintiffs. It was, and remains, essential that police officers have clear direction and training for interacting with protesters with various disabilities—for, just like Robert Delgado, and Michael Ray Townsend, and Elijah McClain, protest attendees who cannot comply with police orders because they cannot hear them, or do not understand them, or simply do not have the capacity to comply exactly as officers want them to, is not defiance by any means; it

---

[15] *See,* Conrad Wilson, *3rd active duty Portland police officer possibly facing protest-related charges*, OPB (June 25, 2021), https://www.opb.org/article/2021/06/25/portland-police-possible-charges-3rd-officer-protest-enforcement/ (embedding and describing video footage in which PPB Officer Thomas Clark tackled a protest medic and then punched him in the face repeatedly, leaving the medic, himself a Neurotrauma Intensive Care Unit nurse, with a traumatic brain injury).

is simply the reality of what their bodies are capable of doing in that moment. When police interpret disabilities as threats or defiance, we see the result:  It is, too often, a death sentence. No more.

**Defendants' Response to the 2020 Protests**

34.    As explained above, Defendants met the protests that started in May 2020 with brutal crowd control tactics, including the use of force and "less-lethal" munitions, such as tear gas, flashbang grenades, pepper balls, and rubber bullets. Since then, the Courts (including this one), the United States Attorney's Office for the District of Oregon, and the press have condemned that Defendants failed to use their training as police officers to evaluate the difference between people engaged in criminal conduct (who may be subject to an appropriate level of force) and people who pose no threat to officer or public safety (who should not be shot with crowd control munitions, arrested, or otherwise singled out for physical force).

35.    For example, on June 9, 2020, the Honorable Marco A. Hernández, United States District Judge for the District of Oregon, issued a temporary restraining order restricting use of tear gas and other crowd control tactics, except where live or safety of the public or police were at risk.[16] Judge Hernández' order was based on evidence (including testimony from PPB officers) that PPB had indiscriminately used tear gas during protests, at times without any evidence that would support officers' decision to use such a blanket measure that, by its nature, affects anyone who is nearby, including protesters engaged in only peaceful non-

---

[16] *Don't Shoot Portland v. City of Portland,* 465 F. Supp. 3d 1150 (D. Or. 2020).

destructive demonstration.[17] Then, just months later, Judge Hernández found the
City of Portland in contempt of the Court's order, because PPB officers still were
incapable of identifying any "active aggression" on protesters' part that would
warrant the crowd control measures the officers decided to use.[18] The City's Mayor
Ted Wheeler even has acknowledged the impropriety of the level of force
Defendants used at the protests, apologizing to non-violent demonstrators,
bystanders, and even people in their own homes, who were exposed to tear gas and
dangerously loud announcements blasted over the LRAD.[19]

36.    According to PPB's own data, self-reported by officers present at
protests and collected by PPB's audit team, PPB used force over 2,378 times in the
first month of the 2020 protests alone—tripling, in just 30 days, the number of force
incidents PPB had used during the combined four years leading up to then.[20]

---

[17] *Id.* at 1155.

[18] *Don't Shoot Portland v. City of Portland*, 503 F. Supp. 3d 1022, 1033–35 (D. Or.
2020).

[19] Rebecca Ellis, *Portland leaders promise less tear gas as Oregon State Police arrive*,
OPB (July 30, 2020), https://www.opb.org/article/2020/07/30/portland-oregon-
downtown-park-blocks-cleared-protests/. Mayor Wheeler's apology came shortly
after he decided to go to a protest himself, when DHS Operation Diligent Valor was
in full effect. He got tear gassed that night, apparently experiencing for the first
time what that's like. That he was tear gassed (likely by federal agents) made
national headlines. *See,* Alta Spells & Josh Campbell, *Portland mayor tear gassed
after speaking with protesters on presence of federal agents*, CNN (July 23, 2020),
https://www.cnn.com/2020/07/23/us/portland-protests-mayor/index.html. Wheeler's
apology rang fairly hollow to many in Portland, given that he had already earned
the nicknames "Tear Gas Teddy" and "War Crimes Wheeler", for his ratification of
PPB's decision to deploy tear gas over 200 times on his watch as Portland Police
Commissioner—well before the federal agents had started responding to the
protests.

[20] Alex Zielinski, *Portland Police Used Force Against Protestors 2,378 Times During
First Month of 2020 Protests*, PORTLAND MERCURY (Nov. 13, 2020),

37.     Defendants' approach to policing the 2020 protests has also raised flags with civil rights attorneys for the U.S. government. As this Court knows, the United States Attorney's Office for the District of Oregon and the United States Department of Justice, Civil Rights Division, have been aware of the City's and PPB's propensity to resort to excessive force—especially when it comes to policing people with disabilities—since at least 2012.[21] DOJ has been monitoring, and continues to monitor, the City's and PPB's use of force and related conduct under the parties' Settlement Agreement. As part of the DOJ's monitoring role, it released its Fifth Periodic Compliance Assessment Report, which covered a review of PPB's conduct during the 2020 protests.[22] The DOJ's findings in that Report confirm that PPB officers believe—and their senior supervisors affirm them in believing—that people at a protest who walk slowly or fail to disperse are engaged in "active aggression" and are thus fair game for being subjected to physical force.[23]  The DOJ also included in its Report that PPB officers and their supervisors relied on announcements broadcast over the LRAD as a "de-escalation" technique. The DOJ took that opportunity to remind the City and PPB that making LRAD

---

https://www.portlandmercury.com/blogtown/2020/11/13/30444612/portland-police-used-force-against-protesters-2378-times-during-the-police-used-force-2378-times-during-first-month-of-2020-protests.

[21] Complaint, *United States v. City of Portland*, No. 3:12-cv-02265-SI (D. Or. Dec. 17, 2012), ECF No. 1.

[22] DOJ's Fifth Periodic Compliance Assessment Report, *United States v. City of Portland*, No. 3:12-cv-02265-SI (D. Or. Feb. 10, 2021), ECF No. 236-1.

[23] *Id.* at 8–9.

announcements "may be valid warnings to the crowd generally," but officers "should not assume that subjects heard the LRAD."[24]

38.     Plaintiffs are informed, believe, and thereupon allege that the City and PPB often enlist other law enforcement agencies to provide assistance or backup in crowd control during protests. Plaintiffs are further informed, believe, and thereupon allege that the City and PPB typically coordinate with the County and the Sheriff's deputies to be present at protests and to provide assistance or backup in implementing crowd control measures.

39.     Plaintiffs are informed, believe, and thereupon allege that, both PPB and the Sheriffs work in tandem to respond to protests in Portland and, as a result, each agency is liable for failing to provide reasonable accommodations to Plaintiffs and other protesters with disabilities and the resulting harm.

40.     Additionally, at times, State, County, or City officials, or some combination of them, have used the power of their respective offices to authorize and provide structure for law enforcement agencies to share authority and responsibility in policing protests. For example, on September 25, 2020, in preparation for the Proud Boys rally and demonstrations, Oregon Governor Kate Brown issued Executive Order 20-54, which established a unified incident command, mobilizing Sheriffs and other local law enforcement agencies to work with PPB in a collaborative, structured joint command. Likewise, in early November 2020, Governor Brown issued similar Executive Orders 20-61, 20-62, 20-

---

[24] *Id.* at 9.

63 and 20-64, which established and extended the unified incident command of PPB and MCSO, among other agencies.

**Defendants' Law Enforcement Response Disproportionately and Discriminatorily Subjects Persons with Disabilities to Unjustified Police Violence**

41.    Persons with disabilities were disproportionately and discriminatorily subjected to unnecessary and unreasonable use of force by Defendants due to their failure to adopt and implement protest crowd control and public safety policies and procedures that afford persons with disabilities equal opportunity to safely engage in protests.

42.    In response to protests, Defendants' issue declarations of unlawful assembly and orders demanding that protesters disperse from the area. Defendants provided those dispersal orders only orally, and often with confusing and contradictory directions as to how one can appropriately comply. Pursuant to Defendant PPB's own internal policy, those who do not comply with dispersal orders, or who comply with them too slowly, are "active aggressors" and thus subject to the use of force. The result of Defendants' policy is to disproportionately affect people with disabilities—like Philip, who is Deaf and cannot hear the dispersal orders as PPB chooses to deliver them, or like Katie, who is blind and needs more time to both decipher where Defendants want them to go and to navigate safely in that direction.

43.    As described above, in 2012, the DOJ found that PPB engages in a pattern or practice of unnecessary or unreasonable force during interactions with

people who have or are perceived to have psychiatric disabilities.[25] The DOJ found a pattern of dangerous uses of force against persons who posed little or no threat and who could not, as a result of their psychiatric disabilities, comply with officers' commands, including practices that escalate the use of force where there were clear earlier junctures when the force could have been avoided or minimized.[26] These practices, the DOJ concluded, resulted from deficiencies in policy, training, and supervision.[27]

44.    The DOJ's findings, as part of its ongoing monitoring of PPB's conduct during the protests, confirm that PPB still does not have appropriate policies, practices, training, or supervision, to ensure that officers understand how to identify and respond to the needs of people with disabilities. "Slow walking," failing to disperse, and failing to hear an announcement over the LRAD are not the stuff of "active aggression," as Defendants have so interpreted. In fact, "slow walking," staying in an area longer than PPB wants, or undertaking no action at all due to an inability to hear PPB's announcements are things often associated with people with disabilities. But where most people see that for what it is, Defendants see it as "active aggression," and behave accordingly.

45.    Because dispersal orders are often contradictory, confusing, and lacking orienting information, people who are Blind who rely on cardinal directions,

[25] Letter from Thomas E. Perez, Assistant Attorney General, Civil Rights Division, to Honorable Sam Adams, Mayor of City of Portland (September 12, 2012), at 1, https://www.portlandoregon.gov/police/article/469399.
[26] *Id.* at 2.
[27] *Id.* at 3.

like Katie Durden, are unable to fully understand the directions to comply with the order before they are subjected to use of force. Defendants have also separated people with disabilities from their guides and sighted aids, making it impossible for them to safely comply with dispersal orders.

46.     Defendants also fail to provide reasonable accommodations as required by the ADA and the Rehabilitation Act in their crowd dispersal methods. Individuals with mobility impairments require additional time to be physically able to comply with dispersal orders, but Defendants rarely provide them with any time—much less additional time—to comply before Defendants use force against them.

47.     Defendants' failure to provide effective communication and reasonable accommodations denies people with disabilities full and equal access to the police services they provide—services ostensibly intended to promote public safety—and therefore, violates the ADA and Section 504.

**Defendants Fail to Provide Effective Communication and Reasonable Accommodation to People who are Deaf or Hard of Hearing**

48.     Defendants discriminate against people who are Deaf or hard of hearing at protests, including by failing to properly plan, modify standard policies, and otherwise provide reasonable accommodations and effective communication to protesters and others.

49.     Defendants have failed to provide effective and accessible communications in multiple formats regarding law enforcement or other activities at protests. Defendants have routinely failed to communicate orders to disperse,

instructions for doing so, warnings about imminent use of force, and declarations of unlawful assemblies and riots. When Defendants have communicated orders at the protests, they have done so only orally. As a result, people who are Deaf or hard of hearing are subjected to egregious uses of force for failing to comply with orders and warnings that, for all practical purposes, were never issued to them.

50.    Philip has been subjected to use of force on numerous occasions after being unable to understand a verbal dispersal order Defendants issued to the crowd. For example, in 2014 during a Black Lives Matter Protest, Philip recalls being confronted by police and could see them attempting to communicate with Philip. But, because no accommodations or interpretive services were provided, Philip could not understand what the officers were trying to say. Then, suddenly, police threw flashbang grenades and chaos ensued. Philip had no idea what was happening or why officers were launching grenades. Philip had to flee for safety amid the pandemonium.

51.    Another more recent example occurred on May 31, 2020, at around 10:30 or 11:00 pm, when PPB officers again fired flashbang grenades into a crowd of thousands of people without any warning accessible to people who are Deaf or hard of hearing.

52.    Flashbang grenades, like their name suggests, simultaneously emit an extremely loud noise and a bright flash of light, specifically designed to disorient people. For people who are Deaf or hard of hearing, flashbang grenades are particularly disorienting and can cause additional hearing damage. Deaf and hard

of hearing people often rely heavily on their vision, along with residual hearing if applicable, to access and move through the world around them. Flashbang grenades can cause Deaf and hard of hearing people to lose their residual hearing temporarily or permanently, and to experience a temporary but devastating impact on their ability to see and maintain physical balance. They may also experience severe ringing in their ears. The combination of these various factors leads to extreme disorientation and an unsafe situation for Deaf and hard of hearing people. This is especially true when Deaf or hard of hearing people are being commanded to disperse an area within a specific, short time frame.

53.    Additionally, PPB frequently uses bright flood lights and the LRAD at extremely high volumes, both of which are disorientating for persons who are Deaf or hard of hearing. As Philip primarily relies on vision to determine what law enforcement officers are doing and whether they are giving orders or starting to clear protesters from the streets, very bright, disorienting lights obscure Philip's ability to see police and determine if it is time to disperse. Additionally, at very high volumes, the LRAD can be disorienting by affecting the residual hearing for persons who are hard of hearing, and for persons who are Deaf, like Philip, the vibrations of the high volume reverberate throughout one's body and can cause pressure in one's head, which is disorienting.

54.    PPB's use of flashbang grenades and other force that evening caused a stampede in the crowd, putting Philip and others, including those with disabilities that impact mobility, at significant risk of injury. Philip and Philip's friends, who

are also Deaf, desperately tried to hold hands and stay together amid the chaos.
PPB officers then fired tear gas into the crowd, causing Philip and others to cough
and Philip's eyes to burn and water profusely. As a result, Philip was unable to see
or hear what was happening in an already chaotic environment. Philip was
fortunate to have escaped the crowd without significant physical injury, although
Philip was left dizzy, nauseous, lethargic, and dazed from the exposure to tear gas
and overall experience.

55.     Philip was not so fortunate on other occasions. On June 19, 2020, for
example, Philip, like many others, attended a protest at the Multnomah County
Justice Center in downtown Portland. That evening, as on other occasions, PPB
officers shot tear gas canisters and flashbang grenades indiscriminately into the
crowd.

56.     No accessible warnings were ever given to persons with disabilities.
Philip perceived that officers began to fire out of nowhere, and then Philip felt a
sharp, searing pain as a flashbang grenade hit Philip in the back. Officers shouted
at protesters as they continued to fire indiscriminately into the crowd and strike
protesters with batons, even as the crowd began to disperse. Without effective
communication, Philip was unable to understand what the officers were saying. It
felt like a war zone to Philip.

57.     On July 22, 2020, after federal agents established a presence in the
City, Philip attended a rally a few blocks away from the Justice Center and, later
on, another event happening on Fourth Avenue. Philip observed PPB officers and

federal agents work in tandem to disperse the large group with both agencies firing tear gas and flashbang grenades into the crowd.

58.    Because warnings and dispersal orders were again provided only orally, Philip was unable to independently understand or comply with the demands of law enforcement. Philip brought an interpreter that evening, who informed Philip that the authorities gave an oral warning that the event was becoming unlawful. However, PPB and federal agents did not give Philip sufficient time to disperse before using force, and Philip could not avoid exposure to the tear gas, coughed and became dizzy. A friend who is Deaf/blind and who accompanied Philip that evening was terrified.

59.    Additionally, like other Deaf or hard of hearing protesters, Philip must be extremely careful that the police do not misperceive a lack of response from Philip as non-compliance, which can result in use of force that is unnecessary, violent, and possibly deadly.

60.    For example, Magdiel Sanchez, a deaf man, was shot and killed by police in Oklahoma City in September 2017, when Mr. Sanchez failed to comply with officers' verbal orders that he could not understand.[28]

61.    Similarly, like other Deaf or hard of hearing protesters, Philip must be extremely careful when using sign language, which to an untrained officer could be

---

[28] Ken Miller & Tim Talley, *Police Chief: 'A Lot of Concerns' After Shooting of Deaf Man,* ASSOCIATED PRESS (September 21, 2017), https://apnews.com/article/1850623653aa4658a49281f5d6685922.

misinterpreted as non-compliance or even a threatening gesture, which can result in the use of force that is unnecessary, violent, and possibly deadly.

62.     For example, during the Summer of 2020, Philip was put in fear of Philip's own life when attending a protest at the ICE building. Philip brought an interpreter to the protest and approached the officers to inform them that Philip was Deaf and needed an accommodation. In response, officers surrounded Philip, separated Philip from the interpreter, and aimed their weapons at Philip's chest. Philip was afraid to use sign language to communicate with officers because any miscommunication between Philip and the officers could have resulted in Philip being shot. It was only after Philip's interpreter was able to carefully navigate the dynamic and explain to officers that Philip was Deaf that the officers lowered their weapons.

63.     Similarly, during the Summer of 2020, Philip witnessed a PPB officer pointing a gun in Philip's direction. When Philip attempted to wave to obtain the officer's attention, the officer continued pointing the gun at Philip. Only by providing the officer a message via phone explaining Philip is Deaf did the officer begin communicating with Philip.

64.     It is not uncommon for officers to misinterpret sign language as a threat. For example, in February 2013, Jonathan Meister was severely beaten by

police in Hawthorne, California, after officers misinterpreted his use of ASL as threatening behavior.[29]

65.    When Philip articulated concerns about accessibility to PPB officers, the officers told Philip not to attend protests because the inaccessibility made it unsafe. As discussed below, Philip brought those concerns directly to Mayor Ted Wheeler, who also failed to make reasonable accommodations available.

66.    PPB's use of tear gas on Philip could and should have been avoided through effective communication. Philip has had recurring headaches and other medical complications since mid-August because of the tear gas. Philip's existing PTSD has been exacerbated as a result of the war zone-like environment and Philip has experienced severe anxiety, insomnia, fatigue, hypervigilance, night terrors, and other symptoms.

67.    In spite of all that, Philip has continued to engage in protest throughout 2021, attending many marches and rallies for racial justice and other social justice issues that were smaller community events that were unlikely to draw a significant police presence.  For example, on March 13, 2021, Philip attended a rally in downtown Portland to honor Breonna Taylor. As another example, on March 20, 2021, Philip attended an organized event to protest violence against the Asian community.

---

[29] *Hawthorne Police Accused of Beating Deaf Man,* NBC Los Angeles (Feb. 18, 2014), https://www.nbclosangeles.com/news/local/lawsuit-hawthorne-police-allegedly-beat-deaf-man/2089920/.

68.    Philip has regularly attended marches to protest PPB's killing of Patrick Kimmons on September 30, 2018. Those protests are organized by Kimmons' mother, with support from local racial justice groups, and have been held weekly on Thursdays and Sundays over the last two years. During 2021, Philip has regularly attended these marches, which are peaceful events that usually draw no police response or only a limited police presence.

69.    Over the last several months, Philip has specifically avoided large protests where police are more likely to be present and use crowd control measures, including force. Without effective communication or accommodations, Philip is deterred from attending larger protest events or demonstrations in certain locations in Portland that are more likely to draw a significant presence and response from Defendants. In Philip's experience, protests with a significant presence from PPB or Sheriffs are unsafe for persons with disabilities, given that Defendants do not have proper policies, practices, or officer training to accommodate persons with disabilities and provide effective communication. Defendants' have meaningfully curtailed Philip's engagement in First Amendment activity.

70.    For example, on April 11, 2021, Philip attended a public vigil for the police killing of Daunte Wright that was held in Chapman Park. The crowd had gathered to peacefully to honor and pay respects to Daunte Wright and mourn his passing. Eventually, PPB arrived and Philip decided to leave because it would no longer be safe to stay without effective communication or accommodations.

71.     Another example occurred on November 19, 2021, when Philip
attended a protest in response to the Kyle Rittenhouse acquittal decision near the
Justice Center. The crowd began to grow in size and, fearful that law enforcement
would show up, Philip left the protest earlier than initially intended. Instead of
feeling that Defendants' presence at the protest would ensure public safety and
allow people with disabilities to be able to continue peacefully engaging in First
Amendment activity, Philip knew the police presence would increase the risk of
being caught up in police violence without effective communication or
accommodations. This turned out to be the right decision because, later that same
evening, Defendants shoved a protester in a wheelchair, causing both her and her
wheelchair to crash to the ground.

72.     Philip has attempted to meaningfully address PPB's disability
discrimination through the years. In 2012, Philip filed a lawsuit challenging PPB's
failure to provide accommodations to people who are Deaf or hard of hearing when
responding to calls for service. When Philip reported a domestic violence situation
and requested an interpreter, the police responded without an interpreter, refused
to get one, spoke only to Philip's partner, and, as a result, did nothing.

73.     After the lawsuit settled, Philip served as a role player for the State's
Department of Public Safety Standards and Training ("DPSST"), attempting to
train PPB officers on how to effectively work with and serve people who are Deaf or
hard of hearing. During the six months Philip worked in that capacity, Philip saw
firsthand PPB's resistance to change and to accommodating people with

disabilities—a resistance that continues to this day and makes this lawsuit necessary.

74.    Philip intends to continue to engage in peaceful First Amendment protest activity. But Philip has to choose carefully which protests to attend, taking into account the protest's location, time of day, anticipated size and social makeup of the crowd, along with other factors. In other words, Defendants have effectively placed indefinite time, place, and manner restrictions on Philip's participation in First Amendment–protected events, for no reason other than Defendants' own failure to fulfill their legal obligations under the ADA and Section 504 to adopt and implement proper policies, procedures, and officer training for interactions with persons with disabilities, accommodations, and effective communication. Defendants pose a threat to Deaf and hard of hearing peaceful protesters, like Philip, instead of providing for greater public safety in protected First Amendment activity. In fact, Defendants have basically offloaded their legal requirements onto Philip, shifting the burden to Philip to accommodate officers' lack of any modicum of understanding for how to interact with Deaf or hard of hearing people—by observing when officers seem spooked by Philip using ASL and de-escalating that tension immediately, or by being hypervigilant in finding ways to communicate with officers in a way the officers will both understand and interpret as nonthreatening. Yet, Defendants still find ways to hurt Philip and exclude Philip from peacefully participating in demonstrations.

**Defendants Fail to Provide Effective Communication and Reasonable Accommodations to People who are Blind or Low Vision**

75. Defendants discriminate against people who are blind or low vision at protests, including by subjecting them to excessive force and by failing to provide clear and consistent directions, such as orders to disperse, with sufficient opportunity to comply.

76. Plaintiff Katie Durden reads Braille, uses a screen reader, and primarily relies on their service dog Betsy to assist with navigation. Katie is concerned that Betsy would be injured by law enforcement if they brought her to a protest. When they attend protests, Katie therefore relies on their cane and one or more sighted guides, i.e., a sighted individual who can safely lead them through crowds and over uneven ground.

77. A sighted guide can be used by individuals who are blind or visually impaired, to help them travel safely in any environment. Using a sighted guide allows individuals who are blind or low-vision a comfortable way to travel safely in any environment. The sighted guide technique can be the most efficient way for a person who is blind or low-vision to travel with a sighted person.[30]

78. Generally, if Katie needs a sighted guide at all (apart from Betsy), they need just one to assist them through crowds or other unusual circumstances. But Katie had observed how Defendants were responding to the protests—and in

---

[30] Mark Wilkinson, OD, FAAO, *Guiding the Blind or Visually Impaired: Techniques for Sighted Guides,* UNIVERSITY OF IOWA CARVER COLLEGE OF MEDICINE EYEROUNDS.ORG (March 14, 2017), https://webeye.ophth.uiowa.edu/eyeforum/tutorials/sighted-guide-technique.htm.

particular, how they were treating people with disabilities at the protests—they sought additional sighted guides for their safety. There has been no other situation where Katie felt it was necessary to have more than one sighted guide.

79.    Since August of 2020, Plaintiff Jackson ("Jack") Tudela has served as Katie's primary sighted guide at protests—or, as Katie affectionately has nicknamed their cohort of sighted guides, "eyeballs." As Katie's primary "eyeball," Jack links arms with Katie on their left side, and through spoken communication and nonverbal cues through their linked arms, helps Katie navigate safely through the crowd and around obstacles, as well as providing them with directions and information necessary to comply with police orders. As a sighted guide, Jack's primary responsibility, behind ensuring Katie's safety, is to narrate the scene enough so that Katie has the information they need to exercise their own autonomy in deciding where to go.

80.    Katie is an independent journalist and attends protests with sound recording equipment to develop 360° binaural audio recordings that they then edit and publish on Soundcloud and share on Twitter under the moniker "Paradoxical Media."[31] When attending a protest as a member of the press, Katie wears a press badge and a helmet with "PRESS" emblazoned across the front and back in big reflective stickers that are visible (to the sighted officers) from all angles. Along with their role as a sighted guide, Jack also assists Katie with their journalism

---

[31] Paradoxical Media's Twitter profile, which has links to the referenced audio coverage, as well as updates and commentary on issues relating to accessibility, can be accessed here: https://twitter.com/Paradoxical9999?s=20.

work by describing for Katie the different "mini scenes"—drummers, chanters, speakers, police lines, and the like—that Katie might want to capture a little more closely with their recording equipment. Jack also takes photos and videos to supplement Katie's audio recordings.

81.     On Friday, July 24, 2020, Katie attended a nighttime march with Jacob Hanning, another journalist who also served as Katie's sighted guide for the evening. Katie and Jacob both wore full-face gas masks and helmets. Jacob's helmet also had the word "PRESS" written on it in block letters. As an independent journalist, Jacob was live streaming the events of the evening on Periscope.

82.     During the course of the evening, Katie and Jacob were tear-gassed several times, but thanks to their gas masks, they suffered only minor irritation.

83.     Katie and Jacob spent the majority of the evening near the fence surrounding the Justice Center. At no point were Katie and Jacob within fifteen feet of the fence. PPB, the Sheriffs, and other law enforcement agencies were stationed on the other side of the fence firing tear gas and flashbangs into the crowd.

84.     At approximately 1:58 am, Katie and Jacob were standing around thirty feet from the fence while Jacob filmed the protesters standing between them and the fence. They were standing still, and Katie had their cane visible in front of them.

85.     Katie and Jacob heard a series of loud pops and felt several objects hit them hard in the side and legs. Jacob led Katie away from the area as quickly as he could, and they moved to the next street corner. Once there, they examined their

clothing and realized that they had been shot with "pepper balls" – paintball-sized
pellets filled with oleoresin capsicum (OC), the same substance as pepper spray. The
impacts were hard enough to leave a large welt just below Katie's hip.

86.    On August 6, 2020, Katie was attending another nighttime protest
with their cane and sighted guides, this time in Southeast Portland. PPB declared
an unlawful assembly within fifteen minutes of their arrival and quickly declared
the assembly a riot shortly thereafter.

87.    PPB bull rushed the protesters, shoving them and hitting them with
their batons to drive them in a chosen direction while yelling at them to run.

88.    Katie, led by their sighted guides, was moving as fast as they could,
but was shoved in the back by the police, lost their balance, and skidded on their
knees.

89.    To get away from the crush of people, Katie's guides led them up a
flight of stairs. It was narrow enough that they had to move single-file; without
their guides to help them, Katie ran face-first into a metal pole.

90.    Katie has suffered occasional knee pain since the incident on August 6,
2020.

91.    On August 7, 2020, Katie attended a nighttime protest outside the
Penumbra Kelly Building in Southeast Portland, together with three sighted guides.

92.    After approximately three hours, PPB declared an unlawful assembly.
At around 12:30 a.m., the police bull rushed the protesters. Police shoved Katie
while yelling at them to move. Only after Katie identified themself as a member of

the press and informed the police that they were being recorded did officers stop actively pushing them.

93.    At the same time as the bull rush, officers using the LRAD orally instructed protesters to disperse to the East. Over the next twenty minutes, the LRAD instructions changed several times. Protesters were instructed to disperse to the East, then to the East or South, then solely to the South, and then finally to the West, but in no event were protesters to enter private property or they would be arrested. Even the officers making the announcements seemed confused about the directions they were providing.[32]

94.    In addition to the changing LRAD directions, officers also deployed multiple flashbang grenades as well as some form of chemical irritant, possibly OC. The feeling of having no escape route and the chaos of this night affected Katie's mental health greatly.

95.    On September 18, 2020, Katie attended a nighttime protest in  with Plaintiff Jack and another sighted guide. Between 200 and 300 protesters were gathered approximately two blocks from the ICE detention facility near the Southwest Waterfront to protest the forced sterilization of women in ICE custody.

96.    Katie normally wears a full-face gas mask to protests. On this particular night, however, they had traded masks with a sighted guide whose goggles were broken. Katie was left with only a respirator and very little eye

---

[32] Katie's recording of that is here: https://soundcloud.com/user-426859291/dispurse-which-way-dj-lrad.

protection. Katie believed that because of the ban on CS gas that Mayor Wheeler had issued on September 10, 2020, the chances of tear gas exposure were lower than they had been previously.

97.    When Katie, Jack, and the other guides arrived at the protest, federal agents were in a riot line in front of the protesters. Federal agents attempted to push the crowd back several times without significant success.

98.    While federal agents formed a riot line to the South, PPB officers arrived, declared an unlawful assembly, and swept from the West to the North, blocking egress for protesters in multiple directions.

99.    Mayor Wheeler's ban on CS gas applies only to PPB and not to federal agencies. Thus, federal agents were free to use tear gas to disperse the crowd, and they did so vigorously, firing numerous canisters of tear gas into the crowd along with hundreds of rounds of pepper balls and other munitions.

100.    Interspersed with the tear gas canisters were numerous flashbangs. One of these flashbangs went off so close to Katie that they saw the flash with their limited vision through closed eyes and they felt acute pain and ringing in their ears.

101.    As federal agents blocked their path from the South and PPB pushed in from the North and West, officers from different agencies ordered Katie to disperse in opposing directions.

102.    Katie's air was saturated with tear gas and OC powder, and it was nearly impossible to escape the protest area without being affected. The tear gas and pepper spray caused Katie significant discomfort and pain. Katie had their eyes

rinsed three times that night, only to be re-affected by tear gas and OC powder each time.

103.   Dispersal orders and excessive force are often disorienting for Katie, who cannot read street signs without assistance. Katie, like many blind people, navigates primarily using cardinal directions such as north, south, east, or west. Cardinal directions, however, are not useful to Katie after they become disoriented by law enforcement's use of force so quickly after dispersal orders are given.

104.   On Saturday, September 26, 2020, Katie attended a daytime "Proud Boys" rally to record speeches and a nighttime protest at the Justice Center. At both events, Plaintiff Jack served as Katie's primary sighted guide. Their friend Kevin Cook served as an additional sighted guide at the nighttime protest. Katie also had their cane with them.

105.   Katie, Jack, and Kevin walked arm-in-arm through the nighttime protest while Jack took video and Katie made audio recordings. Jack was wearing a yellow high-visibility jacket, and Katie wore their bright blue helmet labeled "Press." Katie additionally was carrying their red and white reflective cane.

106.   Around midnight, PPB declared an unlawful assembly and law enforcement officers rushed the protesters. As the crowd moved backwards with their hands up, police shoved people to the ground and beat them with batons. The retreat became a stampede as people tried to escape the police.

107.   Plaintiffs are informed, believe, and thereupon allege that law enforcement officers from both PPB and the Sheriffs were present as a unified

command and actively policing the demonstration and engaged in crowd control procedures.

108.    Katie, Jack, and Kevin were caught in the crowd moving backwards. Katie and Jack repeatedly and loudly stated that Katie was blind and a member of the press. As Jack and Kevin turned around to help move Katie backwards, Defendants' officers shoved them, knocking all three of them to the ground.

109.    Plaintiffs Katie and Jack are informed, believe, and thereupon allege that Defendants targeted them precisely because they were working together as paired blind person and sighted guide, including but not limited to walking with linked arms, which is a typical method for a sighted guide to assist someone who is blind or low vision in navigating.

110.    Defendants' officers surrounded Jack, who was unable to quickly get up after being shoved to the ground, and proceeded to violently arrest Jack. The arresting Sheriff's deputy grabbed Jack by the hair and slammed their face into the ground, which busted their lip. Additionally, the arresting Sheriff's deputy, along with other of Defendants' officers, lifted Jack by their arm with a bad shoulder in a stress position and slammed Jack against a vehicle so hard that the car alarm went off. As all of this was happening, Jack repeated, with an increasing sense of urgency, that they were serving as a sighted guide to a disabled member of the press. Police responded by ripping off the press pass hanging from Jack's neck, making some kind of comment to the effect that Katie and Jack weren't "real press."

111.    While Jack was being arrested, other officers continued to strike Katie and Kevin with their batons. Through the limited vision in their left eye, Katie saw the batons, which hit them in the helmet, chest, and shoulders. Jack was extremely distressed to witness the police baton Katie and to not be able to do anything to assist them. Kevin eventually was able to drag Katie away to prevent them from being injured, and Katie heard Jack screaming their name as they were separated.

112.    Jack was stressed and distraught that in being arrested, they had been separated from Katie. No longer fulfilling their role as Katie's sighted guide, Jack was worried for Katie's safety.

113.    Katie has relied on Jack as their primary sighted guide since August 2020, and the two have grown close and now share a life together as romantic and life partners. Thus, Jack's arrest was traumatic for Katie on multiple levels.

114.    After being separated from Jack, Kevin and Katie escaped the stampede and were able to locate a group of their friends. Katie and the group of friends waited for Jack to be released from custody at 5:00 am. When their personal effects were returned to Jack, everything, including all of Jack and Katie's electronic recording equipment, had been destroyed.

115.    Plaintiffs Katie and Jack are informed, believe, and thereupon allege that Jack was targeted for arrest due to their actions as a sighted guide to assist Katie. As of November 29, 2021, the District Attorney voluntarily summarily dismissed all charges that were pending against Jack.

116.    Katie suffered numerous physical injuries from her experiences at the Portland protests, including heavy bruising and pain across their body.

117.    Repeated exposure to physical violence at the hands of law enforcement has taken a severe emotional toll on Katie. Katie's therapist of eight years indicates that they are displaying symptoms of active trauma and PTSD: they are barely sleeping, has persistent nightmares, hypervigilance, and experiences brief but repeated dissociative episodes.

118.    As a result of the repeated exposure to physical violence at the hands of law enforcement, Katie has had to receive treatment from a specialized therapist from January 2021 to present.

119.    Katie's job and classwork have suffered because they have found it increasingly difficult to concentrate. Katie was forced to withdraw from classes and put their education on hold to concentrate on their mental health. Similarly, Katie had to take a month's worth of FMLA leave at their job and now can only work a reduced number of hours.

120.    This experience has also caused Jack severe psychological harm and trauma. For over a year, before all charges were summarily dismissed, Jack was severely restricted in their ability to make basic life changes, such as switching employment or residences, resulting in a great financial stress and struggle. As a result of being arrested and beaten by Defendants' officers, while at the same time watching their blind partner be beaten by Defendants' officers, Jack is fearful of law enforcement and now avoids attending any protest.

121.    As a result of the Defendants' discriminatory and violent treatment of Katie and Jack, they are both deterred from attending protests. Without proper policies, procedures, and officer training in place to ensure that officers do not target persons with disabilities and their assistants and provide accommodations and modified policies to ensure that persons with disabilities have an equal opportunity to comply with police orders and public safety measures, Katie and Jack will continue to be deterred from engaging in protest activity for fear of being subjected to additional unwarranted violence and baseless criminal charges. Their First Amendment rights to engage in peaceful protest have been chilled.

**Defendants Are Aware of the Need to Provide Reasonable Accommodations and Effective Communication But Refuse to Do So**

122.    The ADA and Rehabilitation Act have required for more than 30 years that public entities and recipients of federal funding, such as Defendants, ensure that their programs and services are accessible to persons with disabilities and provide equal benefits, services and advantages to persons with disabilities as those provided to persons without disabilities. The ADA and Rehabilitation Act both require that public entities undertake a self-evaluation of its policies, practices and procedures to ensure program accessibility and compliance with these laws. 28 C.F.R. § 35.105; 28 C.F.R. § 42.505(c). Despite these requirements, Defendants have failed for over 30 years to ensure that their services to ensure safe protests are accessible and provide equal benefit to protesters with disabilities.

123.    Plaintiffs Philip Wolfe and Katie Durden are people with disabilities and require reasonable modifications and effective communication at protests. Defendants have an affirmative obligation to make their programs and services accessible, including programs and services related to law enforcement. Failing to provide accessible services related to law enforcement at protests effectively denies equal access to the City and County's public spaces to exercise the right to protest and creates immeasurable dangers for people with disabilities. Defendants must provide reasonable modifications and effective communication to protesters with disabilities as a matter of course.

124.    Additionally, Defendants must cease targeting persons with disabilities and their assistants, including sighted guides, like Plaintiff Jack Tudela, for use of unnecessary and unreasonable force, when they are merely peacefully protesting. To the extent Defendants' officers erroneously perceive typical conduct by persons with disabilities (and their aides to accommodate the disability) as threatening or noncompliant with crowd control procedures, Defendants' officers require policies, procedures, and training to recognize how to identify persons with disabilities, their assistants, and behaviors they engage in as part of their experience (using ASL, linking arms, carrying a cane, or the like) to ensure their safety in protests.

125.    The PPB has enacted policies to allow protesters without disabilities to avoid harm by police officers. For example, PPB Directive 0635.10, entitled "Crowd

Management/Crowd Control,"[33] provides that when feasible, police should make "loud, intelligible and consistent announcements and warnings to the crowd […] to allow the crowd time to comply with orders given from police members." Before taking action to disperse a crowd, the police should order the crowd to disperse, and should only use riot control agents (such as teargas) "when avenues of escape (i.e., clear path or route) are available to the crowd." Police can detain protesters after "providing a lawful order to disperse followed by a reasonable opportunity to comply with that order."

126.    Additionally, recently enacted Oregon House Bill 2928 regulates the use of sound devices by law enforcement agencies.[34] Specifically, Section 2(2)(c) states: "Whenever possible, a law enforcement agency shall provide announcements for purposes of crowd control both audibility and visually." This provision fails to protect Plaintiffs' rights under the ADA and Section 504, because both require more than just audible and visual communication. Both the ADA and Section 504 require *effective* communication, which, in the context of orders of dispersal, requires communication in multiple formats discernible by all persons, more than merely an announcement from a sound truck or a social media post.

---

[33] https://www.portlandoregon.gov/police/article/649358. According to the website, this Directive is "currently under review." Plaintiffs will pay attention to any changes made in the future.

[34] HB 2928 (2021), has not yet been included in the Oregon Revised Statutes. A copy of the bill as enrolled is available here: https://olis.oregonlegislature.gov/liz/2021R1/Downloads/MeasureDocument/HB2928/Enrolled.

127.    Moreover, Section 2(3)(c) states that law enforcement "shall take reasonable action to accommodate disabilities when issuing or enforcing orders to disperse," yet no regulations or guidance have been provided as to what a reasonable accommodation is, leaving the decision as to how to interact with Plaintiffs and others with disabilities entirely up to the untrained responding officers. Without any additional guidance, HB 2928 falls short of the protections guaranteed by the ADA and Section 504 and is, therefore, insufficient to protect the rights of protesters with disabilities.

128.    Plaintiffs are informed, believe, and thereupon allege that Defendants have not enacted any similar policies, procedures, or training to provide protesters with disabilities an equal opportunity to avoid harm by police officers.  Plaintiffs are further informed, believe, and thereupon allege that there are no directives requiring sign language interpreters (or interpretive technology) to communicate dispersal warnings or other orders, providing people with mobility disabilities an accessible route to escape teargas, or otherwise providing modifications to ensure that people with disabilities have a reasonable opportunity to comply with dispersal orders.

129.    Before filing suit, Plaintiffs and others have repeatedly notified Defendants that they have an obligation to provide modifications and make law enforcement actions at protests accessible to people with disabilities.

130.    Defendants have been notified of the need for modifications by numerous people on a variety of social media platforms, including Twitter,

Facebook, and Instagram, through messages and posts directed at or tagging the agencies or their officials.  In response, Defendants did nothing.

131.    In addition to the efforts of individual Plaintiffs and other community members, Disability Rights Oregon (DRO), the federally funded not-for-profit organization that provides advocacy and assistance to Oregonians with disabilities, sent letters detailing the need for accommodations to PPB Police Chief PPB Chuck Lovell, Portland Mayor and PPB Police Commissioner Ted Wheeler, the City of Portland's ADA coordinator, Multnomah County Sheriff Michael Reese, the U.S. Attorney for the District of Oregon, the Superintendent of the Oregon State Police Travis Hampton, and Acting Secretary for the U.S. Department of Homeland Security Chad Wolfe between July and September of 2020.

132.    DRO's letters explained the issues that impact people who use service dogs, are Deaf or hard of hearing, are blind or low vision, have asthma, mobility-based disabilities, and epilepsy, and who have inflammatory conditions.  The letters explicitly requested reasonable accommodations and modifications of tactics on behalf of protesters with disabilities.

133.    To date, only PPB and the City have responded to those letters. On September 17, 2020, during discussions with DRO and Plaintiffs' counsel, PPB and the City acknowledged that they do not have *any* policies governing police interactions with protesters with disabilities.

134.    On October 8, 2020, via email communication, the City stated that it could not provide ASL interpreters onsite at demonstrations to communicate PPB

instructions to Deaf and hard of hearing protesters. No other options or technologies were either offered or discussed.

135.    On October 14, 2020, PPB informed Plaintiffs' counsel that the City would not provide any concrete steps, plans, or timelines to ensure that protesters with disabilities are afforded their constitutional rights and to prevent undue force and discrimination against them.  Indeed, PPB made clear that any potential steps they could take would be subject to a lengthy bureaucratic approval process that could take weeks or even months.

136.    In response to the various efforts, previous notifications, and requests, and this lawsuit, Defendants have done little to nothing beyond setting up a Twitter account that inconsistently announces police actions at certain protest events.

137.    Rather than showing any inclination to self-review, contract with disability experts, and provide reasonable accommodations to -- or respect the constitutional rights of -- people with disabilities, the prevailing sentiment from Defendants has been that protesting is only for people who do not have disabilities.

138.    The City and County have coordinated their response to the protests with each other. Each Defendant has individually and jointly failed to provide reasonable accommodations to protesters with disabilities. Neither PPB nor the County communicate reasonably accessible notice to protesters who are Deaf or hard of hearing before using force or making arrests. Neither PPB nor the County appropriately restrict the use of tear gas, bull rush charges, strobes, or other force against protesters with disabilities.  After DRO submitted requests for

accommodation to the agencies, neither PPB nor the County adopted reasonable accommodations that would adequately provide equal access to protesters with disabilities.

**First Claim for Relief**

**(Violation of Title II of the ADA)**

**42 U.S.C. §§ 12131 et seq.**

**Against All Defendants**

139.    Plaintiffs reallege and incorporate by reference each of the allegations in all other paragraphs of this Complaint as fully set forth here.

140.    Title II of the ADA and its implementing regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 28 C.F.R. § 35.130. Title II's requirements extend to "anything a public entity does," including arrests and other law enforcement interactions. 28 C.F.R. § 35, app. B. Despite these requirements, Defendants violate the ADA and its implementing regulations in multiple ways.

141.    Both PPB and the County have an affirmative obligation to make benefits, services, and programs accessible to people with disabilities, including making reasonable modifications in policies, practices or procedures when the modification are necessary to avoid discrimination of the basis of disability. 28 C.F.R. § 35.130(b)(7)(i). "The general regulatory obligation to modify policies,

practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities." 28 C.F.R. pt. 35, app. B. Defendants, however, have failed to make reasonable modifications that will make law enforcement's actions equally accessible to people with disabilities; indeed, their responses to protests actively deny people with disabilities their rights at protests.

142.    The obligation to provide reasonable modifications requires covered entities to provide effective communication to people with communication disabilities. 28 C.F.R. § 35.160.

143.    Additionally, the ADA and it's implementing regulations prohibit Defendants from:

a.   Denying a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service (28 C.F.R. § 35.130(b)(1)(i));

b.   Affording a qualified individual with a disability an opportunity to participate in or benefit from the aid, service, or benefit that is not equal to that afforded others (28 C.F.R. § 35.130(b)(1)(ii));

c.   Providing a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result to gain the same benefit as that provided to others (28 C.F.R. § 35.130(b)(1)(iii));

    d.   Aiding or perpetuating discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or services to beneficiaries of the public entity's program (28 C.F.R. § 35.130(b)(1)(v));

    e.   Utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination of the basis of disability, or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities (28 C.F.R. § 35.130(b)(3)(i) and (ii)); or

    f.   Otherwise limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service of a public entity (28 C.F.R. § 35.130(b)(1)(vii));

144.   The ADA further prohibits exclusion or denial of equal services, programs, or activities to an individual because of the known disability of an individuals with whom the individual is known to have a relationship or association. 28 C.F.R. § 35.130(g).

145.   Defendants fail to provide reasonable modifications, including effective communication, for people with disabilities at protests.  For Philip and others who are Deaf or hard of hearing, for example, Defendants have failed to take

"appropriate steps to ensure that communications with . . . participants, members of the public, and companions with disabilities are as effective as communications with others." § 35.160(a)(1). To that end, Defendants are required to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." § 35.160(b)(1).

146.    Defendants make no efforts whatsoever to communicate with protesters who are Deaf or hard of hearing, including when they declare unlawful assemblies and riots and issue orders to disperse. In the same way, Defendants discriminate against Plaintiffs by communicating about their activities at protests only to protesters who are hearing persons. Defendants' use of bull rushes and other forms of force violate the rights of people with a variety of disabilities, including those with mobility disabilities and those who are blind or low vision. Unlike people without disabilities, Plaintiffs are unable to disperse quickly or respond in the same way to other police commands, putting them at significant risk of violence from Defendants. Use of force by Defendants also has a disproportionate effect on people with disabilities, many of whom heal more slowly and are more susceptible to long-term damage.

147.    Defendants' use of flashbang grenades, tear gas, and other riot control agents, and their separation of people from their service animals or sighted guides, denies people who use service animals or guides the equal opportunity to participate in protests by restricting their ability to attend protests with needed assistance.

148. The lack of clear egress routes for dispersal, and barriers to egress erected by Defendants, violate the rights of people with disabilities who are forced to risk stampedes and trampling from other protesters, law enforcement force, and other grievous harm.

149. The lack of clear and consistent directions likewise puts Plaintiffs, including those who are blind and low vision, at significant risk of harm, arrest, and violence.

150. Defendants subject Plaintiffs to use of force and arrest because they mistake Plaintiffs' inaction, delayed action, or slowed action in response to orders to disperse and other commands as a refusal to comply.

151. Further, Defendants' crowd management directives and other measures constitute programs and/or activities under the ADA. By failing to establish crowd management measures that permit protesters with disabilities an opportunity to avoid harm by police, Defendants have denied those people with disabilities meaningful access to their crowd management program/activity.

152. Reasonable modifications and effective communication measures are readily available.  For communications with Deaf or hard of hearing protesters, for example, ASL interpreters and visual messaging systems of the sort already used on the roadside to communicate closed exits could be effectively employed to notify protesters who are Deaf or hard of hearing when an unlawful assembly is declared. Reasonable modifications might also include ceasing the use of certain less-lethal weapons and tactics entirely, using them only in circumstances designed to

minimize risk to protesters with disabilities, or providing substantial verbal and visual warning before using the less-lethal weapons and tactics.  Likewise, Defendants can identify and inform protesters of accessible avenues of egress before using force or other tactics that may harm people with mobility disabilities.

153.    Nor would the requested modifications require a fundamental alteration of Defendants' programs and services.  For example, Defendants are already constitutionally required to provide adequate notice and an opportunity to comply before dispersing crowds; PPB's own policies already require the same, yet they have made no attempt to provide adequate and timely notice to people who are Deaf or hard of hearing, denying them the benefits of these policies.

154.    As set forth above, Defendants have failed to satisfy their affirmative obligation to provide reasonable modifications and auxiliary aids and services that provide equal access, with or without a specific request from a person with a disability. Defendants have also failed to response to requests for modifications and auxiliary aids and services by individual Plaintiff.

155.    Defendants' failure to provide reasonable modifications and auxiliary aids and services was (and continues to be) with deliberate indifference and reckless disregard to the rights of people with disabilities.

156.    Pursuant to 42 U.S.C §§ 12133 and 12205, Plaintiffs are entitled to declaratory and injunctive relief, as well as damages and reasonable attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

## (Violation of Section 504 of the Rehabilitation Act)

## 29 U.S.C. §§ 794 et seq.

## Against All Defendants

157.   Plaintiffs reallege and incorporate by reference each of the allegations in all other paragraphs of this Complaint as fully set forth here.

158.   Section 504 and its implementing regulations provide that "[N]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance . . ." 29 U.S.C. § 794. Despite these requirements, Defendants violate Section 504 in multiple ways.

159.   A "program or activity" means "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government, or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government."  29 U.S.C. 794(b)(1)(A), (B).

160.   Section 504 regulations prohibit discrimination by a recipient of federal funds by denying a qualified person with a disability the opportunity to participate in or benefit from the aid, benefit, or service.  28 C.F.R. § 41.51(b)(1)(i).[35]

---

[35] References to the C.F.R. constitute examples of applicable regulations and are non-exhaustive.

161.    Section 504 regulations prohibit discrimination by a recipient of federal funds by affording a qualified person with a disability an opportunity to participate in and benefit from the aid, benefit, or service that is not equal to that afforded others. 28 C.F.R. § 41.51(b)(1)((ii).

162.    Section 504 regulations prohibit discrimination by a recipient of federal funds by affording a qualified person with a disability an opportunity to participate in and benefit from the aid, benefit, or service that is not as effective in affording the opportunity to obtain the same result or to gain the same benefit as that provided to others. 28 C.F.R. § 41.51(b)(1)(iii).

163.    Section 504 regulations prohibit aiding or perpetuating discrimination by a recipient of federal funds by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the recipients' program or activity. 28 C.F.R. § 41.51(b)(1)(v).

164.    Section 504 regulations prohibit otherwise limiting a qualified person with a disability in the enjoyment or any rights, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service. 28 C.F.R. § 41.51(b)(1)(vii).

165.    Section 504 regulations prohibit discrimination by a recipient of federal funds by utilizing criteria or methods of administration that have the effect of subjecting qualified persons with disabilities to discrimination on the basis of disability or have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's programs with respect to persons

with disabilities. 28 C.F.R. § 41.51(b)(3)(i) and (ii).

166.   Section 504 regulations require that recipients of federal financial assistance "shall take appropriate steps to ensure that communications with their . . . beneficiaries are available to persons with impaired vision and hearing." 28 C.F.R. § 41.51(e).

167.   Plaintiffs Philip Wolfe and Katie Durden are otherwise qualified to participate in the services, programs, or activities that are provided to individuals by Defendants.  29 U.S.C. § 794(b).

168.   Plaintiff Jack Tudela is subject to the protections of Section 504 by virtue of their association with a person with a disability, as Katie Durden's sighted guide. 29 U.S.C. § 794a(a)(2).

169.   Defendants receive federal assistance.

170.   Defendants make no efforts whatsoever to communicate with protesters who are Deaf or hard of hearing, including when they declare unlawful assemblies and riots and issue orders to disperse. In the same way, Defendants discriminate against Plaintiffs by communicating about their activities at protests only to protesters who are hearing persons. Defendants' use of bull rushes and other forms of force violate the rights of people with a variety of disabilities, including those with mobility disabilities and those who are blind or low vision. Unlike people without disabilities, Plaintiffs are unable to disperse quickly or respond in the same way to other police commands, putting them at significant risk of violence from Defendants. Use of force by Defendants also has a disproportionate effect on people with

disabilities, many of whom heal more slowly and are more susceptible to long-term damage.

171.    Through the acts and omissions described above, Defendants and their agents and employees have and continue to violate the Rehabilitation Act and the regulations promulgated thereunder by excluding Plaintiffs from participation in, denying Plaintiffs the benefits of, and subjecting Plaintiffs based solely by reason of their disability to, discrimination in Defendants' services and activities in managing and regulating protests in Portland.

172.    Defendants' use of flashbang grenades, tear gas, and other riot control agents, and their separation of people from their service animals, denies people who use service animals the equal opportunity to participate in protests by restricting their ability to attend protests with their animals.

173.    Defendants' use of teargas, pepper balls, and other chemical irritants poses a significant risk of harm or death for people with respiratory and inflammatory conditions.

174.    The lack of clear egress routes for dispersal, and barriers to egress erected by Defendants, violate the rights of people with disabilities who are forced to risk stampedes and trampling from other protesters, law enforcement force, and other grievous harm.

175.    The lack of clear and consistent directions likewise puts Plaintiffs, including those who are blind and low vision, at significant risk of harm, arrest, and violence.

176.    Defendants subject Plaintiffs to use of force and arrest because they mistake Plaintiffs' inaction, delayed action, or slowed action in response to orders to disperse and other commands as a refusal to comply.

177.    Further, Defendants' crowd management directives and other measures constitute programs and/or activities. By failing to establish crowd management measures that permit protesters with disabilities an opportunity to avoid harm by police, Defendants have denied those people with disabilities meaningful access to their crowd management program/activity.

178.    Reasonable modifications and effective communication measures are readily available. For example, Defendants could provide additional orienting information on how to comply with dispersal orders beyond simple cardinal directions, training on identifying service dogs and sighted guides assisting a person with a disability, changes in policy to allow sighted guides to physically assist people who are Blind or low vision during protests without harassment, additional time for people who are Blind or low vision to comply with orders of dispersal prior to using force or issuing arrests, and ceasing the use of flashbangs or other non-lethal munitions that result in disorientation.

179.    Reasonable accommodations might also include ceasing the use of certain less-lethal weapons and tactics entirely, using them only in circumstances designed to minimize risk to protesters with disabilities, or providing substantial verbal and visual warning before using the less-lethal weapons and tactics. Likewise, Defendants can identify and inform protesters of accessible avenues of egress before

using force or other tactics that may harm people with mobility disabilities.

180.    Nor would the requested modifications require a fundamental alteration of Defendants' programs and services. For example, Defendants are already constitutionally required to provide adequate notice and an opportunity to comply before dispersing crowds; PPB's own policies already require the same, yet they have made no attempt to provide adequate and timely notice to people who are blind, denying them the benefits of these policies.

181.    As set forth above, Defendants have failed to satisfy their affirmative obligation to provide reasonable modifications and auxiliary aids and services that provide equal access, with or without a specific request from a person with a disability.

182.    Defendants' failure to provide reasonable modifications and auxiliary aids and services was and continues to be with deliberate indifference and reckless disregard for the rights of people with disabilities.

183.    Pursuant to 29 U.S.C. § 794(a), Plaintiffs are entitled to declaratory and injunctive relief as well as damages and reasonable attorney fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

184.    A declaration that Defendants' alleged conduct has violated and continues to violate Title II of the ADA and its implementing regulations, and Section 504 of the Rehabilitation Act and its implementing regulations.

185. Preliminary and permanent orders enjoining Defendants, their agents, employees, successors, and all other persons acting in active concert or participation with Defendants from violating Title II of the ADA and its implementing regulations, and Section 504 of the Rehabilitation Act and its implementing regulations. The orders shall mandate a comprehensive self-review utilizing disability accommodation experts and consultants knowledgeable on the needs of, and auxiliary aids and services available for, people with various physical and intellectual disabilities.

186. Preliminary and permanent orders requiring Defendants to cease discriminatory practices against individuals with disabilities at protests and provide reasonable modifications, including, but not limited to:

a. Modify policies to address the needs of people with disabilities and/or their auxiliary aids including service animals, including but not limited to: ceasing use of impact munitions, flashbang grenades, batons, shoving and other types of force and tactics unless necessary for officer safety based on an immediate threat of serious harm from an individual;

b. Use the least amount of force possible against the disabled, their assistants, interpreters, sighted guides and/or service animals;

c. Provide ASL interpreters either in person or via technology, and visual and other alternative messaging systems, to convey all law enforcement orders and other directions and instructions at protests;

d. Provide adequate time and clear and consistent directions for individuals with disabilities to comply with lawful orders;

    e.  Provide additional orienting information for individual with disabilities to comply with lawful orders;

    f.  Before dispersing a crowd or taking other actions that may place persons with disabilities in danger, identify and inform protesters and others of accessible avenues of escape;

    g.  Stop separating people with disabilities from their assistants, devices, interpreters, sighted guides and/or service animals;

187.   Award compensatory damages as provided by the laws set forth above;

188.   An order awarding Plaintiffs' attorneys' fees, expenses, and costs as provided by law; and

189.   Such other and further relief as the Court may deem just and proper.

DATED this 10th of December, 2021.

VISIBLE LAW

*/s/ Rian Peck*
Rian Peck (they/them), OSB No. 144012
rian@visible.law
333 SW Taylor Street, Suite 300
Portland, OR 97204
Phone: 503.907.9090

DISABILITY RIGHTS LEGAL CENTER
Christopher H. Knauf, admitted *pro hac vice*
ck@drlcenter.org
Corrigan L. Lewis, admitted *pro hac vice*
cll@drlcenter.org
Alexandra M. Robertson, admitted *pro hac vice*
ar@drlcenter.org
Phone: 213.736.1031

Attorneys for Plaintiffs